# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br>ProAir Intermediate Holdco, LLC,[1]<br>Debtor. | Chapter 7<br>Case No. 22-11195 (LSS) |
| In re:<br>ProAir, LLC,<br>Debtor. | Chapter 7<br>Case No. 22-11196 (LSS) |
| In re:<br>American Cooling Technology, LLC,<br>Debtor. | Chapter 7<br>Case No. 22-11197 (LSS) |
| In re:<br>Bus Air, LLC,<br>Debtor. | Chapter 7<br>Case No. 22-11198 (LSS) |
| In re:<br>Evans Tempcon Delaware, LLC,<br>Debtor. | Chapter 7<br>Case No. 22-11199 (LSS) |

## DECLARATION OF JAMES PATRICK FOX IN SUPPORT OF MOTION OF
## BERKSHIRE BANK FOR RELIEF FROM THE AUTOMATIC STAY

---

[1] The Debtors in the above captioned Chapter 7 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: ProAir Intermediate Holdco, LLC (3331), ProAir, LLC (8392), American Cooling Technology, LLC (7742), Bus Air, LLC (8627) and Evans Tempcon Delaware, LLC (8229). The Debtors' principal place of business is 2900 County Road 6 West, Elkhart, IN 46514.

I, James Patrick Fox, hereby declare, as follows:

1. I am over twenty-one (21) years of age, of sound mind, am capable of making this Declaration, am fully competent to testify to, and have personal knowledge of the matters stated herein.

2. I am currently employed as a Vice President and Commercial Workout Officer for Berkshire Bank ("**Berkshire**"), a banking organization chartered by the Commonwealth of Massachusetts.

3. I have reviewed Berkshire's *Motion for Relief from the Automatic Stay* (the "**Motion**") and, to the best of my knowledge, the allegations contained therein are true and correct.

## RELEVANT LOAN DOCUMENTS

4. On or about February 11, 2022, Berkshire and the Debtors entered into a certain Third Amended and Restated Loan and Security Agreement (All Assets) (as amended and/or restated from time to time, the "**Loan Agreement**"). The Loan Agreement was amended by a First Amendment to Third Amended and Restated Loan and Security Agreement (All Assets) dated as of March 8, 2022. Pursuant to the terms of the Loan Agreement, the Bank agreed to extend a working line of credit to the Debtors of up to $12 Million Dollars. A true and correct copy of the Loan Agreement is attached hereto as Exhibit A.

5. The Loan Agreement is the third in a series of loan agreements between Berkshire and the Debtors dating back over twelve years to April 26, 2010.

6. The obligations of the Debtors owing under the Loan Agreement and related transaction documents (the "**Obligations**") are evidenced by an Amended and Restated Revolving Note from the Debtors to the Bank dated February 11, 2022 in the maximum principal

amount of $12,000,000 (the "**Note,**" collectively with the Loan Agreement and each related loan document, certificate, notice, agreement and other document, the "**Loan Documents**"). A true and correct copy of the Note is attached hereto as Exhibit B.

7.     As of the Petition Date, the outstanding amount of the Obligations owed by the Debtors to Berkshire was $7,858,133.75 on account of principal, together with additional interest, attorneys' fees, and costs of collection, itemized as follows:

| | |
|---|---|
| Unpaid Principal | $7,858,133.75 |
| Accrued Interest through 11/15/22 | $38,293.89 |
| Late Charges | $2,368.67 |
| Attorney's Fees as of 10/31/22 | $60,538.50 |
| Collateral Preservation and Liquidation Costs[2] | $558,333.04 |
| **Total** | **$8,517,667.85** |

8.     Pursuant to the terms of the Loan Agreement, the Debtors granted to Berkshire a lien and security interest in all of the business assets of the Debtors. Berkshire perfected its security interest in the Debtors' assets by filing UCC-1 financing statements with the Secretary of State of Delaware. True and correct copies of such UCC-1 financing statements are attached hereto as Exhibit C.

9.     Berkshire and Crystal Financial SBIC LP, as administrative and collateral agent for certain term lenders (the "**Term Agent**")[3], are parties to a certain Amended and Restated Intercreditor Agreement dated as of February 11, 2022 (the "**Intercreditor Agreement**"), a true and correct copy of which is attached hereto as Exhibit D.

10.     Under the terms of the Intercreditor Agreement, Berkshire's security interest was effectively relegated to a first position on Accounts, Inventory, and the proceeds thereof, while

---

[2] *See* Section 12 of the Loan Agreement.
[3] The Term Agent is also an equity holder of the Debtors, owning approximately 40% of the Debtors' stock.

the Term Agent retained a first position security interest on all of the Debtors' other assets including Equipment, titled vehicles, leasehold interests, and general intangibles (i.e. all the collateral necessary for operations or a "turn key" sale).

11.     Specifically, the Intercreditor Agreement defined "**Bank Priority Collateral**" to include:

> (i) all Accounts (other than Accounts constituting royalties, settlement payments, license fees or other payments made in respect of Intellectual Property or other Term Priority Collateral),
>
> (ii) all Inventory,
>
> (iii) the Real Estate owned in fee and the leasehold interests of any of the Loan Parties pertaining solely to the property in Elkhart, Indiana, being known as and numbered as 28731 and 28769 County Road 6 (the "Elkhart Property"),[4]
>
> (iv) all deposit accounts and all other bank accounts into which the proceeds of Accounts or Inventory are deposited, including all cash, cash equivalents, financial assets, negotiable instruments and other evidence of payment, and other funds on deposit therein or credited thereto (other than Term Priority Accounts),
>
> (v) all money, cash or cash equivalents relating to the foregoing,
>
> (vi) all proceeds, insurance claims and other rights to payments, and books and records relating to Accounts and Inventory not otherwise included in the foregoing,
>
> (vii) all products of any of the foregoing, and
>
> (viii) all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing as each term is used and defined in the Bank Collateral Documents as in effect on the date hereof.

(*See* Ex. D at 3).

Similarly, the Intercreditor Agreement defined the "**Term Priority Collateral**" to include:

---

[4] The Elkhart Property was carved out from the Term Priority Collateral in the Intercreditor Agreement and other Loan Documents because Berkshire holds a first priority commercial real estate mortgage on such property from a non-debtor affiliate.

(i) all Equipment;

(ii) all Real Estate owned in fee and all leasehold interests exclusive of the Elkhart Property.

(iii) all Term Priority Accounts and all money, cash, checks, other negotiable instruments, funds, and other evidences of payments held therein and all security entitlements, securities, and commodity contracts credited thereto, provided, however, that any identifiable proceeds of Term Priority Collateral deposited in any such accounts shall be treated as Term Priority Collateral, provided, however, that any identifiable proceeds of Bank Priority Collateral deposited in any such accounts shall be treated as Bank Priority Collateral;

(iv) all Intellectual Property, intercompany indebtedness pledged by the Loan Parties (except, for avoidance of doubt, intercompany indebtedness between Loan Parties arising from the purchase or sale of any Bank Priority Collateral, or in connection with any intercompany loans derived from any identifiable proceeds of Bank Priority Collateral, all of which shall be treated as Bank Priority Collateral), and investment property (including any equity interests pledged by the Loan Parties), all instruments, commercial tort claims, chattel paper, documents and general intangibles (including any claims under any acquisition agreement or under any representation and warranty insurance or similar policy), supporting obligations and rights under letters-of-credit;

(v) all money, cash or cash equivalents relating to the foregoing,

(vi) all proceeds, insurance claims and other rights to payments, and books and records relating to any of the foregoing,

(vii) all products of any of the foregoing, and

(viii) all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing as each term is used and defined in the Term Collateral Documents as in effect on the date hereof.

(*See* Ex. D at 7-8).

## EVENTS LEADING TO CHAPTER 7 FILINGS

12.     Prior to the Petition Date, the Debtors were engaged in the manufacture of High-Volume Air Conditioning ("**HVAC**") units for specialized vehicles such as ambulances, school buses, and the like.

13.     The Debtors had historically faced operational and cash flow challenges, but between the Debtors' equity holders and various mezzanine lenders, including but not limited to the Term Agent, there had been sufficient capital to keep the companies operating.

14.     In February 2022, the Loan Agreement was executed in connection with a total restructuring and recapitalization of the Debtors' capital structure whereby the Term Agent converted a significant portion of its secured loan into equity and other equity holders contributed additional cash resources as an equity infusion to jump start the Debtors' restructuring plan.

15.     The purpose of Berkshire's extension of its line of credit under the Loan Agreement was to provide a runway of continuing working capital to enable the Debtors to complete their restructuring. To that end, the Loan Agreement authorized the Debtors to sell up to $6.3 million dollars of their inventory outside of the ordinary course of business in bulk transactions provided that such sales were for less than fifty percent (50%) but greater than twenty-five percent (25%) of cost. *See* Loan Agreement, Ex. A at § 15(d). Further, the Loan Agreement established an "Other Inventory" component under the Borrowing Base to enable the Debtors to liquidate their obsolete inventory at reduced prices without an attendant drop in availability under the line of credit. *See id*. at § 5(c).

16.     The Loan Agreement also eased the Debtors' financial covenants by deferring testing of the consolidated fixed charge coverage ratio until March of 2023 and providing for an equity cure in the event of a violation. *See id*. at § 15(b).

17.     As part of the February 2022 restructuring, Michael Nowlan of Accordion (formerly Mackinac Partners) was appointed to serve as the Debtors' Chief Restructuring Officer ("**CRO**").

18.     Beginning in the summer of 2022, the Debtors fell behind in their financial reporting and the information that was being provided to Berkshire indicated deteriorating performance.

19.     In mid-September 2022, the Debtors' CRO shared financial projections with Berkshire and indicated the Debtors would require a cash infusion of approximately $5.25 million dollars to continue operations into 2023. Rather than an equity infusion, the Debtors' equity holders insisted that Berkshire subordinate its first priority position on inventory to new $5.25 million dollar secured loan on the inventory.

20.     By Notice of Reporting Violation and Reservation of Rights letter dated September 16, 2022 (the **"Notice of Reporting Violation"**, a true and correct copy of which is attached hereto as <u>Exhibit E</u>), Berkshire notified the Debtors that they had failed to provide certain reporting as required under the Loan Agreement (the **"Reporting Violation"**). As noted in the Notice of Reporting Violation, the failure by the Debtors to remedy the Reporting Violation within thirty (30) days of the Notice of Reporting Violation would constitute an Event of Default under the Loan Agreement.

21.     By late September 2022, the Debtors' equity holders were conditioning their cash infusion on Berkshire voluntarily splitting the Note into a $4 million dollar "A Note" which would be fully secured and performing, and a $6 million dollar "B Note" which would be unsecured, non-performing, and subject to the equity holder's $0.01 purchase option if the A Note was paid off with eighteen (18) months.

22.     On October 4, 2022, the Debtors circulated a cash flow with four scenarios regarding the timing and conditions of the infusion from equity holders (the "**Cash Flow Scenarios**", a true and correct copy of which is attached hereto as <u>Exhibit F</u>). The final cash flow

scenario presented an orderly wind-down in which the Debtors' ceased operating on October 14, 2022, with a net recovery to Berkshire of only $2.8 million dollars against its $10 million dollar loan balance.

23.     In October 2022, as losses continued to mount, the Debtors' equity holders continued to press Berkshire to commit to the "A/B Note" structure. The October proposals were modified slightly so that Berkshire would only be required to walk away from $5 million dollars instead of $6 million dollars, while continuing to advance new money under the line of credit.

24.     By Notice of Default and Reservation of Rights Letter dated October 17, 2022 (the **"Notice of Default")**, a true and correct copy of which is attached hereto as <u>Exhibit G</u>), Berkshire notified the Debtors that (i) the Reporting Violation remained unremedied, and that an Event of Default had therefore occurred and remained continuing under the Loan Agreement and the related transaction documents; and (ii) based upon the Debtors' indication that they required substantial additional capital and may be forced to cease operations, Berkshire believing in good faith that the prospect of payment of all or any part of the Obligations or the performance by the Debtors under the Loan Agreement was impaired, that a material adverse change in the business or financial condition of the Borrowers had occurred, and that an Event of Default had also therefore occurred under Section 16(a)(xiii) of the Loan Agreement (collectively, the "**Existing Events of Default**").

25.     Following the Notice of Default, Berkshire continued to negotiate and expressed openness to the Debtors' equity holders A/B Note structure provided there could be a more reasonable split between balances. On October 21, 2022, Berkshire submitted its counterproposal with an A Note balance of $7.4 million dollars and a B Note balance of $2.6 million dollars. The point being that Berkshire was prepared to forgive $2.6 million dollars in connection with the

proposed restructuring. A true and correct copy of Berkshire's counterproposal is attached hereto as <u>Exhibit H</u>.

26.     On October 26, 2022, at a meeting between the parties, the Debtors' equity holders indicated to Berkshire that they were not interested in discussing Berkshire's counterproposal, and that they would not be moving forward with their $5.25 million cash infusion without Berkshire agreeing to: a) walk away from $5 million B Note, and b) add an additional $2 million in availability to be drawn under the A Note.

27.     Less than twenty-four hours later, on October 27, 2022, the Debtors equity holders informed Berkshire that that they were making ready to terminate their workforce beginning on November 1, 2022.

28.     By Demand Letter and Notice of Sale dated October 28, 2022 (the "**Notice of Sale**", a true and correct copy of which is attached hereto as <u>Exhibit I</u>), the Debtors were again notified of the Existing Events of Default, that Berkshire may decline to make any or all revolving loan advances under the Loan Agreement and that any of Berkshire's obligations thereunder were cancelled, and that Berkshire declared all of the Obligations to be immediately due and payable. Berkshire also notified the Debtors, in accordance with Section 16(a)(xxv) of the Loan Agreement, that interest on all Obligations would accrue at a per annum rate of two (2%) percent greater than the rate of interest otherwise applicable under the Loan Agreement, retroactive to the October 17, 2022 Notice of Default. Finally, in accordance with Section 16(e) of the Loan Agreement, Berkshire made demand upon the Debtors to assemble all Inventory pledged to the Bank and notified the Debtors that the Bank intends to sell some or all of the Collateral pledged to it at one or more public or private sales to be held on or after November 8, 2022.

29.     Notwithstanding its demand and acceleration of the Obligations, pursuant to § 12 of the Loan Agreement, Berkshire honored the Debtors' request for advances to compensate employees who continued to turn work-in-progress into saleable inventory for the payroll period ending October 29, 2022. During this period, Berkshire advanced $11,785.49 for employee $401k contributions, $44,990.75 for employee health insurance benefits, $117,640.57 in payroll taxes, and $342,516.23 in employee wages and salary.

### COLLATERAL VALUATION

30.     Based on the Debtors' most recent Borrowing Base Certificate dated as of November 4, 2022 (the "**Borrowing Base Certificate**", a true and correct copy of which is attached hereto as <u>Exhibit J</u>) the Debtors' Accounts as of November 4, 2022 totaled $4,105,735.47. Likewise, according to the Borrowing Base Certificate, the cost value of the Debtors' inventory totaled $17,826,687.92 as of November 4, 2022.

31.     According to the inventory appraisal prepared by Paul E. Saperstein Co., Inc. dated November 15, 2022 (the "**Saperstein Appraisal**", a true and correct copy of which is attached hereto as <u>Exhibit K</u>) the gross "fair market" value of the Debtors' inventory is $1,782,668.79 (10% of cost value) and the gross "forced liquidation" value of the Debtors' inventory is $891,334.40 (5% of cost value).[5] These appraised values are the gross recovery only, without any accounting for liquidation costs or auctioneer fees, which the Saperstein Appraisal estimates would further reduce the net value recovery to 2-7%[6] of the cost value.

---

[5] According to the Saperstein Appraisal, when the Debtors' inventory was in the hands of the Debtors operating as a going concern, the value of such inventory would likely have been in the range of 75-80% of cost value.
[6] The appraised estimate of the net recovery from inventory is consistent with the 4% assumed in the Debtors' wind-down cash flow scenario. *See* Ex. F to Fox Declaration, at pg 7.

32. Based on my experience in collecting accounts receivable of borrowers who have ceased operations, as well as initial feedback from the Debtors' customers and account debtors, in my professional experience I estimate the recovery on the Debtors' Accounts will be approximately seventy (70%) percent of their face value.

33. Based on the forgoing, Berkshire's good faith estimated value of the Bank Priority Collateral as of the Petition Date is as follows:

|  | Accounts | Inventory | Total | Berkshire Deficiency |
|---|---|---|---|---|
| **Fair Market Value** | $4,105,735.47 | $1,782,668.79 | $5,888,404.26 | $2,629,263.59 |
| **Forced Liquidation Value** | $2,874,014.83 | $891,334.40 | $3,675,349.22 | $4,842,318.63 |

34. When the Term Agent's $5.6 million dollar claim (secured by a second priority lien on the Bank Priority Collateral and a first-priority lien on the Term Priority Collateral) is included in the analysis, the total secured claims against the Bank Priority Collateral vastly exceed the value of the property under any imaginable circumstance:

| | Estimated FMV | Estimated FLV |
|---|---|---|
| Accounts | $4,105,735.47 | $2,874,014.83 |
| Inventory | $1,782,668.79 | $891,334.40 |
| Machinery and Equipment[7] | $2,000,000.00 | $1,000,000.00 |
| Leaseholds and General Intangibles | $0 | $0 |
| **Subtotal Collateral Value** | $7,888,404.26 | $4,765,349.23 |
| | | |
| Berkshire Obligations | $8,517,667.85 | $8,517,667.85 |
| Term Agent Estimated Claim[8] | $5,600,000.00 | $5,600,000.00 |
| Total Secured Claims | $14,117,667.85 | $14,117,667.85 |
| | | |
| **Total Deficiency** | **$6,229,263.59** | **$9,352,318.62** |

35. Berkshire reserves the right to supplement the documents attached hereto as exhibits should it determine that it will rely on additional documents at the time of the hearing on the Motion.

36. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 22nd day of November, 2022.

*/s/ James Patrick Fox*
James Patrick Fox, Vice President and
Commercial Workout Officer for Berkshire
Bank

---

[7] The Debtors estimated the value of their Machinery and Equipment at $1,000,000.00 in their "wind-down" cash flow scenario. *See* Ex. F to Fox Declaration, at pg 7.

[8] The Term Agent Estimated Claim is based on the definition of "Maximum Term Amount" provided in the Intercreditor Agreement. *See* Ex. D at pg 5.

# EXHIBIT A-1

**First Amendment to Third Amended and Restated Loan and Security Agreement**

## FIRST AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (ALL ASSETS)

This FIRST AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (ALL ASSETS) (this "**First Amendment**") dated as of March 8, 2022 (the "**First Amendment Effective Date**"), by and among (i) PROAIR, LLC, a Delaware limited liability company ("**ProAir**"), AMERICAN COOLING TECHNOLOGY, LLC, a Delaware limited liability company ("**ACT**"), BUS AIR, LLC, a Delaware limited liability company ("**Bus Air**"), and EVANS TEMPCON DELAWARE, LLC, a Delaware limited liability company ("**Evans**", and together with ProAir, ACT and Bus Air, jointly and severally, the "**Borrowers**") and PROAIR INTERMEDIATE HOLDCO, LLC, a Delaware limited liability company ("**Holdings**," and together with the Borrowers, each and together, the "**Company**"), (ii) BERKSHIRE BANK, a Massachusetts banking corporation (the "**Bank**").

W I T N E S S E T H:

WHEREAS, each Company is party to that certain Third Amended and Restated Loan and Security Agreement (All Assets) dated as of February 11, 2022 (as amended and in effect immediately prior to the First Amendment Effective Date, the "**Existing ABL Agreement**", and the Existing ABL Agreement as amended by this First Amendment and as further amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**ABL Agreement**"), pursuant to which such Bank agreed, subject to the terms and conditions contained therein, to extend credit to the Borrowers;

WHEREAS, each Company has requested that the Bank effect certain amendments to the Existing ABL Agreement, as more specifically set forth herein, and the Bank is willing to effect such amendments to the Existing ABL Agreement, in each case, on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties signatory hereto agree as follows:

1.  <u>Defined Terms</u>.  Except as otherwise defined in this First Amendment, terms used herein that are not otherwise defined shall have the meanings given to those terms in the ABL Agreement.

2.  <u>Amendments to Existing ABL Agreement</u>.  Subject to the satisfaction of the conditions precedent specified in <u>Section 4</u> below, and in reliance on the representations and warranties set forth in <u>Section 3</u> below, the Existing ABL Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in the changed pages to the agreement attached hereto as <u>Exhibit A</u>.

3.  Representations and Warranties. Each Company hereby represents and warrants that:

(a)  no Event of Default has occurred and is continuing;

(b)  such Company has all requisite power and authority and all governmental licenses, authorizations, permits, consents and approvals to execute and deliver this First Amendment and to perform its obligations under this First Amendment and the other Loan Documents (including as amended by this First Amendment) to which it is a party;

(c)  the execution and delivery by such Company of this First Amendment, and the performance by such Company of its obligations under this First Amendment and the other Loan Documents (including as amended by this First Amendment) to which it is a party, have been duly authorized by all necessary organizational action, and do not and will not (i) contravene the terms of any of such Company's organization documents; (ii) conflict with or result in the creation of any Lien (except Liens created pursuant to the Loan Documents) under, any document evidencing any indebtedness to which such Company is a party or any order, injunction, writ or decree of any governmental authority to which such Company or its property is subject; (iii) conflict with or result in any breach or contravention of any document evidencing (A) any material contract or (B) any other indebtedness to which such Company is a party or any order, injunction, writ or decree of any governmental authority to which such Company or its property is subject; or (iv) violate any requirement of law;

(d)  this First Amendment and each other Loan Document (including as amended by this First Amendment) to which such Company is a party constitute the legal, valid and binding obligations of such Company, enforceable against such Company in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability, regardless of whether considered in a proceedings in equity or at law; and

(e)  after giving effect to this First Amendment, all representations and warranties contained in the ABL Agreement and each other Loan Document are true and correct in all material respects on and as of the First Amendment Effective Date, except (i) to the extent that such representations and warranties refer to an earlier date, in which case they shall be true and correct as of such earlier date, and (ii) in the case of any representation and warranty qualified by materiality, in which case they shall be true and correct in all respects.

4.  Conditions to Effectiveness. The effectiveness of this First Amendment is subject to satisfaction or waiver of the following conditions in a manner reasonably satisfactory to the Bank, in each case on or prior to the First Amendment Effective Date:

(a)  First Amendment. The Bank shall have received this First Amendment, duly executed by each of the parties hereto.

(b)     <u>Crystal Amendment</u>. The Bank shall have received that certain First Amendment to Amended and Restated Term Loan Agreement, dated as of the First Amendment Effective Date, in form and substance reasonably satisfactory to the Bank and duly executed by Crystal, the Borrowers and the other parties thereto.

(c)     <u>Resolutions</u>. The Bank shall have received customary limited liability company resolutions authorizing each Borrower party to the Subordinated Insitutional Promissory Notes to borrow the Subordinated Institutional Indebtedness thereunder and to enter into the transactions contemplated thereby.

(d)     <u>Representations and Warranties</u>. The representations and warranties set forth in <u>Section 3</u> above shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) on and as of the First Amendment Effective Date.

(e)     <u>No Event of Default</u>. No Event of Default shall have occurred and be continuing or shall result after giving effect to this First Amendment.

5.     <u>Legal Fees</u>. Each of the Borrowers acknowledges and agrees that the aggregate amount of unpaid legal fees and expenses owing to the Bank through January 31, 2022 is $141,818.16 (the "Outstanding Legal Fee Amount") and each of the Borrowers further agrees to pay to the Lender such Outstanding Legal Fee Amount in three (3) installments: (a) the first installment, in the amount of $47,252.50, shall be paid to the Bank no later than March 10, 2022, and (ii) each subsequent installment, in the amount of $47,282.83, shall be paid to the Bank on the first day of each calendar month thereafter. In addition, unbilled Bank's fees and expenses incurred in the period from February 1, 2022 through March 7, 2022 total $24,180.29.

6.     <u>Reaffirmation</u>. Each Compny as borrower, debtor, grantor, chargor, pledgor, guarantor, assignor, or in other any other capacity in which such Company grants Liens or security interests in its Collateral or otherwise acts as accommodation party or guarantor under the Existing ABL Agreement or any other Loan Document, as the case may be, hereby (a) ratifies and reaffirms all of its payment and performance obligations (including, without limitation, its obligation to pay or reimburse the Bank for all fees, costs and expenses incurred by it), contingent or otherwise, under the ABL Agreement and each of the other Loan Documents to which it is a party and (b) to the extent such Company granted Liens on or security interests in any of its Collateral pursuant to the ABL Agreement or any such other Loan Document as security for or otherwise guaranteed the Obligations under or with respect to the ABL Agreement and the other Loan Documents, ratifies and reaffirms such guarantee and grant of security interests and Liens and confirms and agrees that such security interests and Liens shall continue in full force and effect and ranks as continuing security for the payment and discharge of the liabilities and obligations secured or guaranteed thereunder (as the case may be) including, without limitation, all of the Obligations as amended hereby.

7.     <u>Effect on Loan Documents</u>. The ABL Agreement and the other Loan Documents, after giving effect to this First Amendment, shall be and remain in full force and effect in

accordance with their terms and hereby are ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this First Amendment shall not operate as a waiver of any right, power, or remedy of the Bank or any other secured party under the ABL Agreement or any other Loan Document, as in effect prior to the First Amendment Effective Date. Each Company hereby ratifies and confirms in all respects all of its obligations under the Loan Documents to which it is a party and each Company hereby ratifies and confirms in all respects any guaranty and any prior grant of a security interest under the Loan Documents to which it is party.

8. <u>Release</u>. Each Company hereby remises, releases, acquits, satisfies and forever discharges Bank, its agents, employees, officers, directors, predecessors, attorneys and all others acting on behalf of or at the direction of Bank, of and from any and all manner of actions, causes of action, suit, debts, accounts, covenants, contracts, controversies, agreements, variances, damages, judgments, claims and demands whatsoever, in law or in equity, which any of such parties ever had, or now has, to the extent arising from or in connection with any act, omission or state of facts taken or existing on or prior to the First Amendment Effective Date, against Bank, its agents, employees, officers, directors, attorneys and all persons acting on behalf of or at the direction of Bank (**"Releasees"**), for, upon or by reason of any matter, cause or thing whatsoever arising under, or in connection with, or otherwise related to, the Loan Documents through the First Amendment Effective Date. Without limiting the generality of the foregoing, each Company waives and affirmatively agrees not to allege or otherwise pursue any defenses, affirmative defenses, counterclaims, claims, causes of action, setoffs or other rights they have or may have under, or in connection with, or otherwise related to, the Loan Documents as of the First Amendment Effective Date, including, but not limited to, the rights to contest any conduct of Bank or other Releasees on or prior to the First Amendment Effective Date.

9. <u>No Novation; Entire Agreement</u>. This First Amendment evidences solely the amendment of certain specified terms and obligations of each Company under the Existing ABL Agreement and is not a novation or discharge of any of the other obligations of the Company under the Existing ABL Agreement. There are no other understandings, express or implied, among the Company and the Bank regarding the subject matter hereof or thereof.

10. <u>Choice of Law</u>. THIS FIRST AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF.

11. <u>Counterparts; Facsimile Execution</u>. This First Amendment may be executed in any number of counterparts and by different parties and separate counterparts, each of which when so executed and delivered shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this First Amendment by facsimile (or other electronic transmission) shall be as effective as delivery of a manually executed counterpart of this First Amendment. Any party delivering an executed counterpart of this First Amendment by facsimile (or other electronic transmission) also shall deliver a manually executed

counterpart of this First Amendment but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this First Amendment.

12. <u>Construction</u>.  This First Amendment is a Loan Document.  This First Amendment and the Existing ABL Agreement shall be construed collectively and in the event that any term, provision or condition of any of such documents is inconsistent with or contradictory to any term, provision or condition of any other such document, the terms, provisions and conditions of this First Amendment shall supersede and control the terms, provisions and conditions of the Existing ABL Agreement.

13. <u>Miscellaneous</u>.  The terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, this First Amendment has been duly executed and delivered by each of the parties hereto as a sealed instrument as of the date first above written.

## BORROWERS:

### PROAIR, LLC

By: _____
Name: Todd Courts
Title:  Chief Financial Officer

### AMERICAN COOLING TECHNOLOGY, LLC

By: _____
Name: Todd Courts
Title:  Chief Financial Officer

### BUS AIR, LLC

By: _____
Name: Todd Courts
Title:  Chief Financial Officer

### EVANS TEMPCON DELAWARE, LLC

By: _____
Name: Todd Courts
Title:  Chief Financial Officer

## HOLDINGS:

### PROAIR INTERMEDIATE HOLDCO, LLC

By: _____
Name: Todd Courts
Title:  Chief Financial Officer

**BERKSHIRE BANK**

By: _____

Name: C. Lee Willingham

Title: Senior Vice President

**BERKSHIRE BANK**

**THIRD AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**
**(ALL ASSETS)**

February 11, 2022

## PREAMBLE

This Third Amended and Restated Loan and Security Agreement (All Assets) between the Company and the Bank dated as of the date set forth above (this "**Agreement**") amends and restates in its entirety that certain Second Amended and Restated Loan and Security Agreement (All Assets) between the Borrower and the Bank dated September 25, 2017 which amended the Amended and Restated Loan and Security Agreement (All Assets) between the Borrower and the Bank dated April 8, 2016, which amended and restated that certain Loan and Security Agreement (All Assets) dated April 26, 2010, as amended, to make certain changes to the financial covenants and other terms and conditions of this Agreement.

For purposes of this Agreement, the term(s):

"**Approved Budget**" shall have the meaning ascribed to that defined term in the Crystal Term Loan Agreement (as defined below in Section 9(ix)), with supporting information and in form reasonably satisfactory to the Bank.

"**Approved Budget Variance Report**" shall have the meaning ascribed to that defined term in the Crystal Term Loan Agreement, with supporting information and in form reasonably satisfactory to the Bank.

"**Assignment and Debt Cancellation Agreement**" shall have the meaning ascribed to that defined term in the Crystal Term Loan Agreement.

"**Business Day" means** any day which is neither a Saturday or Sunday nor a legal holiday on which commercial banks are authorized or required to be closed in Boston, Massachusetts.

"**Closing Date**" means February 11, 2022.

"**Closing Date Restructuring**" shall have the meaning ascribed to that defined term in the Crystal Term Loan Agreement.

"**Crystal Investor**" means, collectively, Crystal Financial SBIC LP and Crystal Financial SPV LLC.

"**Debt Discharges**" shall have the meaning ascribed to that defined term in the Crystal Term Loan Agreement.

"**First Amendment Effective Date**" means March 8, 2022.

"**KODA Investor**" means collectively, (a) William S. Karol and (b) William S. Karol Family Trust (or any successor or replacement trust for the benefit of William S. Karol), and in each case together with any successors or permitted assigns.

"**Loan Documents**" means this Agreement, the Revolving Note, the Crystal Intercreditor Agreement and all documents, instruments and certificates delivered from time to time to Bank in connection with the foregoing.

"**Permitted Holders**" means, collectively, the Crystal Investor, the Portman Ridge Investor, and the KODA Investor.

"**Permitted Non-Ordinary Course Inventory Sales**" shall have the meaning ascribed to that term in Section 15(d) below.

"**Portman Ridge Investor**" means Portman Ridge Finance Corporation, together with its successors and permitted assigns.

"**Subordinated Institutional Indebtedness**" means Indebtedness under the Subordinated Institutional Promissory Notes.

"**Subordinated Institutional Indebtedness Maturity Date**" means (a) December 31, 2022 or (b) such later date agreed to by the applicable holder of such Subordinated Institutional Indebtedness (provided that, in the case of the foregoing clause (b), the Borrowers shall have promptly notified, or shall have caused the applicable holder of such Subordinated Institutional Indebtedness to promptly notify, the Bank in writing of such later date).

"**Subordinated Institutional Promissory Notes**" means, collectively, each promissory note evidencing Subordinated Institutional Indebtedness, including, without limitation, that certain (a) Unsecured Subordinated Promissory Note issued by the Borrowers to Crystal Financial LLC, dated as of the First Amendment Effective Date, in the original principal amount of $393,461.90, (b) Unsecured Subordinated Promissory Note issued by the Borrowers to Crystal Financial SBIC LP, dated as of the First Amendment Effective Date, in the original principal amount of $1,356,538.10 and (c) Unsecured Subordinated Promissory Note issued by the Borrowers to the Portman Ridge Investor, dated as of the First Amendment Effective Date, in the original principal amount of $1,750,000.00, each in form and substance satisfactory to the Bank, in each case as the same may be amended, restated, supplemented and/or modified from time to time subject to the terms hereof.

1.    **SECURITY INTEREST.** ProAir, LLC, a Delaware limited liability company ("**ProAir**"), American Cooling Technology, LLC, a Delaware limited liability company ("**ACT**"), Bus Air, LLC, a Delaware limited liability company ("**Bus Air**"), and Evans Tempcon Delaware, LLC, a Delaware limited liability company ("**Evans**") (hereinafter each and together referred to as the "**Borrower**") and ProAir Intermediate Holdco, LLC, a Delaware limited liability company ("**Holdings**" and together with the Borrower, hereinafter each and together with all subsidiaries

of Borrower or Holdings that is an obligor under the Crystal Term Loan Agreement or any Subordinated Institutional Promissory Note referred to as the "**Company**"), for valuable consideration, receipt whereof is hereby acknowledged, hereby grants to Berkshire Bank, a Massachusetts banking corporation, the secured party hereunder (hereinafter called the "**Bank**"), a continuing security interest in and to, and assigns to Bank, all assets of the Company, wherever located and whether now owned or hereafter acquired, including, without limitation, the following:

(a)     all inventory, including all goods, merchandise, raw materials and work in process, finished goods, and other tangible personal property now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts of service or used or consumed in Company's business (all hereinafter called the "**Inventory**");

(b)     all accounts (as defined in Article 9 of the Uniform Commercial Code in effect in the Commonwealth of Massachusetts from time to time, hereinafter "**Accounts**"), contracts, contract rights, notes, bills, drafts, acceptances, general intangibles (including without limitation registered and unregistered tradenames, copyrights, customer lists, goodwill, computer programs, computer records, computer software, computer data, trade secrets, trademarks, patents, ledger sheets, files, records, data processing records relating to any Accounts and all tax refunds of every kind and nature to which Company is now or hereafter may become entitled to, no matter how arising), instruments, documents, chattel paper (whether tangible or electronic) deposit accounts, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, security entitlements, security accounts, investment property, supporting obligations, choses in action, commercial tort claims, and all other debts, obligations and liabilities in whatever form, owing to Company from any person, firm, corporation, limited liability company or any other legal entity, whether now existing or hereafter arising, now or hereafter received by or belonging or owing to Company, for goods sold by it or for services rendered by it, or however otherwise same may have been established or created, all guarantees and collateral therefor, all right, title and interest of Company in the merchandise or services which gave rise thereto, including the rights of reclamation and stoppage in transit, all rights to replevy goods, and all rights of an unpaid seller of merchandise or services (all  hereinafter called the "**Receivables**");

(c)     all machinery, equipment, fixtures and other goods (as defined in Article 9 of the Uniform Commercial Code) whether now owned or hereafter acquired by the Company and wherever located, all replacements and substitutions therefor or accessions thereto and all proceeds thereof (all hereinafter called the "**Equipment**"); and

(d)     all proceeds and products of all of the foregoing in any form, including, without limitation, all proceeds of credit, fire or other insurance, and also including, without limitation, rents and profits resulting from the temporary use of any of the foregoing (which, with Inventory, Receivables and Equipment are all hereinafter called "**Collateral**").

2.    **OBLIGATIONS SECURED.** The security interest granted hereby is to secure payment and performance of all debts, liabilities and obligations of Company to Bank hereunder (and, in the case of Holdings, all debts, liabilities and obligations of Holdings to Bank under the Guaranty made by Holdings to Bank on or about the date hereof (the "**Guaranty**")) and also any and all other debts, liabilities and obligations of Company to Bank of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not such obligations are related to the transactions described in this Agreement, by class, or kind, or whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, fees, charges, expenses and overdrafts, and also including, without limitation, all obligations and liabilities which Bank may incur or become liable for, on account of, or as a result of, any transactions between Bank and Company including any which may arise out of any letter of credit, acceptance or similar instrument or obligation issued or caused to be issued pursuant to this Agreement and also including obligations arising out of any foreign exchange contracts, interest rate swap, cap, floor or hedging agreements and all obligations of Company to Bank arising out of or in connection with any Automated Clearing House ("**ACH**") agreements relating to the processing of ACH transactions, together with the fees, expenses, charges and other amounts owing or chargeable to Company under any ACH agreements (all hereinafter called "**Obligations**").

3.    **COMPANY'S PLACES OF BUSINESS, INVENTORY LOCATIONS AND RETURNS POLICY.** Company warrants that Company has no places of business other than that shown at the end of this Agreement, unless other places of business are listed on Schedule "A", annexed hereto, in which event Company represents that it has additional places of business at those locations set forth on Schedule "A".

Company's principal executive office and the office where Company keeps its records concerning its accounts, contract rights and other property, is that shown at the end of this Agreement.  All Inventory presently owned by Borrower is stored at the locations set forth on Schedule "A", and shall be designated as either a leasehold or a warehouse space.

Company will promptly notify Bank in writing of any change in the location of any place of business or the location of any Inventory or the establishment of any new place of business or location of Inventory or office where its records are kept which would be shown in this Agreement if it were executed after such change.

Company represents and warrants that it has described its returns policy in writing to Bank and that it does now, and will continue to, apply such policy consistently in the conduct of its business and agrees that it shall notify Bank in writing before changing its policy or the application thereof.

4.    **COMPANY'S ADDITIONAL REPRESENTATIONS AND WARRANTIES.** Company represents and warrants that:

(a)     Company is a limited liability company or corporation, as applicable, duly organized, validly existing and in good standing under the laws of the state of such Company's formation or incorporation, as applicable, and shall hereafter remain in good standing as a limited liability company or corporation, as applicable, in that state, and is duly qualified and in good standing in every other state in which it conducts business, and shall hereafter remain duly qualified and in good standing in every other state in which, by reason of the nature or location of such Company's assets or operations, such qualification may be necessary, except as would not reasonably be expected to have, either individually or in the aggregate, a material adverse effect on its financial condition, business or prospects.

(b)     Company's exact legal name is as set forth in this Agreement.

(c)     The organizational identification number of the Company is as set forth on Schedule "A" annexed hereto.

(d)     The execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within the Company's powers, have been duly authorized, are not in contravention of law or the terms of the Company's Certificate of Formation, Operating Agreement or other organizational papers, or of any indenture, agreement or undertaking to which the Company is a party or by which it or any of its properties may be bound.

(e)     The Certificate of Formation and all amendments thereto of Company have been duly filed and are in proper order. All equity interests of the Company have been paid for in full and properly sold and all books and records of Company, including but not limited to its minute books, Operating Agreement and books of account, are accurate and up to date and will be so maintained.

(f)     Borrower owns all of the assets reflected in the most recent of Company's financial statements provided to Bank, except assets sold or otherwise disposed of in the ordinary course of business since the date thereof, and such assets together with any assets acquired since such date, including without limitation the Collateral, are free and clear of any lien, pledge, security interest, charge, mortgage or encumbrance of any nature whatsoever, except (i) the security interests and other encumbrances (if any) listed on Schedule "B" annexed hereto, (ii) those leases of personal property set forth on Schedule "C" annexed hereto, (iii) those liens permitted pursuant to Section 15(e) of this Agreement, or (iv) liens and security interests in favor of Bank (hereinafter, collectively, "**Permitted Liens**").

(g)     Company has made or filed all tax returns, reports and declarations relating to any material tax liability required by any jurisdiction to which it is subject (any tax liability which may result in a lien on any Collateral being hereby deemed material); has paid all taxes shown or determined to be due thereon except those being contested in good faith and which Company has, prior to the date of such contest, identified in writing to Bank as being contested; and has made adequate provision for the payment of all taxes so contested, so that no lien will encumber any Collateral, and in respect of subsequent periods.

(h)    Company (i) is subject to no charter, limited liability, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction which could have a material adverse effect on its financial condition, business or prospects, and (ii) is in compliance with its Certificate of Formation and Operating Agreement, all contractual requirements by which it or any of its properties may be bound and all applicable laws, rules and regulations (including without limitation those relating to environmental protection) other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of any Collateral.

(i)    There is no action, suit, proceeding or investigation pending or, to Company's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of any Collateral.

(j)    Company is in compliance with ERISA; no Reportable Event has occurred and is continuing with respect to any Plan; and it has no unfunded vested liability under any Plan. The word "**Plan**" as used in this Agreement means any employee plan subject to Title IV of the Employee Retirement Income Security Act of 1974 ("**ERISA**") maintained for employees of Company, any subsidiary of Company or any other trade or business under common control with Company within the meaning of Section 414(c) of the Internal Revenue Code of 1986 or any regulations thereunder.

(k)    Neither Company nor, to the knowledge of Company, any of its owners, subsidiaries or affiliates, is in violation of any laws relating to terrorism or money laundering ("**Anti-Terrorism Laws**"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "**Executive Order**"), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

(l)    Neither Company nor, to the knowledge of Company, any of its owners, subsidiaries or affiliates or other agent of Company acting or benefitting in any capacity in connection with the transactions contemplated hereunder, is any of the following: (i) a person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (ii) a person owned or controlled by, or acting for or on behalf of, any person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person with which Bank is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (iv) a person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or (v) a person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control ("**OFAC**") at its official website or any replacement website or other replacement official publication of such list.

(m)    Neither Company nor, to the knowledge of Company, any agent of any of its owners, subsidiaries or affiliates acting in any capacity in connection with the transactions

contemplated hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in subsection (l) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

## 5. LOANS AND OTHER FINANCIAL ACCOMMODATIONS.

(a)     From time to time upon Borrower's request, so long as the sum of the aggregate principal amount of all revolving loans outstanding (the "**Revolving Loans**") and the requested Revolving Loan does not exceed the lesser of (i) the Borrowing Base (as defined below), or (ii) the Credit Limit (as defined below), Bank shall make such requested Revolving Loan, provided that there has not occurred an Event of Default or an event which, with notice or the lapse of time or both, would constitute an Event of Default.  In order to facilitate the requesting and making of Revolving Loans hereunder, each Borrower does hereby appoint ProAir as its agent authorized to request, receive and distribute all Revolving Loans under this Agreement and to communicate with the Bank with respect to this credit facility, and ProAir hereby accepts such appointment.

(b)     (i)     <u>Revolving Note</u>. All Revolving Loans shall bear interest as set forth below, and at the option of Bank shall be evidenced by and repayable in accordance with an amended and restated revolving note drawn to the order of Bank in the form of **Exhibit 1** attached hereto and made a part hereof (the "**Note**"), as the same may hereafter be amended, supplemented or restated from time to time and any note or notes issued in substitution therefor, but in all events shall be conclusively evidenced by Bank's records of Revolving Loans and repayments.

(ii)     <u>Interest Rate; Interest Payment</u>.  Except as otherwise provided in Section 16(a)(xxv) , the outstanding principal balance of  the Revolving Loans shall bear interest for the duration of each Interest Period at a per annum rate equal to the Term SOFR Rate (or, if applicable under Sections 5(b)(iv), (v) or (vi), the Daily Simple SOFR Rate or the Base Rate, as applicable).  Interest shall be paid on each Interest Payment Date.

(iii)     <u>Computations</u>.  Interest due hereunder shall be computed on the basis of a year of 360 days and paid in arrears for the actual number of days elapsed.  If the due date for any payment required hereunder is extended by operation of law, interest shall be payable for such extended time.  If any payment required hereunder is due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension shall be included in computing interest in connection with such payment.

(iv)     <u>Illegality</u>.  If the Bank determines that any law has made it unlawful, or that any governmental authority has asserted it is unlawful, for the Bank to determine or charge interest by reference to Term SOFR, then, upon notice thereof by the Bank to the Borrower, any obligation of the Bank to make or maintain the interest rate hereunder by reference to Term SOFR shall be suspended, and the interest shall thereafter accrue on the outstanding principal balance of

the Revolving Loans at the Base Rate until the Bank notifies the Borrower that the circumstances giving rise to such determination no longer exist.

(v)      Temporary Unavailability of Term SOFR or Daily Simple SOFR. If the Bank determines (which determination shall be conclusive absent manifest error) that (i) the circumstances under Section 5(b)(vi) have occurred and such circumstances are likely to be temporary, (ii) adequate and reasonable means do not exist for determining Term SOFR, or (iii) the Term SOFR Rate does not adequately and fairly reflect the cost to the Bank of funding the Revolving Loans, then, upon notice thereof by the Bank to the Borrower, any obligation of the Bank to make or maintain the interest rate hereunder by reference to Term SOFR shall be suspended, and interest shall thereafter accrue on the outstanding principal balance of the Revolving Loans at a variable rate per annum equal to the Daily Simple SOFR Rate (or, if the Bank makes any of the foregoing determinations with respect to Daily Simple SOFR or the Daily Simple SOFR Rate, the Base Rate) until the Bank notifies the Borrower that the circumstances giving rise to such determination no longer exist.

(vi)      Permanent Unavailability of Term SOFR or Daily Simple SOFR. If the Bank determines (which determination shall be conclusive absent manifest error) that (i) adequate and reasonable means do not exist for determining Term SOFR, including, because SOFR or Term SOFR is not available or published on a current basis, and such circumstances are unlikely to be temporary, (ii) the SOFR Administrator or Term SOFR Administrator, or a governmental authority having jurisdiction over the Bank or any such administrator, has announced that SOFR or Term SOFR will no longer be provided, (iii) any relevant agency or authority has announced that SOFR or Term SOFR is no longer representative, or (iv) any similar circumstance exists such that SOFR or Term SOFR has become permanently unavailable or ceased to exist, any obligation of the Bank to make or maintain the interest rate hereunder by reference to Term SOFR shall be suspended, and the interest shall thereafter accrue on the outstanding principal balance of the Revolving Loans at a variable rate per annum equal to the Daily Simple SOFR Rate (or, if the Bank makes any of the foregoing determinations with respect to Daily Simple SOFR or the Daily Simple SOFR Rate, the Base Rate).

(c)      The term '**Borrowing Base**' as used herein shall mean the sum of the following:

(i)      eighty-five (85%) percent of the unpaid face amount of Qualified Accounts (as defined below) or such other percentage thereof as may from time to time be fixed by Bank upon notice to Borrower, PLUS

(ii)      the lesser of (A) Seven Million Five Hundred Thousand ($7,500,000.00) Dollars, or (B) the sum of (i) fifty (50%) percent of the cost of all Eligible Inventory (as defined below) consisting of raw materials and finished goods inventory, plus (ii) fifty (50%) percent of the aggregate amount then undrawn on all outstanding Commercial Letters of Credit issued pursuant to this Agreement for the account of the Borrower, or such other percentages of Eligible Inventory and/or outstanding Commercial Letters of Credit as may from time to time be fixed by Bank upon notice to Borrower, PLUS

(iii)    one-hundred (100%) percent of the Inventory Advance up to One Million ($1,000,000.00) Dollars on account of Other Inventory as that term is defined in Section 15(d). Draws will be permitted on a one-time basis following receipt of documentation acceptable to the Bank for Permitted Non-Ordinary Course Business Sales, as that term is defined in Section 15(d), through December 31, 2022 only and may not be re-drawn (the **"Inventory Advance"**).  The Inventory Advance will only be permitted when availability of Eligible Inventory is less than $7,500,000.  The Inventory Advance, to the extent utilized, shall amortize in five (5) consecutive monthly installments based upon a two year straight line amortization basis commencing September 30, 2023, MINUS

(iv)    one hundred (100%) percent of the aggregate amount then undrawn on all Letters of Credit and acceptances issued pursuant to this Agreement for the account of the Borrower;

but in no event shall the sum of all Revolving Loans plus the sum of the aggregate amount undrawn on all Letters of Credit and acceptances be in excess of the Credit Limit.

The Bank shall maintain a static reserve for Eligible Inventory equal to ten (10%) percent of the total Inventory (the **"Static Reserve"**).  The Static Reserve shall remain in place through March 31, 2023, at which time the methodology will be reviewed by the Bank based upon examination recommendations. In addition to the foregoing, the Bank may from time to time, in its reasonable judgment consistent with current credit policies, establish reserves against the Accounts and/or the Inventory of the Borrower (**"Reserves"**) and subsequently reduce or eliminate such Reserves, and reinstate such Reserves; provided that, the Bank shall provide ten (10) days' prior written notice of any such action to Borrower and upon receipt of such notice by Borrower, the Borrowing Base shall be determined after giving effect to such Reserves for all purposes of this Agreement. The amount of such Reserves shall be subtracted from Qualified Accounts or Eligible Inventory, as applicable, when calculating the amount of the Borrowing Base.

As used in this Agreement, the term **'Commercial Letters of Credit'** shall mean a letter of credit issued to support the purchase by Borrower of Inventory prior to its transport to one of Borrower's places of business that provides that all draws thereunder must require presentation of customary documentation including, if applicable, commercial invoices, packing lists, certificate of origin, bill of lading, an airway bill, customs clearance documents, quota statement, certificate, beneficiaries statement and bill of exchange, bills of lading, dock warrants, dock receipts, warehouse receipts or other documents of title, in form and substance satisfactory to Bank and reflecting passage to Borrower of title to first quality Inventory conforming to Borrower's contract with the seller thereof.

(d)　　The term '**Credit Limit**' as used herein shall mean, an amount equal to Twelve Million ($12,000,000.00).

(e)　　Company hereby authorizes and directs Bank, in Bank's sole discretion (provided, however, Bank shall have no obligation to do so): (i) to pay accrued interest as the same becomes due and payable pursuant to this Agreement or pursuant to any note or other agreement between Company and Bank, and to treat the same as a Revolving Loan to Borrower, which shall be added to Borrower's Revolving Loan balance pursuant to this Agreement; (ii) to charge any of Company's accounts under the control of Bank; or (iii) apply the proceeds of Collateral, including, without limitation, payments on Accounts and other payments from sales or lease of Inventory and any other funds to the payment of such items.  Bank shall promptly notify Company of any such charges or applications.

(f)　　The Borrowing Base formula set forth above is intended solely for monitoring purposes.  The making of Revolving Loans, advances, and credits by Bank to the Borrower in excess of the above described Borrowing Base formula is for the benefit of the Borrower and does not affect the obligations of Borrower hereunder; all such Revolving Loans constitute Obligations and must be repaid by Borrower in accordance with the terms of this Agreement.

(g)　　At the request of the Borrower, and upon the execution of letter of credit documentation satisfactory to Bank, Bank, within the limits of the Borrowing Base, as then computed and also within the limits of the Credit Limit as then computed, shall issue letters of credit from time to time by Bank for the account of the Borrower (collectively "**Letters of Credit**").  The Letters of Credit shall be on terms mutually acceptable to Bank and the Borrower, and no Letter of Credit shall have an expiration date later than the sooner to occur of (i) twelve (12) months from the date of issuance of the subject Letter of Credit, or (ii) the Termination Date.  A Revolving Loan in an amount equal to any amount paid by Bank under a Letter of Credit shall be deemed made to Borrower, without request therefor, immediately upon any payment by Bank on such Letter of Credit.  In connection with the issuance of any Letter of Credit, Borrower shall pay to Bank a percentage of the face amount of such Letter of Credit according to the fee schedule then in effect at Bank plus transaction fees at the customary rates charged by Bank and all other normal and customary fees charged by Bank.  Borrower hereby authorizes and directs Bank, in Bank's sole discretion (provided, however, Bank shall have no obligation to do so) to pay all such fees and costs as the same become due and payable and to treat the same as a Revolving Loan to Borrower, which shall be added to Borrower's Revolving Loan balance pursuant to this Agreement.  For purposes of computing the Credit Limit, all Letters of Credit and acceptances shall be deemed to be Revolving Loans.

(h)　　Borrower shall pay to Bank the principal amount of all Revolving Loans as follows:

(i)　　<u>Borrowing Base Exceeded</u>. Whenever the outstanding principal balance of all Revolving Loans exceed the Borrowing Base, Borrower shall immediately pay to Bank the excess of the outstanding principal balance of the Revolving Loans over the Borrowing Base.

(ii)    _Payment in Full on Termination_. On termination of this Agreement, pursuant to Section 21 or acceleration of the Obligations pursuant to Section 16, Borrower shall pay to Bank the entire outstanding principal balance of all Revolving Loans and shall deliver to Bank cash collateral in an amount equal to the aggregate of (A) amounts then undrawn on all outstanding Letters of Credit issued pursuant to this Agreement for the account of the Borrower, and (B) the amount of all outstanding acceptances issued pursuant to this Agreement.

(i)    _Certain Definitions_.  As used herein, the following terms shall have the definitions specified below:

"Base Rate" means a variable rate of interest per annum equal to the Prime Rate with such adjustments (which may be positive or negative) to the spread or margin as the Bank deems necessary in its sole discretion to maintain an all-in yield on the Revolving Loans substantially equivalent to the Daily Simple SOFR Rate.

"Business Day" means any day other than a Saturday or a Sunday on which the head office of the Bank is open for transaction of all of its normal and customary business; provided that, for purposes of determining SOFR, Daily Simple SOFR or Term SOFR, "Business Day" means any day other than a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. government securities.

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to the greater of (A) one percent (1.00%) and (B) SOFR for the day (each such day a "Rate Set Day") that is five (5) Business Days prior to (i) if such SOFR Rate Day is a Business Day, such SOFR Rate Day, or (ii) if such SOFR Rate Day is not a Business Day, the Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website.  If by 5:00pm (ET) on the second (2nd) Business Day immediately following any Rate Set Day, SOFR in respect of such Rate Set Day has not been published on the SOFR Administrator's Website, then SOFR for such Rate Set Day will be SOFR as published in respect of the first preceding Business Day for which such SOFR was published on the SOFR Administrator's Website.  Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to or consent from the Borrower.

"Daily Simple SOFR Rate" means a variable rate of interest per annum equal to the sum of (A) the applicable Daily Simple SOFR, plus (B) 0.11448% (11.448 basis points), plus (C) the Term SOFR Margin.

"Interest Payment Date means the first day of each calendar month.

"Interest Period" means the period beginning on the first day of each calendar month and ending on and including (A) the last day of each calendar month or (B) with respect to the last Interest Period, the Maturity Date.

"Prime Rate" means the "prime rate" published by *The Wall Street Journal* in its "Money Rate" column. In the event (A) *The Wall Street Journal* stops publishing prime rates or (B) The Wall Street Journal ceases to be available, then a substitute index rate shall be selected by the Bank from a comparable publication which publishes a rate which has historical fluctuations similar to that of the "prime rate" appearing in *The Wall Street Journal*. Any announced changes in said published "prime rate" shall result in an immediate and corresponding change in the Prime Rate without notice to or consent from the Borrower.

"SOFR" means, with respect to any Business Day, the secured overnight financing rate published for such Business Day by the SOFR Administrator's Website.

"SOFR Administrator" means, the Federal Reserve Bank of New York (or a successor administrator of SOFR).

"SOFR Administrator's Website" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for SOFR identified as such by the SOFR Administrator from time to time.

"Term SOFR" means, for any Interest Period, the greater of (A) one percent (1.00%) and (B) the one-month forward-looking term rate based on SOFR published on the Term SOFR Administrator's Website, or other commercially available source providing such quotations as may be selected by the Bank from time to time, two Business Days prior to the commencement of such Interest Period (as adjusted for any reserve requirement and any subsequent costs arising from a change in government regulation); provided that if the Term SOFR rate is not published on a Business Day due to a holiday or other circumstance, the applicable Term SOFR shall be the Term SOFR last published prior to such Business Day.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (or a successor administrator of SOFR).

"Term SOFR Administrator's Website" means the website or any successor source for Term SOFR identified by the Term SOFR Administrator (or a successor administrator of Term SOFR).

"Term SOFR Margin" means two and one-quarter of one percent (2.25%) per annum.

"Term SOFR Rate" means a variable rate of interest per annum equal to the sum of (A) the applicable Term SOFR, plus (B) 0.11448% (11.448 basis points), plus (C) the Term SOFR Margin.

(j)     In addition to all other sums payable hereunder, the Borrower shall pay the Bank a fee equal to one-quarter of one (.25%) percent per annum of the difference between: (i) the Availability reflected in each monthly Borrowing Base Certificate and (ii) the average amount of the principal balance of Revolving Loans outstanding for each corresponding monthly period

while this Agreement is in effect.  Such fee shall be payable monthly in arrears and shall be treated as a Revolving Loan to Borrower, which shall be added to Borrower's Revolving Loan balance pursuant to this Agreement.

(k)     Borrower shall also pay Bank a collateral monitoring fee of Five Hundred ($500.00) Dollars per month.  Such fee shall be paid monthly in arrears and shall be treated as a Revolving Loan to Borrower, which shall be applied to Borrower's Revolving Loan balance pursuant to this Agreement.

(l)     It is the intention of the parties hereto to comply strictly with applicable usury laws, if any; accordingly, notwithstanding any provisions to the contrary in this Agreement or any other documents or instruments executed in connection herewith, in no event shall this Agreement or such documents or instruments require or permit the payment, taking, reserving, receiving, collecting or charging of any sums constituting interest under applicable laws which exceed the maximum amount permitted by such laws.  If any such excess interest is called for, contracted for, charged, paid, taken, reserved, collected or received in connection with the Obligations or in any communication by Bank or any other person to the Borrower or any other person, or in the event all or part of the principal of the Obligations or interest thereon shall be prepaid or accelerated, so that under any of such circumstances or under any other circumstance whatsoever the amount of interest contracted for, charged, taken, collected, reserved, or received on the amount of principal actually outstanding from time to time under this Agreement shall exceed the maximum amount of interest permitted by applicable usury laws, if any, then in any such event it is agreed as follows: (i) the provisions of this paragraph shall govern and control, (ii) neither the Borrower nor any other person or entity now or hereafter liable for the payment of the Obligations shall be obligated to pay the amount of such interest to the extent such interest is in excess of the maximum amount of interest permitted by applicable usury laws, if any, (iii) any such excess which is or has been received notwithstanding this paragraph shall be credited against the then unpaid principal balance hereof or, if the Obligations have been or would be paid in full by such credit, refunded to the Borrower, and (iv) the provisions of this Agreement and the other documents or instruments executed in connection herewith, and any communication to the Borrower, shall immediately be deemed reformed and such excess interest reduced, without the necessity of executing any other document, to the maximum lawful rate allowed under applicable laws as now or hereafter construed by courts having jurisdiction hereof or thereof.  Without limiting the foregoing, all calculations of the rate of interest contracted for, charged, taken, collected, reserved, or received in connection herewith which are made for the purpose of determining whether such rate exceeds the maximum lawful rate shall be made to the extent permitted by applicable laws by amortizing, prorating, allocating and spreading during the period of the full term of the Obligations, including all prior and subsequent renewals and extensions, all interest at any time contracted for, charged, taken, collected, reserved or received.  The terms of this paragraph shall be deemed to be incorporated in every loan document and communication relating to the Obligations.

6.     **DEFINITION OF QUALIFIED ACCOUNT.**  The term "**Qualified Account**", as used herein, means an Account owing to Borrower which met the following specifications at the time it came into existence and continues to meet the same until it is collected in full:

(a)     The Account is not more than ninety (90) days from the date of the invoice thereof.

(b)     The Account arose from the performance of services or an outright sale of goods by Borrower, such goods have been shipped to the account debtor, and Borrower has possession of, or has delivered to Bank, shipping and delivery receipts evidencing such shipment.

(c)     The Account is not subject to any prior assignment, claim, lien, or security interest, and Borrower will not make any further assignment thereof or create any further security interest therein, nor permit Borrower's rights therein to be reached by attachment, levy, garnishment or other judicial process.

(d)     The Account is not subject to set−off, credit, allowance or adjustment by the account debtor, except discount allowed for prompt payment and the account debtor has not complained as to his liability thereon and has not returned any of the goods from the sale of which the Account arose.

(e)     The Account arose in the ordinary course of Borrower's business and did not arise from the performance of services or a sale of goods to a supplier or employee of the Borrower.

(f)     No notice of bankruptcy or insolvency of the account debtor has been received by or is known to the Borrower.

(g)     The Account is not owed by an account debtor whose principal place of business is outside the United States of America, except Canada, unless supported by a letter of credit or foreign credit insurance acceptable to the Bank in all respects.

(h)     The Account is not owed by an entity which is a parent, brother/sister, subsidiary or affiliate of Borrower.

(i)     The Account does not represent a deferred warranty sale.

(j)     The Account does not arise from an invoice coded as "RMA" (return merchandise authorization) pertaining to future returns.

(k)     The account debtor is not located in the State of New Jersey or in the State of Minnesota or West Virginia (or any other state that requires an entity to file a business activity report or similar document in order to bring suit or otherwise enforce its remedies against an account debtor in the courts or through any judicial process of such state), unless (i) Borrower has filed and shall file all legally required Notice of Business Activities Reports with the New Jersey Division of Taxation or the Minnesota Department of Revenue or the West Virginia Department of Revenue, as the case may be; or (ii) Borrower is exempt from such filing requirement.

(l)     The Account when aggregated with all of the Accounts of that account debtor does not exceed fifty (50%) percent of the then aggregate of Qualified Accounts.

(m)     The Account is not evidenced by a promissory note.

(n)     The Account did not arise out of any sale made on a bill and hold, dating or delayed shipment basis.

(o)     The Account does not arise out of a progress billing prior to completion of the order therefor.

(p)     Bank, in accordance with its normal credit policies, has not deemed the Account to be unacceptable; provided that, the Bank shall provide ten (10) days' prior written notice of any such ineligibility determination to Borrower and upon receipt of such notice by Borrower, the Borrowing Base shall be determined after giving effect to such ineligibility determination for all purposes of this Agreement.

PROVIDED THAT if at any time fifty (50%) percent or more of the aggregate amount of the Accounts due from any account debtor are unpaid in whole or in part more than ninety (90) days from the respective dates of invoice, from and after such time none of the Accounts (then existing or hereafter arising) due from such account debtor shall be deemed to be Qualified Accounts until such time as all Accounts due from such account debtor are (as a result of actual payments received thereon) no more than ninety (90) days from the date of invoice; Accounts payable by Borrower to an account debtor shall be netted against Accounts due from such account debtor and the difference (if positive) shall constitute Qualified Accounts from such account debtor for purposes of determining the Borrowing Base (notwithstanding paragraph (d) above); characterization of any Account due from an account debtor as a Qualified Account shall not be deemed a determination by Bank as to its actual value nor in any way obligate Bank to accept any Account subsequently arising from such account debtor to be, or to continue to deem such Account to be, a Qualified Account; it is Borrower's responsibility to determine the creditworthiness of account debtors and all risks concerning the same and collection of Accounts are with Borrower; and all Accounts whether or not Qualified Accounts constitute Collateral.

7.     **DEFINITION OF ELIGIBLE INVENTORY.**  The term **"Eligible Inventory"**, as used herein, means Borrower's raw materials and finished goods which are initially and at all times until sold: new and unused (except, with Bank's written approval, used equipment held for sale or lease), in first−class condition, merchantable and saleable through normal trade channels; at a location which has been identified in writing to Bank; subject to a perfected first priority security interest in favor of Bank; owned by Borrower free and clear of any lien except in favor of Bank; not obsolete; not scrap, waste, defective goods and the like; have been produced by Borrower in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders promulgated thereunder; not stored with a bailee, warehouseman or similar party unless Bank has given its prior written consent thereto; not work in process; not perishable or alive; and have not been designated by Bank, in accordance with its normal credit policies, as unacceptable for any reason by notice to Borrower.

8.     **BANK'S REPORTS.**  After the end of each month, Bank will render to Borrower a statement of Borrower's Revolving Loan account with Bank hereunder, showing all applicable

credits and debits. Each statement shall be considered correct and to have been accepted by Borrower and shall be conclusively binding upon Borrower in respect of all charges, debits and credits of whatsoever nature contained therein under or pursuant to this Agreement, and the closing balance shown therein, unless Borrower notifies Bank in writing of any discrepancy within twenty (20) days from the mailing by Bank to Borrower of any such monthly statement.

9.    **CONDITIONS OF LENDING.**

(a)    The obligation of Bank to continue to make Revolving Loans hereunder or issuing or causing to be issued any Letter of Credit hereunder shall be subject to the condition precedent that Bank shall have received all of the following, each in form and substance satisfactory to Bank:

(i)    This Agreement, properly executed on behalf of the Company.

(ii)    The Note drawn to the order of Bank in the face amount of the Credit Limit.

(iii)    A true and correct copy of any and all leases pursuant to which Borrower is leasing any real property, together with a landlord's consent and waiver with respect to such real property.

(iv)    Current searches of appropriate filing offices showing that (A) no state or federal tax liens have been filed and remain in effect against Company, (B) no financing statements have been filed and remain in effect against Company, except those financing statements relating to liens set forth on Schedule "B", the liens of the secured lender to be paid with the proceeds of the initial Revolving Loan and those financing statements filed by the Bank, and (C) the Bank has duly filed all financing statements necessary to perfect the security interests granted hereunder, to the extent the security interests are capable of being perfected by filing.

(v)    A certificate of the Clerk/Secretary/Managing Member of the Company, certifying as to (A) the resolutions of the Managers/Directors and, if required, the Members/Shareholders of Company, authorizing the execution, delivery and performance of this Agreement and related documents, (B) the Certificate of Formation and Operating Agreement of Company, and (C) the signatures of the Managers, Members, officers or agents of Company authorized to execute and deliver this Agreement and other instruments, agreements and certificates, including Revolving Loan requests, on behalf of Company.

(vi)    A current certificate issued by the Secretary of State of the state of the Company's organization, certifying that Company is in compliance with all organizational requirements of such state.

(vii)   Evidence that Company is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.

(viii)   A current Borrowing Base Certificate.

(ix)   After giving effect to the Closing Date Restructuring and such other transactions to be consummated on the Closing Date not in contravention of this Agreement, Availability under the Borrowing Base is not less than $200,000.00 as of the date hereof.

(x)   Amended and Restated Intercreditor Agreement dated on or about the date hereof (as amended from time to time, the "**Crystal Intercreditor Agreement**"), with Crystal Financial SBIC LP, in its capacity as administrative and collateral agent (in such capacities, together with its successors and permitted assigns, "**Crystal**"), for the benefit and on behalf of the entities (each a "**Term Lender**" and collectively, and including their respective successors and assigns, the "**Term Lenders**"), who may from time to time become a "Lender" under (and as defined in) the Amended and Restated Term Loan Agreement dated as of the date hereof by and among, among others, the Borrowers, Crystal and the Term Lenders (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of the Crystal Intercreditor Agreement, the "**Crystal Term Loan Agreement**").

(xi)   A Customer Identification Information form and such other forms and verification as the Bank may need to comply with the U.S.A. Patriot Act.

(xii)   Such other documents, instruments and agreements as Bank in its reasonable discretion may require.

(xiii)   Consummation of the Closing Date Restructuring, including, for avoidance of doubt, the Debt Discharges and the Assignment and Debt Cancellation Agreement (as those terms are defined in the preamble to this Agreement).

(xiv)   the Guaranty from Holdings.

(b)   The obligation of Bank to make each Revolving Loan shall be subject to the further conditions precedent on such date:

(i)   the representations and warranties contained in Sections 3 and 4 hereof are correct in all material respects (without duplication of any materiality qualifier contained therein) on and as of the date of such Revolving Loan or the issuance of a Letter of Credit, as the case may be, as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date; and

(ii)   no event has occurred and is continuing, or would result from such Revolving Loan or issuance of such Letter of Credit, as the case may be, which constitutes

an Event of Default or which, with notice or the passage of time or both, would constitute an Event of Default.

## 10. CAPITAL ADEQUACY.

(a)     If Bank shall determine that, after the date hereof, the adoption of any applicable law, rule or regulation, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Bank or its parent corporation with any requirement or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:

(i)     shall subject Bank or its parent corporation to any tax, duty or other similar charge with respect to any Letter of Credit, the Revolving Loans or the Note or shall change the basis of taxation of payments to Bank or its parent corporation of the Obligations or reimbursement obligations of Letters of Credit or the principal of or interest on the Revolving Loans or of any other amounts due under this Agreement in respect of any Letter of Credit, the Revolving Loans or the Note (except for any change in respect of any tax imposed on the overall income of Bank or its parent corporation); or

(ii)     shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System) against assets of, deposits with or for the account of, or credit extended by, Bank or its parent corporation or shall impose on Bank or its parent corporation any other condition affecting any Letter of Credit, the Revolving Loans or the Note;

and the result of any of the foregoing is to increase the cost to Bank or its parent corporation of issuing or maintaining any Letter of Credit or of making or maintaining any Revolving Loans, or to reduce the amount of any sum received or receivable by Bank or its parent corporation under the application and agreement pursuant to which the Letter of Credit was issued, this Agreement or the Note with respect thereto, by an amount deemed by Bank or its parent corporation to be material, then upon demand by Bank, Borrower shall pay to Bank such additional amount or amounts as will compensate Bank or its parent corporation for such increased cost or reduction.

(b)     If Bank shall determine that the adoption after the date hereof of any applicable law, rule or regulation regarding capital adequacy, or any change therein after the date hereof, any change after the date hereof in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank or its parent corporation with any guideline or request issued after the date hereof regarding capital adequacy (whether nor not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Bank's or the Bank's parent corporation's capital as a consequence of any Letters of Credit, the Revolving Loans or the Bank's obligations hereunder to a level below that which the Bank or its parent corporation could have achieved but for such adoption, change or compliance (taking into consideration the Bank's policies with respect to

capital adequacy and those of the Bank's parent corporation) by an amount reasonably deemed to the Bank or its parent corporation to be material, then from time to time on demand by the Bank, the Borrower shall pay to the Bank such additional amount or amounts as will compensate the Bank or its parent corporation for such reduction.

(c)     Bank shall allocate such cost increases or reductions in its returns among its customers reasonably and in good faith and on an equitable basis.  Notwithstanding anything to the contrary contained herein, the Borrower shall not have any obligation to pay to the Bank amounts owing under this section unless, at the time it requests such compensation, it is the policy or general practice of the Bank to request compensation for comparable costs in similar circumstances under other comparable loan agreements.  Certificates of the Bank sent to the Borrower from time to time claiming compensation under this section, stating the reason therefor and setting forth in reasonable detail the calculation of the additional amount or amounts to be paid to the Bank hereunder shall be conclusive absent manifest error.  In determining such amounts, the Bank or its parent corporation may use any reasonable averaging and attribution methods consistent with the other provisions of this section.

11.     **COLLECTIONS; SET OFF; DEPOSIT ACCOUNTS; NOTICE OF ASSIGNMENT; EXPENSES; POWER OF ATTORNEY.**

(a)     Company will immediately, upon receipt of all checks, drafts, cash and other remittances in payment of any Inventory sold or in payment or on account of Company's accounts, contracts, contract rights, notes, bills, drafts, acceptances, general intangibles, choses in action and all other forms of obligations, deliver the same to Bank accompanied by a remittance report in form specified by Bank.  Said proceeds shall be delivered to Bank in the same form received except for the endorsement of Company where necessary to permit collection of items, which endorsement Company agrees to make.  Bank will credit (conditional upon final collection) all such payments, including electronic payments, against the principal or interest of any Revolving Loans secured hereby; provided, however, for the purpose of computing interest, the amount of principal paid shall continue to accrue interest at the applicable interest rate until two (2) Business Days after receipt by Bank of any such payment.  The order and method of such application shall be in the sole discretion of Bank and any portion of such funds which Bank elects not to so apply shall be paid over from time to time by Bank to Company. Bank will at all times have the right to require Company (i) to enter into a lockbox arrangement with Bank for the collection of such remittances and payments, or (ii) to maintain its deposit accounts at Bank, or, in the alternative, at another financial institution which has agreed to accept drafts drawn on it by Bank under a written depository transfer agreement with Bank and to block Company's account and waive its rights as against such account.

(b)     Borrower, Holdings and any other guarantor hereby grants to Bank a lien, security interest and right of setoff as security for all liabilities and Obligations to Bank, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Bank or in transit to the Bank.  At any time, without demand or notice, Bank may set off the same or any part thereof and apply the same to any liability or Obligation of Borrower, Holdings and any other guarantor even though unmatured and regardless of the adequacy of any other collateral securing the Obligations.

ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF BORROWER, HOLDINGS OR ANY OTHER GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

      (c)     Bank shall be Company's main bank of deposit. For each deposit account that Borrower at any time opens or maintains, Company shall, at Bank's request and option, pursuant to an agreement in form and substance satisfactory to Bank, either (i) cause the depository bank to agree to comply at any time with instructions from Bank to such depository bank directing the disposition of funds from time to time credited to such deposit account, without further consent of Company, or (ii) arrange for Bank to become the customer of the depository bank with respect to the deposit account, with Borrower being permitted, only with the consent of Bank, to exercise rights to withdraw funds from such deposit account. Bank agrees with Company that Bank shall not give any such instructions or withhold any withdrawal rights from Company, unless an Event of Default has occurred and is continuing, or, after giving effect to any withdrawal not otherwise permitted by this Agreement would occur. The provisions of this paragraph shall not apply to (i) any deposit account for which Company, the depository bank and Bank have entered into a cash collateral agreement specially negotiated among Borrower, the depository bank and Bank for the specific purpose set forth therein, (ii) deposit accounts specifically and exclusively used as trust accounts for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's salaried employees, (iii) deposit accounts which, in the aggregate, have less than Five Thousand ($5,000.00) Dollars on deposit, or (iv) a deposit account of any Borrower that contains solely the proceeds, or any portion thereof, of the PPP Loans (as that term is defined below in Section 15(j)).

      (d)     Bank may at any time, after the occurrence of an Event of Default or an event which, with notice or the passage of time or both, would constitute an Event of Default, notify account debtors that Collateral has been assigned to Bank and that payments shall be made directly to or as directed by Bank. Upon request of Bank at any time, Company will so notify such account debtors and will indicate on all billings to such account debtors that their Accounts must be paid directly to or as directed by Bank. Bank shall have full power to collect, compromise, endorse, sell or otherwise deal with the Collateral or proceeds thereof in its own name or in the name of Company.

      (e)     Borrower shall pay to Bank within five (5) days of demand any and all reasonable counsel fees and other expenses incurred by Bank in connection with the preparation, interpretation, enforcement, administration or amendment of this Agreement, or of any documents relating thereto, and any and all expenses, including, but not limited to, a collection charge on all Accounts collected, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Bank to obtain or enforce payment of any Account either as against the account debtor, Borrower, Holdings or any other guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Bank's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel

fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses incurred or paid by Bank in connection with the administration, supervision, protection or realization on any security held by Bank for the debt secured hereby, whether such security was granted by Borrower or Holdings or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Bank in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Bank in connection herewith, all of which amounts shall be considered advances to protect Bank's security, and shall be secured hereby. At its option, and without limiting any other rights or remedies, Bank may at any time pay or discharge any taxes, liens, security interests or other encumbrances at any time levied against or placed on any of the Collateral, and may procure and pay any premiums on any insurance required to be carried by Company, and provide for the maintenance and preservation of any of the Collateral, and otherwise take any action reasonably deemed necessary to Bank to protect its security, and all amounts expended by Bank in connection with any of the foregoing matters, including reasonable attorneys' fees, shall be considered obligations of Company and shall be secured hereby.

(f)     Company does hereby make, constitute and appoint any officer or agent of Bank as Company's true and lawful attorney−in−fact, with power to endorse the name of Company or any of Company's Managers, Members, officers or agents upon any notes, checks, drafts, money orders, or other instruments of payment (including payments payable under any policy of insurance on the Collateral) or Collateral that may come into possession of Bank in full or part payment of any amounts owing to Bank; to sign and endorse the name of Company or any of Company's Managers, Members, officers or agents upon any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with Accounts, and any instrument or documents relating thereto or to Company's rights therein; to give written notice to such office and officials of the United States Post Office to effect such change or changes of address so that all mail addressed to Company may be delivered directly to Bank; granting upon Company's said attorney full power to do any and all things necessary to be done in and about the premises as fully and effectually as Company might or could do, and hereby ratifying all that said attorney shall lawfully do or cause to be done by virtue hereof. Neither Bank nor the attorney shall be liable for any acts or omissions nor for any error of judgment or mistake, except for their gross negligence or willful misconduct. This power of attorney shall be irrevocable for the term of this Agreement and all transactions hereunder and thereafter as long as Company may be indebted to Bank. Notwithstanding anything to the contrary contained herein Bank shall not exercise the power of attorney granted herein unless and until there is an Event of Default which is continuing.

12.     **FINANCING STATEMENTS.** Company hereby irrevocably authorizes Bank at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of Company or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether Company is an organization, the type of organization and any organization identification number issued to

Company, and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted Collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. Company agrees to furnish any such information to Bank promptly upon request. Company also ratifies its authorization for Bank to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

13. **COMPANY'S REPORTS.**

(a) Borrower shall, upon the Bank's request, deliver to Bank, monthly, a schedule in form and content satisfactory to Bank describing the invoices issued by Borrower since the last schedule submitted to Bank. The schedules to be provided under this subsection are solely for the convenience of Bank in administering this Agreement and maintaining records of the Collateral. Borrower's failure to provide Bank with any such schedule shall not affect the security interest of Bank in such Accounts.

(b) Borrower shall, upon Bank's request, cause all of its invoices, including the copies thereof, to be printed and to bear consecutive numbers and shall prepare and issue its invoices in such consecutive numerical order. If requested by Bank, all copies of invoices not previously delivered to Bank shall be delivered to Bank with each schedule of Accounts. Copies of all invoices which are voided or canceled or which for any other reason do not evidence an Account shall be included in such delivery. If any invoice or copy thereof is lost, destroyed or otherwise unavailable, Borrower shall account in writing, in form satisfactory to Bank, for such missing invoice.

(c) Within thirty (30) calendar days after the end of each month or on such other more frequent basis as may be required by Bank from time to time, Borrower shall submit to Bank an aging report in form satisfactory to Bank showing the amounts due and owing on all Accounts according to Borrower's records as of the close of such month or such shorter period as may be required by Bank from time to time, together with such other information as Bank may require. If Borrower's monthly aging reports are prepared by an accounting service or other agent, Borrower hereby authorizes such service or agent to deliver such aging reports and any other related documents to Bank.

(d) Within thirty (30) calendar days after the end of each month or on such other basis as may be required by Bank from time to time, Borrower shall submit to Bank an accounts payable aging report in form satisfactory to Bank showing the amounts due and owing on all accounts payable according to Borrower's records as of the close of such month or such shorter period as may be required by Bank from time to time, together with such other information as Bank may require. If Borrower's monthly accounts payable aging reports are prepared by an accounting service or other agent, Borrower hereby authorizes such service or agent to deliver such accounts payable aging reports and any other related documents to Bank.

(e) Within thirty (30) calendar days after the end of each month or on such other more frequent basis as may be required by Bank from time to time, Borrower shall furnish to Bank a certificate describing all of Borrower's Inventory by value based on cost, listing all

Inventory by nature, quantity and location, together with such other information as Bank may require.

(f) Borrower shall deliver to Bank all documents, as frequently as indicated below, or at such other times as Bank may reasonably request, and all other documents and information reasonably requested by Bank:

|  | DOCUMENT | FREQUENCY DUE |
|---|---|---|
| (i) | A Borrowing Base Certificate, including cash receipts, credit memos, sales, debit memos, the unpaid Revolving Loan balance, new borrowing requests and the adjusted Revolving Loan balance | Monthly, reported within twenty (20) days after the end of each fiscal month of Borrower, together with a weekly accounts receivable roll forward reported each following Tuesday. |
| (ii) | List of names and addresses of account debtors to whom Borrower has made sales during the previous fiscal year | Annually, within sixty (60) days after the end of each fiscal year of Borrower |
| (iii) | Reconciliation report, in form satisfactory to Bank, showing all accounts, collections, payments, credits, and extensions since the preceding report | Monthly, within forty-five (45) days after the end of each fiscal month of Borrower |
| (iv) | Projections of Borrower's balance sheet, statement of profit and loss and cash flow for the next succeeding fiscal year broken down on a month to month basis | Annually, within seventy-five (75) days after the end of the fiscal year of Borrower ended December 31, 2021, and thereafter within sixty (60) days after the end of each following fiscal year of Borrower |
| (v) | A listing of the names and addresses of all suppliers and vendors from whom Borrower has made purchases during the previous fiscal year, together with a listing of any other suppliers or vendors from whom Borrower expects to make purchases during the succeeding fiscal year | Annually, within sixty (60) days after the end of each fiscal year of Borrower |
| (vi) | Notice of noncompliance with the provisions of this Agreement | Immediately upon learning of such noncompliance, or if any representation or warranty contained herein is no longer true or accurate |

| (vii) | Compliance Certificate in the form annexed hereto as Exhibit 2 | As soon as available and in any event within forty-five (45) days after the close of each quarterly period of Borrower's fiscal year |
|---|---|---|

(g)    Borrower will furnish Bank as soon as available, and in any event within forty-five (45) days after the close of each monthly period of its fiscal year, a balance sheet as of the end of such period, and a statement of income and retained earnings for the period commencing at the end of the previous fiscal year and ending with the end of such period, and a statement of cash flows of the Company (other than Holdings in the case of the fiscal months ended on December 31, 2021, January 31, 2022, as well as February 28, 2022 if the Closing Date falls after January 31, 2022) for the portion of the fiscal year ended with the last day of such period, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the previous fiscal year, and all prepared in accordance with generally accepted accounting principles consistently applied, certified by the chief financial officer of the Borrower (subject to year-end adjustment).

(h)    Borrower will furnish Bank, annually, as soon as available, and in any event within one hundred fifty (150) days after the end of the fiscal year of Borrower ended on December 31, 2021, and within one hundred twenty (120) days after the end of each following fiscal year of Borrower thereafter, audited financial statements of the Company (other than Holdings in the case of the fiscal year ended on December 31, 2021) including a balance sheet as of the end of such fiscal year, and a statement of income and retained earnings for such fiscal year, and a statement of cash flows for such fiscal year, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the prior fiscal year, and all prepared in accordance with generally accepted accounting principles, accompanied by an unqualified opinion prepared by independent public accountants selected by the Borrower and acceptable to Bank, provided however for the fiscal year of Borrower ended December 31, 2021 only, such opinion may be qualified.

(i)    Borrower will promptly, upon receipt thereof, deliver to Bank, copies of any reports submitted to the Company by Company's independent public accountants in connection with the examination of the financial statements of the Company made by such accountants (the so-called "**Management Letter**").

(j)    Borrower will furnish Bank, on or before 2:00 PM (Eastern Standard Time) on Thursday of each week (or if such day is not a Business day, on the next succeeding Business Day) (1) the Approved Budget, in form and substance reasonably satisfactory to the Bank, and prepared by the Borrower in good faith based upon reasonable assumptions for the period covered thereby; and (2) an Approved Budget Variance Report, in form and substance reasonably satisfactory to the

Bank and including supporting documentation as reasonably requested by the Bank from time to time.

(k)     In addition to the foregoing, the Borrower promptly shall provide Bank with such other and additional information concerning the Borrower, the Collateral, the operation of the Borrower's business, and the Borrower's financial condition, including financial reports and statements, as Bank may from time to time reasonably request from the Borrower. All financial information provided Bank by the Borrower shall be prepared in accordance with generally accepted accounting or auditing principles (as applicable) applied consistently in the preparation thereof and with prior periods to fairly reflect the financial conditions of the Borrower at the close of, and its results of operations for, the periods in question.

## 14.     GENERAL AGREEMENTS OF COMPANY.

(a)     Company agrees to keep all the Collateral insured with coverage and in amounts not less than that usually carried by one engaged in a like business and in any event not less than that required by Bank with loss payable to Bank and Company, as their interests may appear, hereby appointing Bank as attorney for Company in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts. As further assurance for the payment and performance of the Obligations, Company hereby assigns to Bank all sums, including returns of unearned premiums, which may become payable under any policy of insurance on the Collateral and Company hereby directs each insurance company issuing any such policy to make payment of such sums directly to Bank.

(b)     Bank or its agents have the right to inspect the Collateral and all records pertaining thereto at intervals to be determined by Bank and without hindrance or delay. Bank shall also have the right to obtain from time to time at the sole cost and expense of Bank an appraisal of the Collateral by an appraiser acceptable to Bank, provided however that following an Event of Default that has occurred and is continuing, such appraisal shall be conducted at Company's sole cost and expense.

(c)     Although, as above set forth, Bank has a continuing security interest in all of Company's Collateral and in the proceeds thereof, Borrower will at all times maintain as the minimum security hereunder a Borrowing Base not less than the aggregate unpaid principal of all Revolving Loans made hereunder and if Borrower fails to do so, Borrower will immediately make the necessary reduction in the unpaid principal amount of said Revolving Loans so that the Revolving Loans outstanding hereunder do not in the aggregate exceed the Borrowing Base.

(d)     Company will at all times keep accurate and complete records of Company's Inventory, Accounts and other Collateral, and Bank, or any of its agents, shall have the right, upon reasonable prior notice, to call at Company's place or places of business at intervals to be determined by Bank (but not more than two (2) times in any twelve (12) month period absent the occurrence of an Event of Default hereunder), and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence which relate to Company's Accounts, and other Collateral or other transactions, between the parties thereto and the general financial condition of Company (provided that any

such audit shall not unreasonably interfere with the normal business operations of Company) and Bank may remove any of such records temporarily for the purpose of having copies made thereof. Borrower shall pay to Bank an audit fee of One Thousand Fifty ($1,050.00) Dollars per day, per audit, plus expenses, provided, however, in no event shall the aggregate amount of the audit fees and expenses exceed Twenty Thousand ($20,000) Dollars per audit.

(e)     Company will maintain a standard and modern system of accounting which enables Company to produce financial statements in accordance with generally accepted accounting principles and maintain records pertaining to the Collateral that contain information as from time to time may be requested by Bank.

(f)     Company will maintain its legal existence in good standing and comply with all laws and regulations of the United States or of any state or states thereof or of any political subdivision thereof, or of any governmental authority which may be applicable to it or to its business.

(g)     Company will pay all real and personal property taxes, assessments and charges and all franchises, income, unemployment, old age benefits, withholding, sales and other taxes assessed against it, or payable by it at such times and in such manner as to prevent any penalty from accruing or any lien or charge from attaching to its property.

(h)     Bank may in its own name or in the name of others communicate with account debtors in order to verify with them to Bank's satisfaction the existence, amount and terms of any Accounts.

(i)     This Agreement may but need not be supplemented by separate assignments of Accounts and if such assignments are given the rights and security interests given thereby shall be in addition to and not in limitation of the rights and security interests given by this Agreement.

(j)     If any of Company's Accounts arise out of contracts with the United States or any department, agency, or instrumentality thereof, Company will immediately notify Bank thereof in writing and execute any instruments and take any steps required by Bank in order that all monies due and to become due under such contracts shall be assigned to Bank and notice thereof given to the Government under the Federal Assignment of Claims Act.

(k)     If any of Company's Accounts should be evidenced by promissory notes, trade acceptances, or other instruments for the payment of money, Company will immediately deliver same to Bank, appropriately endorsed to Bank's order and, regardless of the form of such endorsement, Company hereby waives presentment, demand, notice of dishonor, protest and notice of protest and all other notices with respect thereto.

(l)     If any goods are at any time in the possession of a bailee, Company shall promptly notify Bank thereof and, if requested by Bank, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to Bank, that the bailee holds such Collateral for the benefit of Bank and shall act upon the instructions of Bank, without the further consent of

Company.  Bank agrees with Company that Bank shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by Company with respect to the bailee.

(m)     If Company is at any time a beneficiary under a letter of credit now or hereafter issued in favor of Company, Company shall promptly notify Bank thereof and, at the request and option of Bank, Company shall, pursuant to an agreement in form and substance satisfactory to Bank, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Bank of the proceeds of any drawing under the letter of credit, or (ii) arrange for Bank to become the transferee beneficiary of the letter of credit, with Bank agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied in the same manner as any other payment on an Account.

(n)     If Company shall at any time hold or acquire a commercial tort claim, Company shall immediately notify Bank in a writing signed by Company of the brief details thereof and grant to Bank in such writing a security interest therein, and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Bank.

(o)     Company will promptly pay when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement, or upon any note or notes evidencing the Obligations, and will, at the request of Bank, promptly furnish Bank the receipted bills therefor.  At its option, Bank may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral, may pay for insurance on the Collateral and may pay for the maintenance and preservation of the Collateral.  Company agrees to reimburse Bank on demand for any payments made, or any expenses incurred by Bank pursuant to the foregoing authorization, and upon failure of the Company so to reimburse Bank, any such sums paid or advanced by Bank shall be deemed secured by the Collateral and constitute part of the Obligations.

(p)     Company shall promptly notify Bank upon receipt of notification of any potential or known release or threat of release of any Hazardous Substances under any Environmental Law.  As used herein, the following terms shall have the following meanings:

"**Hazardous Substances**" means pollutants, contaminants, hazardous substances, hazardous wastes, petroleum and fractions thereof, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law; and

"**Environmental Law**" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

(q)     Except for Bank's gross negligence or willful misconduct, Company will indemnify and save Bank harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Bank may sustain or incur by reason of defending or protecting this security interest or the priority thereof or enforcing the

Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of Bank's agreement to make Revolving Loans available to Borrower and the termination of this Agreement.

(r)      At the option of Bank, Company will furnish to Bank, from time to time, within five (5) days after the accrual in accordance with applicable law of Company's obligation to make deposits for F.I.C.A. and withholding taxes and/or sales taxes, proof satisfactory to Bank that such deposits have been made as required.

(s)      Should Company fail to make any of such deposits or furnish such proof then Bank may, in its sole and absolute discretion, (a) make any of such deposits or any part thereof, (b) pay such taxes, or any part thereof, or (c) set−up such reserves as Bank, in its judgment, shall deem necessary to satisfy the liability for such taxes. Each amount so deposited or paid shall constitute an advance under the terms hereof, repayable on demand with interest, as provided herein, and secured by all Collateral and any other property at any time pledged by Company with Bank. Nothing herein shall be deemed to obligate Bank to make any such deposit or payment or set−up such reserve and the making of one or more of such deposits or payments or the setting−up of such reserve shall not constitute (i) an agreement on Bank's part to take any further or similar action, or (ii) a waiver of any default by Company under the terms hereof.

(t)      All advances by Bank to Borrower under this Agreement and under any other agreement constitute one general revolving fluctuating loan, and all indebtedness of Borrower to Bank under this and under any other agreement constitute one general Obligation. Each advance to Borrower hereunder or otherwise shall be made upon the security of all of the Collateral held and to be held by Bank. It is distinctly understood and agreed that all of the rights of Bank contained in this Agreement shall likewise apply, insofar as applicable, to any modification of or supplement to this Agreement and to any other agreements between Bank and Borrower. Any default of this Agreement by Borrower shall constitute, likewise, a default by Borrower of any other existing agreement with Bank, and any default by Borrower of any other agreement with Bank shall constitute a default of this Agreement. All Obligations of Borrower to Bank shall become due and payable upon termination of this Agreement.

(u)      Company hereby grants to Bank for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations of any kind or character owing from Company to Bank are fully paid and discharged, the right to use all premises or places of business which Company presently has or may hereafter have and where any of the Collateral may be located, at a total rental for the entire period of $1.00. Bank agrees not to exercise the rights granted in this paragraph unless and until Bank determines to exercise its rights against the Collateral.

(v)      Company will, at its expense, upon request of Bank promptly and duly execute and deliver such documents and assurances and take such actions as may be necessary or desirable or as Bank may request in order to correct any defect, error or omission which may at any time be discovered or to more effectively carry out the intent and purpose of this Agreement and to

establish, perfect and protect Bank's security interest, rights and remedies created or intended to be created hereunder. Without limiting the generality of the above, Company will join with Bank in executing notices appropriate under applicable Federal or state law in form satisfactory to Bank and filing the same in all public offices and jurisdictions wherever and whenever requested by Bank.

(w)     Company shall perform any and all further steps requested by Bank to perfect Bank's security interest in Inventory, such as leasing warehouses to Bank or its designee, placing and maintaining signs, appointing custodians, maintaining membership records and transferring Inventory to warehouses. A physical listing of all Inventory, wherever located, shall be taken by Company at least annually and whenever requested by Bank if one or more of the Events of Default exist.

(x)     Company hereby grants to Bank for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations of any kind or character owed to Bank are fully paid and discharged, a non−exclusive irrevocable royalty−free license in connection with Bank's exercise of its rights hereunder, to use, apply or affix any trademark, trade name logo or the like and to use any patents, in which the Company now or hereafter has rights, which license may be used by Bank upon and after the occurrence of any one or more of the Events of Default, provided, however, that such use by Bank shall be suspended if such Events of Default are cured. This license shall be in addition to, and not in lieu of, the inclusion of all of Company's trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses in the Collateral; in addition to the right to use said Collateral as provided in this paragraph, Bank shall have full right to exercise any and all of its other rights regarding Collateral with respect to such trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses.

(y)     Company covenants and agrees that during the term of this Agreement, neither Company nor any of its owners, subsidiaries or affiliates shall, directly or indirectly, by operation of law or otherwise (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in Section 4(l) above, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempt to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and Company shall deliver to Bank any certification or other evidence requested from time to time by Bank in its reasonable discretion, confirming Company's compliance with this section, or (iv) cause or permit any of the funds of Company that are used to repay any loans to be derived from any unlawful activity with the result that the making of any loans would be in violation of law.

(z)     Company covenants and agrees that during the term of this Agreement, neither Company nor any of its owners, subsidiaries or affiliates shall, directly or indirectly, by operation of law or otherwise, knowingly cause or permit (i) any of the funds or properties of Company or any of its owners, subsidiaries or affiliates that are used to repay any loans to constitute property of, or be beneficially owned directly or indirectly by, any person subject to sanctions or trade restrictions under United States law (**"Embargoed Person"** or **"Embargoed**

**Persons**") that is identified on (A) the "List of Specially Designated Nationals and Blocked Person" (the "**SDN List**") maintained by OFAC and/or on any other similar list ("**Other List**") maintained by OFAC pursuant to any authorizing statutes including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or regulation promulgated thereunder, with the result that the investment in Company (whether directly or indirectly) is prohibited by law, or any loans made by Bank would be in violation of law, or (B) the Executive Order, any related enabling legislation or any other similar Executive Orders, or (ii) any Embargoed Person to have any direct or indirect interest, or any nature whatsoever in Company or any of its owners, subsidiaries or affiliates, with the result that the investment in Company (whether directly or indirectly) is prohibited by law or any of the transactions contemplated hereunder is in violation of law.

15. **COMPANY'S NEGATIVE COVENANTS.** Company will not at any time:

(a)     (Holding Company Status) Except as expressly permitted under this Agreement, Holdings shall not engage in any business or activity, hold any assets or incur any indebtedness or other liabilities, other than (i) the direct or indirect ownership of all outstanding membership interests of the Borrowers, (ii) maintenance of its corporate existence, (iii) the participation in tax, accounting and other administrative activities as a member of the consolidated group of companies including the Borrowers and (iv) the execution, delivery and the performance of its rights and obligations under  (A) this Agreement, the Guaranty and the Security Agreement (Pledged Collateral), and (B) the Crystal Term Loan Agreement and the other Loan Documents (as defined in the Crystal Term Loan Agreement) to which Holdings is a party, as such Loan Documents may be amended from time to time consistent with the Crystal Intercreditor Agreement, and (C) the PPP Loan Guaranty; provided that, such covenant shall not restrict any action taken by Holdings necessary to consummate the Closing Date Restructuring as expressly outlined in the related closing documents;

(b)     (Minimum Consolidated Fixed Charge Coverage Ratio) as of the end of each fiscal quarter with respect to the immediately preceding twelve (12) month period ending March 31, 2023, and for each twelve (12) month period ending at the end of each fiscal quarter thereafter, permit the Consolidated Fixed Charge Coverage Ratio to be less than 1 to 1; notwithstanding the foregoing, the Company shall have fifteen (15) days following the day on which financial statements are required to be delivered to provide the Bank with evidence of a cash equity infusion in an amount sufficient to maintain the required minimum Consolidated Fixed Charge Coverage Ratio, provided however no more than two such equity cures will be permitted in any twelve (12) month period (the "**Permitted Equity Cure(s)**");

(c)     (Minimum Availability) permit its Availability to be less than Two Hundred Thousand ($200,000.00) Dollars as at the end of any weekly period; provided that, this covenant shall be suspended in the event that (x) the Company furnishes the Bank with evidence of compliance with the Consolidated Fixed Charge Coverage Ratio set forth more fully in Section 15(b) for the period ending March 31, 2023, or (y) if an Event of Default exists due to the Company's failure to comply with the Consolidated Fixed Charge Coverage Ratio set forth more fully in Section 15(b) for the period ending March 31, 2023, the Company has timely cured such Event of Default in accordance with Section 15(b), and further provided no other Event of Default

under Section 16(a)(i), (ii), (x), or (xi) has occurred and is continuing and the Agreement hasn't been previously terminated. The term "**Availability**" as used herein shall mean the amount by which the Borrowing Base exceeds the aggregate amount of Revolving Loans, including the sum of the aggregate amount undrawn on all Letters of Credit and acceptances issued for the account of Borrower, plus the aggregate unrestricted cash of Company on deposit in an account maintained at Bank or subject to a deposit account control agreement in favor of Bank. Company shall deliver a Compliance Certificate to the Bank weekly on Thursday of each week reporting the Availability as of Tuesday of such weekly period in addition to Company's delivery of quarterly Compliance Certificates as required pursuant to Section 13(f)(vii) hereof.

(d)  (Disposition of Collateral) sell, assign, exchange or otherwise dispose of any of the Collateral, other than (i) dispositions of Inventory consisting of (w) scrap, waste, defective goods and the like; (x) obsolete goods; (y) finished goods sold in the ordinary course of business or any interest therein to any individual, partnership, trust, corporation or limited liability company; and (z) Equipment which is no longer required or deemed necessary for the conduct of Borrower's business, so long as Borrower receives therefor a sum substantially equal to such Equipment's fair market value, remits such sum to Bank in accordance with the terms of this Agreement or replaces such Equipment with other equipment of similar value which is subject to a first security interest in Bank's favor, (ii) sales, assignments, leases, subleases, conveyances, transfers, and other dispositions of any Collateral (other than Inventory exceeding $250,000) by any Borrower to any other Borrower, (iii) so long as no Event of Default then exists or would arise therefrom, sales, assignments, leases, conveyances, transfers, and other dispositions not otherwise permitted under this Section 15(d) in an amount up to $100,000 in the aggregate in any calendar year and (iv) dispositions necessary to consummate the Closing Date Restructuring as expressly outlined in the related closing documents. Notwithstanding the foregoing, up to Six Million Three Hundred Thousand ($6,300,000) Dollars Inventory of Borrower may be sold via non-ordinary course bulk transactions for less than fifty (50%) percent of cost, but greater than twenty-five (25%) percent of cost (the "**Permitted Non-Ordinary Course Inventory Sales**") and an additional inventory component of the Borrowing Base entitled "**Other Inventory**") shall be created such that the Permitted Non-Ordinary Course Inventory Sales permitted hereunder shall remain liquidity neutral after giving effect to the removal of the subject Inventory from the Borrowing Base. The amount of the Other Inventory draws are the product of the value of the inventory in the Borrowing Base (50% of cost) prior to the Permitted Non-Ordinary Course Sales minus the receipts from the Permitted Non-Ordinary Course Sales of the inventory (as long as such sales are less than 50% of cost but greater than or equal to 25% of cost). The additional Availability of the Other Inventory shall be limited to a maximum of One Million ($1,000,000) Dollars and shall be subject to and supported by documentation acceptable to the Bank. Draws will be permitted through December 31, 2022 on a one-time basis, and shall be amortized as outlined more fully in Section 5(c) above;

(e)  (Liens) create, permit to be created or suffer to exist any lien, encumbrance or security interest of any kind ("**Lien**") upon any of the Collateral or any other property of Borrower, now owned or hereafter acquired, other than the Liens in favor of Crystal as described in the Crystal Intercreditor Agreement, whether now existing or hereafter arising, and except for: (i) landlords', carriers', warehousemen's, mechanics' and other similar Liens arising by operation of law in the ordinary course of Borrower's business; (ii) Liens arising out of pledge or deposits

under worker's compensation, unemployment insurance, old age pension, social security, retirement benefits or other similar legislation; (iii) purchase money Liens arising in the ordinary course of business for the purchase of equipment (so long as the indebtedness secured thereby does not exceed the lesser of the cost or fair market value of the property subject thereto, and such Lien extends to no other property); (iv) Liens for unpaid taxes that are either (x) not yet due and payable, or (y) are subject of permitted protests; (v) Liens which are the subject of permitted protests; (vi) those Liens and encumbrances set forth on Schedule "B" annexed hereto; and (vii) Liens in favor of Bank; the term "permitted protests" as used herein means the right of the Borrower to protest any Lien (other than a Lien that secures the Obligations), tax (other than payroll taxes or taxes that are the subject of a federal or state tax Lien) or rental payment, provided that (x) a reserve with respect to such liability is established on the books of the Borrower in an amount that is reasonably satisfactory to the Bank, (y) any such protest is instituted and diligently prosecuted by the Borrower in good faith, and (z) the Bank is satisfied that, while such protest is pending, there will be no impairment of the enforceability, validity or priority of any of the Liens of the Bank in and to the Collateral; and provided however that any Lien created or suffered to exist which is not permitted hereby shall be removed on or bonded within thirty (30) days from the date of Borrower's knowledge thereof unless such Lien impairs the enforceability, validity or priority of the Bank's Lien on the Collateral in which no grace period shall be applicable;

(f)     (Redemptions, Distributions, Etc.) purchase, acquire, redeem, retire, or make any commitments to purchase, acquire, redeem or retire any membership or stock interest of Company whether now or hereafter outstanding or declare, pay or make any distributions to its members or shareholders, excepting only that (i) Company may declare and make dividend payments or other distributions with respect to its common stock payable solely in additional shares of its common stock and (ii) Holdings may make Tax Distributions;

(g)     (Changes to Operating Agreement) make or permit to be made any material changes to the Operating Agreement of Company without first obtaining the prior written consent of Bank, such consent not to be unreasonably withheld or delayed;

(h)     (Loans) make any loans or advances to any individual, partnership, trust, corporation or other limited liability company, including without limitation Borrower's Managers, Members, officers or employees, except (i) advances to officers or employees with respect to expenses incurred by them in the ordinary course of their duties which are properly reimbursable by Borrower and (ii) loans or advances made by a Borrower to any other Borrower so long as such indebtedness is permitted under Section 15(j)(ii) below and does not exceed Five Hundred Thousand ($500,000.00) Dollars in the aggregate absent the Bank's prior written consent;

(i)     (Guarantees) assume, guaranty, endorse or otherwise become directly or contingently liable in respect of (including without limitation by way of agreement, contingent or otherwise, to purchase, provide funds to or otherwise invest in a debtor or otherwise to assure a creditor against loss), any indebtedness (except guarantees by endorsement of instruments for deposit or collection in the ordinary course of business and guarantees in favor of Bank) of any individual, partnership, trust, corporation or other limited liability company, except for existing and future guarantees and other contingent obligations under (i) the Crystal Term Loan Agreement

and (ii) that certain PPP Loan Guaranty (as that term is defined at the conclusion of this Section 15 below);

(j)      (Indebtedness) issue evidence of indebtedness or suffer to exist indebtedness in addition to indebtedness to the Bank except (i) indebtedness or liabilities of the Borrower other than for money borrowed, incurred or arising in the ordinary course of business, (ii) indebtedness of the Borrower for money borrowed which has been subordinated to Bank on terms and conditions satisfactory to the Bank, (iii) indebtedness to the Term Lenders under the Crystal Term Loan Agreement, (iv) indebtedness relating to Permitted Liens, or (v) unsecured indebtedness under the Paycheck Protection Program of the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116–136 (2020), as amended (the "**CARES Act**") in an aggregate principal amount not to exceed $2,000,000 (the "**PPP Loans**"), and (vi) Subordinated Institutional Indebtedness in an aggregate principal amount not to exceed $5,000,000 (plus any accrued unpaid interest on such Subordinated Institutional Indebtedness, including interest that is paid in kind and added to the principal amount in accordance with the applicable Subordinated Institutional Promissory Note), so long as such Indebtedness is at all times unsecured and subject to the subordination provisions set forth in the applicable Subordinated Institutional Promissory Note. Each Borrower shall take all necessary steps to ensure that the indebtedness thereunder shall at all times be subordinated in right of payment to the Obligations, except as specifically permitted by the Subordination Provisions set forth in each Subordinated Institutional Promissory Note;

(k)      (Investments) (i) use any loan proceeds to purchase or carry any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System) or (ii) invest in or purchase any stock or securities of any individual, partnership, trust, corporation or other limited liability company except (x) readily marketable direct obligations of, or obligations guaranteed by, the United States of America or any agency thereof, (y) time deposits with or certificates of deposit issued by the Bank or (z) receipt of dividend payments or other distributions with respect to any Company's common stock payable solely in additional shares of such Company's common stock as permitted under Section 15(f);

(l)      (Transactions with Affiliates) enter into any lease or other transaction with any Manager, Member or affiliate of Company except (i) as expressly permitted by this Agreement, (ii) transactions in the ordinary course of business and pursuant to the reasonable requirements of the business of Company upon fair and reasonable terms no less favorable to Company than would be obtained in a comparable arm's length transaction with a person not an affiliate of Company, (iii) advances to officers or employees permitted under Section 15(h), (iv) payments of rent to any landlord that is an affiliate of Company in an aggregate amount not to exceed the lesser of (x) the pass-through cost of such landlord's applicable mortgage debt service obligations, payable no more than monthly in advance, and (y) $190,677 in any fiscal year, (v) payments or contributions to an insurance loss fund maintained by an affiliate of Company in an aggregate amount not to exceed the pass-through cost of expenses related to the maintenance of insurance for Company (excluding, for the avoidance of doubt, expenses related to the maintenance of insurance of any affiliate of Company) in any fiscal year, and (vi) the Closing Date Restructuring as expressly outlined in the related closing documents;

(m)      (Management Fees) pay any management fees;

(n)    (Subsidiaries) sell, transfer or otherwise dispose of any ownership interest of any subsidiary of Borrower unless such disposition is expressly outlined in the Closing Date Restructuring closing documents;

(o)    (Mergers, Consolidations or Sales) except as expressly outlined in the Closing Date Restructuring closing documents, (i) merge or consolidate with or into any corporation or limited liability company; (ii) enter into any joint venture or partnership with any person, firm, corporation or limited liability company; (iii) convey, lease or sell all or any material portion of its property or assets or business to any other person, firm, corporation or limited liability company, except for dispositions permitted under Section 15(d) above; or (iv) convey, lease or sell any of its assets to any person, firm, corporation or limited liability company for less than the fair market value thereof, excepting however Permitted Non-Ordinary Course Business Sales; or

(p)    (Change in Legal Status) absent the prior written consent of the Bank, such consent not to be unreasonably withheld or delayed, (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction or organization or other legal structure. If the Borrower does not have an organizational identification number and later obtains one, the Borrower shall forthwith notify the Bank of such organizational identification number;

(q)    (Payment of Subordinated Institutional Indebtedness). No Company shall, and no Company shall permit any of its subsidiaries to make a payment with respect to Subordinated Institutional Indebtedness that would constitute a "Restricted Payment" under clause (iii) of the definition thereof, except that (v) upon and following the Subordinated Institutional Indebtedness Maturity Date, Borrowers may make payments of principal and interest to the holders of Subordinated Institutional Indebtedness permitted by Section 15(j)(vi) in accordance with the terms of the applicable Subordinated Institutional Promissory Note so long as (i) no Event of Default has occurred and is continuing or will occur immediately after giving effect to such payment; (ii) on the date of such payment and after giving pro forma effect thereto, the Borrowers shall have not less that $2,500,000 of Borrowing Base availability (subject to the Credit Limit); and (iii) the Borrowers shall have provided the Bank with a certification certifying that the foregoing conditions have been satisfied, which certification shall include a current Borrowing Base Certificate reflecting availability after giving effect to the applicable payment; provided that, if any such payments on the Subordinated Institutional Indebtedness are not permitted to be paid hereby or for any other reason, interest shall be permitted to accrue on the Subordinated Institutional Indebtedness until paid.

(r)    (Amendments to Subordinated Institutional Indebtedness). No Company shall, and no Company shall permit any of its subsidiaries directly or indirectly to, amend, or modify any Subordinated Institutional Promissory Note without the prior written consent of the Bank in a manner that would (i) increase the rates of interest set forth therein as in effect on the First Amendment Effective Date (other than any increase occurring because of the imposition of the default rate thereunder), (ii) shorten the maturity of the Subordinated Institutional Indebtedness set forth therein as in effect on the First Amendment Effective Date, (iii) amend the subordination

provisions set forth therein as in effect on the First Amendment Effective or (iv) otherwise violate the terms of this Agreement.

For purposes of this section:

"**affiliate**" shall mean any person or entity (i) which directly or indirectly controls, or is controlled by or is under common control with the Company or a subsidiary, (ii) which directly or indirectly beneficially holds or owns five (5%) percent or more of any class of membership interest of the Company or any subsidiary, or (iii) five (5%) percent or more of the membership interest of which is directly or indirectly beneficially owned or held by the Company or a subsidiary;

"**Capital Expenditures**" shall mean for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset;

"**Capital Lease**" means, with respect to any person, any lease of, or other arrangement conveying the right to use, any property by such person as lessee that has been or should be accounted for as a capital lease on a balance sheet of such person prepared in accordance with GAAP;

"**Consolidated**" means, when used to modify a financial term, test, statement, or report of a Company, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial position, cash flows, or operating results of each Company;

"**Consolidated EBITDA**" means, for any period, for the Company and its subsidiaries on a Consolidated basis, an amount equal to Consolidated Net Income for such period plus (i) the following to the extent deducted in calculating such Consolidated Net Income, without duplication: (A) Consolidated Interest Expense for such period, (B) the provision for federal, state, local and foreign income taxes (including by way of tax distributions under Section 15(f) hereof) payable by the Company and its subsidiaries for such period, (C) depreciation and amortization expense, (D) payments made or accrued under any applicable management agreements to the extent permitted under Section 15(m), (E) non-cash charges (including, without limitation, non-cash expenses related to stock-based compensation and incentives) other than charges constituting an accrual or reserve for cash expenditures to be made, or anticipated to be made, in a future period or relating to a write-down, write-off or reserve with respect to accounts receivable or Inventory, (F) expenses paid with the proceeds of business interruption insurance, (G) expenses that have been indemnified or reimbursed in cash by unaffiliated third parties, or are reasonably expected to be so indemnified or reimbursed within one hundred eighty (180) days after the accrual thereof pursuant to a written contractual obligation, (H) restructuring, integration, recruiting and severance costs, including legal costs related to overall recapitalization and credit agreements, (I) [deleted] (J) payments to the Crystal Investor, the Portman Ridge Investor and the KODA Investor for accounting and legal fees not to exceed $500,000, (K) CRO expenses, (L) losses on sales of Inventory including write-downs and costs of liquidators, (M) one-time costs related to closing/consolidation of operating facilities, (N) [deleted], and (O) Permitted Equity Cure amounts, and minus (ii) the following to the extent included in calculating such Consolidated Net Income, without duplication: (A) federal, state, local and foreign income tax credits of the Company and its subsidiaries for such period, (B) extraordinary gains for such period, (C) all non-cash items increasing such Consolidated Net Income for such period, (D) any reversal of a

reserve or any cash expenditures, in each case, made in respect of any non-cash charge that was added back in such period or a prior period, and (E) amounts that were added back in a prior period in respect of expenses that were reasonably expected to be indemnified or reimbursed in cash by unaffiliated third parties within one hundred eighty (180) days after the accrual thereof pursuant to a written contractual obligation, to the extent that such expenses were not so indemnified or reimbursed within such one hundred eighty (180) day period.

**"Consolidated Fixed Charge Coverage Ratio"** means, with respect to the Company on a Consolidated basis for any period, the ratio of (i) the result of (A) Consolidated EBITDA for such period minus (B) the sum of (1) unfinanced Capital Expenditures paid in cash during such period, plus (2) the aggregate amount (but not less than $0) of federal, state, local and foreign income taxes paid in cash (including by way of tax distributions under Section 15(f) hereof) during such period plus (3) Restricted Payments paid in cash during such period, to (ii) Debt Service Charges paid in cash during such period;

**"Consolidated Interest Expense"** means, with respect to the Company on a Consolidated basis for any period, (i) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, (ii) all interest paid or payable with respect to discontinued operations, (iii) the portion of rent expense under Capital Leases that is treated as interest in accordance with GAAP, and (iv) any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk;

**"Consolidated Net Income"** means, with respect to the Company and its subsidiaries for any period, the aggregate of the net income (loss) of the Company and its subsidiaries for such period, on a Consolidated basis, and otherwise determined in accordance with GAAP; provided that Consolidated Net Income shall exclude (a) the net income of any Company or subsidiary during such period to the extent that the declaration or payment of dividends or similar distributions by such Company or subsidiary of such income is not permitted by operation of the terms of its organization documents or any agreement, instrument or applicable law to such Company or subsidiary during such period, except that the Company's or subsidiary's equity in any net loss of any such Company or subsidiary for such period shall be included in determining Consolidated Net Income, (b) any income (or loss) for such period of any person if such person is not a subsidiary, except that the Company's equity in the net income of any such person for such period shall be included in Consolidated Net Income up to the aggregate amount of cash actually distributed by such person during such period to the Company or a subsidiary as a dividend or other distribution (and in the case of a dividend or other distribution to a subsidiary, such subsidiary is not precluded from further distributing such amount to the Company as described in clause (b) of this proviso) and (c) income from forgiveness of all or any portion of the PPP Loans;

**"control"** shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any person or entity, whether through the ownership of voting securities, by contract or otherwise;

**"Debt Service Charges"** means, for any period, the sum of (a) Consolidated Interest Expense plus (b) all scheduled principal payments made or required to be made on account of indebtedness for

borrowed money (including, without limitation, obligations with respect to Capital Leases for such period (excluding, for the avoidance of doubt, all voluntary and mandatory prepayments and all principal payments made in connection with any revolving credit facility which do not result in a permanent reduction of such facility), in each case determined in accordance with GAAP;

**"distributions"** shall mean all payment or distributions to members in cash or in property other than reasonable salaries, bonuses and expense reimbursements;

**"GAAP"** means generally accepted accounting principles in the United States of America, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions and comparable stature and authority within the accounting profession) that are applicable to the circumstances as of the date of determination;

**"indebtedness"** shall mean (i) all liabilities for borrowed money, for the deferred purchase price of property or services, and under leases which are or should be, under generally accepted accounting principles, recorded as Capital Leases, in respect of which a person or entity is directly or indirectly, absolutely or contingently liable as obligor, guarantor, endorser or otherwise, or in respect of which such person or entity otherwise assures a creditor against loss, (ii) all liabilities of the type described in (i) above which are secured by (or for which the holder has an existing right, contingent or otherwise, to be secured by) any lien upon property owned by such person or entity, whether or not such person or entity has assumed or become liable for the payment thereof, and (iii) all other liabilities or obligations which would, in accordance with generally accepted accounting principles, be classified as liabilities of such person or entity;

**"interest"** shall mean, for the applicable period, all interest paid, including, but not limited to, interest paid on indebtedness and on Capital Leases, determined in accordance with generally accepted accounting principles;

**""PPP Loans""** shall have the meaning ascribed to that term in Section 15(j).

**""PPP Loan Guaranty""** means that certain Guaranty and Reimbursement Agreement dated on or about of even date of this Agreement by and between the Company and ProAir Holdings Corporation whereby the Company guarantees ProAir Holdings Corporation's obligations under the PPP Loans.

**"Restricted Payments"** means (i) dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any stock or stock equivalent, (ii) purchases, redemptions or other acquisitions for value any stock or stock equivalent now or hereafter outstanding, (iii) any payment or prepayment of principal of, premium, if any, interest, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to, indebtedness (including, without limitation, any subordinated indebtedness), or (iv) payments of any management, consulting, advisory or similar fees to any of Company's equity holders, or any of their respective affiliates;

"**subordinated indebtedness**" shall mean indebtedness which is expressly stated to be subordinated or junior in right of payment to Company's Obligations to Bank in a manner and in a form which is satisfactory to Bank;

""**Tax Distributions**"" means, for so long as any Company is a member of a group filing a consolidated, combined or unitary tax return with any direct or indirect parent of such Company, tax distributions made to a direct or indirect holder of stock of a Company in amounts required for such parent to pay its federal, state and local tax liabilities attributable to the Company, reduced by any such taxes paid directly by any Company to the relevant taxing authority; *provided* that, the amount of such payments with respect to any fiscal year does not exceed the amount that Company would have been required to pay in respect of such taxes for such fiscal year if Company paid such taxes as a standalone consolidated, combined or unitary tax group, *provided further*, that Tax Distributions may be made not more frequently than quarterly with respect to each period for which an installment of estimated tax would be required to be paid by the direct or indirect holders of stock of Company, except that an additional final Tax Distribution may be made after the final tax liabilities of Company has been determined;

Notwithstanding anything to the contrary in this Agreement, the PPP Loans and any principal and interest payments thereon and proceeds thereof shall be excluded from calculation of the financial covenants set forth in this Section 15, except that if any portion of the PPP Loans are not forgiven, for purposes of calculating such foregoing financial covenants, the unforgiven portion will not be disregarded.

16.    **DEFAULT; RIGHTS AND REMEDIES UPON DEFAULT.**

(a)    Upon the occurrence of any one or more of the following events (herein, "**Events of Default**"), Bank may decline to make any or all further Revolving Loans or issue Letters of Credit hereunder or under any other agreements with Borrower or Holdings, any and all Obligations of the Company to Bank shall become immediately due and payable, at the option of Bank and without notice or demand.  The occurrence of any such Event of Default shall also constitute, without notice or demand, a default under all other agreements between Bank and the Company and instruments and papers given Bank by the Company, whether such agreements, instruments, or papers now exist or hereafter arise, namely:

(i)    The failure by the Company to pay when due any principal, interest, fees, costs, and expenses due pursuant to this Agreement other than as a result of Lender's failure to timely debit Company's loan account for the amount of such payment.

(ii)    The failure by the Company to pay, within ten (10) days of becoming due, any other Obligations.

(iii)    Default by the Company in the observance or performance of any of the covenants or agreements of the Company contained in Sections 11(a), 13(f)(vii) or 15 of this Agreement.

(iv)    The failure by the Company to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to any of the provisions of this Agreement, other than those described in Sections 5(b), 5(g), 5(h), 11(a), 11(d), 13(f)(vii), 15, or in any other agreement with Bank which is not remedied within the earlier of thirty (30) days after (i) notice thereof by Bank to Company, or (ii) the date Company was required to give notice to Bank pursuant to Section 13(f)(vi) hereof.

(v)    The determination by Bank that any representation or warranty heretofore, now or hereafter made by the Company to Bank, in any documents, instrument, agreement, or paper was not true or accurate when given in any material respect.

(vi)    The occurrence of any event such that any material indebtedness of the Company from any lender other than Bank could be accelerated, notwithstanding that such acceleration has not taken place including, without limitation, indebtedness of Company to Crystal or under the Subordinated Institutional Promissory Notes.

(vii)    The occurrence of any event which would cause a lien creditor, as that term is defined in Section 9−102 of the Code, to take priority over advances made by Bank.

(viii)    A filing against or relating to the Company of (A) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (B) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state.

(ix)    The occurrence of any event of default under any agreement between Bank and the Company or instrument or paper given Bank by the Company, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Bank may not have exercised its rights upon default under any such other agreement, instrument or paper).

(x)    Any act by, against, or relating to the Company, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of the Company's property, which is not discharged within thirty (30) days, provided however, that there shall be no cure period for any such voluntary act by the Company (provided hereunder during said period Bank shall not be obligated to make any advances hereunder), and provided further that with respect to any act which constitutes an application for appointment of a receiver, trustee or other person, as provided above, such act shall not be considered an Event of Default in the event the same is being contested in good faith by the Company.

(xi)    The granting of any trust mortgage or execution of an assignment for the benefit of the creditors of the Company, or the occurrence of any other voluntary

or involuntary liquidation or extension of debt agreement for the Company; the failure by the Company to generally pay the debts of the Company as they mature; adjudication of bankruptcy or insolvency relative to the Company; the entry of an order for relief or similar order with respect to the Company in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (hereinafter the "Bankruptcy Code") or any other federal bankruptcy law; the filing of any complaint, application, or petition by or against the Company initiating any matter in which the Company is or may be granted any relief from the debts of the Company pursuant to the Bankruptcy Code or any other insolvency statute or procedure which such matter is not discharged within thirty (30) days (provided hereunder during said period Bank shall not be obligated to make any advances hereunder); the calling or sufferance of a meeting of creditors of the Company; the meeting by the Company of a formal or informal creditor's committee; the offering by or entering into by the Company of any composition, extension or any other arrangement seeking relief or extension for the debts of the Company, or the initiation of any other judicial or non−judicial proceeding or agreement by, against or including the Company which seeks or intends to accomplish a reorganization or arrangement with creditors.

(xii)    The entry of any judgment(s) against Company, in excess of $100,000.00 in the aggregate, which judgment(s) is(are) not satisfied or appealed from (with execution or similar process stayed) within thirty (30) days of its entry.

(xiii)    The occurrence of any event or circumstance with respect to the Company such that Bank shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by the Company under this Agreement or any other agreement between Bank and the Company is impaired or there shall occur any material adverse change in the business or financial condition of the Company.

(xiv)    The entry of any court order which enjoins, restrains or in any way prevents the Company from conducting all or any part of its business affairs in the ordinary course of business for a period of more than five (5) days.

(xv)    The service of any process upon Bank seeking to attach by trustee process any funds of the Company on deposit with Bank.

(xvi)    The Permitted Holders fail to jointly own and control, directly or indirectly, at least 50.1% of the Company.

(xvii)    The occurrence of any material uninsured loss, theft, damage or destruction to any material asset(s) of the Company.

(xviii)    Any act by or against, or relating to the Borrower or its assets pursuant to which any creditor of the Company seeks to reclaim or repossess or reclaims or repossesses all or a portion of the Company's assets.

(xix)    The termination of existence, dissolution, or liquidation of the Company, or the ceasing to carry on actively any substantial part of Company's current business.

(xx)    This Agreement shall, at any time after its execution and delivery and for any reason, cease (A) to create a valid and perfected first priority security interest in and to the property purported to be subject to this Agreement subject only to permitted protests under this Agreement and excluding the failure by Bank to file Uniform Commercial Code Financing Statement continuation statements; or (B) to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by the Company or any guarantor of the Company denies it has any further liability or obligation hereunder.

(xxi)    Any of the following events occur or exist with respect to the Company or any ERISA affiliate: (A) any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Internal Revenue Code) involving any Plan; (B) any "reportable event" (as defined in Section 4043 of ERISA and the regulations issued under such Section) shall occur with respect to any Plan; (C) The filing under Section 4041 of ERISA of a notice of intent to terminate any Plan or the termination of any Plan; (D) any event or circumstance exists which might constitute grounds entitling the Pension Benefit Guaranty Corporation (PBGC) to institute proceedings under Section 4042 of ERISA for the termination of, or for the appointment of a trustee to administer, any Plan, or the institution by the PBGC of any such proceedings; (E) or partial withdrawal under Section 4201 or 4204 of ERISA from a Multiemployer Plan or the reorganization, insolvency, or termination of any Multiemployer Plan; and in each case above, such event or condition, together with all other events or conditions, if any, could in the opinion of Bank subject the Company to any tax, penalty, or other liability to a Plan, a Multiemployer Plan, the PBGC, or otherwise.

(xxii)    The occurrence of any of the foregoing Events of Default with respect to any guarantor, endorser or surety to Bank of the Obligations, as if such guarantor, endorser or surety were the "Company" described therein.

(xxiii)    The financial covenants contained in Section 15 shall become inapplicable due to the lapse of time and the failure to amend any such covenant to cover future periods.

(xxiv)    The occurrence of any default in connection with any note or any related loan documents arising from the Paycheck Protection Program of the CARES Act, or alternatively the failure by any Company to comply with the CARES Act and all other rules and regulations applicable to the Paycheck Protection Program of the CARES Act, and such failure continues unremedied for a period of thirty (30) days.

(xxv)    The subordination provisions of any Subordinated Institutional Promissory Note or of the Crystal Intercreditor Agreement shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect, or any Person

shall contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations, for any reason shall not have the priority contemplated by this Agreement or such subordination provisions;

(xxvi)  Upon the occurrence of an Event of Default, Bank may declare any obligation Bank may have hereunder to be cancelled, declare all Obligations of Company to be due and payable and proceed to enforce payment of the Obligations and to exercise any and all of the rights and remedies afforded to Bank by the Uniform Commercial Code or under the terms of this Agreement or otherwise.  In addition, upon the occurrence of an Event of Default, if Bank proceeds to enforce payment of the Obligations, Company shall be obligated to deliver to Bank cash collateral in an amount equal to the aggregate amounts then undrawn on all outstanding Letters of Credit or acceptances issued or guaranteed by Bank for the account of Company, and Bank may proceed to enforce payment of the same and to exercise all rights and remedies afforded to Bank by the Uniform Commercial Code or under the terms of this Agreement or otherwise. Upon the occurrence of, and during the continuance of, an Event of Default, the Company, as additional compensation to the Bank for its increased credit risk, promises to pay interest on all Obligations (including, without limitation, principal, whether or not past due, past due interest and any other amounts past due under this Agreement) at a per annum rate of two (2%) percent greater than the rate of interest then specified in Section 5 of this Agreement.

(b)      Upon the filing of any complaint, application, or petition by or against the Company initiating any matter in which the Company is or may be granted any relief from the debts of the Company pursuant to the Bankruptcy Code, Bank's obligation hereunder shall be canceled immediately, automatically, and without notice, and all Obligations of the Company then outstanding shall become immediately due and payable without presentation, demand, or notice of any kind to the Company.

(c)      Any sale or other disposition of the Collateral may be at public or private sale upon such terms and in such manner as the Bank deems advisable, having due regard to compliance with any statute or regulation which might affect, limit or apply to the Bank's disposition of the Collateral.  The Bank may conduct any such sale or other disposition of the Collateral upon the Company's premises.  Unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Bank shall provide the Company with such notice as may be practicable under the circumstances), the Bank shall give the Company at least the greater of the minimum notice required by law or seven (7) days prior written notice of the date, time and place of any proposed public sale, and of the date after which any private sale or other disposition of the Collateral may be made.  The Bank may purchase the Collateral, or any portion of it at any such sale.

(d)      In connection with the Bank's exercise of the Bank's rights under this Agreement after the occurrence of an Event of Default, the Bank may enter upon, occupy and use any premises owned or occupied by the Company, and may exclude the Company from such premises or portion thereof as may have been so entered upon, occupied, or used by the Bank.  The Bank shall not be required to remove any of the Collateral from any such premises upon the

Bank's taking possession thereof, and may render any Collateral unusable to the Company. In no event shall the Bank be liable to the Company for use or occupancy by the Bank of any premises pursuant to this Agreement.

(e)     Upon the occurrence of any Event of Default, the Bank may require the Company to assemble the Collateral and make it available to the Bank at the Company's sole risk and expense at a place or places which are reasonably convenient to both the Bank and the Company.

17.    **STANDARDS FOR EXERCISING REMEDIES.**  To the extent that applicable law imposes duties on Bank to exercise remedies in a commercially reasonable manner, Company acknowledges and agrees that it is not commercially unreasonable for Bank (a) to fail to incur expenses reasonably deemed significant by Bank to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as Company, for expressions of interest in acquiring  all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of the Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties specifically to disclaim any warranties of title or the like, (k) to purchase insurance or credit enhancements to insure Bank against risks of loss, collection or disposition of Collateral or to provide to Bank a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by Bank, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Bank in the collection or disposition of any of the Collateral. Company acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Bank would not be commercially unreasonable in Bank's exercise of remedies against the Collateral and that other actions or omissions by Bank shall not be deemed commercially unreasonable solely on account of not being indicated in this section.  Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to Company or to impose any duties on Bank that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

18.    **PROCESSING AND SALES OF INVENTORY.**  So long as Company is not in default hereunder, Company shall have the right, in the regular course of business, to process and sell Company's Inventory.  A sale in the ordinary course of business shall not include a transfer in total or partial satisfaction of a debt.

19.   **WAIVER OF JURY TRIAL.**   COMPANY AND BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE OR HEREAFTER HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. Company hereby certifies that neither Bank nor any of its representatives, agents or counsel has represented, expressly or otherwise, that Bank would not, in the event of any such suit, action or proceeding, seek to enforce this waiver of right to trial by jury.  Company acknowledges that Bank has been induced to enter into this Agreement by, among other things, this waiver.  Company acknowledges that it has read the provisions of this Agreement and in particular, this section; has consulted legal counsel; understands the right it is granting in this Agreement and is waiving in this section in particular; and makes the above waiver knowingly, voluntarily and intentionally.

20.   **CONSENT TO JURISDICTION.**   Company and Bank agree that any action or proceeding to enforce or arising out of this Agreement may be commenced in any court of the Commonwealth of Massachusetts sitting in the counties of Suffolk or Middlesex, or in the District Court of the United States for the District of Massachusetts, and Company waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Company, or as otherwise provided by the laws of the Commonwealth of Massachusetts or the United States of America.

21.   **TERMINATION.**

(a)     Unless renewed in writing, this Agreement shall terminate on March 31, 2024 (the **"Termination Date"**), and all Obligations shall be due and payable in full without presentation, demand, or further notice of any kind, whether or not all or any part of the Obligations is otherwise due and payable pursuant to the agreement or instrument evidencing same.  Bank may terminate this Agreement immediately and without notice upon the occurrence of an Event of Default.  Notwithstanding the foregoing or anything in this Agreement or elsewhere to the contrary, the security interest, Bank's rights and remedies hereunder and Company's obligations and liabilities hereunder shall survive any termination of this Agreement and shall remain in full force and effect until all of the Obligations outstanding, or contracted or committed for (whether or not outstanding), shall be finally and irrevocably paid in full.  No Collateral shall be released or financing statement terminated until such final and irrevocable payment in full of the Obligations, as described in the preceding sentence.

(b)     In the event that Bank continues to make Revolving Loans hereunder after the Termination Date without a written extension of the Termination Date or after the occurrence of an Event of Default, all such Revolving Loans: (i) shall be made in the sole and absolute discretion of Bank; and (ii) shall, together with all other Obligations, be payable thereafter **ON DEMAND**.

22.     **JOINT AND SEVERAL LIABILITY.**

(a)     Each Borrower is accepting joint and several liability under this Agreement in consideration of the financial accommodations to be provided by Bank under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of each other Borrower to accept joint and several liability for the Obligations of each Borrower to Bank.

(b)     Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with each other Borrower, with respect to the payment and performance of all of the Obligations of each Borrower to Bank under this Agreement (including, without limitation, any Obligations arising under this section), it being the intention of the parties hereto that all the Obligations of each Borrower to Bank under this Agreement shall be the joint and several Obligations of each of the Borrowers without preferences or distinction among them.

(c)     If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations of each Borrower to Bank under this Agreement, as and when due or to perform any of such Obligations in accordance with the terms thereof, then in each such event the other Borrower, under this Agreement will make such payment with respect to, or perform, such Obligation.

(d)     The Obligations of each Borrower under the provisions of this section constitute full recourse Obligations of each Borrower enforceable against each such Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstance whatsoever.

(e)     Except as otherwise provided in this Agreement, each Borrower and Holdings hereby waives notice of acceptance of its joint and several liability, notice of any loans made under this Agreement, notice of any action at any time taken or omitted by Bank under or in respect of any of the Obligations of each Borrower and Holdings to Bank under this Agreement, and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement.  Except as otherwise provided in this Agreement, each Borrower and Holdings hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations of each Borrower and Holdings to Bank under this Agreement, the acceptance of any payment of any of such Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Bank at any time or times in respect of any default by any Borrower and/or Holdings in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Bank in respect of any of the Obligations of each Borrower and/or Holdings to Bank under this Agreement, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of such Obligations of each Borrower and Holdings to Bank or the addition, substitution or release, in whole or in part, of any Borrower or Holdings.  Without limiting the generality of the foregoing, each Borrower and Holdings assents to any other action or delay in acting or failure to act on Bank's part with respect to the failure by any Borrower or Holdings to comply with any of its

respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this section, afford grounds for terminating, discharging or relieving any Borrower and/or Holdings, in whole or in part, from any of its Obligations under this section, it being the intention of each Borrower and Holdings that, so long as any of the Obligations under this Agreement remain unsatisfied, the Obligations of such Borrower or Holdings under this section shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower and Holdings under this section shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower, Holdings, or Bank. The joint and several liability of each Borrower and Holdings under this Agreement shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, membership, constitution or place of formation of any Borrower, Holdings, or Bank.

(f)     The provisions of this section are made for the benefit of Bank and Bank's successors and assigns, and may be enforced by Bank in good faith from time to time against any or all of the Borrowers and/or Holdings as often as occasion therefor may arise and without requirement on Bank's part first to marshal any of its claims or to exercise any of its rights against any Borrower or to exhaust any remedies available to Bank against any other Borrower and/or Holdings or to resort to any other source or means of obtaining payment of any of the Obligations under this Agreement or to elect any other remedy. The provisions of this section shall remain in effect until all of the Obligations of each Borrower and Holdings to Bank under this Agreement shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of such Obligations of each Borrower and Holdings to Bank, is rescinded or must otherwise be restored or returned by Bank upon the insolvency, bankruptcy or reorganization of any Borrower and/or Holdings, or otherwise, the provisions of this section will forthwith be reinstated in effect, as though such payment had not been made.

(g)     Each Borrower and Holdings agrees that it shall not exercise, and hereby expressly waives until full and final payment of all Obligations to Bank: (i) any right to subrogation or indemnification, and any other right to payment from or reimbursement by any other Borrower and/or Holdings, in connection with or as a consequence of any payment made by any Borrower and/or Holdings to Bank, (ii) any right to enforce any right or remedy which Bank may have or may hereafter have against any other Borrower and/or Holdings, and (iii) any benefit of, and any right to participate in (A) any collateral now or hereafter held by Bank, or (B) any payment to Bank by, or collection by Bank from any other Borrower and/or Holdings. The provisions of this paragraph are made for the express benefit of each Borrower and Holdings as well as Bank, and may be enforced independently by each Borrower, Holdings, or any successor in interest to each Borrower or Holdings.

23.     **MISCELLANEOUS.**

(a)     No delay or omission on the part of Bank in exercising any rights shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Bank's rights

and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

(b)     Bank is authorized to make Revolving Loans under the terms of this Agreement upon the request, either written or oral, in the name of Borrower or any authorized person whose name appears at the end of this Agreement or of any of the following named person, or persons, from time to time, holding the following offices of Borrower, Manager, Member and such other officers and authorized signatories as may from time to time be set forth in separate resolutions.

(c)     This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Company may not assign this Agreement or any rights or duties hereunder without Bank's prior written consent and any prohibited assignment shall be absolutely void.  No consent to an assignment by Bank shall release Company from its Obligations.  Bank may assign this Agreement and its rights and duties hereunder and no consent or approval by Company is required in connection with any such assignment.  Bank reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Bank's rights and benefits hereunder.  In connection with any assignment or participation, Bank may disclose all documents and information which Bank now or hereafter may have relating to Company or Company's business.  To the extent that Bank assigns its rights and obligations hereunder to another party, Bank thereafter shall be released from such assigned obligations to Company and such assignment shall effect a novation between Company and such other party.

(d)     Company agrees that any and all Revolving Loans made by Bank to Borrower or for its account under this Agreement shall be conclusively deemed to have been authorized by Company and to have been made pursuant to duly authorized requests therefor on its behalf.

(e)     Unless otherwise defined in this Agreement, capitalized words shall have the meanings set forth in the Uniform Commercial Code as in effect in the Commonwealth of Massachusetts as of the date of this Agreement.

(f)     Unless otherwise defined in this Agreement, capitalized words shall have the meanings set forth in the Uniform Commercial Code as in effect in the Commonwealth of Massachusetts as of the date of this Agreement.

(g)     Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement.  If one or more provisions of this Agreement (or the application thereof) shall be invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not, invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).  This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

(h)     Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other loan document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested ), overnight courier, or telefacsimile to Company or to Bank, as the case may be, at its address set forth below:

| | |
|---|---|
| If to Bank: | Berkshire Bank |
| | One Van de Graaff Drive, Suite 202 |
| | Burlington, MA 01803 |
| | Attn:   C. Lee Willingham, Senior Vice President |
| | Telephone:     (781) 897-0705 |
| | Telecopier:     (781) 933-0409 |
| | Email:               lwillingham@berkshirebank.com |
| | |
| With a copy to: | Ruberto, Israel & Weiner, P.C. |
| | 255 State Street, 7th Floor |
| | Boston, MA 02109 |
| | Attn: James C. Fox, Esq. |
| | Telephone:     (617) 742-4200 |
| | Telecopier:     (617) 742-2355 |
| | Email:               jcf@riw.com |
| | |
| If to Borrower | c/o ProAir, LLC |
| | 2900 County Road |
| | Elkhart, IN 46514 |
| | Attn: Todd Courts, Chief Financial Officer |
| | Telephone: 616-447-2812 |
| | Telecopier: 574-264-2194 |
| |  Email:    tcourts@proairllc.com |
| | |
| If to Holdings | c/o ProAir, LLC |
| | 2900 County Road |
| | Elkhart, IN 46514 |
| | Attn: Todd Courts, Chief Financial Officer |
| | Telephone: 616-447-2812 |
| | Telecopier: 574-264-2194 |
| |  Email:    tcourts@proairllc.com |
| | |
| With a copy to: | Burns & Levinson LLP |
| | 125 Summer Street |
| | Boston, MA 02110 |
| | Attn:   Frank A. Segall, Esq. |
| | Telephone:     (617) 345-3000 |
| | Telecopier:     (617) 345-3299 |
| | Email:               fsegall@burnslev.com |

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other. All notices or demands sent in accordance with this section shall be deemed received on the earlier of the date of actual receipt or three (3) days after the deposit thereof in the mail.

(i)     Bank shall have no obligation to maintain any electronic records or any documents, schedules, invoices, agings or any other paper delivered to Bank by Company in connection with this Agreement or any other agreement for more than four (4) months after receipt of the same by Bank.

(j)     Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Bank or Company, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

(k)     Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

(l)     This Agreement, together with the other documents and instruments executed concurrently herewith represent the entire and final understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by evidence of any prior, contemporaneous or subsequent other agreement, oral or written, before the date hereof.

(m)     This Agreement can only be amended by a writing signed by both Bank and Company.

(n)     The laws of Massachusetts shall govern the construction of this Agreement and the rights and duties of the parties hereto. This Agreement shall take effect as a sealed instrument.

*[Signature Page to Follow]*

Witnessed by:                          PROAIR, LLC (for itself and as Agent)


_____         By:_____
                                           Todd Courts, Chief Financial Officer

                                       Address:     28731 County Road 6
                                                    Elkhart, IN 46514

                                       AMERICAN COOLING TECHNOLOGY, LLC


_____         By:_____
                                           Todd Courts, Chief Financial Officer

                                       Address:     715 Willow Spring Lane
                                                    York, PA 17406

                                       BUS AIR, LLC


_____         By:_____
                                           Todd Courts, Chief Financial Officer

                                       Address:     6630 East Highway 114
                                                    Rhome, TX 76078

                                       EVANS TEMPCON DELAWARE, LLC


_____         By:_____
                                           Todd Courts, Chief Financial Officer

                                       Address:     51 Sawyer Road, Suite 420
                                                    Waltham, MA 02453

                                       PROAIR INTERMEDIATE HOLDCO, LLC


_____         By:_____
                                           Todd Courts, Chief Financial Officer

                                       Address:     2900 County Road 6 West
                                                    Elkhart, IN 46514

BERKSHIRE BANK

By:_____
        C. Lee Willingham, Senior Vice President

Address:      One Van de Graaff Drive, Suite 202
                 Burlington, MA 01803

*[Signature Page to Third Amended and Restated Loan and Security Agreement (All Assets) 2 of 2]*

**SCHEDULES**

The following Schedules to the within <u>Third Amended and Restated</u> Loan and Security Agreement (All Assets) are respectively described in the section indicated.  Those Schedules in which no information has been inserted shall be deemed to read "None".

## SCHEDULE "A"
### Borrower's Places of Business and Organizational Identification Number (§3)

| Address | Property At Such Address | Leasehold | Borrower |
|---|---|---|---|
| 2900 County Road 6W<br>Elkhart, Indiana | Inventory, Equipment | Leasehold | ProAir |
| 2920 County Road 6W<br>Elkhart, Indiana | Inventory, Equipment | Leasehold | ProAir |
| 715 Willow Spring Lane<br>York, Pennsylvania 17406 | Equipment | Leasehold | ACT |
| 12151 Madera Way<br>Riverside, California | Inventory, Equipment | Leasehold | ProAir |
| 600 South German Lane<br>Bldg 5<br>Conway, Arkansas 72034 | Inventory, Equipment | Leasehold | ProAir |
| 1641 E Pine St.<br>Tulsa, Oklahoma 74106 | Inventory, Equipment | Leasehold | Bus Air |
| 6630 East Highway 114<br>Rhome, Texas 76078 | Inventory, Equipment | Leasehold | Bus Air |
| 3260 Eagle Park Dr., NE<br>Suite #100<br>Grand Rapids, Michigan 49525 | Equipment | Leasehold | Evans |
| 606 S. Camellia Boulevard<br>Fort Valley, Georgia 31030 | Equipment | Leasehold | ProAir |

Organizational Identification Number:  ProAir, LLC: 2810757
Bus Air, LLC:  6529343
American Cooling Technology, LLC: 6545300
Evans Tempcon Delaware, LLC: 7149498
ProAir Intermediate Holdco, LLC: 6523157

## SCHEDULE "B"
### Other Encumbrances and Liens (§4(f)(i))

| Secured Party or Mortgagee | Description of Collateral | Payment Terms and Dates of Maturity |
|---|---|---|
| Trumpf Finance | Trumpf<br>TruBend 5085 SX<br>S/N B1503I0068 | $4,616.75 payable monthly,<br>Maturity 7/8/2023 |
| Trumpf Finance | Trumpf<br>TruBend 7036<br>S/N B0702A2137 | $1,356.72 payable monthly,<br>Maturity 11/10/2024 |
| Trumpf Finance | Trumpf<br>TruLaser 2030<br>S/N A1312L0071 | $7,622.02 payable monthly,<br>Maturity 11/10/2024 |
| CCA Financial, LLC | 10 Scanners and<br>related accessories and<br>software | $762.00 payable monthly<br>Maturity 5/1/2024 |

## SCHEDULE "C"
### Leases (§4(f)(ii))

| Credit Party | Lessor Name | Collateral | Monthly Payment | End Date | Current Balance |
|---|---|---|---|---|---|
| | | | | | |
| Bus Air | Trumpf Finance | Trumpf TruBend 5085 SX | $4,616.75 | 7/8/2023 | $96,405.85 |
| Bus Air | Trumpf Finance | Trumpf TruBend 7036 | $1,356.72 | 11/10/2024 | $48,496.21 |
| Bus Air | Trumpf Finance | Trumpf TruLaser 2030 | $7,622.02 | 11/10/2024 | $275,075.75 |
| ProAir, LLC | CCA Financial, LLC | 10 Scanners; Related software and accessories | $762.00 | 5/1/2024 | N/A |

# EXHIBIT 1

## BERKSHIRE BANK

## AMENDED AND RESTATED REVOLVING NOTE

$12,000,000.00
Burlington, Massachusetts

February 11, 2022

For value received, the undersigned, ProAir, LLC, a Delaware limited liability company, American Cooling Technology, LLC, a Delaware limited liability company, Bus Air, LLC, a Delaware limited liability corporation, and Evans Tempcon Delaware, LLC, a Delaware limited liability corporation (each and together, the "**Borrower**"), hereby jointly and severally promise to pay to the order of Berkshire Bank (the "**Bank**"), at its main office at One Van de Graaff Drive, Suite 202, Burlington, Massachusetts 01803, or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of Twelve Million ($12,000,000.00) Dollars, or, if less, the aggregate unpaid principal amount of all loans made by the Bank to the Borrower under the Loan Agreement (defined below) together with interest on the principal amount hereunder remaining unpaid from time to time, computed on the basis of the actual number of days elapsed and a 360-day year, from the date hereof until this Note is fully paid at the rate from time to time in effect under the Third Amended and Restated Loan and Security Agreement (All Assets) dated on or about of even date, as amended or restated from time to time (the "**Loan Agreement**"), by and between the Bank and the Borrower. The principal hereof and interest accruing thereon shall be due and payable as provided in the Loan Agreement. This Note may be prepaid only in accordance with the Loan Agreement.

This Note is issued pursuant, and is subject, to the Loan Agreement, which provides, among other things, for acceleration hereof. This Note is the "Note" referred to in the Loan Agreement.

This Note is secured, among other things, pursuant to the Loan Agreement, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

This Note amends, restates and supersedes that certain Amended and Restated Revolving Note dated as of October 7, 2020, payable to the order of the Bank, in the original principal amount of Twelve Million Five Hundred Thousand ($12,500,000.00) Dollars, but is not intended to and shall not extinguish or cancel the indebtedness evidenced thereby, including without limitation, accrued but unpaid interest, fees, expenses and other charges through the date hereof.

The Borrower hereby agrees to pay all costs of collection, including attorneys' fees and legal expenses in the event this Note is not paid when due, whether or not legal proceedings are commenced.

Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

*[Signature Page to Follow]*

All rights and obligations hereunder shall be governed by the laws of the Commonwealth of Massachusetts and this Note shall be deemed to be under seal.

PROAIR, LLC

By:_____
    Todd Courts, Chief Financial Officer

AMERICAN COOLING TECHNOLOGY, LLC

By:_____
    Todd Courts, Chief Financial Officer

BUS AIR, LLC

By:_____
    Todd Courts, Chief Financial Officer

EVANS TEMPCON DELAWARE, LLC

By:_____
    Todd Courts, Chief Financial Officer

*[Signature Page to $12,000,000.00 Amended and Restated Revolving Note]*

**EXHIBIT 2**

**FORM OF COMPLIANCE CERTIFICATE**

ProAir, LLC (for itself and as Agent), American Cooling Technology, LLC, Bus Air, LLC and Evans Tempcon Delaware, LLC (each a **"Borrower"** and collectively **"Borrower"**) and ProAir Intermediate Holdco, LLC, (**"Holdings"** and together with the Borrower, hereinafter each and together referred to as the **"Company"**), hereby certify to Berkshire Bank (**"Bank"**), pursuant to the Third Amended and Restated Loan and Security Agreement (All Assets) between Borrower and Bank dated February 11, 2022, as may be amended from time to time (**"Loan Agreement"**), that:

A.    General

1.      Capitalized terms not defined herein shall have the meanings set forth in the Loan Agreement.

2.      The Company has complied with all the terms, covenants and conditions to be performed or observed by the Company contained in the Loan Agreement and other documents required to be executed by the Company in connection with the Loan Agreement.

3.      Neither on the date hereof nor, if applicable, after giving effect to the Revolving Loan made on the date hereof, does there exist an Event of Default or an event which would with notice or the lapse of time, or both, constitute an Event of Default.

4.      The representations and warranties contained in the Loan Agreement and in any certificate, document or financial or other statement furnished at any time thereunder are true, correct and complete in all material respects with the same effect as though such representations and warranties had been made on the date hereof, except to the extent that any such representation and warranty relates solely to an earlier date (in which case such representation and warranty shall be true, correct and complete on and as of such earlier date).

B.    Financial Covenants

As of the date hereof or, for such period as may be designated below, the computations, ratios and calculations as set forth below in accordance with Section 15 of the Loan Agreement are true and correct:

**Financial Calculations.**  Attached hereto as Exhibit 2-A are reasonably detailed calculations necessary to determine that the Company [is][is not] in compliance with the Minimum Availability requirement of Section 15(c) of the Loan Agreement and that the Borrower [is][is not] in compliance with the Minimum Consolidated Fixed Charge Coverage Ratio covenant set forth in Section 15(b) of the Loan Agreement.

IN WITNESS WHEREOF, the undersigned, a duly authorized Member/Manager/officer of Company, has executed and delivered this Certificate in the name and on behalf of the Company on _____, 20____.

PROAIR, LLC (for itself and as Agent)

By:_____

Name:

Title:

<u>EXHIBIT 2A</u>

A.                    <u>Borrowing Base Certificate as of _____, 20__ (as of each Thursday of the month)</u>

     B.   <u>Calculation of Consolidated EBITDA</u>

1.      Consolidated Net Income of Company:               $_____

2.      Consolidated Interest Expense for such period:      $_____

3.      The provision for federal, state, local and foreign income taxes (including by way of Tax Distributions under Section 15(f) of the Loan Agreement) payable by the Company for such period:     $_____

4.      Depreciation and amortization expense:            $_____

5.      Non-cash charges (including, without limitation, non-cash expenses related to stock-based compensation and incentives) other than charges constituting an accrual or reserve for cash expenditures to be made, or anticipated to be made, in a future period or relating to a write-down, write-off or reserve with respect to accounts receivable or Inventory:     $_____

6.      Expenses paid with the proceeds of business interruption insurance:     $_____

7.      Expenses that have been indemnified or reimbursed in cash by unaffiliated third parties, or are reasonably expected to be so indemnified or reimbursed within 180 days after the accrual thereof pursuant to a written contractual obligation:     $_____

8.      Payments to Crystal Investor, Portman Ridge Investor, and KODA Investor for accounting and legal:     $_____

9.      CRO expenses:     $_____

10.    Losses on Permitted Non-Ordinary Course Inventory Sales:     $_____

11.    One time closing/consolidation costs of operating facilities:     $_____

12.    Restructuring, integration, recruiting and severance costs     $_____

13.    Permitted Equity Cure amounts paid:     $_____

14.    Federal, state, local and foreign income tax credits of the Company and its subsidiaries for such period:     $_____

15.    Extraordinary gains for such period:     $_____

16.    All non-cash items increasing Consolidated Net Income for such period: $_____

17. Any reversal of a reserve or any cash expenditures, in each case, made in respect of any non-cash charge that was added back in such period or a prior period: $_____

18. Amounts that were added back in a prior period in respect of expenses that were reasonably expected to be indemnified or reimbursed in cash by unaffiliated third parties within 180 days after the accrual thereof pursuant to a written contractual obligation, to the extent that such expenses were not so indemnified or reimbursed within such 180-day period: $_____

19. the sum of lines B-2 – B-13: $_____

20. the sum of lines B-14– B-18: $_____

21. Consolidated EBITDA (line B-1 plus[1] line B-19 minus[2] line B-20): $_____

C. Calculation of Consolidated Fixed Charge Coverage Ratio

1. Consolidated EBITDA (line B-21): $_____

2. Unfinanced Capital Expenditures paid in cash: $_____

3. The aggregate amount (but not less than $0) of federal, state, local and foreign income taxes paid in cash (including by way of tax distributions under Section 15 (f) of the Loan Agreement): $_____

4. Restricted Payments paid in cash: $_____

5. Debt Service Charges paid in cash: $_____

6. The sum of lines C-2, C-3, and C-4: $_____

7. Line C-1 minus line C-6: $_____

8. Consolidated Fixed Charge Coverage Ratio (the ratio of line C-7 to line C-5): _____:1

In compliance with Minimum Consolidated Fixed Charge Coverage Ratio covenant, pursuant to Section 15(b) of the Loan Agreement: [Yes/No]

---

[1] Without duplication and only to the extent reflected as a charge or reduction in the statement of such Consolidated Net Income for such period.

[2] Without duplication and only to the extent included in such Consolidated Net Income for such period.

Document comparison by Workshare 9.5 on Friday, September 16, 2022 10:08:54 AM

| Input: | |
|---|---|
| Docume nt 1 ID | file://\\PHL1NAS4\Worldox180$\WDOX\Bank_RE\BANK\10769\00002\01091485.DOCX |
| Descripti on | 01091485 |
| Docume nt 2 ID | file://\\PHL1NAS4\Worldox180$\WDOX\Bank_RE\BANK\10769\00002\01123205.DOCX |
| Descripti on | 01123205 |
| Renderin g set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 100 |
| Deletions | 81 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |

| Total changes | 181 |
|---|---|

# EXHIBIT A-2

**Third Amended and Restated Loan and Security Agreement**

**BERKSHIRE BANK**

**THIRD AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT
(ALL ASSETS)**

February 11, 2022

<u>**PREAMBLE**</u>

This Third Amended and Restated Loan and Security Agreement (All Assets) between the Company and the Bank dated as of the date set forth above (this "**Agreement**") amends and restates in its entirety that certain Second Amended and Restated Loan and Security Agreement (All Assets) between the Borrower and the Bank dated September 25, 2017 which amended the Amended and Restated Loan and Security Agreement (All Assets) between the Borrower and the Bank dated April 8, 2016, which amended and restated that certain Loan and Security Agreement (All Assets) dated April 26, 2010, as amended, to make certain changes to the financial covenants and other terms and conditions of this Agreement.

For purposes of this Agreement, the term(s):

"**Approved Budget**" shall have the meaning ascribed to that defined term in the Crystal Term Loan Agreement (as defined below in Section 9(ix)), with supporting information and in form reasonably satisfactory to the Bank.

"**Approved Budget Variance Report**" shall have the meaning ascribed to that defined term in the Crystal Term Loan Agreement, with supporting information and in form reasonably satisfactory to the Bank.

"**Assignment and Debt Cancellation Agreement**" shall have the meaning ascribed to that defined term in the Crystal Term Loan Agreement.

"**Business Day**" **means** any day which is neither a Saturday or Sunday nor a legal holiday on which commercial banks are authorized or required to be closed in Boston, Massachusetts.

"**Closing Date**" means February 11, 2022.

"**Closing Date Restructuring**" shall have the meaning ascribed to that defined term in the Crystal Term Loan Agreement.

"**Crystal Investor**" means, collectively, Crystal Financial SBIC LP and Crystal Financial SPV LLC.

"**Debt Discharges**" shall have the meaning ascribed to that defined term in the Crystal Term Loan Agreement.

"**KODA Investor**" means collectively, (a) William S. Karol and (b) William S. Karol Family Trust (or any successor or replacement trust for the benefit of William S. Karol), and in each case together with any successors or permitted assigns.

"**Permitted Holders**" means, collectively, the Crystal Investor, the Portman Ridge Investor, and the KODA Investor.

"**Permitted Non-Ordinary Course Inventory Sales**" shall have the meaning ascribed to that term in Section 15(d) below.

"**Portman Ridge Investor**" means Portman Ridge Finance Corporation, together with its successors and permitted assigns.

1.      **SECURITY INTEREST.** ProAir, LLC, a Delaware limited liability company ("**ProAir**"), American Cooling Technology, LLC, a Delaware limited liability company ("**ACT**"), Bus Air, LLC, a Delaware limited liability company ("**Bus Air**"), and Evans Tempcon Delaware, LLC, a Delaware limited liability company ("**Evans**") (hereinafter each and together referred to as the "**Borrower**") and ProAir Intermediate Holdco, LLC, a Delaware limited liability company ("**Holdings**" and together with the Borrower, hereinafter each and together referred to as the "**Company**"), for valuable consideration, receipt whereof is hereby acknowledged, hereby grants to Berkshire Bank, a Massachusetts banking corporation, the secured party hereunder (hereinafter called the "**Bank**"), a continuing security interest in and to, and assigns to Bank, all assets of the Company, wherever located and whether now owned or hereafter acquired, including, without limitation, the following:

(a)      all inventory, including all goods, merchandise, raw materials and work in process, finished goods, and other tangible personal property now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts of service or used or consumed in Company's business (all hereinafter called the "**Inventory**");

(b)      all accounts (as defined in Article 9 of the Uniform Commercial Code in effect in the Commonwealth of Massachusetts from time to time, hereinafter "**Accounts**"), contracts, contract rights, notes, bills, drafts, acceptances, general intangibles (including without limitation registered and unregistered tradenames, copyrights, customer lists, goodwill, computer programs, computer records, computer software, computer data, trade secrets, trademarks, patents, ledger sheets, files, records, data processing records relating to any Accounts and all tax refunds of every kind and nature to which Company is now or hereafter may become entitled to, no matter how arising), instruments, documents, chattel paper (whether tangible or electronic) deposit accounts, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, security entitlements, security accounts, investment property, supporting obligations, choses in action, commercial tort claims, and all other debts, obligations and liabilities in whatever form, owing to Company from any person, firm, corporation, limited liability company or any other legal entity, whether now existing or hereafter arising, now or hereafter received by or belonging or owing to Company, for goods sold by it or for services rendered by it, or however otherwise same may have been established or created, all guarantees and collateral therefor, all right, title and interest of Company in the merchandise or services which gave rise thereto, including the rights of reclamation and stoppage in transit, all rights to

replevy goods, and all rights of an unpaid seller of merchandise or services (all hereinafter called the "**Receivables**");

(c)      all machinery, equipment, fixtures and other goods (as defined in Article 9 of the Uniform Commercial Code) whether now owned or hereafter acquired by the Company and wherever located, all replacements and substitutions therefor or accessions thereto and all proceeds thereof (all hereinafter called the "**Equipment**"); and

(d)      all proceeds and products of all of the foregoing in any form, including, without limitation, all proceeds of credit, fire or other insurance, and also including, without limitation, rents and profits resulting from the temporary use of any of the foregoing (which, with Inventory, Receivables and Equipment are all hereinafter called "**Collateral**").

2.      **OBLIGATIONS SECURED.** The security interest granted hereby is to secure payment and performance of all debts, liabilities and obligations of Company to Bank hereunder (and, in the case of Holdings, all debts, liabilities and obligations of Holdings to Bank under the Guaranty made by Holdings to Bank on or about the date hereof (the "**Guaranty**")) and also any and all other debts, liabilities and obligations of Company to Bank of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not such obligations are related to the transactions described in this Agreement, by class, or kind, or whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, fees, charges, expenses and overdrafts, and also including, without limitation, all obligations and liabilities which Bank may incur or become liable for, on account of, or as a result of, any transactions between Bank and Company including any which may arise out of any letter of credit, acceptance or similar instrument or obligation issued or caused to be issued pursuant to this Agreement and also including obligations arising out of any foreign exchange contracts, interest rate swap, cap, floor or hedging agreements and all obligations of Company to Bank arising out of or in connection with any Automated Clearing House ("**ACH**") agreements relating to the processing of ACH transactions, together with the fees, expenses, charges and other amounts owing or chargeable to Company under any ACH agreements (all hereinafter called "**Obligations**").

3.      **COMPANY'S PLACES OF BUSINESS, INVENTORY LOCATIONS AND RETURNS POLICY.** Company warrants that Company has no places of business other than that shown at the end of this Agreement, unless other places of business are listed on Schedule "A", annexed hereto, in which event Company represents that it has additional places of business at those locations set forth on Schedule "A".

Company's principal executive office and the office where Company keeps its records concerning its accounts, contract rights and other property, is that shown at the end of this Agreement. All Inventory presently owned by Borrower is stored at the locations set forth on Schedule "A", and shall be designated as either a leasehold or a warehouse space.

Company will promptly notify Bank in writing of any change in the location of any place of business or the location of any Inventory or the establishment of any new place of business or location of Inventory or office where its records are kept which would be shown in this Agreement if it were executed after such change.

Company represents and warrants that it has described its returns policy in writing to Bank and that it does now, and will continue to, apply such policy consistently in the conduct of its business and agrees that it shall notify Bank in writing before changing its policy or the application thereof.

4. **COMPANY'S ADDITIONAL REPRESENTATIONS AND WARRANTIES.** Company represents and warrants that:

(a) Company is a limited liability company or corporation, as applicable, duly organized, validly existing and in good standing under the laws of the state of such Company's formation or incorporation, as applicable, and shall hereafter remain in good standing as a limited liability company or corporation, as applicable, in that state, and is duly qualified and in good standing in every other state in which it conducts business, and shall hereafter remain duly qualified and in good standing in every other state in which, by reason of the nature or location of such Company's assets or operations, such qualification may be necessary, except as would not reasonably be expected to have, either individually or in the aggregate, a material adverse effect on its financial condition, business or prospects.

(b) Company's exact legal name is as set forth in this Agreement.

(c) The organizational identification number of the Company is as set forth on Schedule "A" annexed hereto.

(d) The execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within the Company's powers, have been duly authorized, are not in contravention of law or the terms of the Company's Certificate of Formation, Operating Agreement or other organizational papers, or of any indenture, agreement or undertaking to which the Company is a party or by which it or any of its properties may be bound.

(e) The Certificate of Formation and all amendments thereto of Company have been duly filed and are in proper order. All equity interests of the Company have been paid for in full and properly sold and all books and records of Company, including but not limited to its minute books, Operating Agreement and books of account, are accurate and up to date and will be so maintained.

(f) Borrower owns all of the assets reflected in the most recent of Company's financial statements provided to Bank, except assets sold or otherwise disposed of in the ordinary course of business since the date thereof, and such assets together with any assets acquired since such date, including without limitation the Collateral, are free and clear of any lien, pledge, security interest, charge, mortgage or encumbrance of any nature whatsoever, except (i) the

security interests and other encumbrances (if any) listed on Schedule "B" annexed hereto, (ii) those leases of personal property set forth on Schedule "C" annexed hereto, (iii) those liens permitted pursuant to Section 15(e) of this Agreement, or (iv) liens and security interests in favor of Bank (hereinafter, collectively, "**Permitted Liens**").

(g)     Company has made or filed all tax returns, reports and declarations relating to any material tax liability required by any jurisdiction to which it is subject (any tax liability which may result in a lien on any Collateral being hereby deemed material); has paid all taxes shown or determined to be due thereon except those being contested in good faith and which Company has, prior to the date of such contest, identified in writing to Bank as being contested; and has made adequate provision for the payment of all taxes so contested, so that no lien will encumber any Collateral, and in respect of subsequent periods.

(h)     Company (i) is subject to no charter, limited liability, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction which could have a material adverse effect on its financial condition, business or prospects, and (ii) is in compliance with its Certificate of Formation and Operating Agreement, all contractual requirements by which it or any of its properties may be bound and all applicable laws, rules and regulations (including without limitation those relating to environmental protection) other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of any Collateral.

(i)     There is no action, suit, proceeding or investigation pending or, to Company's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of any Collateral.

(j)     Company is in compliance with ERISA; no Reportable Event has occurred and is continuing with respect to any Plan; and it has no unfunded vested liability under any Plan.  The word "**Plan**" as used in this Agreement means any employee plan subject to Title IV of the Employee Retirement Income Security Act of 1974 ("**ERISA**") maintained for employees of Company, any subsidiary of Company or any other trade or business under common control with Company within the meaning of Section 414(c) of the Internal Revenue Code of 1986 or any regulations thereunder.

(k)     Neither Company nor, to the knowledge of Company, any of its owners, subsidiaries or affiliates, is in violation of any laws relating to terrorism or money laundering ("**Anti-Terrorism Laws**"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "**Executive Order**"), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

(l)     Neither Company nor, to the knowledge of Company, any of its owners, subsidiaries or affiliates or other agent of Company acting or benefitting in any capacity in

connection with the transactions contemplated hereunder, is any of the following: (i) a person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (ii) a person owned or controlled by, or acting for or on behalf of, any person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person with which Bank is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (iv) a person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or (v) a person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control ("**OFAC**") at its official website or any replacement website or other replacement official publication of such list.

(m)     Neither Company nor, to the knowledge of Company, any agent of any of its owners, subsidiaries or affiliates acting in any capacity in connection with the transactions contemplated hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in subsection (l) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

## 5.     LOANS AND OTHER FINANCIAL ACCOMMODATIONS.

(a)     From time to time upon Borrower's request, so long as the sum of the aggregate principal amount of all revolving loans outstanding (the "**Revolving Loans**") and the requested Revolving Loan does not exceed the lesser of (i) the Borrowing Base (as defined below), or (ii) the Credit Limit (as defined below), Bank shall make such requested Revolving Loan, provided that there has not occurred an Event of Default or an event which, with notice or the lapse of time or both, would constitute an Event of Default.   In order to facilitate the requesting and making of Revolving Loans hereunder, each Borrower does hereby appoint ProAir as its agent authorized to request, receive and distribute all Revolving Loans under this Agreement and to communicate with the Bank with respect to this credit facility, and ProAir hereby accepts such appointment.

(b)     (i)     Revolving Note. All Revolving Loans shall bear interest as set forth below, and at the option of Bank shall be evidenced by and repayable in accordance with an amended and restated revolving note drawn to the order of Bank in the form of **Exhibit 1** attached hereto and made a part hereof (the **"Note"**), as the same may hereafter be amended, supplemented or restated from time to time and any note or notes issued in substitution therefor, but in all events shall be conclusively evidenced by Bank's records of Revolving Loans and repayments.

(ii)     Interest Rate; Interest Payment.   Except as otherwise provided in Section 16(a)(xxv) , the outstanding principal balance of  the Revolving Loans shall bear interest for the duration of each Interest Period at a per annum rate equal to the Term SOFR Rate (or, if applicable under Sections 5(b)(iv), (v) or (vi), the Daily Simple SOFR Rate or the Base Rate, as applicable).   Interest shall be paid on each Interest Payment Date.

(iii)    Computations.  Interest due hereunder shall be computed on the basis of a year of 360 days and paid in arrears for the actual number of days elapsed.  If the due date for any payment required hereunder is extended by operation of law, interest shall be payable for such extended time.  If any payment required hereunder is due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension shall be included in computing interest in connection with such payment.

(iv)    Illegality.  If the Bank determines that any law has made it unlawful, or that any governmental authority has asserted it is unlawful, for the Bank to determine or charge interest by reference to Term SOFR, then, upon notice thereof by the Bank to the Borrower, any obligation of the Bank to make or maintain the interest rate hereunder by reference to Term SOFR shall be suspended, and the interest shall thereafter accrue on the outstanding principal balance of the Revolving Loans at the Base Rate until the Bank notifies the Borrower that the circumstances giving rise to such determination no longer exist.

(v)    Temporary Unavailability of Term SOFR or Daily Simple SOFR. If the Bank determines (which determination shall be conclusive absent manifest error) that (i) the circumstances under Section 5(b)(vi)  have occurred and such circumstances are likely to be temporary, (ii) adequate and reasonable means do not exist for determining Term SOFR, or (iii) the Term SOFR Rate does not adequately and fairly reflect the cost to the Bank of funding the Revolving Loans, then, upon notice thereof by the Bank to the Borrower, any obligation of the Bank to make or maintain the interest rate hereunder by reference to Term SOFR shall be suspended, and interest shall thereafter accrue on the outstanding principal balance of the Revolving Loans at a variable rate per annum equal to the Daily Simple SOFR Rate (or, if the Bank makes any of the foregoing determinations with respect to Daily Simple SOFR or the Daily Simple SOFR Rate, the Base Rate) until the Bank notifies the Borrower that the circumstances giving rise to such determination no longer exist.

(vi)    Permanent Unavailability of Term SOFR or Daily Simple SOFR. If the Bank determines (which determination shall be conclusive absent manifest error) that (i) adequate and reasonable means do not exist for determining Term SOFR, including, because SOFR or Term SOFR is not available or published on a current basis, and such circumstances are unlikely to be temporary, (ii) the SOFR Administrator or Term SOFR Administrator, or a governmental authority having jurisdiction over the Bank or any such administrator, has announced that SOFR or Term SOFR will no longer be provided, (iii) any relevant agency or authority has announced that SOFR or Term SOFR is no longer representative, or (iv) any similar circumstance exists such that SOFR or Term SOFR has become permanently unavailable or ceased to exist, any obligation of the Bank to make or maintain the interest rate hereunder by reference to Term SOFR shall be suspended, and the interest shall thereafter accrue on the outstanding principal balance of the Revolving Loans at a variable rate per annum equal to the Daily Simple SOFR Rate (or, if the Bank makes any of the foregoing determinations with respect to Daily Simple SOFR or the Daily Simple SOFR Rate, the Base Rate).

(c)    The term '**Borrowing Base**' as used herein shall mean the sum of the following:

(i)        eighty-five (85%) percent of the unpaid face amount of Qualified Accounts (as defined below) or such other percentage thereof as may from time to time be fixed by Bank upon notice to Borrower, PLUS

(ii)        the lesser of (A) Seven Million Five Hundred Thousand ($7,500,000.00) Dollars, or (B) the sum of (i) fifty (50%) percent of the cost of all Eligible Inventory (as defined below) consisting of raw materials and finished goods inventory, plus (ii) fifty (50%) percent of the aggregate amount then undrawn on all outstanding Commercial Letters of Credit issued pursuant to this Agreement for the account of the Borrower, or such other percentages of Eligible Inventory and/or outstanding Commercial Letters of Credit as may from time to time be fixed by Bank upon notice to Borrower, PLUS

(iii)        one-hundred (100%) percent of the Inventory Advance up to One Million ($1,000,000.00) Dollars on account of Other Inventory as that term is defined in Section 15(d). Draws will be permitted on a one-time basis following receipt of documentation acceptable to the Bank for Permitted Non-Ordinary Course Business Sales, as that term is defined in Section 15(d), through December 31, 2022 only and may not be re-drawn (the "**Inventory Advance**"). The Inventory Advance will only be permitted when availability of Eligible Inventory is less than $7,500,000. The Inventory Advance, to the extent utilized, shall amortize in five (5) consecutive monthly installments based upon a two year straight line amortization basis commencing September 30, 2023, MINUS

(iv)        one hundred (100%) percent of the aggregate amount then undrawn on all Letters of Credit and acceptances issued pursuant to this Agreement for the account of the Borrower;

but in no event shall the sum of all Revolving Loans plus the sum of the aggregate amount undrawn on all Letters of Credit and acceptances be in excess of the Credit Limit.

The Bank shall maintain a static reserve for Eligible Inventory equal to ten (10%) percent of the total Inventory (the "**Static Reserve**"). The Static Reserve shall remain in place through March 31, 2023, at which time the methodology will be reviewed by the Bank based upon examination recommendations. In addition to the foregoing, the Bank may from time to time, in its reasonable judgment consistent with current credit policies, establish reserves against the Accounts and/or the Inventory of the Borrower ("**Reserves**") and subsequently reduce or eliminate such Reserves, and reinstate such Reserves; provided that, the Bank shall provide ten (10) days' prior written notice of any such action to Borrower and upon receipt of such notice by Borrower, the Borrowing Base shall be determined after giving effect to such Reserves for all purposes of this Agreement. The amount of such Reserves shall be subtracted from Qualified

Accounts or Eligible Inventory, as applicable, when calculating the amount of the Borrowing Base.

As used in this Agreement, the term **'Commercial Letters of Credit'** shall mean a letter of credit issued to support the purchase by Borrower of Inventory prior to its transport to one of Borrower's places of business that provides that all draws thereunder must require presentation of customary documentation including, if applicable, commercial invoices, packing lists, certificate of origin, bill of lading, an airway bill, customs clearance documents, quota statement, certificate, beneficiaries statement and bill of exchange, bills of lading, dock warrants, dock receipts, warehouse receipts or other documents of title, in form and substance satisfactory to Bank and reflecting passage to Borrower of title to first quality Inventory conforming to Borrower's contract with the seller thereof.

(d)     The term '**Credit Limit**' as used herein shall mean, an amount equal to Twelve Million ($12,000,000.00).

(e)     Company hereby authorizes and directs Bank, in Bank's sole discretion (provided, however, Bank shall have no obligation to do so): (i) to pay accrued interest as the same becomes due and payable pursuant to this Agreement or pursuant to any note or other agreement between Company and Bank, and to treat the same as a Revolving Loan to Borrower, which shall be added to Borrower's Revolving Loan balance pursuant to this Agreement; (ii) to charge any of Company's accounts under the control of Bank; or (iii) apply the proceeds of Collateral, including, without limitation, payments on Accounts and other payments from sales or lease of Inventory and any other funds to the payment of such items.  Bank shall promptly notify Company of any such charges or applications.

(f)     The Borrowing Base formula set forth above is intended solely for monitoring purposes.  The making of Revolving Loans, advances, and credits by Bank to the Borrower in excess of the above described Borrowing Base formula is for the benefit of the Borrower and does not affect the obligations of Borrower hereunder; all such Revolving Loans constitute Obligations and must be repaid by Borrower in accordance with the terms of this Agreement.

(g)     At the request of the Borrower, and upon the execution of letter of credit documentation satisfactory to Bank, Bank, within the limits of the Borrowing Base, as then computed and also within the limits of the Credit Limit as then computed, shall issue letters of credit from time to time by Bank for the account of the Borrower (collectively "**Letters of Credit**").  The Letters of Credit shall be on terms mutually acceptable to Bank and the Borrower, and no Letter of Credit shall have an expiration date later than the sooner to occur of (i) twelve (12) months from the date of issuance of the subject Letter of Credit, or (ii) the Termination Date.  A Revolving Loan in an amount equal to any amount paid by Bank under a Letter of Credit shall be deemed made to Borrower, without request therefor, immediately upon any payment by Bank on such Letter of Credit.  In connection with the issuance of any Letter of Credit, Borrower shall pay to Bank a percentage of the face amount of such Letter of Credit according to the fee schedule then in effect at Bank plus transaction fees at the customary rates

charged by Bank and all other normal and customary fees charged by Bank. Borrower hereby authorizes and directs Bank, in Bank's sole discretion (provided, however, Bank shall have no obligation to do so) to pay all such fees and costs as the same become due and payable and to treat the same as a Revolving Loan to Borrower, which shall be added to Borrower's Revolving Loan balance pursuant to this Agreement. For purposes of computing the Credit Limit, all Letters of Credit and acceptances shall be deemed to be Revolving Loans.

   (h) Borrower shall pay to Bank the principal amount of all Revolving Loans as follows:

     (i) <u>Borrowing Base Exceeded</u>. Whenever the outstanding principal balance of all Revolving Loans exceed the Borrowing Base, Borrower shall immediately pay to Bank the excess of the outstanding principal balance of the Revolving Loans over the Borrowing Base.

     (ii) <u>Payment in Full on Termination</u>. On termination of this Agreement, pursuant to Section 21 or acceleration of the Obligations pursuant to Section 16, Borrower shall pay to Bank the entire outstanding principal balance of all Revolving Loans and shall deliver to Bank cash collateral in an amount equal to the aggregate of (A) amounts then undrawn on all outstanding Letters of Credit issued pursuant to this Agreement for the account of the Borrower, and (B) the amount of all outstanding acceptances issued pursuant to this Agreement.

   (i) <u>Certain Definitions</u>. As used herein, the following terms shall have the definitions specified below:

   "<u>Base Rate</u>" means a variable rate of interest per annum equal to the Prime Rate with such adjustments (which may be positive or negative) to the spread or margin as the Bank deems necessary in its sole discretion to maintain an all-in yield on the Revolving Loans substantially equivalent to the Daily Simple SOFR Rate.

   "<u>Business Day</u>" means any day other than a Saturday or a Sunday on which the head office of the Bank is open for transaction of all of its normal and customary business; provided that, for purposes of determining SOFR, Daily Simple SOFR or Term SOFR, "Business Day" means any day other than a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. government securities.

   "<u>Daily Simple SOFR</u>" means, for any day (a "<u>SOFR Rate Day</u>"), a rate per annum equal to the greater of (A) one percent (1.00%) and (B) SOFR for the day (each such day a "<u>Rate Set Day</u>") that is five (5) Business Days prior to (i) if such SOFR Rate Day is a Business Day, such SOFR Rate Day, or (ii) if such SOFR Rate Day is not a Business Day, the Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website. If by 5:00pm (ET) on the second (2nd) Business Day immediately following any Rate Set Day, SOFR in respect of such Rate Set Day has not been published on the SOFR Administrator's Website, then SOFR for such Rate Set

Day will be SOFR as published in respect of the first preceding Business Day for which such SOFR was published on the SOFR Administrator's Website. Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to or consent from the Borrower.

"Daily Simple SOFR Rate" means a variable rate of interest per annum equal to the sum of (A) the applicable Daily Simple SOFR, plus (B) 0.11448% (11.448 basis points), plus (C) the Term SOFR Margin.

"Interest Payment Date means the first day of each calendar month.

"Interest Period" means the period beginning on the first day of each calendar month and ending on and including (A) the last day of each calendar month or (B) with respect to the last Interest Period, the Maturity Date.

"Prime Rate" means the "prime rate" published by *The Wall Street Journal* in its "Money Rate" column. In the event (A) *The Wall Street Journal* stops publishing prime rates or (B) The Wall Street Journal ceases to be available, then a substitute index rate shall be selected by the Bank from a comparable publication which publishes a rate which has historical fluctuations similar to that of the "prime rate" appearing in *The Wall Street Journal*. Any announced changes in said published "prime rate" shall result in an immediate and corresponding change in the Prime Rate without notice to or consent from the Borrower.

"SOFR" means, with respect to any Business Day, the secured overnight financing rate published for such Business Day by the SOFR Administrator's Website.

"SOFR Administrator" means, the Federal Reserve Bank of New York (or a successor administrator of SOFR).

"SOFR Administrator's Website" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for SOFR identified as such by the SOFR Administrator from time to time.

"Term SOFR" means, for any Interest Period, the greater of (A) one percent (1.00%) and (B) the one-month forward-looking term rate based on SOFR published on the Term SOFR Administrator's Website, or other commercially available source providing such quotations as may be selected by the Bank from time to time, two Business Days prior to the commencement of such Interest Period (as adjusted for any reserve requirement and any subsequent costs arising from a change in government regulation); provided that if the Term SOFR rate is not published on a Business Day due to a holiday or other circumstance, the applicable Term SOFR shall be the Term SOFR last published prior to such Business Day.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (or a successor administrator of SOFR).

"Term SOFR Administrator's Website" means the website or any successor source for Term SOFR identified by the Term SOFR Administrator (or a successor administrator of Term SOFR).

"Term SOFR Margin" means two and one-quarter of one percent (2.25%) per annum.

"Term SOFR Rate" means a variable rate of interest per annum equal to the sum of (A) the applicable Term SOFR, plus (B) 0.11448% (11.448 basis points), plus (C) the Term SOFR Margin.

(j)	In addition to all other sums payable hereunder, the Borrower shall pay the Bank a fee equal to one-quarter of one (.25%) percent per annum of the difference between: (i) the Availability reflected in each monthly Borrowing Base Certificate and (ii) the average amount of the principal balance of Revolving Loans outstanding for each corresponding monthly period while this Agreement is in effect. Such fee shall be payable monthly in arrears and shall be treated as a Revolving Loan to Borrower, which shall be added to Borrower's Revolving Loan balance pursuant to this Agreement.

(k)	Borrower shall also pay Bank a collateral monitoring fee of Five Hundred ($500.00) Dollars per month. Such fee shall be paid monthly in arrears and shall be treated as a Revolving Loan to Borrower, which shall be applied to Borrower's Revolving Loan balance pursuant to this Agreement.

(l)	It is the intention of the parties hereto to comply strictly with applicable usury laws, if any; accordingly, notwithstanding any provisions to the contrary in this Agreement or any other documents or instruments executed in connection herewith, in no event shall this Agreement or such documents or instruments require or permit the payment, taking, reserving, receiving, collecting or charging of any sums constituting interest under applicable laws which exceed the maximum amount permitted by such laws. If any such excess interest is called for, contracted for, charged, paid, taken, reserved, collected or received in connection with the Obligations or in any communication by Bank or any other person to the Borrower or any other person, or in the event all or part of the principal of the Obligations or interest thereon shall be prepaid or accelerated, so that under any of such circumstances or under any other circumstance whatsoever the amount of interest contracted for, charged, taken, collected, reserved, or received on the amount of principal actually outstanding from time to time under this Agreement shall exceed the maximum amount of interest permitted by applicable usury laws, if any, then in any such event it is agreed as follows: (i) the provisions of this paragraph shall govern and control, (ii) neither the Borrower nor any other person or entity now or hereafter liable for the payment of the Obligations shall be obligated to pay the amount of such interest to the extent such interest is in excess of the maximum amount of interest permitted by applicable usury laws, if any, (iii) any such excess which is or has been received notwithstanding this paragraph shall be credited against the then unpaid principal balance hereof or, if the Obligations have been or would be paid in full by such credit, refunded to the Borrower, and (iv) the provisions of this Agreement and the other documents or instruments executed in connection herewith, and any communication to the Borrower, shall immediately be deemed reformed and such excess interest

reduced, without the necessity of executing any other document, to the maximum lawful rate allowed under applicable laws as now or hereafter construed by courts having jurisdiction hereof or thereof. Without limiting the foregoing, all calculations of the rate of interest contracted for, charged, taken, collected, reserved, or received in connection herewith which are made for the purpose of determining whether such rate exceeds the maximum lawful rate shall be made to the extent permitted by applicable laws by amortizing, prorating, allocating and spreading during the period of the full term of the Obligations, including all prior and subsequent renewals and extensions, all interest at any time contracted for, charged, taken, collected, reserved or received. The terms of this paragraph shall be deemed to be incorporated in every loan document and communication relating to the Obligations.

6. **DEFINITION OF QUALIFIED ACCOUNT.** The term **"Qualified Account"**, as used herein, means an Account owing to Borrower which met the following specifications at the time it came into existence and continues to meet the same until it is collected in full:

(a) The Account is not more than ninety (90) days from the date of the invoice thereof.

(b) The Account arose from the performance of services or an outright sale of goods by Borrower, such goods have been shipped to the account debtor, and Borrower has possession of, or has delivered to Bank, shipping and delivery receipts evidencing such shipment.

(c) The Account is not subject to any prior assignment, claim, lien, or security interest, and Borrower will not make any further assignment thereof or create any further security interest therein, nor permit Borrower's rights therein to be reached by attachment, levy, garnishment or other judicial process.

(d) The Account is not subject to set−off, credit, allowance or adjustment by the account debtor, except discount allowed for prompt payment and the account debtor has not complained as to his liability thereon and has not returned any of the goods from the sale of which the Account arose.

(e) The Account arose in the ordinary course of Borrower's business and did not arise from the performance of services or a sale of goods to a supplier or employee of the Borrower.

(f) No notice of bankruptcy or insolvency of the account debtor has been received by or is known to the Borrower.

(g) The Account is not owed by an account debtor whose principal place of business is outside the United States of America, except Canada, unless supported by a letter of credit or foreign credit insurance acceptable to the Bank in all respects.

(h) The Account is not owed by an entity which is a parent, brother/sister, subsidiary or affiliate of Borrower.

(i)     The Account does not represent a deferred warranty sale.

(j)     The Account does not arise from an invoice coded as "RMA" (return merchandise authorization) pertaining to future returns.

(k)     The account debtor is not located in the State of New Jersey or in the State of Minnesota or West Virginia (or any other state that requires an entity to file a business activity report or similar document in order to bring suit or otherwise enforce its remedies against an account debtor in the courts or through any judicial process of such state), unless (i) Borrower has filed and shall file all legally required Notice of Business Activities Reports with the New Jersey Division of Taxation or the Minnesota Department of Revenue or the West Virginia Department of Revenue, as the case may be; or (ii) Borrower is exempt from such filing requirement.

(l)     The Account when aggregated with all of the Accounts of that account debtor does not exceed fifty (50%) percent of the then aggregate of Qualified Accounts.

(m)     The Account is not evidenced by a promissory note.

(n)     The Account did not arise out of any sale made on a bill and hold, dating or delayed shipment basis.

(o)     The Account does not arise out of a progress billing prior to completion of the order therefor.

(p)     Bank, in accordance with its normal credit policies, has not deemed the Account to be unacceptable; provided that, the Bank shall provide ten (10) days' prior written notice of any such ineligibility determination to Borrower and upon receipt of such notice by Borrower, the Borrowing Base shall be determined after giving effect to such ineligibility determination for all purposes of this Agreement.

PROVIDED THAT if at any time fifty (50%) percent or more of the aggregate amount of the Accounts due from any account debtor are unpaid in whole or in part more than ninety (90) days from the respective dates of invoice, from and after such time none of the Accounts (then existing or hereafter arising) due from such account debtor shall be deemed to be Qualified Accounts until such time as all Accounts due from such account debtor are (as a result of actual payments received thereon) no more than ninety (90) days from the date of invoice; Accounts payable by Borrower to an account debtor shall be netted against Accounts due from such account debtor and the difference (if positive) shall constitute Qualified Accounts from such account debtor for purposes of determining the Borrowing Base (notwithstanding paragraph (d) above); characterization of any Account due from an account debtor as a Qualified Account shall not be deemed a determination by Bank as to its actual value nor in any way obligate Bank to accept any Account subsequently arising from such account debtor to be, or to continue to deem such Account to be, a Qualified Account; it is Borrower's responsibility to determine the

creditworthiness of account debtors and all risks concerning the same and collection of Accounts are with Borrower; and all Accounts whether or not Qualified Accounts constitute Collateral.

7. **DEFINITION OF ELIGIBLE INVENTORY.** The term **"Eligible Inventory"**, as used herein, means Borrower's raw materials and finished goods which are initially and at all times until sold: new and unused (except, with Bank's written approval, used equipment held for sale or lease), in first−class condition, merchantable and saleable through normal trade channels; at a location which has been identified in writing to Bank; subject to a perfected first priority security interest in favor of Bank; owned by Borrower free and clear of any lien except in favor of Bank; not obsolete; not scrap, waste, defective goods and the like; have been produced by Borrower in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders promulgated thereunder; not stored with a bailee, warehouseman or similar party unless Bank has given its prior written consent thereto; not work in process; not perishable or alive; and have not been designated by Bank, in accordance with its normal credit policies, as unacceptable for any reason by notice to Borrower.

8. **BANK'S REPORTS**. After the end of each month, Bank will render to Borrower a statement of Borrower's Revolving Loan account with Bank hereunder, showing all applicable credits and debits. Each statement shall be considered correct and to have been accepted by Borrower and shall be conclusively binding upon Borrower in respect of all charges, debits and credits of whatsoever nature contained therein under or pursuant to this Agreement, and the closing balance shown therein, unless Borrower notifies Bank in writing of any discrepancy within twenty (20) days from the mailing by Bank to Borrower of any such monthly statement.

9. **CONDITIONS OF LENDING.**

(a) The obligation of Bank to continue to make Revolving Loans hereunder or issuing or causing to be issued any Letter of Credit hereunder shall be subject to the condition precedent that Bank shall have received all of the following, each in form and substance satisfactory to Bank:

(i) This Agreement, properly executed on behalf of the Company.

(ii) The Note drawn to the order of Bank in the face amount of the Credit Limit.

(iii) A true and correct copy of any and all leases pursuant to which Borrower is leasing any real property, together with a landlord's consent and waiver with respect to such real property.

(iv) Current searches of appropriate filing offices showing that (A) no state or federal tax liens have been filed and remain in effect against Company, (B) no financing statements have been filed and remain in effect against Company, except those financing statements relating to liens set forth on Schedule "B", the liens of the secured lender to be paid with the proceeds of the initial Revolving Loan and those financing

statements filed by the Bank, and (C) the Bank has duly filed all financing statements necessary to perfect the security interests granted hereunder, to the extent the security interests are capable of being perfected by filing.

(v)     A certificate of the Clerk/Secretary/Managing Member of the Company, certifying as to (A) the resolutions of the Managers/Directors and, if required, the Members/Shareholders of Company, authorizing the execution, delivery and performance of this Agreement and related documents, (B) the Certificate of Formation and Operating Agreement of Company, and (C) the signatures of the Managers, Members, officers or agents of Company authorized to execute and deliver this Agreement and other instruments, agreements and certificates, including Revolving Loan requests, on behalf of Company.

(vi)    A current certificate issued by the Secretary of State of the state of the Company's organization, certifying that Company is in compliance with all organizational requirements of such state.

(vii)   Evidence that Company is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.

(viii)  A current Borrowing Base Certificate.

(ix)    After giving effect to the Closing Date Restructuring and such other transactions to be consummated on the Closing Date not in contravention of this Agreement, Availability under the Borrowing Base is not less than $200,000.00 as of the date hereof.

(x)     Amended and Restated Intercreditor Agreement dated on or about the date hereof (as amended from time to time, the "**Crystal Intercreditor Agreement**"), with Crystal Financial SBIC LP, in its capacity as administrative and collateral agent (in such capacities, together with its successors and permitted assigns, "**Crystal**"), for the benefit and on behalf of the entities (each a "**Term Lender**" and collectively, and including their respective successors and assigns, the "**Term Lenders**"), who may from time to time become a "Lender" under (and as defined in) the Amended and Restated Term Loan Agreement dated as of the date hereof by and among, among others, the Borrowers, Crystal and the Term Lenders (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of the Crystal Intercreditor Agreement, the "**Crystal Term Loan Agreement**").

(xi)    A Customer Identification Information form and such other forms and verification as the Bank may need to comply with the U.S.A. Patriot Act.

(xii)   Such other documents, instruments and agreements as Bank in its reasonable discretion may require.

(xiii) Consummation of the Closing Date Restructuring, including, for avoidance of doubt, the Debt Discharges and the Assignment and Debt Cancellation Agreement (as those terms are defined in the preamble to this Agreement).

(xiv) the Guaranty from Holdings.

(b) The obligation of Bank to make each Revolving Loan shall be subject to the further conditions precedent on such date:

(i) the representations and warranties contained in Sections 3 and 4 hereof are correct in all material respects (without duplication of any materiality qualifier contained therein) on and as of the date of such Revolving Loan or the issuance of a Letter of Credit, as the case may be, as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date; and

(ii) no event has occurred and is continuing, or would result from such Revolving Loan or issuance of such Letter of Credit, as the case may be, which constitutes an Event of Default or which, with notice or the passage of time or both, would constitute an Event of Default.

10. **CAPITAL ADEQUACY.**

(a) If Bank shall determine that, after the date hereof, the adoption of any applicable law, rule or regulation, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Bank or its parent corporation with any requirement or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:

(i) shall subject Bank or its parent corporation to any tax, duty or other similar charge with respect to any Letter of Credit, the Revolving Loans or the Note or shall change the basis of taxation of payments to Bank or its parent corporation of the Obligations or reimbursement obligations of Letters of Credit or the principal of or interest on the Revolving Loans or of any other amounts due under this Agreement in respect of any Letter of Credit, the Revolving Loans or the Note (except for any change in respect of any tax imposed on the overall income of Bank or its parent corporation); or

(ii) shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System) against assets of, deposits with or for the account of, or credit extended by, Bank or its parent corporation or shall impose on Bank or its parent corporation any other condition affecting any Letter of Credit, the Revolving Loans or the Note;

and the result of any of the foregoing is to increase the cost to Bank or its parent corporation of issuing or maintaining any Letter of Credit or of making or maintaining any Revolving Loans, or

to reduce the amount of any sum received or receivable by Bank or its parent corporation under the application and agreement pursuant to which the Letter of Credit was issued, this Agreement or the Note with respect thereto, by an amount deemed by Bank or its parent corporation to be material, then upon demand by Bank, Borrower shall pay to Bank such additional amount or amounts as will compensate Bank or its parent corporation for such increased cost or reduction.

(b)     If Bank shall determine that the adoption after the date hereof of any applicable law, rule or regulation regarding capital adequacy, or any change therein after the date hereof, any change after the date hereof in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank or its parent corporation with any guideline or request issued after the date hereof regarding capital adequacy (whether nor not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Bank's or the Bank's parent corporation's capital as a consequence of any Letters of Credit, the Revolving Loans or the Bank's obligations hereunder to a level below that which the Bank or its parent corporation could have achieved but for such adoption, change or compliance (taking into consideration the Bank's policies with respect to capital adequacy and those of the Bank's parent corporation) by an amount reasonably deemed to the Bank or its parent corporation to be material, then from time to time on demand by the Bank, the Borrower shall pay to the Bank such additional amount or amounts as will compensate the Bank or its parent corporation for such reduction.

(c)     Bank shall allocate such cost increases or reductions in its returns among its customers reasonably and in good faith and on an equitable basis.  Notwithstanding anything to the contrary contained herein, the Borrower shall not have any obligation to pay to the Bank amounts owing under this section unless, at the time it requests such compensation, it is the policy or general practice of the Bank to request compensation for comparable costs in similar circumstances under other comparable loan agreements.  Certificates of the Bank sent to the Borrower from time to time claiming compensation under this section, stating the reason therefor and setting forth in reasonable detail the calculation of the additional amount or amounts to be paid to the Bank hereunder shall be conclusive absent manifest error.  In determining such amounts, the Bank or its parent corporation may use any reasonable averaging and attribution methods consistent with the other provisions of this section.

11.     **COLLECTIONS; SET OFF; DEPOSIT ACCOUNTS; NOTICE OF ASSIGNMENT; EXPENSES; POWER OF ATTORNEY.**

(a)     Company will immediately, upon receipt of all checks, drafts, cash and other remittances in payment of any Inventory sold or in payment or on account of Company's accounts, contracts, contract rights, notes, bills, drafts, acceptances, general intangibles, choses in action and all other forms of obligations, deliver the same to Bank accompanied by a remittance report in form specified by Bank.  Said proceeds shall be delivered to Bank in the same form received except for the endorsement of Company where necessary to permit collection of items, which endorsement Company agrees to make.  Bank will credit (conditional upon final collection) all such payments, including electronic payments, against the principal or interest of any Revolving Loans secured hereby; provided, however, for the purpose of

computing interest, the amount of principal paid shall continue to accrue interest at the applicable interest rate until two (2) Business Days after receipt by Bank of any such payment. The order and method of such application shall be in the sole discretion of Bank and any portion of such funds which Bank elects not to so apply shall be paid over from time to time by Bank to Company. Bank will at all times have the right to require Company (i) to enter into a lockbox arrangement with Bank for the collection of such remittances and payments, or (ii) to maintain its deposit accounts at Bank, or, in the alternative, at another financial institution which has agreed to accept drafts drawn on it by Bank under a written depository transfer agreement with Bank and to block Company's account and waive its rights as against such account.

(b)     Borrower, Holdings and any other guarantor hereby grants to Bank a lien, security interest and right of setoff as security for all liabilities and Obligations to Bank, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Bank or in transit to the Bank.  At any time, without demand or notice, Bank may set off the same or any part thereof and apply the same to any liability or Obligation of Borrower, Holdings and any other guarantor even though unmatured and regardless of the adequacy of any other collateral securing the Obligations.  ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF BORROWER, HOLDINGS OR ANY OTHER GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

(c)     Bank shall be Company's main bank of deposit.  For each deposit account that Borrower at any time opens or maintains, Company shall, at Bank's request and option, pursuant to an agreement in form and substance satisfactory to Bank, either (i) cause the depositary bank to agree to comply at any time with instructions from Bank to such depositary bank directing the disposition of funds from time to time credited to such deposit account, without further consent of Company, or (ii) arrange for Bank to become the customer of the depositary bank with respect to the deposit account, with Borrower being permitted, only with the consent of Bank, to exercise rights to withdraw funds from such deposit account.  Bank agrees with Company that Bank shall not give any such instructions or withhold any withdrawal rights from Company, unless an Event of Default has occurred and is continuing, or, after giving effect to any withdrawal not otherwise permitted by this Agreement would occur. The provisions of this paragraph shall not apply to (i) any deposit account for which Company, the depositary bank and Bank have entered into a cash collateral agreement specially negotiated among Borrower, the depositary bank and Bank for the specific purpose set forth therein, (ii) deposit accounts specifically and exclusively used as trust accounts for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's salaried employees, (iii) deposit accounts which, in the aggregate, have less than Five Thousand ($5,000.00) Dollars on deposit, or (iv) a deposit account of any Borrower that contains solely the proceeds, or any portion thereof, of the PPP Loans (as that term is defined below in Section 15(j)).

(d)     Bank may at any time, after the occurrence of an Event of Default or an event which, with notice or the passage of time or both, would constitute an Event of Default,

notify account debtors that Collateral has been assigned to Bank and that payments shall be made directly to or as directed by Bank. Upon request of Bank at any time, Company will so notify such account debtors and will indicate on all billings to such account debtors that their Accounts must be paid directly to or as directed by Bank. Bank shall have full power to collect, compromise, endorse, sell or otherwise deal with the Collateral or proceeds thereof in its own name or in the name of Company.

(e) Borrower shall pay to Bank within five (5) days of demand any and all reasonable counsel fees and other expenses incurred by Bank in connection with the preparation, interpretation, enforcement, administration or amendment of this Agreement, or of any documents relating thereto, and any and all expenses, including, but not limited to, a collection charge on all Accounts collected, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Bank to obtain or enforce payment of any Account either as against the account debtor, Borrower, Holdings or any other guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Bank's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses incurred or paid by Bank in connection with the administration, supervision, protection or realization on any security held by Bank for the debt secured hereby, whether such security was granted by Borrower or Holdings or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Bank in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Bank in connection herewith, all of which amounts shall be considered advances to protect Bank's security, and shall be secured hereby. At its option, and without limiting any other rights or remedies, Bank may at any time pay or discharge any taxes, liens, security interests or other encumbrances at any time levied against or placed on any of the Collateral, and may procure and pay any premiums on any insurance required to be carried by Company, and provide for the maintenance and preservation of any of the Collateral, and otherwise take any action reasonably deemed necessary to Bank to protect its security, and all amounts expended by Bank in connection with any of the foregoing matters, including reasonable attorneys' fees, shall be considered obligations of Company and shall be secured hereby.

(f) Company does hereby make, constitute and appoint any officer or agent of Bank as Company's true and lawful attorney−in−fact, with power to endorse the name of Company or any of Company's Managers, Members, officers or agents upon any notes, checks, drafts, money orders, or other instruments of payment (including payments payable under any policy of insurance on the Collateral) or Collateral that may come into possession of Bank in full or part payment of any amounts owing to Bank; to sign and endorse the name of Company or any of Company's Managers, Members, officers or agents upon any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with Accounts, and any instrument or documents relating thereto or to Company's rights therein; to give written notice to such office and officials of the United States Post Office to effect such change or changes of address so that all mail addressed to Company may be delivered directly to Bank; granting upon Company's said attorney full

power to do any and all things necessary to be done in and about the premises as fully and effectually as Company might or could do, and hereby ratifying all that said attorney shall lawfully do or cause to be done by virtue hereof. Neither Bank nor the attorney shall be liable for any acts or omissions nor for any error of judgment or mistake, except for their gross negligence or willful misconduct. This power of attorney shall be irrevocable for the term of this Agreement and all transactions hereunder and thereafter as long as Company may be indebted to Bank. Notwithstanding anything to the contrary contained herein Bank shall not exercise the power of attorney granted herein unless and until there is an Event of Default which is continuing.

12. **FINANCING STATEMENTS.** Company hereby irrevocably authorizes Bank at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of Company or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether Company is an organization, the type of organization and any organization identification number issued to Company, and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted Collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. Company agrees to furnish any such information to Bank promptly upon request. Company also ratifies its authorization for Bank to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

13. **COMPANY'S REPORTS.**

(a) Borrower shall, upon the Bank's request, deliver to Bank, monthly, a schedule in form and content satisfactory to Bank describing the invoices issued by Borrower since the last schedule submitted to Bank. The schedules to be provided under this subsection are solely for the convenience of Bank in administering this Agreement and maintaining records of the Collateral. Borrower's failure to provide Bank with any such schedule shall not affect the security interest of Bank in such Accounts.

(b) Borrower shall, upon Bank's request, cause all of its invoices, including the copies thereof, to be printed and to bear consecutive numbers and shall prepare and issue its invoices in such consecutive numerical order. If requested by Bank, all copies of invoices not previously delivered to Bank shall be delivered to Bank with each schedule of Accounts. Copies of all invoices which are voided or canceled or which for any other reason do not evidence an Account shall be included in such delivery. If any invoice or copy thereof is lost, destroyed or otherwise unavailable, Borrower shall account in writing, in form satisfactory to Bank, for such missing invoice.

(c) Within thirty (30) calendar days after the end of each month or on such other more frequent basis as may be required by Bank from time to time, Borrower shall submit

to Bank an aging report in form satisfactory to Bank showing the amounts due and owing on all Accounts according to Borrower's records as of the close of such month or such shorter period as may be required by Bank from time to time, together with such other information as Bank may require. If Borrower's monthly aging reports are prepared by an accounting service or other agent, Borrower hereby authorizes such service or agent to deliver such aging reports and any other related documents to Bank.

(d)    Within thirty (30) calendar days after the end of each month or on such other basis as may be required by Bank from time to time, Borrower shall submit to Bank an accounts payable aging report in form satisfactory to Bank showing the amounts due and owing on all accounts payable according to Borrower's records as of the close of such month or such shorter period as may be required by Bank from time to time, together with such other information as Bank may require. If Borrower's monthly accounts payable aging reports are prepared by an accounting service or other agent, Borrower hereby authorizes such service or agent to deliver such accounts payable aging reports and any other related documents to Bank.

(e)    Within thirty (30) calendar days after the end of each month or on such other more frequent basis as may be required by Bank from time to time, Borrower shall furnish to Bank a certificate describing all of Borrower's Inventory by value based on cost, listing all Inventory by nature, quantity and location, together with such other information as Bank may require.

(f)    Borrower shall deliver to Bank all documents, as frequently as indicated below, or at such other times as Bank may reasonably request, and all other documents and information reasonably requested by Bank:

|  | DOCUMENT | FREQUENCY DUE |
|---|---|---|
| (i) | A Borrowing Base Certificate, including cash receipts, credit memos, sales, debit memos, the unpaid Revolving Loan balance, new borrowing requests and the adjusted Revolving Loan balance | Monthly, reported within twenty (20) days after the end of each fiscal month of Borrower, together with a weekly accounts receivable roll forward reported each following Tuesday. |
| (ii) | List of names and addresses of account debtors to whom Borrower has made sales during the previous fiscal year | Annually, within sixty (60) days after the end of each fiscal year of Borrower |
| (iii) | Reconciliation report, in form satisfactory to Bank, showing all accounts, collections, payments, credits, and extensions since the preceding report | Monthly, within forty-five (45) days after the end of each fiscal month of Borrower |

| (iv) | Projections of Borrower's balance sheet, statement of profit and loss and cash flow for the next succeeding fiscal year broken down on a month to month basis | Annually, within seventy-five (75) days after the end of the fiscal year of Borrower ended December 31, 2021, and thereafter within sixty (60) days after the end of each following fiscal year of Borrower |
|---|---|---|
| (v) | A listing of the names and addresses of all suppliers and vendors from whom Borrower has made purchases during the previous fiscal year, together with a listing of any other suppliers or vendors from whom Borrower expects to make purchases during the succeeding fiscal year | Annually, within sixty (60) days after the end of each fiscal year of Borrower |
| (vi) | Notice of noncompliance with the provisions of this Agreement | Immediately upon learning of such noncompliance, or if any representation or warranty contained herein is no longer true or accurate |
| (vii) | Compliance Certificate in the form annexed hereto as Exhibit 2 | As soon as available and in any event within forty-five (45) days after the close of each quarterly period of Borrower's fiscal year |

(g)    Borrower will furnish Bank as soon as available, and in any event within forty-five (45) days after the close of each monthly period of its fiscal year, a balance sheet as of the end of such period, and a statement of income and retained earnings for the period commencing at the end of the previous fiscal year and ending with the end of such period, and a statement of cash flows of the Company (other than Holdings in the case of the fiscal months ended on December 31, 2021, January 31, 2022, as well as February 28, 2022 if the Closing Date falls after January 31, 2022) for the portion of the fiscal year ended with the last day of such period, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the previous fiscal year, and all prepared in accordance with generally accepted accounting principles consistently applied, certified by the chief financial officer of the Borrower (subject to year-end adjustment).

(h)    Borrower will furnish Bank, annually, as soon as available, and in any event within one hundred fifty (150) days after the end of the fiscal year of Borrower ended on December 31, 2021, and within one hundred twenty (120) days after the end of each following fiscal year of Borrower thereafter, audited financial statements of the Company (other than Holdings in the case of the fiscal year ended on December 31, 2021) including a balance sheet as of the end of such fiscal year, and a statement of income and retained earnings for such fiscal year, and a statement of cash flows for such fiscal year, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the prior fiscal year, and all prepared in accordance with generally accepted accounting principles, accompanied by an unqualified opinion prepared by independent public accountants selected by the Borrower and acceptable to Bank, provided however for the fiscal year of Borrower ended December 31, 2021 only, such opinion may be qualified.

(i)    Borrower will promptly, upon receipt thereof, deliver to Bank, copies of any reports submitted to the Company by Company's independent public accountants in connection with the examination of the financial statements of the Company made by such accountants (the so-called "**Management Letter**").

(j)    Borrower will furnish Bank, on or before 2:00 PM (Eastern Standard Time) on Thursday of each week (or if such day is not a Business day, on the next succeeding Business Day) (1) the Approved Budget, in form and substance reasonably satisfactory to the Bank, and prepared by the Borrower in good faith based upon reasonable assumptions for the period covered thereby; and (2) an Approved Budget Variance Report, in form and substance reasonably satisfactory to the Bank and including supporting documentation as reasonably requested by the Bank from time to time.

(k)    In addition to the foregoing, the Borrower promptly shall provide Bank with such other and additional information concerning the Borrower, the Collateral, the operation of the Borrower's business, and the Borrower's financial condition, including financial reports and statements, as Bank may from time to time reasonably request from the Borrower.  All financial information provided Bank by the Borrower shall be prepared in accordance with generally accepted accounting or auditing principles (as applicable) applied consistently in the preparation thereof and with prior periods to fairly reflect the financial conditions of the Borrower at the close of, and its results of operations for, the periods in question.

14.    **GENERAL AGREEMENTS OF COMPANY.**

(a)    Company agrees to keep all the Collateral insured with coverage and in amounts not less than that usually carried by one engaged in a like business and in any event not less than that required by Bank with loss payable to Bank and Company, as their interests may appear, hereby appointing Bank as attorney for Company in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts.  As further assurance for the payment and performance of the Obligations, Company hereby assigns to Bank all sums, including returns of unearned premiums, which may become payable under any policy of insurance on the Collateral and Company hereby directs each insurance company issuing any such policy to make payment of such sums directly to Bank.

(b)    Bank or its agents have the right to inspect the Collateral and all records pertaining thereto at intervals to be determined by Bank and without hindrance or delay. Bank shall also have the right to obtain from time to time at the sole cost and expense of Bank an appraisal of the Collateral by an appraiser acceptable to Bank, provided however that following an Event of Default that has occurred and is continuing, such appraisal shall be conducted at Company's sole cost and expense.

(c)    Although, as above set forth, Bank has a continuing security interest in all of Company's Collateral and in the proceeds thereof, Borrower will at all times maintain as the minimum security hereunder a Borrowing Base not less than the aggregate unpaid principal of all Revolving Loans made hereunder and if Borrower fails to do so, Borrower will immediately

make the necessary reduction in the unpaid principal amount of said Revolving Loans so that the Revolving Loans outstanding hereunder do not in the aggregate exceed the Borrowing Base.

(d)     Company will at all times keep accurate and complete records of Company's Inventory, Accounts and other Collateral, and Bank, or any of its agents, shall have the right, upon reasonable prior notice, to call at Company's place or places of business at intervals to be determined by Bank (but not more than two (2) times in any twelve (12) month period absent the occurrence of an Event of Default hereunder), and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence which relate to Company's Accounts, and other Collateral or other transactions, between the parties thereto and the general financial condition of Company (provided that any such audit shall not unreasonably interfere with the normal business operations of Company) and Bank may remove any of such records temporarily for the purpose of having copies made thereof.  Borrower shall pay to Bank an audit fee of One Thousand Fifty ($1,050.00) Dollars per day, per audit, plus expenses, provided, however, in no event shall the aggregate amount of the audit fees and expenses exceed Twenty Thousand ($20,000) Dollars per audit.

(e)     Company will maintain a standard and modern system of accounting which enables Company to produce financial statements in accordance with generally accepted accounting principles and maintain records pertaining to the Collateral that contain information as from time to time may be requested by Bank.

(f)     Company will maintain its legal existence in good standing and comply with all laws and regulations of the United States or of any state or states thereof or of any political subdivision thereof, or of any governmental authority which may be applicable to it or to its business.

(g)     Company will pay all real and personal property taxes, assessments and charges and all franchises, income, unemployment, old age benefits, withholding, sales and other taxes assessed against it, or payable by it at such times and in such manner as to prevent any penalty from accruing or any lien or charge from attaching to its property.

(h)     Bank may in its own name or in the name of others communicate with account debtors in order to verify with them to Bank's satisfaction the existence, amount and terms of any Accounts.

(i)     This Agreement may but need not be supplemented by separate assignments of Accounts and if such assignments are given the rights and security interests given thereby shall be in addition to and not in limitation of the rights and security interests given by this Agreement.

(j)     If any of Company's Accounts arise out of contracts with the United States or any department, agency, or instrumentality thereof, Company will immediately notify Bank thereof in writing and execute any instruments and take any steps required by Bank in

order that all monies due and to become due under such contracts shall be assigned to Bank and notice thereof given to the Government under the Federal Assignment of Claims Act.

(k)     If any of Company's Accounts should be evidenced by promissory notes, trade acceptances, or other instruments for the payment of money, Company will immediately deliver same to Bank, appropriately endorsed to Bank's order and, regardless of the form of such endorsement, Company hereby waives presentment, demand, notice of dishonor, protest and notice of protest and all other notices with respect thereto.

(l)     If any goods are at any time in the possession of a bailee, Company shall promptly notify Bank thereof and, if requested by Bank, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to Bank, that the bailee holds such Collateral for the benefit of Bank and shall act upon the instructions of Bank, without the further consent of Company.  Bank agrees with Company that Bank shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by Company with respect to the bailee.

(m)     If Company is at any time a beneficiary under a letter of credit now or hereafter issued in favor of Company, Company shall promptly notify Bank thereof and, at the request and option of Bank, Company shall, pursuant to an agreement in form and substance satisfactory to Bank, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Bank of the proceeds of any drawing under the letter of credit, or (ii) arrange for Bank to become the transferee beneficiary of the letter of credit, with Bank agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied in the same manner as any other payment on an Account.

(n)     If Company shall at any time hold or acquire a commercial tort claim, Company shall immediately notify Bank in a writing signed by Company of the brief details thereof and grant to Bank in such writing a security interest therein, and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Bank.

(o)     Company will promptly pay when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement, or upon any note or notes evidencing the Obligations, and will, at the request of Bank, promptly furnish Bank the receipted bills therefor.  At its option, Bank may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral, may pay for insurance on the Collateral and may pay for the maintenance and preservation of the Collateral.  Company agrees to reimburse Bank on demand for any payments made, or any expenses incurred by Bank pursuant to the foregoing authorization, and upon failure of the Company so to reimburse Bank, any such sums paid or advanced by Bank shall be deemed secured by the Collateral and constitute part of the Obligations.

(p)     Company shall promptly notify Bank upon receipt of notification of any potential or known release or threat of release of any Hazardous Substances under any Environmental Law.  As used herein, the following terms shall have the following meanings:

"**Hazardous Substances**" means pollutants, contaminants, hazardous substances, hazardous wastes, petroleum and fractions thereof, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law; and

"**Environmental Law**" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

(q)     Except for Bank's gross negligence or willful misconduct, Company will indemnify and save Bank harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Bank may sustain or incur by reason of defending or protecting this security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral.  This indemnity shall survive the repayment of the Obligations and the termination of Bank's agreement to make Revolving Loans available to Borrower and the termination of this Agreement.

(r)     At the option of Bank, Company will furnish to Bank, from time to time, within five (5) days after the accrual in accordance with applicable law of Company's obligation to make deposits for F.I.C.A. and withholding taxes and/or sales taxes, proof satisfactory to Bank that such deposits have been made as required.

(s)     Should Company fail to make any of such deposits or furnish such proof then Bank may, in its sole and absolute discretion, (a) make any of such deposits or any part thereof, (b) pay such taxes, or any part thereof, or (c) set−up such reserves as Bank, in its judgment, shall deem necessary to satisfy the liability for such taxes.  Each amount so deposited or paid shall constitute an advance under the terms hereof, repayable on demand with interest, as provided herein, and secured by all Collateral and any other property at any time pledged by Company with Bank.  Nothing herein shall be deemed to obligate Bank to make any such deposit or payment or set−up such reserve and the making of one or more of such deposits or payments or the setting−up of such reserve shall not constitute (i) an agreement on Bank's part to take any further or similar action, or (ii) a waiver of any default by Company under the terms hereof.

(t)     All advances by Bank to Borrower under this Agreement and under any other agreement constitute one general revolving fluctuating loan, and all indebtedness of Borrower to Bank under this and under any other agreement constitute one general Obligation. Each advance to Borrower hereunder or otherwise shall be made upon the security of all of the Collateral held and to be held by Bank.  It is distinctly understood and agreed that all of the rights of Bank contained in this Agreement shall likewise apply, insofar as applicable, to any modification of or supplement to this Agreement and to any other agreements between Bank and Borrower.  Any default of this Agreement by Borrower shall constitute, likewise, a default by Borrower of any other existing agreement with Bank, and any default by Borrower of any other

agreement with Bank shall constitute a default of this Agreement. All Obligations of Borrower to Bank shall become due and payable upon termination of this Agreement.

(u) Company hereby grants to Bank for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations of any kind or character owing from Company to Bank are fully paid and discharged, the right to use all premises or places of business which Company presently has or may hereafter have and where any of the Collateral may be located, at a total rental for the entire period of $1.00. Bank agrees not to exercise the rights granted in this paragraph unless and until Bank determines to exercise its rights against the Collateral.

(v) Company will, at its expense, upon request of Bank promptly and duly execute and deliver such documents and assurances and take such actions as may be necessary or desirable or as Bank may request in order to correct any defect, error or omission which may at any time be discovered or to more effectively carry out the intent and purpose of this Agreement and to establish, perfect and protect Bank's security interest, rights and remedies created or intended to be created hereunder. Without limiting the generality of the above, Company will join with Bank in executing notices appropriate under applicable Federal or state law in form satisfactory to Bank and filing the same in all public offices and jurisdictions wherever and whenever requested by Bank.

(w) Company shall perform any and all further steps requested by Bank to perfect Bank's security interest in Inventory, such as leasing warehouses to Bank or its designee, placing and maintaining signs, appointing custodians, maintaining membership records and transferring Inventory to warehouses. A physical listing of all Inventory, wherever located, shall be taken by Company at least annually and whenever requested by Bank if one or more of the Events of Default exist.

(x) Company hereby grants to Bank for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations of any kind or character owed to Bank are fully paid and discharged, a non−exclusive irrevocable royalty−free license in connection with Bank's exercise of its rights hereunder, to use, apply or affix any trademark, trade name logo or the like and to use any patents, in which the Company now or hereafter has rights, which license may be used by Bank upon and after the occurrence of any one or more of the Events of Default, provided, however, that such use by Bank shall be suspended if such Events of Default are cured. This license shall be in addition to, and not in lieu of, the inclusion of all of Company's trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses in the Collateral; in addition to the right to use said Collateral as provided in this paragraph, Bank shall have full right to exercise any and all of its other rights regarding Collateral with respect to such trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses.

(y) Company covenants and agrees that during the term of this Agreement, neither Company nor any of its owners, subsidiaries or affiliates shall, directly or indirectly, by operation of law or otherwise (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any person

described in Section 4(l) above, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempt to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and Company shall deliver to Bank any certification or other evidence requested from time to time by Bank in its reasonable discretion, confirming Company's compliance with this section, or (iv) cause or permit any of the funds of Company that are used to repay any loans to be derived from any unlawful activity with the result that the making of any loans would be in violation of law.

(z) Company covenants and agrees that during the term of this Agreement, neither Company nor any of its owners, subsidiaries or affiliates shall, directly or indirectly, by operation of law or otherwise, knowingly cause or permit (i) any of the funds or properties of Company or any of its owners, subsidiaries or affiliates that are used to repay any loans to constitute property of, or be beneficially owned directly or indirectly by, any person subject to sanctions or trade restrictions under United States law (**"Embargoed Person"** or **"Embargoed Persons"**) that is identified on (A) the "List of Specially Designated Nationals and Blocked Person" (the **"SDN List"**) maintained by OFAC and/or on any other similar list (**"Other List"**) maintained by OFAC pursuant to any authorizing statutes including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or regulation promulgated thereunder, with the result that the investment in Company (whether directly or indirectly) is prohibited by law, or any loans made by Bank would be in violation of law, or (B) the Executive Order, any related enabling legislation or any other similar Executive Orders, or (ii) any Embargoed Person to have any direct or indirect interest, or any nature whatsoever in Company or any of its owners, subsidiaries or affiliates, with the result that the investment in Company (whether directly or indirectly) is prohibited by law or any of the transactions contemplated hereunder is in violation of law.

15. **COMPANY'S NEGATIVE COVENANTS.** Company will not at any time:

(a) <u>(Holding Company Status)</u> Except as expressly permitted under this Agreement, Holdings shall not engage in any business or activity, hold any assets or incur any indebtedness or other liabilities, other than (i) the direct or indirect ownership of all outstanding membership interests of the Borrowers, (ii) maintenance of its corporate existence, (iii) the participation in tax, accounting and other administrative activities as a member of the consolidated group of companies including the Borrowers and (iv) the execution, delivery and the performance of its rights and obligations under (A) this Agreement, the Guaranty and the Security Agreement (Pledged Collateral), and (B) the Crystal Term Loan Agreement and the other Loan Documents (as defined in the Crystal Term Loan Agreement) to which Holdings is a party, as such Loan Documents may be amended from time to time consistent with the Crystal Intercreditor Agreement, and (C) the PPP Loan Guaranty; <u>provided</u> that, such covenant shall not restrict any action taken by Holdings necessary to consummate the Closing Date Restructuring as expressly outlined in the related closing documents;

(b)        (Minimum Consolidated Fixed Charge Coverage Ratio) as of the end of each fiscal quarter with respect to the immediately preceding twelve (12) month period ending March 31, 2023, and for each twelve (12) month period ending at the end of each fiscal quarter thereafter, permit the Consolidated Fixed Charge Coverage Ratio to be less than 1 to 1; notwithstanding the foregoing, the Company shall have fifteen (15) days following the day on which financial statements are required to be delivered to provide the Bank with evidence of a cash equity infusion in an amount sufficient to maintain the required minimum Consolidated Fixed Charge Coverage Ratio, provided however no more than two such equity cures will be permitted in any twelve (12) month period (the "**Permitted Equity Cure(s)**");

(c)        (Minimum Availability) permit its Availability to be less than Two Hundred Thousand ($200,000.00) Dollars as at the end of any weekly period; provided that, this covenant shall be suspended in the event that (x) the Company furnishes the Bank with evidence of compliance with the Consolidated Fixed Charge Coverage Ratio set forth more fully in Section 15(b) for the period ending March 31, 2023, or (y) if an Event of Default exists due to the Company's failure to comply with the Consolidated Fixed Charge Coverage Ratio set forth more fully in Section 15(b) for the period ending March 31, 2023, the Company has timely cured such Event of Default in accordance with Section 15(b), and further provided no other Event of Default under Section 16(a)(i), (ii), (x), or (xi) has occurred and is continuing and the Agreement hasn't been previously terminated. The term "**Availability**" as used herein shall mean the amount by which the Borrowing Base exceeds the aggregate amount of Revolving Loans, including the sum of the aggregate amount undrawn on all Letters of Credit and acceptances issued for the account of Borrower, plus the aggregate unrestricted cash of Company on deposit in an account maintained at Bank or subject to a deposit account control agreement in favor of Bank. Company shall deliver a Compliance Certificate to the Bank weekly on Thursday of each week reporting the Availability as of Tuesday of such weekly period in addition to Company's delivery of quarterly Compliance Certificates as required pursuant to Section 13(f)(vii) hereof.

(d)        (Disposition of Collateral) sell, assign, exchange or otherwise dispose of any of the Collateral, other than (i) dispositions of Inventory consisting of (w) scrap, waste, defective goods and the like; (x) obsolete goods; (y) finished goods sold in the ordinary course of business or any interest therein to any individual, partnership, trust, corporation or limited liability company; and (z) Equipment which is no longer required or deemed necessary for the conduct of Borrower's business, so long as Borrower receives therefor a sum substantially equal to such Equipment's fair market value, remits such sum to Bank in accordance with the terms of this Agreement or replaces such Equipment with other equipment of similar value which is subject to a first security interest in Bank's favor, (ii) sales, assignments, leases, subleases, conveyances, transfers, and other dispositions of any Collateral (other than Inventory exceeding $250,000) by any Borrower to any other Borrower, (iii) so long as no Event of Default then exists or would arise therefrom, sales, assignments, leases, conveyances, transfers, and other dispositions not otherwise permitted under this Section 15(d) in an amount up to $100,000 in the aggregate in any calendar year and (iv) dispositions necessary to consummate the Closing Date Restructuring as expressly outlined in the related closing documents. Notwithstanding the foregoing, up to Six Million Three Hundred Thousand ($6,300,000) Dollars Inventory of Borrower may be sold via non-ordinary course bulk transactions for less than fifty (50%) percent of cost, but greater than twenty-five (25%) percent of cost (the "**Permitted Non-Ordinary Course Inventory Sales**") and an additional inventory component of the Borrowing Base

entitled "**Other Inventory**" shall be created such that the Permitted Non-Ordinary Course Inventory Sales permitted hereunder shall remain liquidity neutral after giving effect to the removal of the subject Inventory from the Borrowing Base. The amount of the Other Inventory draws are the product of the value of the inventory in the Borrowing Base (50% of cost) prior to the Permitted Non-Ordinary Course Sales minus the receipts from the Permitted Non-Ordinary Course Sales of the inventory (as long as such sales are less than 50% of cost but greater than or equal to 25% of cost). The additional Availability of the Other Inventory shall be limited to a maximum of One Million ($1,000,000) Dollars and shall be subject to and supported by documentation acceptable to the Bank. Draws will be permitted through December 31, 2022 on a one-time basis, and shall be amortized as outlined more fully in Section 5(c) above;

(e)     (Liens) create, permit to be created or suffer to exist any lien, encumbrance or security interest of any kind ("**Lien**") upon any of the Collateral or any other property of Borrower, now owned or hereafter acquired, other than the Liens in favor of Crystal as described in the Crystal Intercreditor Agreement, whether now existing or hereafter arising, and except for: (i) landlords', carriers', warehousemen's, mechanics' and other similar Liens arising by operation of law in the ordinary course of Borrower's business; (ii) Liens arising out of pledge or deposits under worker's compensation, unemployment insurance, old age pension, social security, retirement benefits or other similar legislation; (iii) purchase money Liens arising in the ordinary course of business for the purchase of equipment (so long as the indebtedness secured thereby does not exceed the lesser of the cost or fair market value of the property subject thereto, and such Lien extends to no other property); (iv) Liens for unpaid taxes that are either (x) not yet due and payable, or (y) are subject of permitted protests; (v) Liens which are the subject of permitted protests; (vi) those Liens and encumbrances set forth on Schedule "B" annexed hereto; and (vii) Liens in favor of Bank; the term "permitted protests" as used herein means the right of the Borrower to protest any Lien (other than a Lien that secures the Obligations), tax (other than payroll taxes or taxes that are the subject of a federal or state tax Lien) or rental payment, provided that (x) a reserve with respect to such liability is established on the books of the Borrower in an amount that is reasonably satisfactory to the Bank, (y) any such protest is instituted and diligently prosecuted by the Borrower in good faith, and (z) the Bank is satisfied that, while such protest is pending, there will be no impairment of the enforceability, validity or priority of any of the Liens of the Bank in and to the Collateral; and provided however that any Lien created or suffered to exist which is not permitted hereby shall be removed on or bonded within thirty (30) days from the date of Borrower's knowledge thereof unless such Lien impairs the enforceability, validity or priority of the Bank's Lien on the Collateral in which no grace period shall be applicable;

(f)     (Redemptions, Distributions, Etc.) purchase, acquire, redeem, retire, or make any commitments to purchase, acquire, redeem or retire any membership or stock interest of Company whether now or hereafter outstanding or declare, pay or make any distributions to its members or shareholders, excepting only that (i) Company may declare and make dividend payments or other distributions with respect to its common stock payable solely in additional shares of its common stock and (ii) Holdings may make Tax Distributions;

(g)     (Changes to Operating Agreement) make or permit to be made any material changes to the Operating Agreement of Company without first obtaining the prior written consent of Bank, such consent not to be unreasonably withheld or delayed;

(h)     (Loans) make any loans or advances to any individual, partnership, trust, corporation or other limited liability company, including without limitation Borrower's Managers, Members, officers or employees, except (i) advances to officers or employees with respect to expenses incurred by them in the ordinary course of their duties which are properly reimbursable by Borrower and (ii) loans or advances made by a Borrower to any other Borrower so long as such indebtedness is permitted under Section 15(j)(ii) below and does not exceed Five Hundred Thousand ($500,000.00) Dollars in the aggregate absent the Bank's prior written consent;

(i)     (Guarantees) assume, guaranty, endorse or otherwise become directly or contingently liable in respect of (including without limitation by way of agreement, contingent or otherwise, to purchase, provide funds to or otherwise invest in a debtor or otherwise to assure a creditor against loss), any indebtedness (except guarantees by endorsement of instruments for deposit or collection in the ordinary course of business and guarantees in favor of Bank) of any individual, partnership, trust, corporation or other limited liability company, except for existing and future guarantees and other contingent obligations under (i) the Crystal Term Loan Agreement and (ii) that certain PPP Loan Guaranty (as that term is defined at the conclusion of this Section 15 below);

(j)     (Indebtedness) issue evidence of indebtedness or suffer to exist indebtedness in addition to indebtedness to the Bank except (i) indebtedness or liabilities of the Borrower other than for money borrowed, incurred or arising in the ordinary course of business, (ii) indebtedness of the Borrower for money borrowed which has been subordinated to Bank on terms and conditions satisfactory to the Bank, (iii) indebtedness to the Term Lenders under the Crystal Term Loan Agreement, (iv) indebtedness relating to Permitted Liens, or (v) unsecured indebtedness under the Paycheck Protection Program of the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116–136 (2020), as amended (the **"CARES Act"**) in an aggregate principal amount not to exceed $2,000,000 (the **"PPP Loans"**);

(k)     (Investments) (i) use any loan proceeds to purchase or carry any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System) or (ii) invest in or purchase any stock or securities of any individual, partnership, trust, corporation or other limited liability company except (x) readily marketable direct obligations of, or obligations guaranteed by, the United States of America or any agency thereof, (y) time deposits with or certificates of deposit issued by the Bank or (z) receipt of dividend payments or other distributions with respect to any Company's common stock payable solely in additional shares of such Company's common stock as permitted under Section 15(f);

(l)     (Transactions with Affiliates) enter into any lease or other transaction with any Manager, Member or affiliate of Company except (i) as expressly permitted by this Agreement, (ii) transactions in the ordinary course of business and pursuant to the reasonable requirements of the business of Company upon fair and reasonable terms no less favorable to

Company than would be obtained in a comparable arm's length transaction with a person not an affiliate of Company, (iii) advances to officers or employees permitted under Section 15(h), (iv) payments of rent to any landlord that is an affiliate of Company in an aggregate amount not to exceed the lesser of (x) the pass-through cost of such landlord's applicable mortgage debt service obligations, payable no more than monthly in advance, and (y) $190,677 in any fiscal year, (v) payments or contributions to an insurance loss fund maintained by an affiliate of Company in an aggregate amount not to exceed the pass-through cost of expenses related to the maintenance of insurance for Company (excluding, for the avoidance of doubt, expenses related to the maintenance of insurance of any affiliate of Company) in any fiscal year, and (vi) the Closing Date Restructuring as expressly outlined in the related closing documents;

(m)     (Management Fees) pay any management fees;

(n)     (Subsidiaries) sell, transfer or otherwise dispose of any ownership interest of any subsidiary of Borrower unless such disposition is expressly outlined in the Closing Date Restructuring closing documents;

(o)     (Mergers, Consolidations or Sales) except as expressly outlined in the Closing Date Restructuring closing documents, (i) merge or consolidate with or into any corporation or limited liability company; (ii) enter into any joint venture or partnership with any person, firm, corporation or limited liability company; (iii) convey, lease or sell all or any material portion of its property or assets or business to any other person, firm, corporation or limited liability company, except for dispositions permitted under Section 15(d) above; or (iv) convey, lease or sell any of its assets to any person, firm, corporation or limited liability company for less than the fair market value thereof, excepting however Permitted Non-Ordinary Course Business Sales; or

(p)     (Change in Legal Status) absent the prior written consent of the Bank, such consent not to be unreasonably withheld or delayed, (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction or organization or other legal structure.  If the Borrower does not have an organizational identification number and later obtains one, the Borrower shall forthwith notify the Bank of such organizational identification number;

For purposes of this section:

"**affiliate**" shall mean any person or entity (i) which directly or indirectly controls, or is controlled by or is under common control with the Company or a subsidiary, (ii) which directly or indirectly beneficially holds or owns five (5%) percent or more of any class of membership interest of the Company or any subsidiary, or (iii) five (5%) percent or more of the membership interest of which is directly or indirectly beneficially owned or held by the Company or a subsidiary;

"**Capital Expenditures**" shall mean for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset;

"**Capital Lease**" means, with respect to any person, any lease of, or other arrangement conveying the right to use, any property by such person as lessee that has been or should be accounted for as a capital lease on a balance sheet of such person prepared in accordance with GAAP;

"**Consolidated**" means, when used to modify a financial term, test, statement, or report of a Company, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial position, cash flows, or operating results of each Company;

"**Consolidated EBITDA**" means, for any period, for the Company and its subsidiaries on a Consolidated basis, an amount equal to Consolidated Net Income for such period plus (i) the following to the extent deducted in calculating such Consolidated Net Income, without duplication: (A) Consolidated Interest Expense for such period, (B) the provision for federal, state, local and foreign income taxes (including by way of tax distributions under Section 15(f) hereof) payable by the Company and its subsidiaries for such period, (C) depreciation and amortization expense, (D) payments made or accrued under any applicable management agreements to the extent permitted under Section 15(m), (E) non-cash charges (including, without limitation, non-cash expenses related to stock-based compensation and incentives) other than charges constituting an accrual or reserve for cash expenditures to be made, or anticipated to be made, in a future period or relating to a write-down, write-off or reserve with respect to accounts receivable or Inventory, (F) expenses paid with the proceeds of business interruption insurance, (G) expenses that have been indemnified or reimbursed in cash by unaffiliated third parties, or are reasonably expected to be so indemnified or reimbursed within  one hundred eighty (180) days after the accrual thereof pursuant to a written contractual obligation, (H) restructuring, integration, recruiting and severance costs, including legal costs related to overall recapitalization and credit agreements, (I) [deleted] (J) payments to the Crystal Investor,  the Portman Ridge Investor and the KODA Investor for accounting and legal fees not to exceed $500,000, (K) CRO expenses, (L) losses on sales of Inventory including write-downs and costs of liquidators, (M) one-time costs related to closing/consolidation of operating facilities, (N) [deleted], and (O) Permitted Equity Cure amounts, and minus (ii) the following to the extent included in calculating such Consolidated Net Income, without duplication: (A) federal, state, local and foreign income tax credits of the Company and its subsidiaries for such period, (B) extraordinary gains for such period, (C) all non-cash items increasing such Consolidated Net Income for such period, (D) any reversal of a reserve or any cash expenditures, in each case, made in respect of any non-cash charge that was added back in such period or a prior period, and (E) amounts that were added back in a prior period in respect of expenses that were reasonably expected to be indemnified or reimbursed in cash by unaffiliated third parties within one hundred eighty (180) days after the accrual thereof pursuant to a written contractual obligation, to the extent that such expenses were not so indemnified or reimbursed within such one hundred eighty (180) day period.

"**Consolidated Fixed Charge Coverage Ratio**" means, with respect to the Company on a Consolidated basis for any period, the ratio of (i) the result of (A) Consolidated EBITDA for such period minus (B) the sum of (1) unfinanced Capital Expenditures paid in cash during such period, plus (2) the aggregate amount (but not less than $0) of federal, state, local and foreign income taxes paid in cash (including by way of tax distributions under Section 15(f) hereof)

during such period plus (3) Restricted Payments paid in cash during such period, to (ii) Debt Service Charges paid in cash during such period;

**"Consolidated Interest Expense"** means, with respect to the Company on a Consolidated basis for any period, (i) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, (ii) all interest paid or payable with respect to discontinued operations, (iii) the portion of rent expense under Capital Leases that is treated as interest in accordance with GAAP, and (iv) any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk;

**"Consolidated Net Income"** means, with respect to the Company and its subsidiaries for any period, the aggregate of the net income (loss) of the Company and its subsidiaries for such period, on a Consolidated basis, and otherwise determined in accordance with GAAP; provided that Consolidated Net Income shall exclude (a) the net income of any Company or subsidiary during such period to the extent that the declaration or payment of dividends or similar distributions by such Company or subsidiary of such income is not permitted by operation of the terms of its organization documents or any agreement, instrument or applicable law to such Company or subsidiary during such period, except that the Company's or subsidiary's equity in any net loss of any such Company or subsidiary for such period shall be included in determining Consolidated Net Income, (b) any income (or loss) for such period of any person if such person is not a subsidiary, except that the Company's equity in the net income of any such person for such period shall be included in Consolidated Net Income up to the aggregate amount of cash actually distributed by such person during such period to the Company or a subsidiary as a dividend or other distribution (and in the case of a dividend or other distribution to a subsidiary, such subsidiary is not precluded from further distributing such amount to the Company as described in clause (b) of this proviso) and (c) income from forgiveness of all or any portion of the PPP Loans;

**"control"** shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any person or entity, whether through the ownership of voting securities, by contract or otherwise;

**"Debt Service Charges"** means, for any period, the sum of (a) Consolidated Interest Expense plus (b) all scheduled principal payments made or required to be made on account of indebtedness for borrowed money (including, without limitation, obligations with respect to Capital Leases for such period (excluding, for the avoidance of doubt, all voluntary and mandatory prepayments and all principal payments made in connection with any revolving credit facility which do not result in a permanent reduction of such facility), in each case determined in accordance with GAAP;

**"distributions"** shall mean all payment or distributions to members in cash or in property other than reasonable salaries, bonuses and expense reimbursements;

**"GAAP"** means generally accepted accounting principles in the United States of America, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions and comparable stature and authority within the accounting profession) that are applicable to the circumstances as of the date of determination;

**"indebtedness"** shall mean (i) all liabilities for borrowed money, for the deferred purchase price of property or services, and under leases which are or should be, under generally accepted accounting principles, recorded as Capital Leases, in respect of which a person or entity is directly or indirectly, absolutely or contingently liable as obligor, guarantor, endorser or otherwise, or in respect of which such person or entity otherwise assures a creditor against loss, (ii) all liabilities of the type described in (i) above which are secured by (or for which the holder has an existing right, contingent or otherwise, to be secured by) any lien upon property owned by such person or entity, whether or not such person or entity has assumed or become liable for the payment thereof, and (iii) all other liabilities or obligations which would, in accordance with generally accepted accounting principles, be classified as liabilities of such person or entity;

**"interest"** shall mean, for the applicable period, all interest paid, including, but not limited to, interest paid on indebtedness and on Capital Leases, determined in accordance with generally accepted accounting principles;

**"PPP Loans"** shall have the meaning ascribed to that term in Section 15(j).

**"PPP Loan Guaranty"** means that certain Guaranty and Reimbursement Agreement dated on or about of even date of this Agreement by and between the Company and ProAir Holdings Corporation whereby the Company guarantees ProAir Holdings Corporation's obligations under the PPP Loans.

**"Restricted Payments"** means dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any stock or stock equivalent, (ii) purchases, redemptions or other acquisitions for value any stock or stock equivalent now or hereafter outstanding, (iii) any payment or prepayment of principal of, premium, if any, interest, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to, indebtedness (including, without limitation, any subordinated indebtedness), or (iv) payments of any management, consulting, advisory or similar fees to any of Company's equity holders, or any of their respective affiliates;

**"subordinated indebtedness"** shall mean indebtedness which is expressly stated to be subordinated or junior in right of payment to Company's Obligations to Bank in a manner and in a form which is satisfactory to Bank;

**"Tax Distributions"** means, for so long as any Company is a member of a group filing a consolidated, combined or unitary tax return with any direct or indirect parent of such Company, tax distributions made to a direct or indirect holder of stock of a Company in amounts required for such parent to pay its federal, state and local tax liabilities attributable to the Company,

reduced by any such taxes paid directly by any Company to the relevant taxing authority; *provided* that, the amount of such payments with respect to any fiscal year does not exceed the amount that Company would have been required to pay in respect of such taxes for such fiscal year if Company paid such taxes as a standalone consolidated, combined or unitary tax group, *provided further*, that Tax Distributions may be made not more frequently than quarterly with respect to each period for which an installment of estimated tax would be required to be paid by the direct or indirect holders of stock of Company, except that an additional final Tax Distribution may be made after the final tax liabilities of Company has been determined;

Notwithstanding anything to the contrary in this Agreement, the PPP Loans and any principal and interest payments thereon and proceeds thereof shall be excluded from calculation of the financial covenants set forth in this Section 15, except that if any portion of the PPP Loans are not forgiven, for purposes of calculating such foregoing financial covenants, the unforgiven portion will not be disregarded.

16. **DEFAULT; RIGHTS AND REMEDIES UPON DEFAULT.**

(a)     Upon the occurrence of any one or more of the following events (herein, **"Events of Default"**), Bank may decline to make any or all further Revolving Loans or issue Letters of Credit hereunder or under any other agreements with Borrower or Holdings, any and all Obligations of the Company to Bank shall become immediately due and payable, at the option of Bank and without notice or demand.  The occurrence of any such Event of Default shall also constitute, without notice or demand, a default under all other agreements between Bank and the Company and instruments and papers given Bank by the Company, whether such agreements, instruments, or papers now exist or hereafter arise, namely:

(i)     The failure by the Company to pay when due any principal, interest, fees, costs, and expenses due pursuant to this Agreement other than as a result of Lender's failure to timely debit Company's loan account for the amount of such payment.

(ii)     The failure by the Company to pay, within ten (10) days of becoming due, any other Obligations.

(iii)     Default by the Company in the observance or performance of any of the covenants or agreements of the Company contained in Sections 11(a), 13(f)(vii) or 15 of this Agreement.

(iv)     The failure by the Company to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to any of the provisions of this Agreement, other than those described in Sections 5(b), 5(g), 5(h), 11(a), 11(d), 13(f)(vii), 15, or in any other agreement with Bank which is not remedied within the earlier of thirty (30) days after (i) notice thereof by Bank to Company, or (ii) the date Company was required to give notice to Bank pursuant to Section 13(f)(vi) hereof.

(v)     The determination by Bank that any representation or warranty heretofore, now or hereafter made by the Company to Bank, in any documents, instrument, agreement, or paper was not true or accurate when given in any material respect.

(vi)    The occurrence of any event such that any material indebtedness of the Company from any lender other than Bank could be accelerated, notwithstanding that such acceleration has not taken place including, without limitation, indebtedness of Company to Crystal.

(vii)   The occurrence of any event which would cause a lien creditor, as that term is defined in Section 9−102 of the Code, to take priority over advances made by Bank.

(viii)  A filing against or relating to the Company of (A) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (B) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state.

(ix)    The occurrence of any event of default under any agreement between Bank and the Company or instrument or paper given Bank by the Company, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Bank may not have exercised its rights upon default under any such other agreement, instrument or paper).

(x)     Any act by, against, or relating to the Company, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of the Company's property, which is not discharged within thirty (30) days, provided however, that there shall be no cure period for any such voluntary act by the Company (provided hereunder during said period Bank shall not be obligated to make any advances hereunder), and provided further that with respect to any act which constitutes an application for appointment of a receiver, trustee or other person, as provided above, such act shall not be considered an Event of Default in the event the same is being contested in good faith by the Company.

(xi)    The granting of any trust mortgage or execution of an assignment for the benefit of the creditors of the Company, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for the Company; the failure by the Company to generally pay the debts of the Company as they mature; adjudication of bankruptcy or insolvency relative to the Company; the entry of an order for relief or similar order with respect to the Company in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (hereinafter the "Bankruptcy Code") or any other federal bankruptcy law; the filing of any complaint, application, or petition by or against the Company initiating any matter in which the Company is or may be granted any relief from the debts of the Company pursuant to the Bankruptcy Code or any other

insolvency statute or procedure which such matter is not discharged within thirty (30) days (provided hereunder during said period Bank shall not be obligated to make any advances hereunder); the calling or sufferance of a meeting of creditors of the Company; the meeting by the Company of a formal or informal creditor's committee; the offering by or entering into by the Company of any composition, extension or any other arrangement seeking relief or extension for the debts of the Company, or the initiation of any other judicial or non−judicial proceeding or agreement by, against or including the Company which seeks or intends to accomplish a reorganization or arrangement with creditors.

(xii)    The entry of any judgment(s) against Company, in excess of $100,000.00 in the aggregate, which judgment(s) is(are) not satisfied or appealed from (with execution or similar process stayed) within thirty (30) days of its entry.

(xiii)    The occurrence of any event or circumstance with respect to the Company such that Bank shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by the Company under this Agreement or any other agreement between Bank and the Company is impaired or there shall occur any material adverse change in the business or financial condition of the Company.

(xiv)    The entry of any court order which enjoins, restrains or in any way prevents the Company from conducting all or any part of its business affairs in the ordinary course of business for a period of more than five (5) days.

(xv)    The service of any process upon Bank seeking to attach by trustee process any funds of the Company on deposit with Bank.

(xvi)    The Permitted Holders fail to jointly own and control, directly or indirectly, at least 50.1% of the Company.

(xvii)    The occurrence of any material uninsured loss, theft, damage or destruction to any material asset(s) of the Company.

(xviii)   Any act by or against, or relating to the Borrower or its assets pursuant to which any creditor of the Company seeks to reclaim or repossess or reclaims or repossesses all or a portion of the Company's assets.

(xix)    The termination of existence, dissolution, or liquidation of the Company, or the ceasing to carry on actively any substantial part of Company's current business.

(xx)    This Agreement shall, at any time after its execution and delivery and for any reason, cease (A) to create a valid and perfected first priority security interest in and to the property purported to be subject to this Agreement subject only to permitted protests under this Agreement and excluding the failure by Bank to file

Uniform Commercial Code Financing Statement continuation statements; or (B) to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by the Company or any guarantor of the Company denies it has any further liability or obligation hereunder.

(xxi)    Any of the following events occur or exist with respect to the Company or any ERISA affiliate: (A) any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Internal Revenue Code) involving any Plan; (B) any "reportable event" (as defined in Section 4043 of ERISA and the regulations issued under such Section) shall occur with respect to any Plan; (C) The filing under Section 4041 of ERISA of a notice of intent to terminate any Plan or the termination of any Plan; (D) any event or circumstance exists which might constitute grounds entitling the Pension Benefit Guaranty Corporation (PBGC) to institute proceedings under Section 4042 of ERISA for the termination of, or for the appointment of a trustee to administer, any Plan, or the institution by the PBGC of any such proceedings; (E) or partial withdrawal under Section 4201 or 4204 of ERISA from a Multiemployer Plan or the reorganization, insolvency, or termination of any Multiemployer Plan; and in each case above, such event or condition, together with all other events or conditions, if any, could in the opinion of Bank subject the Company to any tax, penalty, or other liability to a Plan, a Multiemployer Plan, the PBGC, or otherwise.

(xxii)   The occurrence of any of the foregoing Events of Default with respect to any guarantor, endorser or surety to Bank of the Obligations, as if such guarantor, endorser or surety were the "Company" described therein.

(xxiii)  The financial covenants contained in Section 15 shall become inapplicable due to the lapse of time and the failure to amend any such covenant to cover future periods.

(xxiv)   The occurrence of any default in connection with any note or any related loan documents arising from the Paycheck Protection Program of the CARES Act, or alternatively the failure by any Company to comply with the CARES Act and all other rules and regulations applicable to the Paycheck Protection Program of the CARES Act, and such failure continues unremedied for a period of thirty (30) days

(xxv)    Upon the occurrence of an Event of Default, Bank may declare any obligation Bank may have hereunder to be cancelled, declare all Obligations of Company to be due and payable and proceed to enforce payment of the Obligations and to exercise any and all of the rights and remedies afforded to Bank by the Uniform Commercial Code or under the terms of this Agreement or otherwise.  In addition, upon the occurrence of an Event of Default, if Bank proceeds to enforce payment of the Obligations, Company shall be obligated to deliver to Bank cash collateral in an amount equal to the aggregate amounts then undrawn on all outstanding Letters of Credit or acceptances issued or guaranteed by Bank for the account of Company, and Bank may proceed to enforce payment of the same and to exercise all rights and remedies afforded

to Bank by the Uniform Commercial Code or under the terms of this Agreement or otherwise. Upon the occurrence of, and during the continuance of, an Event of Default, the Company, as additional compensation to the Bank for its increased credit risk, promises to pay interest on all Obligations (including, without limitation, principal, whether or not past due, past due interest and any other amounts past due under this Agreement) at a per annum rate of two (2%) percent greater than the rate of interest then specified in Section 5 of this Agreement.

(b)     Upon the filing of any complaint, application, or petition by or against the Company initiating any matter in which the Company is or may be granted any relief from the debts of the Company pursuant to the Bankruptcy Code, Bank's obligation hereunder shall be canceled immediately, automatically, and without notice, and all Obligations of the Company then outstanding shall become immediately due and payable without presentation, demand, or notice of any kind to the Company.

(c)     Any sale or other disposition of the Collateral may be at public or private sale upon such terms and in such manner as the Bank deems advisable, having due regard to compliance with any statute or regulation which might affect, limit or apply to the Bank's disposition of the Collateral.  The Bank may conduct any such sale or other disposition of the Collateral upon the Company's premises.  Unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Bank shall provide the Company with such notice as may be practicable under the circumstances), the Bank shall give the Company at least the greater of the minimum notice required by law or seven (7) days prior written notice of the date, time and place of any proposed public sale, and of the date after which any private sale or other disposition of the Collateral may be made.  The Bank may purchase the Collateral, or any portion of it at any such sale.

(d)     In connection with the Bank's exercise of the Bank's rights under this Agreement after the occurrence of an Event of Default, the Bank may enter upon, occupy and use any premises owned or occupied by the Company, and may exclude the Company from such premises or portion thereof as may have been so entered upon, occupied, or used by the Bank. The Bank shall not be required to remove any of the Collateral from any such premises upon the Bank's taking possession thereof, and may render any Collateral unusable to the Company.  In no event shall the Bank be liable to the Company for use or occupancy by the Bank of any premises pursuant to this Agreement.

(e)     Upon the occurrence of any Event of Default, the Bank may require the Company to assemble the Collateral and make it available to the Bank at the Company's sole risk and expense at a place or places which are reasonably convenient to both the Bank and the Company.

17.     **STANDARDS FOR EXERCISING REMEDIES.**  To the extent that applicable law imposes duties on Bank to exercise remedies in a commercially reasonable manner, Company acknowledges and agrees that it is not commercially unreasonable for Bank (a) to fail to incur expenses reasonably deemed significant by Bank to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished

products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as Company, for expressions of interest in acquiring  all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of the Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties specifically to disclaim any warranties of title or the like, (k) to purchase insurance or credit enhancements to insure Bank against risks of loss, collection or disposition of Collateral or to provide to Bank a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by Bank, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Bank in the collection or disposition of any of the Collateral. Company acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Bank would not be commercially unreasonable in Bank's exercise of remedies against the Collateral and that other actions or omissions by Bank shall not be deemed commercially unreasonable solely on account of not being indicated in this section.   Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to Company or to impose any duties on Bank that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

18.   **PROCESSING AND SALES OF INVENTORY.**  So long as Company is not in default hereunder, Company shall have the right, in the regular course of business, to process and sell Company's Inventory.  A sale in the ordinary course of business shall not include a transfer in total or partial satisfaction of a debt.

19.   **WAIVER OF JURY TRIAL.**   COMPANY AND BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE OR HEREAFTER HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. Company hereby certifies that neither Bank nor any of its representatives, agents or counsel has represented, expressly or otherwise, that Bank would not, in the event of any such suit, action or proceeding, seek to enforce this waiver of right to trial by jury.  Company acknowledges that Bank has been induced to enter into this Agreement by, among other things, this waiver. Company acknowledges that it has read the provisions of this Agreement and in particular, this section; has consulted legal counsel; understands the right it is granting in this Agreement and is waiving in this section in particular; and makes the above waiver knowingly, voluntarily and intentionally.

20.     **CONSENT TO JURISDICTION.**  Company and Bank agree that any action or proceeding to enforce or arising out of this Agreement may be commenced in any court of the Commonwealth of Massachusetts sitting in the counties of Suffolk or Middlesex, or in the District Court of the United States for the District of Massachusetts, and Company waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Company, or as otherwise provided by the laws of the Commonwealth of Massachusetts or the United States of America.

21.     **TERMINATION.**

(a)     Unless renewed in writing, this Agreement shall terminate on March 31, 2024 (the **"Termination Date"**), and all Obligations shall be due and payable in full without presentation, demand, or further notice of any kind, whether or not all or any part of the Obligations is otherwise due and payable pursuant to the agreement or instrument evidencing same.  Bank may terminate this Agreement immediately and without notice upon the occurrence of an Event of Default.  Notwithstanding the foregoing or anything in this Agreement or elsewhere to the contrary, the security interest, Bank's rights and remedies hereunder and Company's obligations and liabilities hereunder shall survive any termination of this Agreement and shall remain in full force and effect until all of the Obligations outstanding, or contracted or committed for (whether or not outstanding), shall be finally and irrevocably paid in full.  No Collateral shall be released or financing statement terminated until such final and irrevocable payment in full of the Obligations, as described in the preceding sentence.

(b)     In the event that Bank continues to make Revolving Loans hereunder after the Termination Date without a written extension of the Termination Date or after the occurrence of an Event of Default, all such Revolving Loans: (i) shall be made in the sole and absolute discretion of Bank; and (ii) shall, together with all other Obligations, be payable thereafter **ON DEMAND**.

22.     **JOINT AND SEVERAL LIABILITY.**

(a)     Each Borrower is accepting joint and several liability under this Agreement in consideration of the financial accommodations to be provided by Bank under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of each other Borrower to accept joint and several liability for the Obligations of each Borrower to Bank.

(b)     Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with each other Borrower, with respect to the payment and performance of all of the Obligations of each Borrower to Bank under this Agreement (including, without limitation, any Obligations arising under this section), it being the intention of the parties hereto that all the Obligations of each Borrower to Bank under this Agreement shall be the joint and several Obligations of each of the Borrowers without preferences or distinction among them.

(c)     If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations of each Borrower to Bank under this Agreement, as and when due or to perform any of such Obligations in accordance with the terms thereof, then in each such event the other Borrower, under this Agreement will make such payment with respect to, or perform, such Obligation.

(d)     The Obligations of each Borrower under the provisions of this section constitute full recourse Obligations of each Borrower enforceable against each such Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstance whatsoever.

(e)     Except as otherwise provided in this Agreement, each Borrower and Holdings hereby waives notice of acceptance of its joint and several liability, notice of any loans made under this Agreement, notice of any action at any time taken or omitted by Bank under or in respect of any of the Obligations of each Borrower and Holdings to Bank under this Agreement, and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement.  Except as otherwise provided in this Agreement, each Borrower and Holdings hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations of each Borrower and Holdings to Bank under this Agreement, the acceptance of any payment of any of such Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Bank at any time or times in respect of any default by any Borrower and/or Holdings in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Bank in respect of any of the Obligations of each Borrower and/or Holdings to Bank under this Agreement, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of such Obligations of each Borrower and Holdings to Bank or the addition, substitution or release, in whole or in part, of any Borrower or Holdings.  Without limiting the generality of the foregoing, each Borrower and Holdings assents to any other action or delay in acting or failure to act on Bank's part with respect to the failure by any Borrower or Holdings to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this section, afford grounds for terminating, discharging or relieving any Borrower and/or Holdings, in whole or in part, from any of its Obligations under this section, it being the intention of each Borrower and Holdings that, so long as any of the Obligations under this Agreement remain unsatisfied, the Obligations of such Borrower or Holdings under this section shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower and Holdings under this section shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower, Holdings, or Bank.  The joint and several liability of each Borrower and Holdings under this Agreement shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, membership, constitution or place of formation of any Borrower, Holdings, or Bank.

(f)     The provisions of this section are made for the benefit of Bank and Bank's successors and assigns, and may be enforced by Bank in good faith from time to time against any or all of the Borrowers and/or Holdings as often as occasion therefor may arise and without requirement on Bank's part first to marshal any of its claims or to exercise any of its rights against any Borrower or to exhaust any remedies available to Bank against any other Borrower and/or Holdings or to resort to any other source or means of obtaining payment of any of the Obligations under this Agreement or to elect any other remedy.  The provisions of this section shall remain in effect until all of the Obligations of each Borrower and Holdings to Bank under this Agreement shall have been paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of such Obligations of each Borrower and Holdings to Bank, is rescinded or must otherwise be restored or returned by Bank upon the insolvency, bankruptcy or reorganization of any Borrower and/or Holdings, or otherwise, the provisions of this section will forthwith be reinstated in effect, as though such payment had not been made.

(g)     Each Borrower and Holdings agrees that it shall not exercise, and hereby expressly waives until full and final payment of all Obligations to Bank: (i) any right to subrogation or indemnification, and any other right to payment from or reimbursement by any other Borrower and/or Holdings, in connection with or as a consequence of any payment made by any Borrower and/or Holdings to Bank, (ii) any right to enforce any right or remedy which Bank may have or may hereafter have against any other Borrower and/or Holdings, and (iii) any benefit of, and any right to participate in (A) any collateral now or hereafter held by Bank, or (B) any payment to Bank by, or collection by Bank from any other Borrower and/or Holdings.  The provisions of this paragraph are made for the express benefit of each Borrower and Holdings as well as Bank, and may be enforced independently by each Borrower, Holdings, or any successor in interest to each Borrower or Holdings.

23.     **MISCELLANEOUS.**

(a)     No delay or omission on the part of Bank in exercising any rights shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.  All Bank's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

(b)     Bank is authorized to make Revolving Loans under the terms of this Agreement upon the request, either written or oral, in the name of Borrower or any authorized person whose name appears at the end of this Agreement or of any of the following named person, or persons, from time to time, holding the following offices of Borrower, Manager, Member and such other officers and authorized signatories as may from time to time be set forth in separate resolutions.

(c)     This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Company may not assign this Agreement or any rights or duties hereunder without Bank's prior written consent and any prohibited assignment shall be absolutely void.  No consent to an assignment by Bank shall

release Company from its Obligations.  Bank may assign this Agreement and its rights and duties hereunder and no consent or approval by Company is required in connection with any such assignment.  Bank reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Bank's rights and benefits hereunder.  In connection with any assignment or participation, Bank may disclose all documents and information which Bank now or hereafter may have relating to Company or Company's business.  To the extent that Bank assigns its rights and obligations hereunder to another party, Bank thereafter shall be released from such assigned obligations to Company and such assignment shall effect a novation between Company and such other party.

(d)     Company agrees that any and all Revolving Loans made by Bank to Borrower or for its account under this Agreement shall be conclusively deemed to have been authorized by Company and to have been made pursuant to duly authorized requests therefor on its behalf.

(e)     Unless otherwise defined in this Agreement, capitalized words shall have the meanings set forth in the Uniform Commercial Code as in effect in the Commonwealth of Massachusetts as of the date of this Agreement.

(f)     Unless otherwise defined in this Agreement, capitalized words shall have the meanings set forth in the Uniform Commercial Code as in effect in the Commonwealth of Massachusetts as of the date of this Agreement.

(g)     Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement.  If one or more provisions of this Agreement (or the application thereof) shall be invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not, invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).  This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

(h)     Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other loan document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested ), overnight courier, or telefacsimile to Company or to Bank, as the case may be, at its address set forth below:

|                     |                                                          |
|---------------------|----------------------------------------------------------|
| If to Bank:         | Berkshire Bank                                           |
|                     | One Van de Graaff Drive, Suite 202                       |
|                     | Burlington, MA 01803                                     |
|                     | Attn:  C. Lee Willingham, Senior Vice President          |
|                     | Telephone:      (781) 897-0705                           |
|                     | Telecopier:     (781) 933-0409                           |
|                     | Email:          lwillingham@berkshirebank.com            |
|                     |                                                          |
| With a copy to:     | Ruberto, Israel & Weiner, P.C.                           |
|                     | 255 State Street, 7th Floor                              |
|                     | Boston, MA 02109                                         |
|                     | Attn: James C. Fox, Esq.                                 |
|                     | Telephone:      (617) 742-4200                           |
|                     | Telecopier:     (617) 742-2355                           |
|                     | Email:          jcf@riw.com                              |
|                     |                                                          |
| If to Borrower      | c/o ProAir, LLC                                          |
|                     | 2900 County Road                                         |
|                     | Elkhart, IN 46514                                        |
|                     | Attn: Todd Courts, Chief Financial Officer               |
|                     | Telephone: 616-447-2812                                  |
|                     | Telecopier: 574-264-2194                                 |
|                     | Email:   tcourts@proairllc.com                           |
|                     |                                                          |
| If to Holdings      | c/o ProAir, LLC                                          |
|                     | 2900 County Road                                         |
|                     | Elkhart, IN 46514                                        |
|                     | Attn: Todd Courts, Chief Financial Officer               |
|                     | Telephone: 616-447-2812                                  |
|                     | Telecopier: 574-264-2194                                 |
|                     | Email:   tcourts@proairllc.com                           |
|                     |                                                          |
| With a copy to:     | Burns & Levinson LLP                                     |
|                     | 125 Summer Street                                        |
|                     | Boston, MA 02110                                         |
|                     | Attn:   Frank A. Segall, Esq.                            |
|                     | Telephone:      (617) 345-3000                           |
|                     | Telecopier:     (617) 345-3299                           |
|                     | Email:          fsegall@burnslev.com                     |

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.  All notices or demands sent in accordance with this section shall be deemed received on the earlier of the date of actual receipt or three (3) days after the deposit thereof in the mail.

(i)     Bank shall have no obligation to maintain any electronic records or any documents, schedules, invoices, agings or any other paper delivered to Bank by Company in connection with this Agreement or any other agreement for more than four (4) months after receipt of the same by Bank.

(j)     Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Bank or Company, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

(k)     Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

(l)     This Agreement, together with the other documents and instruments executed concurrently herewith represent the entire and final understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by evidence of any prior, contemporaneous or subsequent other agreement, oral or written, before the date hereof.

(m)     This Agreement can only be amended by a writing signed by both Bank and Company.

(n)     The laws of Massachusetts shall govern the construction of this Agreement and the rights and duties of the parties hereto.  This Agreement shall take effect as a sealed instrument.

*[Signature Page to Follow]*

Witnessed by:

PROAIR, LLC (for itself and as Agent)

By: _____

Todd Courts, Chief Financial Officer

Address:     28731 County Road 6
Elkhart, IN 46514

_Jennifer Miller_
JENNIFER MILLER

AMERICAN COOLING TECHNOLOGY, LLC

By: _____

Todd Courts, Chief Financial Officer

Address:     715 Willow Spring Lane
York, PA 17406

_Jennifer Miller_
JENNIFER MILLER

BUS AIR, LLC

By: _____

Todd Courts, Chief Financial Officer

Address:     6630 East Highway 114
Rhome, TX 76078

_Jennifer Miller_
JENNIFER MILLER

EVANS TEMPCON DELAWARE, LLC

By: _____

Todd Courts, Chief Financial Officer

Address:     51 Sawyer Road, Suite 420
Waltham, MA 02453

_Jennifer Miller_
JENNIFER MILLER

PROAIR INTERMEDIATE HOLDCO, LLC

By: _____

Todd Courts, Chief Financial Officer

Address:     2900 County Road 6 West
Elkhart, IN 46514

_Jennifer Miller_
JENNIFER MILLER

_[Signature Page to Third Amended and Restated Loan and Security Agreement (All Assets) 1 of 2]_

BERKSHIRE BANK

By: _____

C. Lee Willingham, Senior Vice President

Address:     One Van de Graaff Drive, Suite 202
             Burlington, MA 01803

*[Signature Page to Third Amended and Restated Loan and Security Agreement (All Assets) 2 of 2]*

## SCHEDULES

The following Schedules to the within Loan and Security Agreement (All Assets) are respectively described in the section indicated.  Those Schedules in which no information has been inserted shall be deemed to read "None".

<u>**SCHEDULE "A"**</u>
**Borrower's Places of Business and Organizational Identification Number (§3)**

| <u>Address</u> | <u>Property At Such Address</u> | <u>Leasehold</u> | <u>Borrower</u> |
|---|---|---|---|
| 2900 County Road 6W<br>Elkhart, Indiana | Inventory, Equipment | Leasehold | ProAir |
| 2920 County Road 6W<br>Elkhart, Indiana | Inventory, Equipment | Leasehold | ProAir |
| 715 Willow Spring Lane<br>York, Pennsylvania 17406 | Equipment | Leasehold | ACT |
| 12151 Madera Way<br>Riverside, California | Inventory, Equipment | Leasehold | ProAir |
| 600 South German Lane<br>Bldg 5<br>Conway, Arkansas 72034 | Inventory, Equipment | Leasehold | ProAir |
| 1641 E Pine St.<br>Tulsa, Oklahoma 74106 | Inventory, Equipment | Leasehold | Bus Air |
| 6630 East Highway 114<br>Rhome, Texas 76078 | Inventory, Equipment | Leasehold | Bus Air |
| 3260 Eagle Park Dr., NE<br>Suite #100<br>Grand Rapids, Michigan 49525 | Equipment | Leasehold | Evans |
| 606 S. Camellia Boulevard<br>Fort Valley, Georgia  31030 | Equipment | Leasehold | ProAir |

Organizational Identification Number:     ProAir, LLC: 2810757
Bus Air, LLC:  6529343
American Cooling Technology, LLC: 6545300
Evans Tempcon Delaware, LLC: 7149498
ProAir Intermediate Holdco, LLC: 6523157

## SCHEDULE "B"
## Other Encumbrances and Liens (§4(f)(i))

| Secured Party or Mortgagee | Description of Collateral | Payment Terms and Dates of Maturity |
| --- | --- | --- |
| Trumpf Finance | Trumpf TruBend  5085 SX S/N B1503I0068 | $4,616.75 payable monthly, Maturity 7/8/2023 |
| Trumpf Finance | Trumpf TruBend  7036 S/N B0702A2137 | $1,356.72 payable monthly, Maturity 11/10/2024 |
| Trumpf Finance | Trumpf TruLaser 2030 S/N A1312L0071 | $7,622.02 payable monthly, Maturity 11/10/2024 |
| CCA Financial, LLC | 10 Scanners and related accessories and software | $762.00 payable monthly Maturity 5/1/2024 |

**<u>SCHEDULE "C"</u>**
**Leases (§4(f)(ii))**

| <u>Credit Party</u> | <u>Lessor Name</u> | <u>Collateral</u> | <u>Monthly Payment</u> | <u>End Date</u> | <u>Current Balance</u> |
|---|---|---|---|---|---|
| | | | | | |
| Bus Air | Trumpf Finance | Trumpf TruBend 5085 SX | $4,616.75 | 7/8/2023 | $96,405.85 |
| Bus Air | Trumpf Finance | Trumpf TruBend 7036 | $1,356.72 | 11/10/2024 | $48,496.21 |
| Bus Air | Trumpf Finance | Trumpf TruLaser 2030 | $7,622.02 | 11/10/2024 | $275,075.75 |
| ProAir, LLC | CCA Financial, LLC | 10 Scanners; Related software and accessories | $762.00 | 5/1/2024 | N/A |

# EXHIBIT 1

## BERKSHIRE BANK

## AMENDED AND RESTATED REVOLVING NOTE

$12,000,000.00                                              Burlington, Massachusetts
                                                           February 11, 2022

For value received, the undersigned, ProAir, LLC, a Delaware limited liability company, American Cooling Technology, LLC, a Delaware limited liability company, Bus Air, LLC, a Delaware limited liability corporation, and Evans Tempcon Delaware, LLC, a Delaware limited liability corporation (each and together, the "**Borrower**"), hereby jointly and severally promise to pay to the order of Berkshire Bank (the "**Bank**"), at its main office at One Van de Graaff Drive, Suite 202, Burlington, Massachusetts 01803, or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of Twelve Million ($12,000,000.00) Dollars, or, if less, the aggregate unpaid principal amount of all loans made by the Bank to the Borrower under the Loan Agreement (defined below) together with interest on the principal amount hereunder remaining unpaid from time to time, computed on the basis of the actual number of days elapsed and a 360-day year, from the date hereof until this Note is fully paid at the rate from time to time in effect under the Third Amended and Restated Loan and Security Agreement (All Assets) dated on or about of even date, as amended or restated from time to time (the "**Loan Agreement**"), by and between the Bank and the Borrower. The principal hereof and interest accruing thereon shall be due and payable as provided in the Loan Agreement. This Note may be prepaid only in accordance with the Loan Agreement.

This Note is issued pursuant, and is subject, to the Loan Agreement, which provides, among other things, for acceleration hereof. This Note is the "Note" referred to in the Loan Agreement.

This Note is secured, among other things, pursuant to the Loan Agreement, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

This Note amends, restates and supersedes that certain Amended and Restated Revolving Note dated as of October 7, 2020, payable to the order of the Bank, in the original principal amount of Twelve Million Five Hundred Thousand ($12,500,000.00) Dollars, but is not intended to and shall not extinguish or cancel the indebtedness evidenced thereby, including without limitation, accrued but unpaid interest, fees, expenses and other charges through the date hereof.

The Borrower hereby agrees to pay all costs of collection, including attorneys' fees and legal expenses in the event this Note is not paid when due, whether or not legal proceedings are commenced.

Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

*[Signature Page to Follow]*

All rights and obligations hereunder shall be governed by the laws of the Commonwealth of Massachusetts and this Note shall be deemed to be under seal.

PROAIR, LLC


By:_____
     Todd Courts, Chief Financial Officer

AMERICAN COOLING TECHNOLOGY, LLC


By:_____
     Todd Courts, Chief Financial Officer

BUS AIR, LLC


By:_____
     Todd Courts, Chief Financial Officer

EVANS TEMPCON DELAWARE, LLC


By:_____
     Todd Courts, Chief Financial Officer


*[Signature Page to $12,000,000.00 Amended and Restated Revolving Note]*

**EXHIBIT 2**

**FORM OF COMPLIANCE CERTIFICATE**

ProAir, LLC (for itself and as Agent), American Cooling Technology, LLC, Bus Air, LLC and Evans Tempcon Delaware, LLC (each a **"Borrower"** and collectively **"Borrower"**) and ProAir Intermediate Holdco, LLC, (**"Holdings"** and together with the Borrower, hereinafter each and together referred to as the **"Company"**), hereby certify to Berkshire Bank (**"Bank"**), pursuant to the Third Amended and Restated Loan and Security Agreement (All Assets) between Borrower and Bank dated February 11, 2022, as may be amended from time to time (**"Loan Agreement"**), that:

A.    General

1.    Capitalized terms not defined herein shall have the meanings set forth in the Loan Agreement.

2.    The Company has complied with all the terms, covenants and conditions to be performed or observed by the Company contained in the Loan Agreement and other documents required to be executed by the Company in connection with the Loan Agreement.

3.    Neither on the date hereof nor, if applicable, after giving effect to the Revolving Loan made on the date hereof, does there exist an Event of Default or an event which would with notice or the lapse of time, or both, constitute an Event of Default.

4.    The representations and warranties contained in the Loan Agreement and in any certificate, document or financial or other statement furnished at any time thereunder are true, correct and complete in all material respects with the same effect as though such representations and warranties had been made on the date hereof, except to the extent that any such representation and warranty relates solely to an earlier date (in which case such representation and warranty shall be true, correct and complete on and as of such earlier date).

B.    Financial Covenants

As of the date hereof or, for such period as may be designated below, the computations, ratios and calculations as set forth below in accordance with Section 15 of the Loan Agreement are true and correct:

**Financial Calculations.**  Attached hereto as Exhibit 2-A are reasonably detailed calculations necessary to determine that the Company [is][is not] in compliance with the Minimum Availability requirement of Section 15(c) of the Loan Agreement and that the Borrower [is][is not] in compliance with the Minimum Consolidated Fixed Charge Coverage Ratio covenant set forth in Section 15(b) of the Loan Agreement.

IN WITNESS WHEREOF, the undersigned, a duly authorized Member/Manager/officer of Company, has executed and delivered this Certificate in the name and on behalf of the Company on _____, 20____.

PROAIR, LLC (for itself and as Agent)

By:_____
Name:
Title:

<u>EXHIBIT 2A</u>

    A.  <u>Borrowing Base Certificate as of _____, 20___ (as of each Thursday of the month)</u>

    B.  <u>Calculation of Consolidated EBITDA</u>

1.    Consolidated Net Income of Company:    $_____

2.    Consolidated Interest Expense for such period:    $_____

3.    The provision for federal, state, local and foreign income taxes (including by way of Tax Distributions under Section 15(f) of the Loan Agreement) payable by the Company for such period:    $_____

4.    Depreciation and amortization expense:    $_____

5.    Non-cash charges (including, without limitation, non-cash expenses related to stock-based compensation and incentives) other than charges constituting an accrual or reserve for cash expenditures to be made, or anticipated to be made, in a future period or relating to a write-down, write-off or reserve with respect to accounts receivable or Inventory:    $_____

6.    Expenses paid with the proceeds of business interruption insurance:    $_____

7.    Expenses that have been indemnified or reimbursed in cash by unaffiliated third parties, or are reasonably expected to be so indemnified or reimbursed within 180 days after the accrual thereof pursuant to a written contractual obligation:    $_____

8.    Payments to Crystal Investor, Portman Ridge Investor, and KODA Investor for accounting and legal:    $_____

9.    CRO expenses:    $_____

10.    Losses on Permitted Non-Ordinary Course Inventory Sales:    $_____

11.    One time closing/consolidation costs of operating facilities:    $_____

12.    Restructuring, integration, recruiting and severance costs    $_____

13.    Permitted Equity Cure amounts paid:    $_____

14.    Federal, state, local and foreign income tax credits of the Company and its subsidiaries for such period:    $_____

15.    Extraordinary gains for such period:    $_____

16.    All non-cash items increasing Consolidated Net Income for such period: $_____

17.    Any reversal of a reserve or any cash expenditures, in each case, made in respect of any non-cash charge that was added back in

such period or a prior period: $\underline{\hspace{3cm}}

18. Amounts that were added back in a prior period in respect of expenses that were reasonably expected to be indemnified or reimbursed in cash by unaffiliated third parties within 180 days after the accrual thereof pursuant to a written contractual obligation, to the extent that such expenses were not so indemnified or reimbursed within such 180-day period: $\underline{\hspace{3cm}}

19. the sum of lines B-2 – B-13: $\underline{\hspace{3cm}}

20. the sum of lines B-14– B-18: $\underline{\hspace{3cm}}

21. Consolidated EBITDA (line B-1 plus[1] line B-19 minus[2] line B-20): $\underline{\hspace{3cm}}

    C.  Calculation of Consolidated Fixed Charge Coverage Ratio

1. Consolidated EBITDA (line B-21): $\underline{\hspace{3cm}}

2. Unfinanced Capital Expenditures paid in cash: $\underline{\hspace{3cm}}

3. The aggregate amount (but not less than $0) of federal, state, local and foreign income taxes paid in cash (including by way of tax distributions under Section 15 (f) of the Loan Agreement): $\underline{\hspace{3cm}}

4. Restricted Payments paid in cash: $\underline{\hspace{3cm}}

5. Debt Service Charges paid in cash: $\underline{\hspace{3cm}}

6. The sum of lines C-2, C-3, and C-4: $\underline{\hspace{3cm}}

7. Line C-1 minus line C-6: $\underline{\hspace{3cm}}

8. Consolidated Fixed Charge Coverage Ratio (the ratio of line C-7 to line C-5): $\underline{\hspace{2cm}}$:1

In compliance with Minimum Consolidated Fixed Charge Coverage Ratio covenant, pursuant to Section 15(b) of the Loan Agreement: [Yes/No]

---

1 Without duplication and only to the extent reflected as a charge or reduction in the statement of such Consolidated Net Income for such period.

2 Without duplication and only to the extent included in such Consolidated Net Income for such period.

# **EXHIBIT B**

**Amended and Restated $12,000,000 Revolving Note**

# BERKSHIRE BANK

## AMENDED AND RESTATED REVOLVING NOTE

$12,000,000.00

Burlington, Massachusetts
February 11, 2022

For value received, the undersigned, ProAir, LLC, a Delaware limited liability company, American Cooling Technology, LLC, a Delaware limited liability company, Bus Air, LLC, a Delaware limited liability corporation, and Evans Tempcon Delaware, LLC, a Delaware limited All liability corporation (each and together, the **"Borrower"**), hereby jointly and severally promise to pay to the order of Berkshire Bank (the **"Bank"**), at its main office at One Van de Graaff Drive, Suite 202, Burlington, Massachusetts 01803, or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of Twelve Million ($12,000,000.00) Dollars, or, if less, the aggregate unpaid principal amount of all loans made by the Bank to the Borrower under the Loan Agreement (defined below) together with interest on the principal amount hereunder remaining unpaid from time to time, computed on the basis of the actual number of days elapsed and a 360-day year, from the date hereof until this Note is fully paid at the rate from time to time in effect under the Third Amended and Restated Loan and Security Agreement (All Assets) dated on or about of even date, as amended or restated from time to time (the **"Loan Agreement"**), by and between the Bank and the Borrower. The principal hereof and interest accruing thereon shall be due and payable as provided in the Loan Agreement. This Note may be prepaid only in accordance with the Loan Agreement.

This Note is issued pursuant, and is subject, to the Loan Agreement, which provides, among other things, for acceleration hereof. This Note is the "Note" referred to in the Loan Agreement.

This Note is secured, among other things, pursuant to the Loan Agreement, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

This Note amends, restates and supersedes that certain Amended and Restated Revolving Note dated as of October 7, 2020, payable to the order of the Bank, in the original principal amount of Twelve Million Five Hundred Thousand ($12,500,000.00) Dollars, but is not intended to and shall not extinguish or cancel the indebtedness evidenced thereby, including without limitation, accrued but unpaid interest, fees, expenses and other charges through the date hereof.

The Borrower hereby agrees to pay all costs of collection, including attorneys' fees and legal expenses in the event this Note is not paid when due, whether or not legal proceedings are commenced.

Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

*[Signature Page to Follow]*

All rights and obligations hereunder shall be governed by the laws of the Commonwealth of Massachusetts and this Note shall be deemed to be under seal.

PROAIR, LLC

By: _____
Todd Courts, Chief Financial Officer

AMERICAN COOLING TECHNOLOGY, LLC

By: _____
Todd Courts, Chief Financial Officer

BUS AIR, LLC

By: _____
Todd Courts, Chief Financial Officer

EVANS TEMPCON DELAWARE, LLC

By: _____
Todd Courts, Chief Financial Officer

*[Signature Page to $12,000,000.00 Amended and Restated Revolving Note]*

# **EXHIBIT C**

**UCC-1's**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
(617) 742-4200

**B. E-MAIL CONTACT AT FILER (optional)**
CMB@RIW.COM

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

⌐ ROBERTO, ISRAEL & WEINER, P.C.

255 STATE STREET, 7TH FLOOR

BOSTON, MA 02109

└ US

Delaware Department of State
U.C.C. Filing Section
Filed: 04:14 PM 01/28/2022
U.C.C. Initial Filing No: 2022 0784751

Service Request No:  20220294657

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| **1a. ORGANIZATION'S NAME** PROAIR INTERMEDIATE HOLDCO, LLC | | | | | |
| OR | **1b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **1c. MAILING ADDRESS** 2900 COUNTY ROAD 6 WEST | **CITY** ELKHART | **STATE** IN | **POSTAL CODE** 46514 | **COUNTRY** US | |

**2. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | | | |
| OR | **2b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **2c. MAILING ADDRESS** | CITY | STATE | POSTAL CODE | COUNTRY | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only <u>one</u> Secured Party name (3a or 3b)

| | | | | | |
|---|---|---|---|---|---|
| **3a. ORGANIZATION'S NAME** BERKSHIRE BANK | | | | | |
| OR | **3b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **3c. MAILING ADDRESS** ONE VAN DE GRAAFF DRIVE, SUITE 202 | **CITY** BURLINGTON | **STATE** MA | **POSTAL CODE** 01803 | **COUNTRY** US | |

**4. COLLATERAL:** This financing statement covers the following collateral:
All assets of the Debtor, whether now owned or hereafter acquired, and all products and proceeds of the foregoing.

**5.** Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check <u>only</u> if applicable and check <u>only</u> one box: | **6b.** Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
10769-2

International Association of Commercial Administrators

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Brian T. Garrity, Esquire
Ruberto, Israel & Weiner, P.C.
100 North Washington Street
Boston, Massachusetts 02114

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 04:30 PM 04/22/2010
INITIAL FILING # 2010 1401938

SRV: 100414258

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| ProAir, LLC | | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 28731 County Road 6 | Elkhart | IN | 46514 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Limited Liability Company | Delaware | 2810757 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Berkshire Bank | | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 150 Presidential Way, Suite 210 | Woburn | MA | 01801 | USA |

4. This FINANCING STATEMENT covers the following collateral:

A continuing security interest in all of Debtor's assets, including, without limitation, accounts, chattel paper, documents, general intangibles, instruments, deposit accounts, letter of credit rights, supporting obligations, commercial tort claims, investment property, inventory, equipment and other goods (as those terms are defined in the Uniform Commercial Code).

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA
Filed with Secretary of State, Dover, DE

FILING OFFICE COPY --- UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)          INFO-PRO  www.infoproforma.com  (800-855-2021)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Gisella Melendez                    8008335778

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

UCC DIRECT SERVICES

2727 ALLEN PARKWAY

SUITE 1000

HOUSTON TX 77019

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 09:31 AM 03/12/2015
INITIAL FILING # 2010 1401938
AMENDMENT      # 2015 1036846
SRV: 150346177

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is |
|---|---|
| 2010 1401938 | to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor **or** ☐ Secured Party of record. Check only **one** of these two boxes.

Also check **one** of the following three boxes **and** provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only **one** box.

Describe collateral ☐ deleted **or** ☐ added, **or** give entire ☐ restated collateral description, **or** describe collateral ☐ assigned.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

Berkshire Bank

10. OPTIONAL FILER REFERENCE DATA

DE-0-47136760-49635489

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
BRIAN T. GARRITY (617) 742-4200

**B. E-MAIL CONTACT AT FILER (optional)**
CMB@RIW.COM

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

RUBERTO, ISRAEL & WEINER, P.C.

255 STATE STREET, 7TH FLOOR

BOSTON, MA 02109

US

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 03:56 PM 10/18/2017**
**U.C.C. Initial Filing No: 2010 1401938**
**Amendment No: 2017 6948688**
**Service Request No: 20176679921**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
20101401938

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☑ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                    **AND** Check one of these three boxes to:

This Change affects ☐ Debtor or ☑ Secured Party of record    ☑ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME |  |  |  |
| OR | BERKSHIRE BANK | | | |
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME |  |  |  |
| OR | BERKSHIRE BANK | | | |
| | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| ONE VAN DE GRAAFF DRIVE, SUITE 202 | BURLINGTON | MA | 01803 | US |

**8.** ☐ **COLLATERAL CHANGE: Also** check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a **DEBTOR**, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME |  |  |  |
| OR | BERKSHIRE BANK | | | |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
10769-2

International Association of Commercial Administrators

**FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)**

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

**FOLLOW INSTRUCTIONS**

**11. INITIAL FINANCING STATEMENT FILE NUMBER:** Same as item 1a on Amendment form
20101401938

**12. NAME OF PARTY AUTHORIZING THIS AMENDMENT:** Same as item 9 on Amendment form

12a. ORGANIZATION'S NAME
BERKSHIRE BANK

OR

12b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**13. Name of DEBTOR on related financing statement** (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

13a. ORGANIZATION'S NAME
PROAIR, LLC

OR

| 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

**14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):**

**15. This FINANCING STATEMENT AMENDMENT:**
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**16.** Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest):

**17.** Description of real estate:

**18. MISCELLANEOUS:**

International Association of Commercial Administrato
**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
LIEN SOLUTIONS 800-331-3282

B. E-MAIL CONTACT AT FILER (optional)
UCCFILINGRETURN@WOLTERSKLUWER.COM

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

P.O. BOX 29071

GLENDALE, CA 91209-9071

US

Delaware Department of State
U.C.C. Filing Section
Filed: 09:00 AM 04/15/2020
U.C.C. Initial Filing No: 2010 1401938
Amendment No: 2020 2701136
Service Request No:  20202829862

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
20101401938

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

This Change effects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c

☐ ADD name: Complete item 7a or 7b, and item 7c

☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 7b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:**  Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BERKSHIRE BANK | | | |

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

10. OPTIONAL FILER REFERENCE DATA:
DE-0-74661405-58906028- DEBTOR: PROAIR, LLC

International Association of Commercial Administrators

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
   (617) 742-4200

**B. E-MAIL CONTACT AT FILER (optional)**
   CMB@RIW.COM

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

   RUBERTO, ISRAEL & WEINER, P.C.

   255 STATE STREET, 7TH FLOOR

   BOSTON, MA 02109

   US

Delaware Department of State
U.C.C. Filing Section
Filed: 09:56 AM 04/20/2020
U.C.C. Initial Filing No: 2010 1401938
Amendment No: 2020 2811679
Service Request No: 20202961837

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 20101401938 | Filer: attach Amendment Addendum (Form UCC3AD) and provide Debtor's name in item 13 |

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, *and* address of Assignee in item 7c *and* name of Assignor in item 9
For partial assignment, complete items 7 and 9 *and* also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check *one* of these two boxes: **AND** Check *one* of these three boxes to:

This Change affects ☐ Debtor *or* ☐ Secured Party of record  ☐ CHANGE name and/or address: Complete item 6a or 6b; *and* item 7a or 7b *and* item 7c  ☐ ADD name: Complete item 7a or 7b, *and* item 7c  ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only *one* name (6a or 6b)

| OR | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only *one* name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| OR | 7a. ORGANIZATION'S NAME |
|---|---|
| | 7b. INDIVIDUAL'S SURNAME |
| | INDIVIDUAL'S FIRST PERSONAL NAME |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** *Also* check *one* of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only *one* name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a **DEBTOR**, check here ☐ and provide name of authorizing Debtor

| OR | 9a. ORGANIZATION'S NAME |
|---|---|
| | BERKSHIRE BANK |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
10769-2

International Association of Commercial Administrators

**FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)**

# UCC FINANCING STATEMENT **AMENDMENT ADDENDUM**

FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER:  Same as item 1a on Amendment form
    **20101401938**

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT:  Same as item 9 on Amendment form

| | |
|---|---|
| | 12a. ORGANIZATION'S NAME |
| | **BERKSHIRE BANK** |
| OR | 12b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S)    SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. **Name of DEBTOR on related financing statement** (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13):  Provide only <u>one</u> Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

| | 13a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **PROAIR, LLC** | | | |
| OR | 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

15. This FINANCING STATEMENT AMENDMENT:
    ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in item 17
    (if Debtor does not have a record interest):

17. Description of real estate:

18. MISCELLANEOUS:

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CHRISTINE M. BECKER (617)742-4200

**B. E-MAIL CONTACT AT FILER (optional)**
CMB@RIW.COM

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

```
RUBERTO, ISRAEL & WEINER, P.C.
255 STATE STREET, 7TH FLOOR
BOSTON, MA 02109
US
```

Delaware Department of State
U.C.C. Filing Section
Filed: 11:48 AM 01/14/2022
U.C.C. Initial Filing No: 2022 0358465

Service Request No:  20220132782

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| AMERICAN COOLING TECHNOLOGY, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 715 WILLOW SPRINGS LANE | YORK | PA | 17406 | | US |

**2. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| BERKSHIRE BANK | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| ONE VAN DE GRAAFF DRIVE, SUITE 202 | BURLINGTON | MA | 01803 | | US |

**4. COLLATERAL:** This financing statement covers the following collateral:
A continuing security interest in all of Debtor's personal property including, without limitation, accounts, chattel paper, documents, general intangibles, instruments, deposit accounts, letter of credit rights, supporting obligations, commercial tort claims, investment property, inventory, equipment and other goods (as those terms are defined in the Uniform Commercial Code).

**5.** Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

**6b.** Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

**7.** ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8.** OPTIONAL FILER REFERENCE DATA:
10769-2

International Association of Commercial Administrators

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
BRIAN T. GARRITY (617) 742-4200

**B. E-MAIL CONTACT AT FILER (optional)**
CMB@RIW.COM

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

RUBERTO, ISRAEL & WEINER, P.C.
255 STATE STREET, 7TH FLOOR
BOSTON, MA 02109
US

Delaware Department of State
U.C.C. Filing Section
Filed: 10:08 AM 09/21/2017
U.C.C. Initial Filing No: 2017 6292723

Service Request No: 20176266681

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BUS AIR, LLC | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6630 EAST HIGHWAY 114 | RHOME | TX | 76078 | US |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BERKSHIRE BANK | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| ONE VAN DE GRAAFF DRIVE, SUITE 202 | BURLINGTON | MA | 01803 | US |

**4. COLLATERAL:** This financing statement covers the following collateral:
A continuing security interest in all of Debtor's assets, including, without limitation, accounts, chattel paper, documents, general intangibles, instruments, deposit accounts, letter of credit rights, supporting obligations, commercial torts, investment property, inventory, equipment and other goods (as those items are defined in the Uniform Commercial Code).

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | **6b.** Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
10769-2

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
WK LIEN SOLUTIONS 800-331-3282

**B. E-MAIL CONTACT AT FILER (optional)**
UCCFILINGRETURN@WOLTERSKLUWER.COM

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

P.O. BOX 29071

GLENDALE, CA 91209-9071

US

Delaware Department of State
U.C.C. Filing Section
Filed: 10:26 AM 07/07/2022
U.C.C. Initial Filing No: 2017 6292723
Amendment No: 2022 5656194
Service Request No: 20222924125

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| **1a.** INITIAL FINANCING STATEMENT FILE NUMBER | **1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 20176292723 | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:      **AND** Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:**  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | BERKSHIRE BANK | | | |
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
DE-0-87496039-64278232- DEBTOR: BUS AIR LLC

International Association of Commercial Administrators

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
(617) 742-4200

**B. E-MAIL CONTACT AT FILER (optional)**
CMB@RIW.COM

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

RUBERTO, ISRAEL & WEINER, P.C.

255 STATE STREET, 7TH FLOOR

BOSTON, MA 02109

US

Delaware Department of State
U.C.C. Filing Section
Filed: 03:43 PM 11/28/2018
U.C.C. Initial Filing No: 2018 8223014

Service Request No: 20187851224

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| EVANS TEMPCON DELAWARE, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 51 SAWYER ROAD, SUITE 420 | WALTHAM | MA | 02453 | | US |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| BERKSHIRE BANK | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| ONE VAN DE GRAAFF DRIVE, SUITE 202 | BURLINGTON | MA | 01803 | | US |

**4. COLLATERAL:** This financing statement covers the following collateral:
A continuing security interest in all of Debtor's assets, including, without limitation, accounts, chattel paper, documents, general intangibles, instruments, deposit accounts, letter of credit rights, supporting obligations, commercial torts, investment property, inventory, equipment and other goods (as those items are defined in the Uniform Commercial Code).

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
10769-2

International Association of Commercial Administrator

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# EXHIBIT D

**Amended and Restated Intercreditor Agreement**

<u>AMENDED AND RESTATED INTERCREDITOR AGREEMENT</u>

AMENDED AND RESTATED INTERCREDITOR AGREEMENT, dated as of February 11, 2022 (this "<u>Agreement</u>"), by and among Berkshire Bank, as revolver lender (in such capacity, and including its successors and assigns, the "<u>Revolver Lender</u>") under the Revolving Credit Agreement (defined below); and Crystal Financial SBIC LP, as administrative and collateral agent (in such capacities, and including its successors and assigns, the "<u>Term Agent</u>") for the benefit and on behalf of the entities (each a "<u>Term Lender</u>" and collectively, and including their respective successors and assigns, the "<u>Term Lenders</u>") who may from time to time become a "Lender" under (and as defined in) the Term Loan Agreement (defined below).

<u>BACKGROUND INFORMATION</u>

A.      ProAir Holdings Corporation, a Delaware corporation ("<u>Existing</u> <u>Holdco</u>"), the Borrowers (as hereinafter defined), the Term Agent and certain of the Term Lenders are parties to that certain Term Loan Agreement dated as of September 25, 2017 (as amended and in effect immediately prior to giving effect to the Term Loan Agreement referred to below, the "<u>Existing Term Loan Agreement</u>"), pursuant to which certain of the Term Lenders made term loans to Existing Holdco and the Borrowers, subject to the terms and conditions contained therein.

B.      The Borrowers and the Revolver Lender are parties to that certain Second Amended and Restated Loan and Security Agreement dated as of September 25, 2017 (as amended and in effect immediately prior to giving effect to the Revolving Credit Agreement referred to below, the "<u>Existing Revolving Credit Agreement</u>"), pursuant to which the Revolver Lender provided a revolving credit facility to the Borrowers on the terms and subject to the conditions set forth therein.

C.      Pursuant to that certain Intercreditor Agreement dated as of September 25, 2017 (as amended and in effect immediately prior to giving effect to this Agreement, the "<u>Existing Intercreditor Agreement</u>"), by and between the Revolver Lender and the Term Agent, and acknowledged and agreed to by Existing Holdco and the Borrowers, the Revolver Lender and the Term Agent agreed to, among other things, their respective rights with respect to the Bank Priority Collateral and the Term Priority Collateral (as such terms are defined therein).

D.      The Borrowers, the Term Lenders and the Term Agent, among others, are amending and restating, in its entirety, the Existing Term Loan Agreement pursuant to the terms and conditions set forth in the Term Loan Agreement (as hereinafter defined), pursuant to which the Term Lenders are amending and restating the Term Loan provided for therein to an aggregate principal amount of up to $5,600,000. The Term Loan is secured by a first priority lien on the Term Priority Collateral and a second priority lien on the Bank Priority Collateral, with the rights, priorities and interests as set forth herein.

E.      The Borrowers together with Holdings and the Revolver Lender are amending and restating, in its entirety, the Existing Revolving Credit Agreement pursuant to the terms and conditions set forth in the Revolving Credit Agreement (as hereinafter defined), pursuant to which the Revolver Lender is extending credit to the Borrowers on a revolving basis up to a present maximum amount equal to $12,000,000. The Bank Obligations are secured by a first priority lien on the Bank Priority Collateral and a second priority lien on the Term Priority Collateral, with the rights, priorities and interests as set forth herein.

F.     The Revolver Lender and the Term Agent desire to amend and restate the Existing Intercreditor Agreement in its entirety by executing and delivering this Agreement to set forth certain agreements in respect of their respective rights and the respective rights of the Revolver Lender and the Term Lenders with respect to the Bank Priority Collateral and the Term Priority Collateral.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.   <u>Definitions</u>. Unless otherwise defined herein, as used in this Agreement, all terms defined in the Term Loan Agreement, the Revolving Credit Agreement, the preamble of this Agreement and in the <u>Background</u> <u>Information</u> above shall have the meanings assigned to them therein and, in addition, the following terms shall have the following meanings:

"<u>Bank Collateral Documents</u>" means, collectively, the Revolving Credit Agreement, that certain Security Agreement by and between ProAir and the Revolver Lender dated April 26, 2010, that certain Patent Security Agreement by and between ProAir and the Revolver Lender dated April 26, 2010, that certain Trademark Security Agreement by and between ProAir and the Revolver Lender dated on or about the date hereof, a Security Agreement (Pledged Collateral) from Holdings, together with all other security agreements, pledge agreements, patent and trademark security agreements, lease assignments, guaranties, and other similar agreements, all financing statements against the Loan Parties, and all modifications or supplements thereto, by or between any one or more of the Loan Parties and the Revolver Lender now or hereafter in effect, and as amended from time to time consistent with the terms hereof.

"<u>Bank Documents</u>" means the Revolving Credit Agreement, the Bank Collateral Documents, the Note as that term is defined in the Revolving Credit Agreement, the Guaranty from Holdings to the Revolver Lender being dated as of the date hereof,  and any and all other loan documents now or hereafter evidencing the Bank Loans, and any agreements that evidence a DIP Financing provided by the Revolver Lender, as all of the foregoing may hereafter be amended, modified, supplemented, restated, replaced or refinanced in accordance with the terms of this Agreement.

"<u>Bank Event of Default</u>" means an Event of Default as defined in the Revolving Credit Agreement.

"<u>Bank Loans</u>" means the Revolving Loans as defined in the Revolving Credit Agreement.

"<u>Bank Enforcement Notice</u>" means a written notice delivered by the Revolver Lender to the Term Agent stating that (i) a Bank Event of Default has occurred and is continuing under the Bank Documents, (ii) the Bank intends to commence the enforcement of its rights and remedies under the Bank Documents in connection with a liquidation of the Bank Priority Collateral, and (iii) such written notice commences the Term Standstill Period under this Agreement.

"<u>Bank Obligations</u>" means the collective reference to the unpaid principal of and interest on the Bank Loans, and all other obligations and liabilities of the Loan Parties to the Revolver Lender of whatever kind or nature pursuant to, under or in connection with the Bank Documents (including, without limitation, interest accruing at the then applicable rate provided in the Revolving Credit Agreement after the maturity of the Bank Loans and interest accruing at the then applicable rate provided in the Revolving Credit Agreement during an Insolvency Proceeding, relating to any Loan Party), whether direct or indirect, absolute or contingent, due or

to become due, or now existing or hereafter incurred, whether arising under, out of, or in connection with, the Revolving Credit Agreement, this Agreement, the other Bank Documents or any other document made, delivered or given by any Loan Party, in each case whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including, without limitation, all protective advances, fees and disbursements of counsel to the Revolver Lender that are required to be paid by the Loan Parties pursuant to the terms of the Revolving Credit Agreement, this Agreement or any other Bank Document), in each event, to the extent such principal, interest or other obligations and liabilities are not avoided or set aside by a court of competent jurisdiction.

"Bank Priority Collateral" means the following now-owned or hereafter acquired personal property of the Loan Parties:

(i) all Accounts (other than Accounts constituting royalties, settlement payments, license fees or other payments made in respect of Intellectual Property or other Term Priority Collateral),

(ii) all Inventory,

(iii) the Real Estate owned in fee and the leasehold interests of any of the Loan Parties pertaining solely to the property in Elkhart, Indiana, being known as and numbered as 28731 and 28769 County Road 6 (the "Elkhart Property").

(iv) all deposit accounts and all other bank accounts into which the proceeds of Accounts or Inventory are deposited, including all cash, cash equivalents, financial assets, negotiable instruments and other evidence of payment, and other funds on deposit therein or credited thereto (other than Term Priority Accounts),

(v) all money, cash or cash equivalents relating to the foregoing,

(vi) all proceeds, insurance claims and other rights to payments, and books and records relating to Accounts and Inventory not otherwise included in the foregoing,

(vii) all products of any of the foregoing, and

(viii) all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing as each term is used and defined in the Bank Collateral Documents as in effect on the date hereof.

For greater certainty, Bank Priority Collateral shall include any and all insurance policies or proceeds in respect of the Bank Priority Collateral (including warranty insurance and any insurance claims and rights and proceeds thereof and any related rights to settle or adjust any such claims, but excluding business interruption insurance).

"Bank Standstill Period" means the period commencing on the date of the Revolver Lender's receipt of a Term Enforcement Notice, and ending on the date which is 60 days after receipt of such Term Enforcement Notice, provided that such period shall continue so long as the Term Agent is diligently pursuing, in good faith, the exercise of its rights and remedies against a material portion of the Term Priority Collateral, and provided further that the Bank Standstill Period shall be deemed terminated immediately upon the commencement of an Insolvency Proceeding involving the Borrowers or any other Loan Party.

"Bankruptcy Code" means 11, United States Code, 11 U.S.C., Section 101, et seq.), as amended, or any replacement statute.

"Borrowers" means, collectively, ProAir, LLC, a Delaware limited liability company ("ProAir"), American Cooling Technology, LLC, a Delaware limited liability company (f/k/a American Cooling Technology, Inc., a Pennsylvania corporation) ("ACT"), Bus Air, LLC, a Delaware limited liability company, Evans Tempcon Delaware, LLC, a Delaware limited liability company ("Evans"), and each of their respective subsidiaries or affiliates which may from time to time be party to the Bank Documents or the Term Documents as a "Borrower" thereunder, in each case, together with their successors and permitted assigns, including any receiver, trustee or debtor-in-possession, and "Borrower" shall mean any of the foregoing.

"Borrowing Base" shall mean the "Borrowing Base" as defined in the Revolving Credit Agreement as in effect on the date hereof, as amended from time to time consistent with the terms of this Agreement.

"Cash Management Obligations" means all obligations incurred by the Revolver Lender or any of its affiliates in connection with any Cash Management Services Agreement.

"Cash Management Services" means cash management services or facilities provided by the Revolver Lender or any of its affiliates to a Loan Party with respect to (i) credit card processing services; (ii) ACH transactions; (iii) the execution or processing of electronic transfers of funds by automatic clearing house transfer, wire transfer or otherwise to or from deposit accounts of any Loan Party now or hereafter maintained with Revolver Lender or any of its affiliates, and (iv) the acceptance for deposit or the honoring for payment of any check, draft or other item with respect to any such deposit accounts.

"Cash Management Services Agreement" means any agreement pursuant to which the Revolver Lender or any of its affiliates agrees to provide Cash Management Services.

"Consolidated EBITDA" has the meaning given to such term in the Revolving Credit Agreement, as in effect on the date hereof.

"Consolidated Fixed Charge Coverage Ratio" has the meaning given to such term in the Revolving Credit Agreement, as in effect on the date hereof.

"Credit Limit" has the meaning given to such term in the Revolving Credit Agreement, as amended from time to time consistent with the terms of this Agreement, provided that such amount shall not exceed an amount equal to $12,000,000.

"Crystal Lenders" means, collectively, Crystal Financial SBIC LP and Crystal Financial SPV LLC.

"DIP Financing" has the meaning set forth in Section 5.2 of this Agreement.

"Due Diligence" has the meaning set forth in Section 2(f) of this Agreement

"Holdings" means ProAir Intermediate Holdco, LLC, a Delaware limited liability company, including any of its successors or permitted assigns.

"Inadvertent Overadvances" shall mean the funding of any Bank Loans which did not result in an overadvance under the Borrowing Base when made (to the knowledge of the Revolver Lender) but which became an overadvance thereafter as a result of circumstances beyond the reasonable control of the Revolver Lender.

"Insolvency Proceeding" shall mean (a) any case, action or proceeding before any court or other governmental authority relating to bankruptcy, reorganization, insolvency, liquidation, administration, receivership, dissolution, winding-up or relief of debtors, or (b) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other similar arrangement in respect of its creditors generally or any substantial portion of its creditors.

"Intellectual Property" has the meaning given to such term in the Term Loan Agreement.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest intended as security for an obligation, encumbrance (including, but not limited to, easements, rights of way and the like), lien (statutory or other), security agreement or transfer intended as security for an obligation, including without limitation, any conditional sale or other retention agreement, the interest of a lessor under a capital lease or any financing lease having substantially the same economic effect as any of the foregoing.

"Loan Parties" means Holdings, the Borrowers and each of their respective subsidiaries or affiliates which may from time to time be party to the Bank Documents or the Term Documents, and "Loan Party" shall mean any of the foregoing.

"Maximum Bank Amount" means, at any date of determination, the sum of (a) the outstanding principal amount of the Bank Loans up to a maximum amount not to exceed the lesser of (i) Credit Limit then in effect, and (ii) the Borrowing Base, plus (b) the amount of any interest (including default interest) on the Revolving Loans (and including, without limitation, any interest that would accrue and become due but for the commencement of an Insolvency Proceeding), plus (c) any fees or prepayment premiums, costs, expenses and indemnities related to the Revolving Loans and payable under any of the Bank Documents, including but not limited to those fees and expenses outlined more fully in Section 11 of the Revolving Credit Agreement (and including, without limitation, any fees including without limitation swap or ACH fees, costs, expenses and indemnities that would accrue and become due on such amounts but for the commencement of an Insolvency Proceeding), plus (d) Cash Management Obligations in a maximum amount not to exceed $100,000 at any time outstanding, plus, (e) additional Bank Loans (whenever made, whether for protective advances or otherwise), in an amount not to exceed the greater of (i) 10% of the lesser of the Borrowing Base and the Credit Limit then in effect, and (ii) $500,000, plus (f) Inadvertent Overadvances, plus (g) in connection with any DIP Financing provided by the Revolver Lender, an amount not to exceed 10% of the Bank Obligations then outstanding immediately before the closing of such DIP Financing.

"Maximum Term Amount" means, at any date of determination, (a) the sum of (i) the principal amount of up to $5,600,000, minus (ii) the aggregate amount of all principal payments and prepayments of the Term Loan Debt received by Term Agent or the Term Loan Lenders after the date hereof, plus (b) the amount of any interest (including default interest and any interest that is payable in kind) on such amount (and including, without limitation, any interest that would accrue and become due after the date hereof but for the commencement of an Insolvency Proceeding), plus (c) any fees, costs, expenses and indemnities payable under any of the Term Loan Documents (and including, without limitation, any fees, costs, expenses and indemnities that would accrue and become due on such amounts but for the commencement of an Insolvency

Proceeding), plus (d) protective advances and other advances made by the Term Loan Agent or Term Loan Lenders after a Term Event of Default has occurred under the Term Loan Agreement, in a maximum aggregate amount (for purposes of this clause (d)) not to exceed $2,500,000 at any time outstanding, plus (e) in connection with any DIP Financing provided by a Term Lender, an amount not to exceed $2,500,000.

"Purchase Option Event" means the occurrence of any one of the following events: (a) the occurrence of any Event of Default under the Revolving Credit Agreement or the Term Loan Agreement that continues unwaived for a period of thirty (30) days, (b) the acceleration of all or any substantial portion of the Bank Obligations or the Term Obligations, (c) the occurrence of any Insolvency Proceeding with respect to any Loan Party, (d) the refusal by the Revolver Lender to provide revolving loans when requested by the Loan Parties, (e) the exercise of remedies by the Revolver Lender against any Loan Party or the Bank Priority Collateral, (f) the Loan Parties shall have failed to make payments of principal and/or interest or other amounts due in respect of the Term Obligations or the Bank Obligations, (g) the Revolver Lender shall assign all of the Bank Loans or commitments held by the Revolver Lender under the Revolving Credit Agreement or (h) any refinancing of all or any portion of the Bank Loans or commitments under the Revolving Credit Agreement.

"Revolving Credit Agreement" means that certain Third Amended and Restated Loan and Security Agreement dated as of the date hereof among the Loan Parties and the Revolver Lender, as the same may be amended, restated or extended from time to time, and shall include any other agreement replacing such Revolving Credit Agreement in connection with any replacement, refinancing or refunding thereof, in each case, consistent with the terms of this Agreement.

"Revolving Loans" has the meaning given to such term in the Revolving Credit Agreement, as in effect on the date of this Agreement.

"Term Collateral Documents" means the Collateral Documents (as such term is defined in the Term Loan Agreement, as in effect on the date hereof, as amended from time to time consistent with the terms of this Agreement).

"Term Documents" means the Term Loan Agreement, the Term Collateral Documents and all other "Loan Documents" as defined in the Term Loan Agreement, any agreement that evidence a DIP Financing provided by the Term Agent or Term Lenders, as all of the foregoing may hereafter be amended, modified, supplemented, restated, replaced or refinanced in accordance with the terms of this Agreement.

"Term Enforcement Notice" means a written notice delivered by the Term Agent to the Revolver Lender stating that (i) a Term Event of Default has occurred and is continuing under the Term Documents, (ii) the Term Agent intends to commence the enforcement of its rights and remedies under the Term Documents, and (iii) such written notice commences the Bank Standstill Period under this Agreement.

"Term Event of Default" means a Default or an Event of Default as defined in the Term Loan Agreement.

"Term Loan Agreement" means that certain Amended and Restated Term Loan Agreement dated as of the date hereof, among the Loan Parties, the Term Agent and the Term Lenders, as the same may be amended, restated or extended from time to time, and shall include

any other agreement replacing such Term Loan Agreement in connection with any replacement, refinancing or refunding thereof, in each case, consistent with the terms of this Agreement.

"Term Loans" means, collectively, all term loans made by the Term Lenders to the Borrowers pursuant to the Term Loan Agreement, including any protective advances made thereunder.

"Term Obligations" means an amount equal to the aggregate unpaid amount of all obligations under the Term Loan Agreement, including all unpaid principal of and interest on the Term Loans, and all other obligations and liabilities of the Loan Parties to the Term Agent and Term Lenders of whatever kind or nature pursuant to, under or in connection with the Term Documents (including, without limitation, interest accruing at the then applicable rate provided in the Term Loan Agreement after the maturity of the Term Loans and interest accruing at the then applicable rate provided in the Term Loan Agreement during an Insolvency Proceeding, relating to the Borrowers or any other Loan Party), whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, whether arising under, out of, or in connection with, the Term Loan Agreement, this Agreement, the other Term Documents or any other document made, delivered or given by any Loan Party, in each case whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including, without limitation, all fees and disbursements of counsel to the Term Agent and Term Lenders that are required to be paid by the Loan Parties pursuant to the terms of the Term Loan Agreement, this Agreement or any other Term Document), in each event, to the extent such principal, interest or other obligations and liabilities are not avoided or set aside by a court of competent jurisdiction.

"Term Priority Account" means any deposit or other account established by the Term Agent or any Loan Party that is utilized for the purpose of depositing proceeds of any Term Priority Collateral.

"Term Priority Collateral" means all now-owned or hereafter acquired "Collateral" (as such term is defined in the Term Collateral Documents as in effect on the date hereof, as amended from time to time consistent with the terms of this Agreement) but excluding all Bank Priority Collateral. Without limiting the foregoing, Term Priority Collateral shall include:

(i)     all Equipment;

(ii)     all Real Estate owned in fee and all leasehold interests exclusive of the Elkhart Property.

(iii)     all Term Priority Accounts and all money, cash, checks, other negotiable instruments, funds, and other evidences of payments held therein and all security entitlements, securities, and commodity contracts credited thereto, provided, however, that any identifiable proceeds of Term Priority Collateral deposited in any such accounts shall be treated as Term Priority Collateral, provided, however, that any identifiable proceeds of Bank Priority Collateral deposited in any such accounts shall be treated as Bank Priority Collateral;

(iv) all Intellectual Property, intercompany indebtedness pledged by the Loan Parties (except, for avoidance of doubt, intercompany indebtedness between Loan Parties arising from the purchase or sale of any Bank Priority Collateral, or in connection with any intercompany loans derived from any identifiable proceeds of Bank Priority Collateral, all of which shall be treated as Bank Priority Collateral), and investment property (including any equity interests

pledged by the Loan Parties), all instruments, commercial tort claims, chattel paper, documents and general intangibles (including any claims under any acquisition agreement or under any representation and warranty insurance or similar policy), supporting obligations and rights under letters-of-credit;

(v) all money, cash or cash equivalents relating to the foregoing,

(vi) all proceeds, insurance claims and other rights to payments, and books and records relating to any of the foregoing,

(vii) all products of any of the foregoing, and

(viii) all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing as each term is used and defined in the Term Collateral Documents as in effect on the date hereof.

For greater certainty, Term Priority Collateral shall include any insurance policies or proceeds in respect of the Term Priority Collateral (including business interruption insurance), and rights and proceeds thereof and any related rights to settle or adjust any such claims, but excluding warranty insurance and any rights to settle or adjust any claims in respect of warranty insurance (to the extent in respect of Bank Priority Collateral).

"Term Standstill Period" means the period commencing on the date of the Term Agent's receipt of a Bank Enforcement Notice, and ending on the date which is 60 days after receipt of such Bank Enforcement Notice, provided that such period shall continue so long as the Revolver Lender is diligently pursuing, in good faith, the exercise of its rights and remedies against a material portion of the Bank Priority Collateral, and provided further that the Term Standstill Period shall be deemed terminated immediately upon the commencement of an Insolvency Proceeding involving the Borrowers or any other Loan Party.

Section 2. Acknowledgment of Respective Security Interests; Lien Priorities; No New Liens; Notices of Default; Sharing of Materials.

(a) Notwithstanding the date, manner or order of perfection of the security interests and liens granted to the Revolver Lender or the Term Agent, and notwithstanding any provisions of the Uniform Commercial Code of any state or any applicable law or decision or any provisions of the Bank Documents or the Term Documents, and irrespective of whether the Revolver Lender or the Term Agent holds possession of all or any part of the Term Priority Collateral or the Bank Priority Collateral, the following, as between the Revolver Lender and the Term Agent, shall be the relative priority of the Liens of the Revolver Lender and the Term Agent:

(i) The Revolver Lender shall have a first and prior Lien in all Bank Priority Collateral and the Term Agent shall have a second and junior Lien thereon; and

(ii) The Term Agent shall have a first and prior Lien upon all Term Priority Collateral and the Revolver Lender shall have a second and junior Lien thereon.

(b) Notwithstanding any provisions of the Bank Documents or the Term Documents and so long as each of (x) the Bank Obligations (up to the Maximum Bank Amount) have not been paid in full in cash and all commitments under the Revolving Credit Agreement have not been terminated and (y) the Term Obligations (up to the Maximum Term Amount) have not been paid in full in cash and all

commitments under the Term Loan Agreement have not been terminated, each of the Revolver Lender and the Term Agent hereby agree that it shall not permit any Loan Party to:

(i)  grant or permit any additional new Liens on any asset or property to secure any Bank Obligations unless it has granted or concurrently grants or offers to provide (and actually provides if such offer accepted) a Lien on such asset or property to secure the Term Obligations; and

(ii)  grant or permit any additional new Liens on any asset or property to secure any Term Obligations unless it has granted or concurrently grants or offers to provide (and actually provides if such offer accepted) a Lien on such asset or property to secure the Bank Obligations.

To the extent any additional new Liens are granted on any asset or property (except if the applicable party is offered and declines to accept any additional Lien) pursuant to this Section 2(b), the priority of such additional new Liens shall be determined in accordance with Section 2(a). In addition, to the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights or remedies available hereunder, the Revolver Lender and the Term Agent agree that any amounts received by or distributed to any of them pursuant to or as a result of additional new Liens granted in contravention of this Section 2(b) shall be subject to the terms of this Agreement.

(c)  At any time (i) following the delivery of a Bank Enforcement Notice, (ii) after the commencement of an Insolvency Proceeding involving any of the Loan Parties, or (iii) during any Term Standstill Period, all proceeds of Bank Priority Collateral shall be paid to the Revolver Lender for application to Bank Obligations until the Bank Obligations (up to the Maximum Bank Amount) are paid in full in cash and all commitments under the Revolving Credit Agreement are terminated, after which any residual proceeds of Bank Priority Collateral shall be paid to the Term Agent for application to the Term Obligations up to the Maximum Term Amount. If the Term Agent or the Term Lenders receive any Bank Priority Collateral or identifiable proceeds thereof prior to the time the Bank Obligations (up to the Maximum Bank Amount) are paid in full in cash and all commitments under the Revolving Credit Agreement are terminated, the Term Agent and the Term Lenders shall hold the same in trust for the benefit of, and shall immediately pay and deliver (with any necessary endorsement) the same to, the Revolver Lender for application to the Bank Obligations up to the Maximum Bank Amount. Notwithstanding any provisions herein to the contrary, payments made by any Loan Party to Term Agent or Term Lenders in respect of the Term Obligations with proceeds of the Bank Loans shall not be construed to constitute proceeds of Bank Priority Collateral. The Revolver Lender shall not contest (or support any person in contesting or challenging) the validity or priority of the security interest and Liens of the Term Agent and Term Lenders.

(d)  At any time (i) following the delivery of a Term Enforcement Notice, (ii) after the commencement of an Insolvency Proceeding involving any of the Loan Parties, or (iii) during any Bank Standstill Period, all proceeds of Term Priority Collateral shall be paid to the Term Agent for application to Term Obligations until the Term Obligations (up to the Maximum Term Amount) are paid in full in cash and all commitments under the Term Loan Agreement are terminated, after which any residual proceeds of Term Priority Collateral shall be paid to the Revolver Lender for application to Bank Obligations up to the Maximum Bank Amount. If the Revolver Lender shall receive any Term Priority Collateral or identifiable proceeds thereof prior to the time the Term Obligations (up to the Maximum Term Amount) are paid in full in cash and all commitments under the Term Loan Agreement are terminated, the Revolver Lender shall hold the same in trust for the benefit of, and shall immediately pay and deliver (with any necessary endorsement) the same to, the Term Agent for application to the Term Obligations up to the Maximum Term Amount. Notwithstanding any provisions herein to the contrary,

payments made by any Loan Party to Revolver Lender in respect of the Bank Obligations with proceeds of the Term Loans shall not be construed to constitute proceeds of Term Priority Collateral. The Term Agent shall not contest (or support any person in contesting or challenging) the validity or priority of the Liens of the Revolver Lender.

(e)     Each of the Revolver Lender and the Term Loan Agent shall endeavor to provide a copy of any notice of default, or similar communication under the Bank Documents or the Term Documents, as applicable, as and when given to the Loan Parties. No party shall have any liability to the other party for failure to comply with this Section 2(e).

(f)     Each of the Revolver Lender and the Term Loan Agent agree to endeavor to provide the other copies of any appraisals, field examinations and commercial finance audits or reports it conducts in respect of the Loan Parties or the Collateral (to the extent not prohibited by any third parties that prepared such materials) and/or financial statements and other information relating to the Loan Parties and their Subsidiaries (collectively, "Due Diligence"). No party shall have any liability to the other party for failure to comply with this Section 2(f). Neither the Revolver Agent nor the Term Agent or any of their respective agents and employees make or shall be deemed to have made any representations or warranties whatsoever with respect to the Due Diligence of any kind, nature, or description, including, without limitation, any representation as to the completeness or accuracy of the Due Diligence. The Loan Parties, by their execution of the acknowledgment hereto, irrevocably authorize the Revolver Lender and the Term Loan Agent to provide the other with copies of any Due Diligence.

Section 3.     Restrictions on Actions by the Term Lenders; Limitation on Amendments.

(a)     The Term Lenders and the Term Agent acknowledge and agree that, if a Bank Event of Default has occurred and is continuing, the Revolver Lender shall have the sole right to exercise or refrain from exercising rights and remedies with respect to the Bank Priority Collateral (but the Revolver Lender shall have no obligation to exercise any such rights and remedies), until the earlier to occur of (i) the payment in full of the Bank Obligations (up to the Maximum Bank Amount) and the termination of all commitments to lend under the Bank Documents, and (ii) the expiration of the Term Standstill Period, and the Term Lenders and the Term Agent shall have no right to exercise any rights and remedies with respect to, or object to the Revolver Lender's exercise of rights and remedies with respect to, the Bank Priority Collateral during such time.

(b)     Except as set forth in Section 9, the Revolver Lender shall not be deemed to be agents of or trustees for the Term Lenders or the Term Agent and shall not be liable to them for any action taken or omitted to be taken by them hereunder or under the Bank Documents. Without limiting the generality of the foregoing, during the continuance of a Bank Event of Default, the Term Lenders and the Term Agent will accept and agree to all decisions made by the Revolver Lender in exercising rights and remedies with respect to the Bank Priority Collateral after default pursuant to the Bank Documents with respect to the sale or disposition of the Bank Priority Collateral in the absence of gross negligence, bad faith or willful misconduct by the Revolver Lender, provided that the proceeds of any sale or other disposition of the Bank Priority Collateral following Revolver Lender's issuance of a Bank Enforcement Notice or in connection with the exercise of rights and remedies by the Revolver Lender are applied to the Bank Obligations and permanently reduce the related commitments of the Revolver Lender. All such sales or other dispositions shall be conducted in a commercially reasonable manner.

(c)     The Revolver Lender's rights with respect to the Bank Priority Collateral include, if a Bank Event of Default has occurred and is continuing, the right to release, upon five (5) Business Days prior written notice to the Term Agent, any or all of the Bank Priority Collateral from the Lien under (i) any Bank Collateral Document and (ii) any Term Collateral Document to the extent the Bank

Priority Collateral is released under the Bank Collateral Documents, in connection with any sale of all or any portion of the Bank Priority Collateral, provided that the net proceeds of any such sale shall be used to repay the Bank Obligations and (to the extent of any excess) Term Obligations.  Subject to the Revolver Lender's compliance with this Agreement, the Term Agent and the Term Lenders are hereby deemed to have consented to such sale(s) during the continuance of a Bank Event of Default.  Each of the Term Agent and the Term Lenders hereby authorizes the Revolver Lender to complete and file, on behalf of the Term Agent and the Term Lenders, from time to time and/or deliver such UCC termination statements and partial release statements (with respect to the Liens of the Term Agent and Term Lenders in the Bank Priority Collateral being sold), if the Revolver Lender shall determine, in connection with any sale of Bank Priority Collateral during the continuance of a Bank Event of Default, that the termination or partial release of such Lien in connection with such sale is necessary or advisable and if the Revolver Lender is then terminating or partially releasing its Liens to the same extent in the Bank Priority Collateral.  The Term Agent shall execute such other release, satisfaction, discharge and termination documents and instruments and shall take such further actions as the Revolver Lender shall request with respect to any sale of the Bank Priority Collateral or termination or partial release of the Lien of the Term Agent on the Bank Priority Collateral during the continuance of a Bank Event of Default, in each case, at the sole expense of the Loan Parties.  The Term Agent, on behalf of the Term Lenders, hereby irrevocably constitutes and appoints the Revolver Lender, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such the Term Agent and the Term Lenders and in the name of the Term Agent and the Term Lenders or in the Revolver Lender's own name, from time to time in the Revolver Lender's discretion, solely for the purpose of carrying out the terms of this paragraph, to take any and all action and to execute any and all documents and instruments which may be determined by the Revolver Lender to be necessary or desirable to accomplish the purposes of this paragraph, in each case with respect to the Bank Priority Collateral, including, without limitation, any terminations of financing statements, and executing the partial lien releases, discharges, endorsements, assignments or other instruments of transfer, termination or release, and, in addition, to take any and all other action deemed appropriate by the Revolver Lender, in each case with respect to the Bank Priority Collateral, for the purpose of carrying out the terms of this paragraph.  The Term Agent, on behalf of the Term Lenders, hereby ratifies all that said attorneys shall lawfully do or cause to be done with respect to the Bank Priority Collateral and pursuant to the power of attorney granted in this paragraph, in each case, at the sole expense of the Loan Parties.  No Person to whom this power of attorney is presented, as authority for the Revolver Lender to take any action or actions contemplated hereby, shall be required to inquire into or seek confirmation from the Term Agent or any Term Lender as to the authority of the Revolver Lender to take any action described herein, or as to the existence of or fulfillment of any condition to this power of attorney, which is intended to grant to the Revolver Lender the authority to take and perform the actions contemplated herein.

(d)     The Term Agent and Term Lenders shall not, without the consent of the Revolver Lender, amend, restate, modify, supplement, replace or refinance the Term Documents in any manner that would: (i) cause the Term Obligations to exceed the Maximum Term Amount, (ii) shorten the scheduled maturity of the Term Loans; (iii) increase the rates of interest set forth in Term Loan Agreement as in effect on the date hereof (including by adding or increasing any interest rate floor) by more than 200 basis points per annum (other than any increase occurring because of fluctuations in underlying rate indices or the imposition of the default rate thereunder), (iv), notwithstanding the foregoing clause (iii), increase the default rate set forth in the Term Loan Agreement as in effect on the date hereof, (v) directly restrict the ability of the Borrowers or any other Loan Party from making any payments in respect of the Bank Obligations that would otherwise be permitted under the Term Documents, as in effect on the date hereof, except as otherwise provided herein, (vi) modify, add or make more restrictive, any covenant or default or event of default under the Term Documents in a manner adverse to any Loan Party, or otherwise change any provision that would result in a Bank Event of Default under the Revolving Credit Agreement, (vii) modify or add any covenant or otherwise change any provision under the Term Documents in a manner

that would permit or obligate Holdings to engage in any business or activity, hold any assets or incur any indebtedness or other liabilities other than such permissions and obligations set forth in the Term Documents as in effect on the date hereof or (viii) violate the terms of this Agreement. The Term Agent and Term Lenders may from time to time (i) waive any Term Event of Default, and (ii) except as expressly set forth herein, amend, modify, restate, modify, supplement, replace or refinance any or all of the Term Documents.

Section 4. <u>Restrictions on Actions by the Revolver Lender; Limitation on Amendments</u>.

(a)     The Revolver Lender acknowledges and agrees that, if a Term Event of Default has occurred and is continuing, the Term Agent and Term Lenders shall have the sole right to exercise or refrain from exercising rights and remedies with respect to the Term Priority Collateral (but the Term Agent and Term Lenders shall have no obligation to exercise any such rights and remedies), until the earlier to occur of (i) the payment in full of the Term Obligations (up to the Maximum Term Amount) and the termination of all commitments to lend under the Term Documents, and (ii) the expiration of the Bank Standstill Period, and the Revolver Lender shall have no right to exercise any rights and remedies with respect to, or object to the Term Agent's exercise of rights and remedies with respect to, the Term Priority Collateral during such time.

(b)     Except as set forth in Section 9, the Term Lenders and the Term Agent shall not be deemed to be agents of or trustees for the Revolver Lender and shall not be liable to them for any action taken or omitted to be taken by them hereunder or under the Term Collateral Documents. Without limiting the generality of the foregoing, during the continuance of a Term Event of Default the Revolver Lender will accept and agree to all decisions made by the Term Lenders and the Term Agent in exercising rights and remedies with respect to the Term Priority Collateral after default pursuant to Term Documents with respect to the sale or other disposition of Term Priority Collateral in the absence of gross negligence, bad faith or willful misconduct by the Term Lenders or the Term Agent, <u>provided</u> that the proceeds of any sale or other disposition of the Term Priority Collateral are applied to the Term Obligations and permanently reduce the related commitments of the Term Agent and Term Lenders. All such sales or other dispositions shall be conducted in a commercially reasonable manner.

(c)     The Term Agent's rights with respect to the Term Priority Collateral include, if a Term Event of Default has occurred and is continuing, the right to release, upon five (5) Business Days prior written notice to the Revolver Lender, any or all of the Term Priority Collateral from the Lien under (i) any Term Collateral Document and (ii) any Bank Collateral Document to the extent the underlying Term Priority Collateral is released under the Term Collateral Documents, in connection with any sale of all or any portion of the Term Priority Collateral, provided that the net proceeds of any such sale shall be used to repay the Term Obligations and (to the extent of any excess) Bank Obligations. Subject to the Term Agent's compliance with this Agreement, the Revolver Lender is hereby deemed to have consented to such sale(s) during the continuance of a Term Event of Default. The Revolver Lender hereby authorizes the Term Agent to complete and file, on behalf of the Revolver Lender, from time to time and/or deliver such UCC termination statements and partial release statements (with respect to the Liens of the Revolver Lender in the Term Priority Collateral being sold), if the Term Agent shall determine, in connection with any sale of Term Priority Collateral during the continuance of a Term Event of Default, that the termination or partial release of such Lien in connection with such sale is necessary or advisable and if the Term Lenders are then terminating or partially releasing their Liens to the same extent in the Term Priority Collateral. The Revolver Lender shall execute such other release, satisfaction, discharge and termination documents and instruments and shall take such further actions as the Term Agent shall request with respect to any sale of the Term Priority Collateral or termination or partial release of the Lien of the Revolver Lender on the Term Priority Collateral, during the continuance of a Term Event of Default, in each case, at the sole expense of the Loan Parties. The Revolver Lender hereby irrevocably

constitutes and appoints the Term Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such the Revolver Lender and in the name of the Revolver Lender or in the Term Agent's own name, from time to time in the Term Agent's discretion, solely for the purpose of carrying out the terms of this paragraph, to take any and all action and to execute any and all documents and instruments which may be determined by the Term Agent to be necessary or desirable to accomplish the purposes of this paragraph, in each case with respect to the Term Priority Collateral, including, without limitation, any terminations of financing statements, and executing the partial Lien releases, discharges, endorsements, assignments or other instruments of transfer, termination or release, and, in addition, to take any and all other action deemed appropriate by the Term Agent, in each case with respect to the Term Priority Collateral, for the purpose of carrying out the terms of this paragraph. The Revolver Lender hereby ratifies all that said attorneys shall lawfully do or cause to be done with respect to the Term Priority Collateral and pursuant to the power of attorney granted in this paragraph, in each case, at the sole expense of the Loan Parties. No Person to whom this power of attorney is presented, as authority for the Term Agent to take any action or actions contemplated hereby, shall be required to inquire into or seek confirmation from the Revolver Lender as to the authority of the Term Agent to take any action described herein, or as to the existence of or fulfillment of any condition to this power of attorney, which is intended to grant to the Term Agent the authority to take and perform the actions contemplated herein.

(d)     The Revolver Lender shall not, without the consent of the Term Agent, amend, restate, modify, supplement, replace or refinance the Bank Documents in any manner that would: (i) amend the definition of Credit Limit to an amount greater than provided for herein, (ii) cause the Bank Obligations to exceed the Maximum Bank Amount, (iii) shorten the scheduled maturity of the Bank Obligations, (iv) increase the rates of interest set forth in Revolving Credit Agreement as in effect on the date hereof (including by adding or increasing any interest rate floor) by more than 200 basis points per annum (other than any increase occurring because of fluctuations in underlying rate indices or the imposition of the default rate thereunder), (v) notwithstanding the foregoing clause (iv), increase the default rate set forth in the Revolving Credit Agreement as in effect on the date hereof, (vi) directly restrict the ability of the Borrowers or any other Loan Party from making any payments in respect of the Term Obligations that would otherwise be permitted under the Bank Documents, as in effect on the date hereof, except as otherwise provided herein, (vii) modify, add or make more restrictive, any covenant or default or event of default under the Bank Documents in a manner adverse to any Loan Party, or otherwise change any provision that would result in an Term Event of Default under the Term Loan Agreement, (viii) amend the definitions of Consolidated EBITDA, Consolidated Fixed Charge Coverage Ratio, or Permitted Equity Cure (or any of their respective component definitions) in any manner that would make those terms more favorable to the Loan Parties, (ix) amend the definition of "Borrowing Base" or any component definition thereof contained in the Revolving Credit Agreement as in effect on the date hereof, or increase the advance rates contained in the Borrowing Base, in a manner that would make more credit available to the Borrowers (provided that, for the avoidance of doubt, the Revolver Lender shall be permitted from time to time to establish discretionary reserves against the Borrowing Base after the date hereof as provided for in the Revolving Credit Agreement, and thereafter reduce or eliminate such reserves), or (x) violate the terms of this Agreement. The Revolver Lender may from time to time (i) waive any Bank Event of Default, and (ii) except as expressly set forth herein, amend, modify, restate, modify, supplement, replace or refinance any or all of the Bank Documents.

Section 5.     Insolvency Proceedings.

5.1     General Applicability. This Agreement shall be applicable both before and after the institution of any Insolvency Proceeding involving any of the Borrowers or any other Loan Party, including, without limitation, the filing of any petition by or against a Borrower or any other Loan Party under the Bankruptcy Code or under any comparable statute, and all converted or subsequent cases in

respect thereof, and all references herein to Borrowers or any Loan Party shall be deemed to apply to the trustee for any Borrower or such Loan Party and Borrowers or such Loan Party as a debtor-in-possession. The relative rights of the Revolver Lender and the Term Agent and Term Lenders in or to any distributions from or in respect of any collateral or proceeds of collateral shall continue after the institution of any Insolvency Proceeding involving a Borrower or any other Loan Party. This Agreement shall constitute a subordination agreement for the purposes of Section 510(a) of the Bankruptcy Code and shall be enforceable in any Insolvency Proceeding in accordance with its terms.

5.2     Bankruptcy Financing.

(a)     If any of the Borrowers or any other Loan Party becomes subject to any Insolvency Proceeding, until the payment in full in cash of the Bank Obligations (up to the Maximum Bank Amount) and the termination of any commitment to lend under the Bank Documents has occurred, the Term Agent agrees that:

(i)     the Term Agent and Term Lenders will raise no objection to, nor support any other person objecting to, and will be deemed to have consented to, (A) the use of any Bank Priority Collateral constituting cash collateral under Section 363 of the Bankruptcy Code ("Cash Collateral"), and/or (B) any post-petition financing provided by the Revolver Lender or any Person approved by the Revolver Lender (which agrees to be bound by this Agreement) under Section 364 of the Bankruptcy Code (a "DIP Financing"), and the Term Agent and Term Lenders will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing (except as set forth in the proviso immediately below) and will subordinate (and will be deemed hereunder to have subordinated) the Liens granted to the Term Agent on the Bank Priority Collateral to secure such use of cash collateral or such DIP Financing on the same terms as such Liens are subordinated to the Liens granted to Revolver Lender hereunder (and such subordination will not alter in any manner the terms of this Agreement), to any adequate protection provided to the Revolver Lender and to any commercially reasonable "carve out" for professional fees agreed to by the Revolver Lender, provided that:

(A)     the Revolver Lender does not oppose or object to such use of Cash Collateral,

(B)     the aggregate principal amount of such DIP Financing, together with the Bank Obligations outstanding as of such date, does not exceed the Maximum Bank Amount, and the DIP Financing is treated as part of the Bank Obligations hereunder,

(C)     the Liens granted to the Revolver Lender or any other person in connection with such DIP Financing are subject to this Agreement and considered to be Liens of the Revolver Lender for purposes hereof,

(D)     the Term Agent retains a Lien on the Bank Priority Collateral (including proceeds thereof) with the same priority relative to the Liens of the Revolver Lender as existed prior to such Insolvency Proceeding,

(E)     the Term Agent receives replacement Liens on all post-petition assets of any Loan Party in which the Revolver Lender obtains a replacement Lien, or which secure the DIP Financing, with the same priority relative to the Liens of the Revolver Lender as existed prior to such Insolvency Proceeding,

(F)    such use of Cash Collateral or DIP Financing does not compel any Loan Party to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the documentation relating to such use of Cash Collateral or DIP Financing;

(G)    such use of Cash Collateral or DIP Financing does not expressly require the sale, liquidation, or disposition of all or any substantial part of the Bank Priority Collateral or any of the Term Priority Collateral prior to default under the use of Cash Collateral or DIP Financing (other than a sale pursuant to Section 363 of the Bankruptcy Code that meets the parameters set forth below in Section 5.5);

(H)    such use of Cash Collateral or DIP Financing is otherwise subject to the terms of this Agreement; and

(I)    the Term Agent may oppose or object to such use of Cash Collateral or DIP Financing on the same bases as an unsecured creditor, so long as such opposition or objection is not based on the Term Agent's status as a secured creditor.

(b)    If any of the Borrowers or any other Loan Party becomes subject to any Insolvency Proceeding, until the payment in full, in cash of the Term Obligations (up to the Maximum Term Amount) has occurred, and any commitments of the Term Agent and Term Lenders under the Term Documents have been terminated, the Revolver Lender agrees that:

(i)    the Revolver Lender will raise no objection to, nor support any other Person objecting to, and will be deemed to have consented to, (A) the use of any Term Priority Collateral constituting cash collateral under Section 363 of the Bankruptcy Code, and/or (B) any DIP Financing provided by the Term Agent, the Term Lenders or any Person approved by Term Agent (which agrees to be bound by this Agreement), and the Revolver Lender will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing (except as set forth in the proviso immediately below) and will subordinate (and will be deemed hereunder to have subordinated) the Liens granted to the Revolver Lender on the Term Priority Collateral to secure such use of cash collateral or such DIP Financing on the same terms as such Liens are subordinated to the Liens granted to Term Agent hereunder (and such subordination will not alter in any manner the terms of this Agreement), to any adequate protection provided to the Term Agent and to any commercially reasonable "carve out" for professional fees agreed to by the Term Agent, provided that:

(A)    the Term Agent does not oppose or object to such use of cash collateral,

(B)    the aggregate principal amount of such DIP Financing, together with the Term Loan Obligations as of such date, does not exceed the Maximum Term Amount, and the DIP Financing is treated as part of the Term Obligations hereunder,

(C)    the Liens granted to the Term Agent or such other person in connection with such DIP Financing are subject to this Agreement and considered to be Liens of Term Agent for purposes hereof,

(D)    the Revolver Lender retains a Lien on the Term Priority Collateral (including proceeds thereof) with the same priority relative to the Liens of the Term Agent as existed prior to such Insolvency Proceeding,

(E)    the Revolver Lender receives replacement Liens on all post-petition assets of any Loan Party in which any of the Term Agent obtains a replacement Lien, or which secure the

DIP Financing, with the same priority relative to the Liens of the Term Agent as existed prior to such Insolvency Proceeding,

(F)    such use of Cash Collateral or DIP Financing does not compel any Loan Party to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the documentation relating to such use of Cash Collateral or DIP Financing;

(G)    such use of Cash Collateral or DIP Financing does not expressly require the sale, liquidation, or disposition of all or any substantial part of the Term Priority Collateral or any of the Bank Priority Collateral prior to default under the use of Cash Collateral or DIP Financing (other than a sale pursuant to Section 363 of the Bankruptcy Code that meets the parameters set forth below in Section 5.5);

(H)    such use of Cash Collateral or DIP Financing is otherwise subject to the terms of this Agreement; and

(I)    the Revolver Lender may oppose or object to such use of Cash Collateral or DIP Financing on the same bases as an unsecured creditor, so long as such opposition or objection is not based on the Revolver Lender's status as a secured creditor.

(c)    So long as the Term Obligations remain outstanding, the Revolver Lender shall not provide or seek to provide DIP Financing secured by Liens equal to or senior in priority to the Liens on the Term Priority Collateral of the Term Agent without the prior written consent of the Term Agent. So long as the Bank Obligations remain outstanding, the Term Agent and the Term Lenders shall not provide or seek to provide DIP Financing secured by Liens equal to or senior in priority to the Liens on the Bank Priority Collateral of the Revolver Lender, without the prior written consent of the Revolver Lender. Notwithstanding anything contained herein to the contrary, the Revolver Lender may seek adequate protection in the form of periodic cash payments of interest and payment of reasonable out-of-pocket expenses. Notwithstanding anything contained herein to the contrary, the Term Agent may seek adequate protection in the form of periodic cash payments of interest and payment of reasonable out-of-pocket expenses.

(d)    The Term Agent and Term Lenders agree that, so long as the Bank Obligations remain outstanding, they shall not, without the prior written consent of the Revolver Lender, seek or request relief from or modification of the automatic stay or any other stay in any Insolvency Proceeding in respect of any part of the Bank Priority Collateral or any proceeds thereof.

(e)    The Revolver Lender agrees that, so long as the Term Obligations remain outstanding, it shall not, without the prior written consent of the Term Agent, seek or request relief from or modification of the automatic stay or any other stay in any Insolvency Proceeding in respect of any part of the Term Priority Collateral or any proceeds thereof.

5.3    <u>Reorganization Securities</u>. If, in any Insolvency Proceeding, debt obligations of any reorganized Loan Party secured by Liens upon any property of such reorganized Loan Party are distributed, pursuant to a plan of reorganization, on account of both the Bank Obligations and the Term Obligations then, to the extent the debt obligations distributed on account of the Bank Obligations and on account of the Term Obligations are secured by Liens upon the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations. For purposes of clarification, nothing herein shall prohibit the distribution of equity securities of any reorganized Loan Party issued or distributed to the Revolver Lender or the Term Agent and Term Lenders in respect of the debt obligations pursuant to a

confirmed plan of reorganization or liquidation by a final order or decree of a court of competent jurisdiction (in such plan or otherwise), or adjustment or an out-of-court work out.

5.4     Separate Classes.     Each of the parties hereto irrevocably acknowledges and agrees that (a)  the claims and interests of the Revolver Lender, on the one hand, and the Term Agent and Term Lenders, on the other, are not "substantially similar" within the meaning of Section 1122 of the Bankruptcy Code, or any comparable provision of any other Bankruptcy Law, (b) the grants of the Liens to secure the Bank Obligations and the grants of the Liens to secure the Term Obligations constitute two separate and distinct grants of Liens, (c) the Revolver Lender's rights in the collateral are fundamentally different from the Term Agent's rights in the collateral, and (d) as a result of the foregoing, among other things, the Bank Obligations and the Term Obligations must be separately classified in any plan of reorganization proposed or adopted in any Insolvency Proceeding.

5.5     Asset Dispositions.

(a)     Until the payment in full, in cash of the Bank Obligations (up to the Maximum Bank Amount) has occurred, and any commitments of the Revolver Lender under the Bank Documents have been terminated, the Term Agent and the Term Lenders agree that, in the event of any Insolvency Proceeding, the Term Agent and Term Lenders will not object or oppose (or support any person in objecting or opposing) a motion to any sale, lease, license, exchange, transfer or other disposition of any Bank Priority Collateral that is supported by the Revolver Lender, on any basis applicable solely to a secured creditor, free and clear of the Liens of Term Agent or other claims under Section 363 of the Bankruptcy Code, and shall be deemed to have consented (solely as a secured creditor) to any such sale, lease, license, exchange, transfer or other disposition of any Bank Priority Collateral under Section 363(f) of the Bankruptcy Code that has been consented to by the Revolver Lender; provided, that, the proceeds of such sale, lease, license, exchange, transfer or other disposition of any Bank Priority Collateral are applied to the Bank Obligations and, subject to any approval of court required by the Bankruptcy Code, such obligations are permanently reduced and there occurs a concomitant reduction of the commitments of the Revolver Lender.

(b)     Until the payment in full, in cash of the Term Obligations (up to the Maximum Term Amount) has occurred, and any commitments of the Term Agent and Term Lenders under the Term Documents have been terminated, the   Revolver Lender agrees that, in the event of any Insolvency Proceeding, the Revolver Lender will not object or oppose (or support any Person in objecting or opposing) a motion to any sale, lease, license, exchange, transfer or other disposition of any Term Priority Collateral that is supported by the Term Agent, on any basis applicable solely to a secured creditor, free and clear of the Liens of the Revolver Lender or other claims under Section 363 of the Bankruptcy Code, and shall be deemed to have consented (solely as a secured creditor)  to any such any sale, lease, license, exchange, transfer or other disposition of any Term Priority Collateral under Section 363(f) of the Bankruptcy Code that has been consented to by the Term Agent; provided, that, the proceeds of such sale, lease, license, exchange, transfer or other disposition of any Term Priority Collateral are applied to the Term Obligations and, subject to any approval of court required by the Bankruptcy Code, such obligations are permanently reduced.

5.6     Certain Waivers as to Section 1111(b)(2) of Bankruptcy Code.  The Term Agent and the Term Lenders, waive any claim against the Revolver Lender arising out of the election by the Revolver Lender of the application of Section 1111(b)(2) of the Bankruptcy Code, or any comparable provision of any other Bankruptcy Law.  The Revolver Lender waives any claim against the Term Agent and Term Lenders arising out of the election of the application of Section 1111(b)(2) of the Bankruptcy Code or any comparable provision of any other Bankruptcy Law.

5.7    Other Insolvency Laws.  In the event that an Insolvency Proceeding is filed in a jurisdiction other than the United States or is governed by any law or statute other than the Bankruptcy Code, each reference in this Agreement to a section of the Bankruptcy Code shall be deemed to refer to the substantially similar or corresponding provision of the law or statute applicable to such Insolvency Proceeding, or in the absence of any specific similar or corresponding provision, such other general insolvency law or statute as may be applied in order to achieve substantially the same result as would be achieved under each applicable section of the Bankruptcy Code.

Section 6.    Notice of Action; Purchase Option.

(a)    In the event of the occurrence of any Purchase Option Event, the Revolver Lender shall promptly deliver to the Term Agent written notice of the occurrence of such event, which notice shall describe such event with reasonable specificity (a "Revolver Lender Buy-Out Notice").  In the event that the Term Agent becomes aware of the occurrence of a Purchase Option Event prior to receipt of such notice by the Revolver Lender, the Term Agent may deliver written notice to the Revolver Lender (a "Term Agent Buy-Out Notice").  A Revolver Lender Buy-Out Notice shall constitute an offer by the Revolver Lenders to sell to the Term Lenders, and a Term Agent Buy-Out Notice shall constitute a notice to purchase by the Term Lenders, of, in each case, all of the Revolver Lenders rights and interests under the Bank Documents for an amount, payable in cash, equal to the unpaid principal balance of the Bank Obligations (up to the Maximum Bank Amount) plus all accrued interest, all fees, all charges and all expenses then accrued and due and payable under the Bank Documents (but excluding any prepayment premium or similar fees or charges if not then due and payable by the Loan Parties).

(b)    Consummation of the purchase and sale shall take place within ten (10) business days after (i) acceptance by the Term Lenders, in the case of Revolver Lender Buy-Out Notice, which acceptance must be received by Revolver Lender no later than five (5) business days after the receipt of the of the Revolver Lender Buy-Out Notice by the Term Agent, and (ii) delivery of the notice from the Term Lenders, in the case of a Term Agent Buy-Out Notice.  Payment of the purchase price shall be made in cash in immediately available funds against delivery by the Revolver Lender of all instruments of conveyance reasonably requested by the purchaser.

(c)    Any such purchase and sale shall be expressly made without representation or warranty of any kind by and without recourse to the Revolver Lender, except that Revolver Lender shall represent and warrant: (i) the amount of the Bank Obligations being purchased, (ii) that the Revolver Lender owns the Bank Obligations free and clear of any liens or encumbrances and (iii) the Revolver Lender has the right to assign its obligations and the assignment is duly authorized.

Section 7.    Cooperation.

(a)    The Revolver Lender and the Term Agent agree to use their reasonable commercial efforts to cooperate with each other in connection with the matters contemplated by this Agreement.  The Term Agent agrees that it shall, at the sole cost and expense of the Loan Parties, take such actions as the Revolver Lender shall reasonably request from time to time in connection with the exercise by the Revolver Lender of its rights set forth herein in respect of the Bank Priority Collateral, including, without limitation, by providing the Revolver Lender and its agents with access to any Bank Priority Collateral to the extent such Bank Priority Collateral is then under the possession or control of the Term Agent.  The Revolver Lender agrees that it shall, at the sole cost and expense of the Loan Parties, take such actions as the Term Agent shall reasonably request from time to time in connection with the exercise by the Term Agent of its rights set forth herein in respect of the Term Priority Collateral, including, without limitation, by providing the Term Lender and its agents with access to any Term

Priority Collateral to the extent such Term Priority Collateral is then under the possession or control of the Revolver Lender.

(b)     In the event that the Revolver Lender shall, in the exercise of its rights under the Bank Documents or otherwise, receive possession or control of any books and records of any of the Loan Parties which contain information identifying or pertaining to the Term Priority Collateral, the Revolver Lender shall promptly notify in writing the Term Agent of such fact and, upon written request from the Term Agent and as promptly as practical thereafter, either make available to the Term Agent such books and Records for inspection and duplication or provide to the Term Agent copies thereof.  In the event that the Term Agent shall, in the exercise of its rights under the Term Documents or otherwise, receive possession or control of any books and records of any of the Loan Parties which contain information identifying or pertaining to any of the Bank Priority Collateral, the Term Agent shall promptly notify in writing the Revolver Lender of such fact and, upon written request from the Revolver Lender and as promptly as practicable thereafter, either make available to the Revolver Lender such books and records for inspection and duplication or provide the Revolver Lender copies thereof.  Subjection to Section 7(c), the Term Agent and each of the Loan Parties  hereby irrevocably grants the Revolver Lender a non-exclusive worldwide license or right, to the maximum extent permitted by applicable law (and in the case of the Term Agent, solely to the extent of the Term Agent's interest therein from time to time), exercisable without payment of royalty or other compensation, to use any of the Intellectual Property and Equipment now or hereafter owned by, licensed to, leased, or otherwise used by the Loan Parties in order for Revolver Lender to purchase, use, market, repossess, possess, store, assemble, manufacture, process, sell, transfer, distribute or otherwise dispose of any asset included in the Bank Priority Collateral in connection with the liquidation, disposition or realization upon the Bank Priority Collateral in accordance with the terms and conditions of the Revolving Credit Agreement, the other Bank Documents and this Agreement. The Term Agent agrees that any sale, transfer or other disposition of any of the Loan Parties' Intellectual Property effected by the Term Agent (whether by foreclosure or otherwise) will be subject to the Revolver Lender 's rights as set forth in this Section 7(b).

(c)     The license granted to the Revolver Lender in Section 7(b) shall terminate upon the earliest to occur:  (i) the completion of the sale, disposition and liquidation of all Bank Priority Collateral by the Bank or its assignee; (ii) the date that is ninety (90) days following the date of the Term Agent's receipt of a Bank Enforcement Notice (which period shall be extended while the Revolver Lender is stayed from enforcing its rights and remedies during the pendency of any Insolvency Proceeding relating to any of the Loan Parties), and (iii) the payment in full of the Bank Obligations (up to the Maximum Bank Amount).

Section 8.  <u>Successors and Assigns; Amendments</u>.

(a)     This Agreement shall be binding on and enforceable against the parties hereto and their respective successors and permitted assigns, and any lender or agent who provides a refinancing of the Bank Obligations or Term Obligations, and shall remain in full force and effect during any Insolvency Proceeding involving the Borrowers and any other Loan Party. All references to the Revolver Lender hereunder shall include any co-lender or participants in respect of the Bank Obligations.  All references to the Term Agent hereunder shall include any co-lender or participants in respect of the Term Obligations, including without limitation the Term Lenders. If the Bank Obligations are refinanced while the Term Obligations remain outstanding, the indebtedness that arises pursuant to such refinancing shall be automatically treated as Bank Obligations that are subject to the terms of this Agreement, and the holders of such refinancing indebtedness shall execute joinders or supplements to this Agreement as the Term Agent shall reasonably request. If the Term Obligations are refinanced while the Bank Obligations remain outstanding, the indebtedness that arises pursuant to such refinancing shall be automatically

treated as Term Obligations hereunder that are subject to the terms of this Agreement, and the holders of such refinancing indebtedness shall execute joinders or supplements to this Agreement as the Revolver Lender shall reasonably request. Notwithstanding anything to the contrary herein, (i) the Term Agent shall not assign any portion of the Term Obligations to any Loan Party or any affiliate of a Loan Party (other than the Crystal Lenders) without the prior written consent of the Revolver Lender, and (ii) the Revolver Lender shall not assign any portion of the Bank Obligations to any Loan Party or any affiliate of a Loan Party without the prior written consent of the Term Agent.

(b)     Each of the Loan Parties agrees that it will cause any other person who, after the date hereof, shall become a Borrower or guarantor under the Revolving Credit Agreement or the Term Loan Agreement to become a "Loan Party" under this Agreement and to assume the obligations of a Loan Party hereunder pursuant to a written assumption agreement in form and substance reasonably acceptable to the Revolver Lender and the Term Agent. Any reference to any Loan Party herein shall include any such person as a debtor or debtor-in-possession in any Insolvency Proceeding.

(c)     This Agreement shall not be amended, supplemented or modified without the written consent of the Revolver Lender and the Term Agent, nor may any provision of this Agreement be waived except by written waiver of the party to be charged therewith.

Section 9.  <u>Bailee for Perfection</u>.  Each of the Revolver Lender and the Term Agent hereby appoints the other as agent solely for the purposes of perfecting their respective liens in and on any of the collateral in the possession of such person; <u>provided</u>, <u>that</u>, the agent in the possession of any collateral shall not have any duty or liability to protect or preserve any rights pertaining to any of the collateral and, except for gross negligence, bad faith or willful misconduct, the non-possessing agent hereby waives and releases the other agent from, all claims and liabilities arising pursuant to the possessing agent's role as bailee with respect to the collateral, so long as the possessing agent shall use the same degree of care with respect thereto as the possessing agent uses for similar property pledged to the possessing agent as collateral for indebtedness of others to the possessing agents. After Revolver Lender has received payment in full in cash of all of the Bank Obligations, all Letters of Credit, if any, are returned for cancellation or cash collateralized pursuant to the terms of the Revolving Credit Agreement, and all commitments under the Revolving Credit Agreement are terminated, the Revolver Lender shall relinquish the remainder of the Bank Priority Collateral, if any, in its possession to Term Agent, except as may otherwise be required by applicable law or court order. After Term Agent has received payment in full in cash of all of the Term Obligations, the Term Lender shall relinquish the remainder of the Term Priority Collateral, if any, in its possession to the Revolver Lender, except as may otherwise be required by applicable law or court order.

Section 10.  <u>Notices</u>.  Any notice or communication shall be sufficiently given, if in writing and delivered in person (receipt acknowledged) or by telecopier or overnight courier guaranteeing next day delivery, addressed as follows (or to such other address as any party hereto may hereafter specify by notice to the other parties hereto):

(a)     If to the Term Agent:

Crystal Financial SBIC LP
Two International Place, 17th Floor
Boston, MA 02110
Attn:  Mike Russell
Telephone:  (617) 428-8778
E-mail:  mrussell@slrcreditsolutions.com

with a copy to:

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
Attn: John F. Ventola, Esq.
Telephone: (617) 248-5000
E-mail: jventola@choate.com

(b)     If to the Revolver Lender:

Berkshire Bank
One Van de Graaf Drive, Suite 202
Burlington, MA 01803
Attn: C. Lee Willingham, S.V.P.
Telephone: (781) 897-0705
E-mail: lwillingham@berkshirebank.com

With a copy to:

Ruberto, Israel & Weiner, P.C.
255 State Street, 7th Floor
Boston, MA 02109
Attn: James C. Fox, Esq.
Telephone: (617) 742-4200
E-mail: jcf@riw.com

Section 11.  Further Assurances.  The parties hereto will use all reasonable efforts to execute such certificates and other documents and to take such other actions as may be reasonably necessary to consummate the transactions contemplated hereby.

Section 12.  Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 13.  Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which together shall constitute a single agreement.

Section 14. Waiver of Jury Trial.  Each party hereto hereby waives its right to a jury trial with respect to any action or claim arising out of any dispute in connection with this Agreement, any rights or obligations hereunder or the performance of such rights or obligations.  Except as prohibited by law, each party hereto waives any right it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.

Section 15.  No Additional Rights for the Loan Parties Hereunder.  If the Revolver Lender or Term Agent shall enforce its rights or remedies in violation of the terms of this Agreement, no Loan Party shall be entitled to use such violation as a defense to any action by the Revolver Lender or

Term Agent, nor to assert such violation as a counterclaim or basis for set off or recoupment against any Revolver Lender or Term Agent.

Section 16. <u>Legend</u>. If requested by the Revolver Lender, the Term Agent and each Loan Party will cause each Term Collateral Document to which it is a party to bear upon its face a legend referring to this Agreement and indicating that such documents are subject hereto, all in form and substance reasonably satisfactory to the Revolver Lender. If requested by the Term Agent, the Revolver Lender and each Loan Party will cause each Bank Collateral Document to which it is a party to bear upon its face a legend referring to this Agreement and indicating that such documents are subject hereto, all in form and substance reasonably satisfactory to the Term Agent.

Section 17. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

Section 18. <u>Amendment and Restatement</u>. Effective as of the date hereof, this Agreement amends, restates, supersedes and replaces in its entirety the Existing Intercreditor Agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Agreement is executed as of the day and year first above written.

BERKSHIRE BANK, as Revolving Lender

By: _____
Name: C. Lee Willingham
Title: Senior Vice President

**CRYSTAL FINANCIAL SBIC LP,** as Term Agent

By: Crystal SBIC GP LLC, its general partner

By: _____

Name: Michael Pizette
Title: Managing Member

## ACKNOWLEDGMENT

As of the date hereof, each Loan Party (a) acknowledges receipt of a copy of this Agreement and agrees to perform its obligations hereunder, (b) agrees to cooperate with the other parties hereto by taking all actions as are contemplated by this Agreement, (c) acknowledges that it has no rights hereunder, and (d) agrees not to assert any provision hereof as a defense to, or otherwise assert any provision hereof in connection with, any action, suit or proceeding relating to any Term Document, any Term Priority Collateral, any Bank Document or any Bank Priority Collateral, nor to assert any such provision as a counterclaim or basis for set-off or recoupment against any party hereto, any Term Lender or any Revolver Lender.

### LOAN PARTIES:

**PROAIR INTERMEDIATE HOLDCO, LLC**

By: _____
    Name:  Todd Courts
    Title:   Chief Financial Officer

**PROAIR, LLC**

By: _____
    Name:  Todd Courts
    Title:   Chief Financial Officer

**AMERICAN COOLING TECHNOLOGY, LLC**

By: _____
    Name:  Todd Courts
    Title:   Chief Financial Officer

**BUS AIR, LLC**

By: _____
    Name:  Todd Courts
    Title:   Chief Financial Officer

**EVANS TEMPCON DELAWARE, LLC**

By: _____
    Name:  Todd Courts
    Title:   Chief Financial Officer

## <u>EXHIBIT E</u>

**Notice of Reporting Violation and Reservation of Rights Letter dated September 16, 2022**



255 State Street, 7th Floor
Boston, MA 02109
Telephone 617.742.4200
Facsimile 617.742.2355
www.riw.com

James C. Fox, Esq.
Ext. 234
E-mail: jcf@riw.com

## <u>NOTICE OF REPORTING VIOLATION<br>AND RESERVATION OF RIGHTS</u>

September 16, 2022

**VIA EMAIL AND FASCIMILIE**

ProAir, LLC
American Cooling Technology, LLC.,
Bus Air, LLC, and
Evans Tempcon Delaware, LLC
c/o ProAir, LLC
2900 Elkhart, IN 46514
ATTN: Todd Courts, Chief Financial Officer
Telecopier: 574-264-2194
Email: tcourts@proairllc.com

Re: Third Amended and Restated Loan and Security Agreement (All Assets) (as amended, the **"Loan Agreement**) dated as of February 11, 2022 by and between ProAir, LLC, American Cooling Technology, LLC, Bus Air, LLC, and Evans Tempcon Delaware, LLC (together, the **"Borrowers"**) and ProAir Intermediate Holdco, LLC ("**Holdings**") and Berkshire Bank (the **"Bank"**) and Related Documents (the **"Transaction Documents"**). Terms not otherwise defined herein shall have the meanings ascribed in the Loan Agreement.

Dear Mr. Courts:

The Borrowers are hereby notified that the Borrowers have failed to provide certain reporting as required under the Loan Agreement, specifically Borrowers' audited annual financial statements for the fiscal year ended on December 31, 2021, including a balance sheet as of the end of such fiscal year, a statement of income and retained earnings for such fiscal year, and a statement of cash flows for such fiscal year, accompanied by a qualified or unqualified opinion prepared by independent public accountants selected by the Borrowers and acceptable to Bank, such audited annual financial statements being due within one hundred fifty (150) days after the end of the fiscal year ended on December 31, 2021 as required by Section 13(h) of the Loan Agreement (the **"Reporting Violation"**).

{01203589.DOC/2}

In accordance with Section 16(a)(iv) of the Loan Agreement, the failure by the Borrowers to remedy this Reporting Violation within thirty (30) days of this notice shall constitute an Event of Default under the Loan Agreement.

Nothing contained in this letter or any communications between the Bank and the Borrowers shall be a waiver of any rights or remedies of the Bank as against the Borrowers. The Bank hereby reserves and preserves all of its rights and remedies against the Borrowers under the Loan Agreement, the Transaction Documents and applicable law.

By copies of this letter dispatched to ProAir Intermediate Holdco, LLC (the **"Guarantor"**), as Guarantor pursuant to that certain Secured Guaranty of ProAir Intermediate Holdco, LLC dated February 11, 2022, and reaffirmed on March 8, 2022 (the **"Guaranty"**), we hereby notify the Guarantor of the above-described Reporting Violation. The Bank hereby reserves and preserves all of its rights and remedies against the Guarantor under the Guaranty, the Transaction Documents and applicable law.

BERKSHIRE BANK,
By Its Counsel,

James C. Fox, Esq.

cc:　　VIA EMAIL AND FASCIMILIE
ProAir Intermediate Holdco, LLC
c/o ProAir, LLC
2900 Elkhart, IN 46514
ATTN: Todd Courts, Chief Financial Officer
Telecopier: 574-264-2194
Email: tcourts@proairllc.com

Burns & Levinson LLP
125 Summer Street
Boston, MA 02110
ATTN: Frank A. Segall, Esq.
Telecopier:　(617) 345-3299
E-mail: fsegall@burnslev.com

　　　VIA EMAIL
Crystal Financial SBIC LP
Two International Place, 17th Floor
Boston, MA 02110
Attention: Tyler Harrington
E-mail: tharrington@crystalfinco.com

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
Attn: John F. Ventola, Esq.
E-mail: jventola@choate.com

{01203589.DOC/2}

# EXHIBIT F

## Cash Flow Scenarios



# Cash Flow Scenarios

October 4, 2022



# Summary

*The scenarios outlined below represent our best estimates for cash flows under each assumption and are being refined daily:*

## No Infusion

**Scenario:** length of time we can continue to operate without a cash infusion

**Summary:** we estimate continued operations thru the WE 10/14 without a cash infusion

**Comments:**
- Estimate weekly sales to range from $500k to $800k without capital, or $2M to $3.5M monthly
- This accounts for daily payroll accrual
- This accounts for minimal trade disbursements, only enough to shore-up one-off shortages

## $500k Bridge

**Scenario:** $500k bridge capital to be funded to bolster operations in the short-term

**Summary:** we estimate this enables continued operations for another ~2 weeks, thru WE 10/28

**Comments:**
- New money assumed to be pari-passu with Berkshire
- Capital is used to pay-down credit limits to increase sales and bolster profitability in the short-term
- Estimate weekly sales to keep at high range of $800k/week

## $500k + $4.75M

**Scenario:** following bridge funding, $4.75M of additional capital to be funded

**Summary:** $5.25M of total capital to be infused into the business to reduce trade liability

**Comments:**
- This enables weekly sales of $1.5M/week ($6M+/month)
- Payment plans are expected to be paid down over $500k weekly increments
- This brings AP down from $11.9M to $9.5M with a year-end availability of $1.1M

## Wind-down

**Scenario:** operations are ceased at the end of the WE 10/14

**Summary:** we estimate that the revolver will reduce from $9.6M to $6.8M with an orderly liquidation

**Comments:**
- Self-insured health plan poses cash flow risks
- The recovery value of assets is largely TBD pending the need for more detailed review

# Scenario 1: No cash infusion

*This scenario includes our best estimates for daily cash flows and availability to determine how long the company can continue to operate under current conditions until we can no longer afford to continue to operate … we currently project that the company can continue to operate through the WE 10/14:*

| Date | Act. 9/26 | Act. 9/27 | Act. 9/28 | Act. 9/29 | Act. 9/30 | 10/1 | 10/2 | 10/3 | 10/4 | 10/5 | 10/6 | 10/7 | 10/8 | 10/9 | 10/10 | 10/11 | 10/12 | 10/13 | 10/14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Day of Week | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri |
| Beginning Revolver Balance | 10,034 | 10,034 | 10,032 | 10,032 | 9,936 | 9,637 | 9,997 | 9,839 | 9,806 | 9,772 | 10,038 | 9,835 | 9,931 | 9,811 | 9,641 | 9,608 | 9,674 | 9,412 | 9,008 |
| Collections | | | | | | | | | | | | | | | | | | | |
| Total Collections | 147 | 237 | 34 | 217 | 518 | 161 | 172 | 95 | 95 | 95 | 264 | 316 | 134 | 184 | 95 | 95 | 324 | 466 | 114 |
| Disbursements | | | | | | | | | | | | | | | | | | | |
| Interest | | | | | | - | - | - | - | - | - | 35 | - | - | - | - | - | - | - |
| IT | | | | | | - | - | - | - | - | - | 17 | - | - | - | - | - | - | - |
| Trade Payables | | | | | | - | - | - | - | - | - | 25 | - | - | - | 100 | - | - | 25 |
| P/R | | | | | | - | - | - | - | 299 | - | - | - | - | - | - | - | - | - |
| Rent | | | | | | - | - | - | - | - | - | 57 | - | - | - | - | - | - | - |
| Anthem (health insurance) | | | | | | - | - | - | - | - | - | 116 | - | - | - | - | - | - | 52 |
| Contingency | | | | | | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 |
| Total Disbursements | 41 | 161 | 108 | 122 | 153 | 14 | 14 | 14 | 14 | 313 | 14 | 264 | 14 | 14 | 14 | 114 | 14 | 14 | 91 |
| Ending Revolver Balance | 9,928 | 9,958 | 10,105 | 9,936 | 9,571 | 9,490 | 9,839 | 9,758 | 9,725 | 9,990 | 9,788 | 9,783 | 9,811 | 9,641 | 9,560 | 9,626 | 9,365 | 8,960 | 8,985 |
| Outstanding Checks | 167 | 167 | 138 | 111 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 |
| Total Adjusted Exposure | 10,096 | 10,125 | 10,244 | 10,048 | 9,712 | 9,631 | 9,981 | 9,900 | 9,866 | 10,131 | 9,929 | 9,925 | 9,952 | 9,782 | 9,701 | 9,768 | 9,506 | 9,102 | 9,126 |
| Planned Disbursements | | | | | | | | | | | | | | | | | | | |
| Trade Payables | - | - | - | - | 18 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | 100 | - | - | - | - | - | - | - |
| Payroll Accrual | 53 | 48 | 48 | 48 | 48 | - | - | 48 | 48 | 48 | 48 | 48 | - | - | 48 | 48 | 48 | 48 | 48 |
| Prior Period Accrued Payroll | | | | | 506 | | | | | | | | | | | | | | |
| Total Planned Disbursements | 53 | 48 | 48 | 48 | 66 | 506 | - | 48 | 48 | 48 | 48 | 148 | - | - | 48 | 48 | 48 | 48 | 48 |
| Borrowing Base | 10,970 | 10,975 | 11,109 | 11,158 | 10,845 | 10,708 | 10,562 | 10,617 | 10,672 | 10,727 | 10,639 | 10,506 | 10,392 | 10,235 | 10,273 | 10,311 | 10,155 | 9,878 | 9,900 |
| Availability | 822 | 802 | 818 | 1,063 | 1,067 | 570 | 582 | 670 | 759 | 548 | 662 | 434 | 440 | 453 | 525 | 496 | 602 | 729 | 726 |
| Notes: | | | | | | | | | | | | | | | | | | | |
| Daily Sales | 208 | 243 | 192 | 275 | 150 | - | - | 160 | 160 | 160 | 160 | 160 | - | - | 140 | 140 | 140 | 140 | 140 |

# Scenario 2: $500k bridge funding

*This scenario includes our best estimates for the cash flows associated with $500k of bridge funding infused into the company in order to bolster sales output through heightened vendor disbursements in order to improve profitability in the short-term … we currently project that this will enable the company to maintain operations for another 2 weeks, thru WE 10/28:*

| | Actual | Actual | Actual | Actual | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week of the year | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 |
| Week beginning | 5-Sep | 12-Sep | 19-Sep | 26-Sep | 3-Oct | 10-Oct | 17-Oct | 24-Oct | 31-Oct | 7-Nov | 14-Nov | 21-Nov | 28-Nov | 5-Dec | 12-Dec | 19-Dec | 26-Dec |
| Week ending | 9-Sep | 16-Sep | 23-Sep | 30-Sep | 7-Oct | 14-Oct | 21-Oct | 28-Oct | 4-Nov | 11-Nov | 18-Nov | 25-Nov | 2-Dec | 9-Dec | 16-Dec | 23-Dec | 30-Dec |
| **Ending Revolver** | (11,150) | (10,346) | (10,139) | (9,571) | (8,923) | (8,859) | (9,725) | (10,265) | (10,673) | (10,530) | (11,002) | (10,895) | (11,313) | (11,176) | (11,767) | (11,693) | (11,975) |
| **Cash In:** | | | | | | | | | | | | | | | | | |
| Customer Receipts | 1,256 | 1,063 | 1,216 | 1,153 | 1,376 | 732 | 620 | 725 | 1,152 | 800 | 800 | 800 | 800 | 700 | 600 | 600 | 600 |
| Other Receipts | - | - | - | - | 500 | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cash In** | 1,256 | 1,063 | 1,216 | 1,153 | 1,876 | 732 | 620 | 725 | 1,152 | 800 | 800 | 800 | 800 | 700 | 600 | 600 | 600 |
| Payroll | 534 | - | 512 | - | 475 | - | 475 | - | 475 | - | 475 | - | 450 | - | 450 | - | 450 |
| 401(k) - No Match | 14 | - | - | 13 | 12 | - | 14 | - | 14 | - | 14 | - | 14 | - | 14 | - | 14 |
| Trade Payables | 326 | 155 | 383 | 516 | 517 | 598 | 572 | 625 | 839 | 563 | 563 | 563 | 513 | 463 | 463 | 313 |
| American Express | - | - | - | - | - | - | - | 459 | - | - | 100 | - | - | - | 100 | - | - |
| Rents | - | - | - | - | 57 | - | - | - | 67 | - | - | - | 67 | - | - | - | - |
| Insurance (Health) | - | 45 | 85 | 32 | 55 | 50 | 100 | 50 | 50 | 50 | 100 | 50 | 50 | 50 | 100 | 50 | 50 |
| Insurance (Other) | 61 | - | - | - | 61 | - | - | 68 | - | - | - | 68 | - | - | - | - | - |
| Professional Fees - Consultants | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees - IT | - | 26 | - | - | 17 | - | 25 | - | 35 | - | - | - | 35 | - | - | - | 55 |
| Professional Fees - Operations | - | - | 30 | - | - | 20 | - | - | - | - | - | 20 | - | - | - | 20 | - |
| Professional Fees - Legal/Acctg | - | 33 | - | 10 | - | - | - | 50 | 50 | - | - | - | - | - | - | - | - |
| Bank Interest | - | - | - | - | 35 | - | - | - | 30 | - | - | - | 30 | - | - | - | - |
| Other/Syspro/Trumpf | - | - | - | 14 | - | - | - | 14 | - | - | - | 14 | - | - | - | 14 | - |
| Miscellaneous | - | - | - | - | - | - | 299 | - | - | 44 | - | - | 9 | - | 44 | - | - |
| **Cash Out** | 935 | 259 | 1,009 | 585 | 1,229 | 668 | 1,485 | 1,265 | 1,560 | 657 | 1,272 | 694 | 1,218 | 563 | 1,191 | 526 | 882 |
| **Cash In (Out)** | 321 | 804 | 207 | 568 | 648 | 64 | (866) | (540) | (408) | 143 | (472) | 106 | (418) | 137 | (591) | 74 | (282) |
| **Trailing 4 week cash flow** | 305 | 934 | 1,268 | 1,900 | 2,227 | 1,487 | 414 | (694) | (1,750) | (1,671) | (1,277) | (630) | (640) | (646) | (765) | (798) | (661) |
| Outstanding Checks | 228 | 134 | 196 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 |
| **Max Availability** | 300 | 876 | 583 | 1,222 | 1,395 | 1,517 | 805 | 328 | (379) | (406) | (1,047) | (1,111) | (1,699) | (1,647) | (2,237) | (2,164) | (2,445) |
| **Max Availability + Checks** | 528 | 1,010 | 779 | 1,363 | 1,536 | 1,658 | 946 | 469 | (238) | (265) | (906) | (970) | (1,558) | (1,506) | (2,096) | (2,023) | (2,304) |

# Scenario 3: $500k bridge funding followed by $4.75M capital infusion

This scenario includes our best estimates for the cash flows associated with $4.75M of additional funding infused into the company after the $500k bridge funding takes place … the projections below assume that sales ramp up to $1.5M/week two weeks after the cash infusion, and allocates an additional $500k/week for payment plans:

| | Actual | Actual | Actual | Actual | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Next 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week of the year | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | |
| Week beginning | 5-Sep | 12-Sep | 19-Sep | 26-Sep | 3-Oct | 10-Oct | 17-Oct | 24-Oct | 31-Oct | 7-Nov | 14-Nov | 21-Nov | 28-Nov | 5-Dec | 12-Dec | 19-Dec | 26-Dec | |
| Week ending | 9-Sep | 16-Sep | 23-Sep | 30-Sep | 7-Oct | 14-Oct | 21-Oct | 28-Oct | 4-Nov | 11-Nov | 18-Nov | 25-Nov | 2-Dec | 9-Dec | 16-Dec | 23-Dec | 30-Dec | |
| **Ending Revolver** | (11,150) | (10,346) | (10,139) | (9,571) | (8,923) | (8,859) | (9,725) | (10,265) | (6,453) | (6,840) | (7,842) | (8,265) | (9,213) | (9,456) | (10,252) | (10,258) | (10,770) | |
| Cash In: | | | | | | | | | | | | | | | | | | |
| Customer Receipts | 1,256 | 1,063 | 1,216 | 1,153 | 1,376 | 732 | 620 | 725 | 1,152 | 800 | 800 | 800 | 800 | 1,000 | 1,250 | 1,500 | 1,500 | 13,055 |
| Other Receipts | - | - | - | - | 500 | - | - | 4,750 | - | - | - | - | - | - | - | - | - | 5,250 |
| **Cash In** | 1,256 | 1,063 | 1,216 | 1,153 | 1,876 | 732 | 620 | 725 | 5,902 | 800 | 800 | 800 | 800 | 1,000 | 1,250 | 1,500 | 1,500 | 18,305 |
| Payroll | 534 | - | 512 | - | 475 | - | 475 | - | 475 | - | 475 | - | 450 | - | 450 | - | 450 | 3,250 |
| 401(k) - No Match | 14 | - | - | 13 | 12 | - | 14 | - | 14 | - | 14 | - | 14 | - | 14 | - | 14 | 96 |
| Trade Payables | 326 | 155 | 383 | 516 | 517 | 598 | 572 | 625 | 1,339 | 1,063 | 1,063 | 1,063 | 1,063 | 1,163 | 1,288 | 1,413 | 1,413 | 13,177 |
| American Express | - | - | - | - | - | - | 459 | - | - | 100 | - | - | - | 100 | - | - | - | 659 |
| Rents | - | - | - | - | 57 | - | - | - | 67 | - | - | - | 67 | - | - | - | - | 191 |
| Insurance (Health) | - | 45 | 85 | 32 | 55 | 50 | 100 | 50 | 50 | 100 | 50 | 50 | 50 | 100 | 50 | 50 | - | 805 |
| Insurance (Other) | 61 | - | - | - | 61 | - | - | 68 | - | - | - | 68 | - | - | - | - | - | 196 |
| Professional Fees - Consultants | - | - | - | - | - | - | - | - | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 270 |
| Professional Fees - IT | - | 26 | - | - | 17 | - | 25 | - | 35 | - | - | - | 35 | - | - | - | 55 | 167 |
| Professional Fees - Operations | - | - | 30 | - | - | 20 | - | - | - | - | 20 | - | - | - | 20 | - | - | 60 |
| Professional Fees - Legal/Acctg | - | 33 | - | 10 | - | - | - | 50 | 50 | - | - | - | - | - | - | - | - | 100 |
| Bank Interest | - | - | - | - | 35 | - | - | - | 30 | - | - | - | 30 | - | - | - | - | 95 |
| Other/Syspro/Trumpf | - | - | - | 14 | - | - | - | 14 | - | - | - | - | 14 | - | - | 14 | - | 41 |
| Miscellaneous | - | - | - | - | - | - | 299 | - | 44 | - | - | - | 9 | - | 44 | - | - | 396 |
| Cash Out | 935 | 259 | 1,009 | 585 | 1,229 | 668 | 1,485 | 1,265 | 2,090 | 1,187 | 1,802 | 1,224 | 1,748 | 1,243 | 2,046 | 1,506 | 2,012 | 19,504 |
| **Cash In (Out)** | 321 | 804 | 207 | 568 | 648 | 64 | (866) | (540) | 3,812 | (387) | (1,002) | (424) | (948) | (243) | (796) | (6) | (512) | (1,199) |
| Trailing 4 week cash flow | 305 | 934 | 1,268 | 1,900 | 2,227 | 1,487 | 414 | (694) | 2,470 | 2,019 | 1,883 | 2,000 | (2,760) | (2,616) | (2,410) | (1,993) | (1,556) | |
| Outstanding Checks | 228 | 134 | 196 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | |
| **Max Availability** | 300 | 876 | 583 | 1,222 | 1,395 | 1,517 | 805 | 328 | 4,096 | 4,092 | 3,685 | 3,594 | 2,646 | 2,403 | 1,607 | 1,601 | 1,089 | |
| **Max Availability + Checks** | 528 | 1,010 | 779 | 1,363 | 1,536 | 1,658 | 946 | 469 | 4,237 | 4,233 | 3,826 | 3,735 | 2,787 | 2,544 | 1,748 | 1,742 | 1,230 | |

# Scenario 4: Wind-down

*This scenario includes our best estimates for the costs associated with an orderly wind-down of the company assuming a termination of operations at the end of the WE 10/14 … the recovery value of assets requires further refinement (and the assumptions included are outlined in the appendix) but at current approximations the recovery on the loan is estimated at $2.8M, the wind-down would reduce the revolver exposure from $9.6M to $6.8M:*

**Summary:**

- **Closure:** operations ceased after WE 10/14, aligning to the approximated daily cash flow in scenario 1

- **Payroll:** 12 FTE's maintained for a portion of the wind-down to continue collections, identify the best recovery on assets, and manage the asset liquidation process

  - 1 sales-person and 1 purchasing employee are retained for two weeks to determine if any customer orders can be produced on an opportunistic basis

- ProAir has a self-insured health plan, claims are drawn on ProAir's operating account weekly. There is also a cost associated with tail payments made after the wind-down, which is estimated to be ~$180k using an average of the last three years prior-period payments

- **Collections:** forthcoming collections are reduced by 20% to account for potential warranty claims and other offsets

- **Assets:**
  - **Inventory:** estimated to be sold at 4% of book value, the mid-point of estimated recovery per discussion with Tiger
  - **M&E:** estimated to be sold at $1M as a placeholder prior to the receipt and valuation of M&E
  - **Land:** estimated at $200k

- **This budget assumes the wind down is resolved through the appointment of a Chief Wind-down Officer (C. Jalbert, V&L) who remains as sole officer to oversee and monitor the wind down.**

# Scenario 4: Wind-down

This scenario includes our best estimates for the costs associated with an orderly wind-down of the company assuming a termination of operations at the end of the WE 10/14 … the recovery value of assets requires further refinement (and the assumptions included are outlined in the appendix) but at current approximations the recovery on the loan is estimated at $2.8M, the wind-down would reduce the revolver exposure from $9.6M to $6.8M:

**Wind-down period** →

| | Actual | Actual | Actual | Actual | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Next 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Week of the year* | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | |
| *Week beginning* | 5-Sep | 12-Sep | 19-Sep | 26-Sep | 3-Oct | 10-Oct | 17-Oct | 24-Oct | 31-Oct | 7-Nov | 14-Nov | 21-Nov | 28-Nov | 5-Dec | 12-Dec | 19-Dec | 26-Dec | |
| *Week ending* | 9-Sep | 16-Sep | 23-Sep | 30-Sep | 7-Oct | 14-Oct | 21-Oct | 28-Oct | 4-Nov | 11-Nov | 18-Nov | 25-Nov | 2-Dec | 9-Dec | 16-Dec | 23-Dec | 30-Dec | |
| **Ending Revolver** | (11,150) | (10,346) | (10,139) | (9,571) | (9,165) | (8,657) | (9,461) | (9,284) | (8,650) | (8,296) | (7,978) | (7,662) | (7,850) | (7,105) | (7,143) | (7,143) | (6,843) | |
| **Cash In:** | | | | | | | | | | | | | | | | | | |
| Customer Receipts | 1,256 | 1,063 | 1,216 | 1,153 | 1,101 | 585 | 496 | 580 | 921 | 560 | 480 | - | - | - | - | - | - | 4,724 |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | 647 | - | 1,000 | - | - | 200 | 1,847 |
| **Cash In** | 1,256 | 1,063 | 1,216 | 1,153 | 1,101 | 585 | 496 | 580 | 921 | 560 | 480 | 647 | - | 1,000 | - | - | 200 | 6,571 |
| Payroll | 534 | - | 512 | - | 512 | - | 424 | 276 | 68 | - | 45 | - | 45 | - | 37 | - | - | 1,409 |
| 401(k) - No Match | 14 | - | - | 13 | 13 | - | - | - | - | - | - | - | - | - | - | - | - | 13 |
| Trade Payables | 326 | 155 | 383 | 516 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | - | - | - | - | 250 |
| American Express | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rents | - | - | - | - | 67 | - | - | - | 67 | - | - | - | 67 | - | - | - | - | 202 |
| Insurance (Health) | - | 45 | 85 | 32 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | - | - | - | - | 180 | 595 |
| Insurance (Other) | 61 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees - Consultants | - | - | - | - | - | - | 125 | 25 | 25 | 15 | 15 | 15 | 15 | 15 | - | - | (100) | 150 |
| Professional Fees - IT | - | 26 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees - Operations | - | - | 30 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees - Legal/Acctg | - | 33 | - | 10 | - | - | 215 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | - | - | (200) | 120 |
| Bank Interest | - | - | - | - | 26 | - | - | - | 25 | - | - | - | 21 | - | - | - | - | 72 |
| Other/Syspro/Trumpf | - | - | - | 14 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Systems | - | - | - | - | - | - | 10 | 10 | 10 | 10 | 10 | 10 | - | - | - | - | - | 60 |
| Liquidator Costs | - | - | - | - | - | - | - | - | - | - | - | 65 | - | 200 | - | - | 20 | 285 |
| Chief Wind-down Officer | - | - | - | - | - | - | - | - | - | - | - | 150 | - | - | - | - | - | 150 |
| Contingency | - | - | - | - | - | - | 150 | - | - | - | - | - | - | - | - | - | - | 150 |
| Tax | - | - | - | - | - | - | 299 | - | - | 88 | - | - | - | - | - | - | - | 387 |
| Contract Termination | | | | | | | | | | | | | | | | | | - |
| Miscellaneous | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cash Out** | 935 | 259 | 1,009 | 585 | 695 | 77 | 1,300 | 403 | 288 | 205 | 162 | 332 | 188 | 255 | 37 | - | (100) | 3,842 |
| **Cash In (Out)** | 321 | 804 | 207 | 568 | 406 | 509 | (805) | 177 | 634 | 355 | 318 | 315 | (188) | 745 | (37) | - | 300 | 2,728 |
| **Trailing 4 week cash flow** | 305 | 934 | 1,268 | 1,900 | 1,985 | 1,689 | 678 | 287 | 515 | 361 | 1,484 | 1,622 | 800 | 1,190 | 835 | 520 | 1,008 | |
| Outstanding Checks | 228 | 134 | 196 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | |
| **Max Availability** | 300 | 876 | 583 | 1,222 | 1,387 | 1,908 | 682 | 366 | 217 | 96 | 6 | 321 | 133 | 878 | 841 | 841 | 1,141 | |
| **Max Availability + Checks** | 528 | 1,010 | 779 | 1,363 | 1,528 | 2,049 | 823 | 507 | 358 | 237 | 147 | 462 | 274 | 1,019 | 982 | 982 | 1,282 | |

# Appendix

# Scenario 4: Wind-down assumptions (page 1 of 2)

| Category | Sub-Category | Amount | Description |
|----------|--------------|--------|-------------|
| Company | Closure | 14-Oct | Date of business operations closure, majority of FTE layoff (Note: date inputted must be a week-ending Friday value) |
| Payroll | PTO amount | $ 276 | Accrued PTO that may be paid out contingent upon state requirements. Figure taken from "Accrued - Vacation" in the T/B |
| Payroll | PTO timing | 2 | Weeks after business closure PTO is paid |
| Payroll | Kept FTE's | 12 | 1 FTE kept in each category (outlined below); and 1 FTE kept in each location (outlined below) |
| Payroll | CEO | 2 | Weeks kept after business closure |
| Payroll | CFO | 8 | Weeks kept after business closure |
| Payroll | Controllership | 6 | Weeks kept after business closure |
| Payroll | AR | 6 | Weeks kept after business closure |
| Payroll | VP Ops | 8 | Weeks kept after business closure |
| Payroll | Sales | 2 | Weeks kept after business closure |
| Payroll | Purchasing | 2 | Weeks kept after business closure |
| Payroll | HR | 8 | Weeks kept after business closure |
| Payroll | Elkhart | 8 | Weeks kept after business closure |
| Payroll | Haslet | 8 | Weeks kept after business closure |
| Payroll | Conway | 8 | Weeks kept after business closure |
| Payroll | Tulsa | 8 | Weeks kept after business closure |
| Payroll | Stay bonus lump-sum | $ 100 | Paid immediately following business closure |
| Payroll | Stay bonus % kicker | 10% | Additional kicker paid on-top-of original salary rate each pay period |
| Payroll | Severance | $ - | Assume there is no liability, not formulaically modeled into cash flows |
| Payroll | 401(k) | $ - | TBD, not formulaically modeled into cash flows |
| Collections | Total value | $ 3,037 | Assumed that collections will continue to inflow over the next few weeks |
| Collections | Warranty withholding | 15% | Reserving a % of collections that will not be collected due to customers reserving an amount to compensate them for future warranty claims |
| Collections | Customers who are suppliers | 5% | Reserving a % of collections that will not be collected due to customers offsetting their uncollected balance as our supplier |
| Collections | Systems cost | $ 10 | Cost per week to maintain systems until AR is fully collected |
| Collections | Systems timing | 6 | Weeks to maintain systems in order to ensure AR is collected before turning off |
| Inventory | Disposition rate | 4% | Book value when sold, mid-point of estimated recovery per discussion with Tiger |
| Inventory | Disposition timing | 6 | Weeks after business closure that disposition takes place |
| Inventory | Liquidator cost | 10% | Cost to employ liquidator, paid the week the disposition takes place |
| M&E | Disposition rate | 100% | Book value when sold |
| M&E | Disposition timing | 8 | Weeks after business closure that disposition takes place |
| M&E | Liquidator cost | 20% | Cost to employ liquidator, paid the week the disposition takes place |
| M&E | Saleable PP&E | $ 1,000 | Value of saleable PP&E to be sold |
| M&E | Cleaning facilities | $ - | Cost to remove equipment and clean facilities, assumed to be paid the same week as the sale of the land |

# Scenario 4: Wind-down assumptions (page 2 of 2)

| Category | Sub-Category | Amount | Description |
|---|---|---|---|
| Land | Disposition value | $ 200 | Value of land to be sold |
| Land | Disposition timing | 11 | Weeks after business closure that sale takes place |
| Land | Liquidator cost | 10% | Cost to employ liquidator, paid the week the disposition takes place |
| Professionals | Wind-down consultants | $ 100 | Retainer, assumed to be repaid at year-end |
| Professionals | Wind-down consultants | $ 25 | Weekly payment |
| Professionals | Wind-down consultants | 8 | Length of engagement, until ABC is funded |
| Professionals | Wind-down consultants | $ (10) | Step-down after machinery and equipment is sold |
| Professionals | Wind-down consultants | 4 | Step-down timing |
| Professionals | Legal | $ 200 | Retainer, assumed to be repaid at year-end |
| Professionals | Legal | $ 15 | Weekly payment |
| Professionals | Legal | 8 | Length of engagement, until ABC is funded |
| Professionals | Caldwell/IT | $ - | Assumed that we will not need IT consultants during the wind-down process |
| Professionals | Caldwell/IT | - | Length of engagement |
| Professionals | Chief Wind-down officer | $ 150 | Retainer, assumed to be paid when inventory is sold, before M&E is liquidated |
| Professionals | Chief Wind-down officer | 6 | Weeks until retainer is paid and engagement begins |
| Rent/utilities | Rent | $ 67 | Monthly rent expense, manually slotted to be paid at the beginning of each month |
| Rent/utilities | Utilities | $ 25 | Weekly payments required to continue to use utilities |
| Rent/utilities | Utility period | 8 | Assumed to pay utilities until M&E is sold |
| Contingency | Contingency | $ 150 | Reserving an amount for contingent expenses not included in the wind-down budget |
| Health claims | Termination | 31-Oct | |
| Health claims | Run-off amount | $ 52 | Weekly healthcare expense, averaged from 2022 weekly actuals thru end of July |
| Health claims | Run-off period | 6 | Amount of weeks to continue health claims expense before tailing off |
| Health claims | Wind-down tail | $ 180 | Amount to reserve for 2022 claims that would be paid in 2023, using an average of the last 3 years |
| Tax | FICA deferral amount | $ 299 | Pulled forward from year-end until mid-October |
| Tax | FICA deferral timing | 1 | Weeks after business closure that the tax gets paid |
| Tax | RE/Prop. tax amount | $ 88 | Due 11/10/2022 |
| Tax | RE/Prop. tax timing | 4 | Weeks after business closure that the tax gets paid |
| Other | Trumpf | $ - | Assumed that this will not get paid, not formulaically modeled into cash flows |
| Other | Amex | $ - | Assumed that this will not get paid, not formulaically modeled into cash flows |
| Contracts | Termination | $ - | Any contract termination costs? Syspro? Salesforce? Printers/copiers? Any renewals during the wind-down? |

## EXHIBIT G

**Notice of Default and Reservation of Rights Letter**



Ext.: James C. Fox
     234
E-mail:  jcf@riw.com

## <u>NOTICE OF DEFAULT AND RESERVATION OF RIGHTS</u>

October 17, 2022

**VIA EMAIL, TELEFACISMILE, AND FIRST CLASS U.S. MAIL**

ProAir, LLC
American Cooling Technology, Inc.,
Bus Air, LLC, and
Evans Tempcon Delaware, LLC
c/o ProAir, LLC
2900 County Road
Elkhart, IN 46514
Attn: Todd Courts, Chief Financial Officer
Telecopier: 574-264-2194
Email: tcourts@proairllc.com

Re:    Third Amended and Restated Loan and Security Agreement (All Assets) (as amended, the **"Loan Agreement**) dated as of February 11, 2022 by and between ProAir, LLC, American Cooling Technology, LLC, Bus Air, LLC, and Evans Tempcon Delaware, LLC (together, the **"Borrowers"**) and ProAir Intermediate Holdco, LLC (**"Holdings"**) and Berkshire Bank (the **"Bank"**) and Related Documents (the **"Transaction Documents"**). Terms not otherwise defined herein shall have the meanings ascribed in the Loan Agreement.

Dear Mr. Courts:

By letter dated September 16, 2022 (the **"Notice of Reporting Violation"**), the Borrowers were notified that the Borrowers had failed to provide certain reporting as required under the Loan Agreement, specifically Borrowers' audited annual financial statements for the fiscal year ended on December 31, 2021, including a balance sheet as of the end of such fiscal year, a statement of income and retained earnings for such fiscal year, and a statement of cash flows for such fiscal year, accompanied by a qualified or unqualified opinion prepared by independent public accountants selected by the Borrowers and acceptable to Bank, such audited annual financial statements being due within one hundred fifty (150) days after the end of the fiscal year ended on December 31, 2021 as required by Section 13(h) of the Loan Agreement (the **"Reporting Violation"**). As noted in the Notice of Reporting Violation, in accordance with

{01209393.DOC/2}

Section 16(a)(iv) of the Loan Agreement, the failure by the Borrowers to remedy this Reporting Violation within thirty (30) days of the Notice of Reporting Violation constitutes an Event of Default under the Loan Agreement.

The Borrowers are hereby notified that the Reporting Violation remains unremedied, and that an Event of Default has therefore occurred and is continuing under the Loan Agreement and the Transaction Documents in accordance with Section 16(a)(iv) of the Loan Agreement.

In addition to the foregoing, you have indicated that the Borrowers require substantial additional capital and may be forced to cease operations in the coming weeks. Based upon the foregoing, and your proposal that the Bank forego as much as $6 million of the Obligations owing the Bank, the Bank believes in good faith that the prospect of payment of all or any part of the Obligations or the performance by the Borrowers under this Agreement is impaired, and that a material adverse change in the business or financial condition of the Borrowers has occurred, thereby constituting an Event of Default under Section 16(a)(xiii) of the Agreement.

As a result of the foregoing Events of Default, the Bank may, in its discretion, declare any obligation Bank may have under the Transaction Documents to be cancelled, declare all Obligations of Borrowers to be due and payable and proceed to enforce payment of the Obligations and to exercise any and all of the rights and remedies afforded to Bank by the Uniform Commercial Code or under the terms of the Transaction Documents or otherwise. In addition, in accordance with Section 16(a)(xxv) of the Loan Agreement, at the Bank's election interest on all Obligations shall accrue at a per annum rate of two (2%) percent greater than the rate of interest then specified in Section 5 of the Loan Agreement, retroactive to the earliest Event of Default. While the Bank retains the right to exercise any or all of these remedies, the Bank is not electing to do so at this time

Nothing contained in this letter or any communications between the Bank and the Borrower shall be a waiver of any rights or remedies of the Bank as against the Borrower. The Bank hereby reserves and preserves all of its rights and remedies against the Borrower under the Loan Agreement, the Transaction Documents and applicable law.

By copies of this letter dispatched to ProAir Intermediate Holdco, LLC (the **"Guarantor"**), as Guarantor pursuant to that certain Secured Guaranty dated February 11, 2022 (the **"Guaranty"**), we hereby notify the Guarantor of the above−described Events of

Default. The Bank hereby reserves and preserves all of its rights and remedies against the Guarantor under the Guaranty, the Transaction Documents and applicable law.

BERKSHIRE BANK,
By Its Counsel,

James C. Fox, Esq.

cc:    VIA TELECOPIER AND EMAIL:

ProAir Intermediate Holdco, LLC
c/o ProAir, LLC
2900 County Road
Elkhart, IN 46514
Attn: Todd Courts, Chief Financial Officer
Telecopier: 574-264-2194
Email: tcourts@proairllc.com

Burns & Levinson LLP
125 Summer Street
Boston, MA 02110
Frank A. Segall, Esq.
Telecopier: 617-345-3299
E-mail: fsegall@burnslev.com

Crystal Financial SBIC LP
Two International Place, 17th Floor
Boston, MA 02110
Attn: Michael Pizette and George Vartanov
Telecopier: 617-428-8701
Email:  mpizette@slrcreditsolutions.com
        gvartanov@slrcreditsolutions.com

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
Attn: John F. Ventola, Esq.
Telecopier: 617-248-4000
Email: jventola@choate.com

{01209393.DOC/2}

## EXHIBIT H

## Berkshire Counterproposal

# Jim Fox

**From:** Jim Fox
**Sent:** Friday, October 21, 2022 11:23 AM
**To:** Ventola, John F.; fsegall@burnslev.com; Ben Snyder
**Cc:** Christopher Lhulier
**Subject:** ProAir/Berkshire Bank

Gentlemen,

In response to the ownership's most recent restructuring proposal for a $5.25MM equity infusion, Berkshire Bank (the "Bank") hereby submits the following counterproposal.  In connection with the foregoing,          and solely for the purpose of establishing a framework for discussions, the Bank proposes the following non-binding proposal:

1. Equity infusion of not less than $5.25MM, with budget and permitted variances acceptable to Bank
2. Revolving Note to be split into an A/B loan modification capped at $10MM
3. Note A shall be a revolving note in the maximum principal amount of $7.4MM
4. Note B shall be a term note for the remaining loan balance not to exceed $2.6MM.  Payment and security of Note B shall be expressly subordinated to Note A.  Interest only payments and rate TBD.
5. Borrowing Base formula to be modified in form acceptable to Bank.
6. If Note A is paid in full and the revolving line is terminated before November 1, 2023, Note B may be assigned to Borrower's equity holders at their election for $.01, plus any accrued and unpaid interest.
7. If Note A is paid in full and the revolving line is terminated on or after November 1, 2023, but on or before the maturity date (i.e., 3/31/24), Note B may be assigned to Borrower's equity holders at their election for 50% of the outstanding principal amount of Note B, plus any accrued and unpaid interest.  Option must be exercised on or before the maturity date.
8. All other terms contained in the Loan Agreement and other related loan documents would remain unchanged and in full force and effect

We reiterate that this proposal is for discussion purposes only and is in no way a binding agreement, nor shall it have any legal force or effect. Additionally, this proposal is not intended to represent fully all terms, conditions and covenant which would be included in any formal agreement between the Bank, the Borrowers and any other applicable parties in interest.  If the Bank, in its sole discretion, elects to approve any such agreement, that decision will be preceded by, among other things, continued due diligence, internal credit approval and negotiation of final terms and conditions acceptable to all parties.

Finally, the Bank hereby reserves and preserves all of its rights and remedies against the Borrowers and Holdings (as defined in the Loan Agreement) under the Loan Agreement, each other applicable loan document, and applicable law in connection with the events of default currently existing and continuing under the Loan Agreement.

We look forward to discussing this proposal at your convenience.

**James C. Fox, Esq.**
Chair, Banking, Finance & Lending Department
Chair, Bankruptcy, Workout & Insolvency Group
255 State Street, 7th Floor | Boston, MA 02109
Direct: 617.570.3534
Office: 617.742.4200
e-mail: jcf@riw.com   www.riw.com
Follow RIW on LinkedIn, Twitter & Facebook

## EXHIBIT I

## Demand Letter and Notice of Sale



James C. Fox
Ext.: 234
E-mail: jcf@riw.com

**DEMAND LETTER AND NOTICE OF SALE**

October 28, 2022

**VIA EMAIL, TELEFACISMILE, AND FEDERAL EXPRESS**

ProAir, LLC
American Cooling Technology, Inc.,
Bus Air, LLC, and
Evans Tempcon Delaware, LLC
c/o ProAir, LLC
2900 County Road
Elkhart, IN 46514
Attn: Todd Courts, Chief Financial Officer
Telecopier: 574-264-2194
Email: tcourts@proairllc.com

Re: Third Amended and Restated Loan and Security Agreement (All Assets) (as amended, the **"Loan Agreement"**) dated as of February 11, 2022 by and between ProAir, LLC, American Cooling Technology, LLC, Bus Air, LLC, and Evans Tempcon Delaware, LLC (together, the **"Borrowers"**) and ProAir Intermediate Holdco, LLC (**"Holdings"**) and Berkshire Bank (the **"Bank"**) and Related Documents (the **"Transaction Documents"**). Terms not otherwise defined herein shall have the meanings ascribed in the Loan Agreement.

Dear Mr. Courts:

The Borrowers are hereby notified that Events of Default have occurred and are continuing under the Loan Agreement and Related Transaction Documents as more fully outlined in a previous Notice of Default dated October 17, 2022 (the **"Notice of Default"**), and as a result of, among other things, (i) the Borrowers continued failure to provide Borrowers' audited annual financial statements for the fiscal year ended on December 31, 2021 within one hundred fifty (150) days after the end of the fiscal year ended on December 31, 2021 as required by Section 13(h) of the Loan Agreement (the **"Reporting Violation"**), said Reporting Violation continuing unremedied for 30 days and thereby constituting an Event of Default under Loan Agreement and the Transaction Documents in accordance with Section 16(a)(iv) of the Loan Agreement; and (ii) the Borrowers acknowledged requirement for substantial additional capital, threatened cessation of

operations, and insistence that the Bank forego over $5 million, repeated this last week by the Borrowers, such that the Bank believes in good faith that the prospect of payment of all or any part of the Obligations or the performance by the Borrowers under the Loan Agreement is impaired, and that a material adverse change in the business or financial condition of the Borrowers has occurred, thereby constituting an Event of Default under Section 16(a)(xiii) of the Agreement.

Accordingly, the Bank may decline to make any or all Revolving Loans under the Loan Agreement and any of Bank's obligations thereunder are cancelled, and the Bank hereby declares all of the Obligations to be immediately due and payable, together with all accrued and unpaid interest thereon, fees and costs, late charges, and all other sums due to the Bank under the Loan Agreement and the Transaction Documents, which Obligations presently total $9,677,048.59 on account of principal, plus interest through October 28, 2022 totaling $37,15.52, late charges in the amount of $2,368.67, together with additional interest, late fees, termination fees, penalties, and attorney's fees and costs of collection including preservation costs.

DEMAND is hereby made upon the Borrowers for immediate payment in full of the Obligations.

In addition, in accordance with Section 16(a)(xxv) of the Loan Agreement, you are hereby notified that interest on all Obligations shall accrue at a per annum rate of two (2%) percent greater than the rate of interest then specified in Section 5 of the Loan Agreement, retroactive to the October 17, 2022 Notice of Event of Default.

Pursuant to the Loan Agreement and the Transaction Documents, the Borrowers are required to pay or reimburse the Bank for all fees, costs, and expenses (including, without limitation, all amounts paid to attorneys, accountants, or other advisors employed by the Bank or to any contractors for labor and materials) incurred by the Bank in the exercise of any of its rights, remedies, or powers under the Loan Agreement or any Transaction Document.

Nothing contained in this letter or any communications between the Bank and the Borrowers shall be a waiver of any rights or remedies of the Bank as against the Borrowers. The Bank hereby reserves and preserves all of its rights and remedies against the Borrowers under the Loan Agreement, the Transaction Documents and applicable law.

By copies of this letter dispatched to ProAir Intermediate Holdco, LLC (the **"Guarantor"**), as Guarantor pursuant to that certain Secured Guaranty dated February 11, 2022 (the **"Guaranty"**), we hereby notify the Guarantor of the above-described Events of

Default, acceleration of the Obligations, and demand for payment. DEMAND is hereby made upon the Guarantor for immediate payment in accordance with the Guaranty. The Bank hereby reserves and preserves all of its rights and remedies against the Guarantor under the Guaranty, the Transaction Documents and applicable law.

In accordance with Section 16(e) of the Loan Agreement, DEMAND is also hereby made upon you to assemble all Inventory pledged to the Bank at either 2900 County Road, Elkhart, Indiana, or any other mutually reasonably convenient leasehold location. You are hereby notified that Berkshire Bank intends to sell some or all of the collateral pledged to it at one or more public or private sales to be held on or after November 8, 2022. In the event of a public sale, you will be notified of the time and place.

You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell for a charge of $100.00. You may request an accounting by calling us at 617-742-4200.

YOU AND ANY GUARANTORS SHALL BE HELD LIABLE FOR ANY DEFICIENCY.

BERKSHIRE BANK,
By Its Counsel,

James C. Fox, Esq.

cc:     VIA TELECOPIER, EMAIL AND FEDERAL EXPRESS

ProAir Intermediate Holdco, LLC
c/o ProAir, LLC
2900 County Road
Elkhart, IN 46514
Attn: Todd Courts, Chief Financial Officer
Telecopier: 574-264-2194
Email: tcourts@proairllc.com

Burns & Levinson LLP
125 Summer Street
Boston, MA 02110
Frank A. Segall, Esq.
Telecopier: 617-345-3299
E-mail: fsegall@burnslev.com

{01214267.DOC/2}

Crystal Financial SBIC LP
Two International Place, 17th Floor
Boston, MA 02110
Attn: Michael Pizette and George Vartanov
Telecopier: 617-428-8701
Email:  mpizette@slrcreditsolutions.com
       gvartanov@slrcreditsolutions.com

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
Attn: John F. Ventola, Esq.
Telecopier: 617-248-4000
Email: jventola@choate.com

# EXHIBIT J

## Borrowing Base Certificate

<u>**EXHIBIT 2**</u>

**FORM OF COMPLIANCE CERTIFICATE**

ProAir, LLC (for itself and as Agent), American Cooling Technology, LLC, Bus Air, LLC and Evans Tempcon Delaware, LLC (each a "**Borrower**" and collectively "**Borrower**") and ProAir Intermediate Holdco, LLC, ("**Holdings**" and together with the Borrower, hereinafter each and together referred to as the "**Company**"), hereby certify to Berkshire Bank ("**Bank**"), pursuant to the Third Amended and Restated Loan and Security Agreement (All Assets) between Borrower and Bank dated February 11, 2022, as may be amended from time to time ("**Loan Agreement**"), that:

A.    <u>General</u>

1)    Capitalized terms not defined herein shall have the meanings set forth in the Loan Agreement.

2)    The Company has complied with all the terms, covenants and conditions to be performed or observed by the Company contained in the Loan Agreement and other documents required to be executed by the Company in connection with the Loan Agreement.

3)    Neither on the date hereof nor, if applicable, after giving effect to the Revolving Loan made on the date hereof, does there exist an Event of Default or an event which would with notice or the lapse of time, or both, constitute an Event of Default.

4)    The representations and warranties contained in the Loan Agreement and in any certificate, document or financial or other statement furnished at any time thereunder are true, correct and complete in all material respects with the same effect as though such representations and warranties had been made on the date hereof, except to the extent that any such representation and warranty relates solely to an earlier date (in which case such representation and warranty shall be true, correct and complete on and as of such earlier date).

B.    <u>Financial Covenants</u>

As of the date hereof or, for such period as may be designated below, the computations, ratios and calculations as set forth below in accordance with Section 15 of the Loan Agreement are true and correct:

**Financial Calculations.**  Attached hereto as Exhibit 2-A are reasonably detailed calculations necessary to determine that the Company is in compliance with the Minimum Availability requirement of Section 15(c) of the Loan Agreement.

IN WITNESS WHEREOF, the undersigned, a duly authorized Member/Manager/officer of Company, has executed and delivered this Certificate in the name and on behalf of the Company on _November 10_____, 20 _22____.

PROAIR, LLC (for itself and as Agent)

By:_____
Name:  Todd Courts
Title:  CFO

<u>EXHIBIT 2A</u>

A. <u>Borrowing Base Certificate as of</u> ___November 4___, 2022 __ <u>(as of each Thursday of the month)</u>

See attached report.



| Borrowing Base History | Borrowing Base Posting | Ineligible Report | Ineligible History | Interest Statement | Loan Ledger Report | Loan Status Report | Upload Files | Upload History |
|---|---|---|---|---|---|---|---|---|

# Borrowing Base Posting

The following information has been sent. Please print this page for your records.

Prir

**Certificate #: 110422**　　　　　　　**Client: PROA**
**Certificate Date: 11/04/22**　　　　　**User: Kristin**

| Loan # - Type | 00 / AR (USD) | 11 / AR (USD) | 21 / IN (USD) | ZZ / OO (USD) |
|---|---|---|---|---|
| | 00021755870-00001 | ProAir Elkhart A/R | Inventory Elkhart | O/A - Not Active |
| Collateral Balance | 0.00 | 5,133,268.66 | 17,826,687.92 | 0.00 |
| Sales/Additions | | 15,324.00 | | |
| Credit Memos | | 0.00 | | |
| Adjustments | | -7,484.00 | | |
| Cash/Removals | | 1,035,373.19 | | |
| Discounts | | | | |
| Non-AR Cash | | | | |
| New Collateral Balance | 0.00 | 4,105,735.47 | 17,826,687.92 | 0.00 |
| Ineligibles | 0.00 | 970,530.98 | 1,782,668.79 | 0.00 |
| Advance Rate | 0.00% | 85.00% | 50.00% | 0.00% |
| Reserves | 0.00 | 0.00 | 0.00 | 0.00 |
| Collateral Limit | 12,000,000.00 | 12,000,000.00 | 7,500,000.00 | 0.00 |
| New Net Collateral | 0.00 | 2,664,923.82 | 8,022,009.57 | 0.00 |
| Revolving Limit (USD) | 12,000,000.00 | | | |
| Total Line Limit (USD) | 15,512,000.00 | | | |
| Total Collateral (USD) | 10,686,933.39 | | | |
| Loan Balance | 8,906,839.01 | 0.00 | 0.00 | 0.00 |
| Advance Request | | | | |
| DDA Account | | | | |
| Collections | | | | |
| New Loan Balance (USD) | 8,906,839.01 | | | |
| New Availability (USD) | 1,258,084.81 | | | |

Copyright 2011, WSA. All rights reserved.

# EXHIBIT K

**Appraisal**



Jim Fox, VP
Berkshire Bank
30 South Pearl St.
Albany, NY 12207

Re:     ProAir – Desktop Appraisal

Dear Mr. Fox,

As per your request I have reviewed the information you provided regarding the above referenced. This included a review of the 16,000+ line inventory along with information regarding the multiple locations of the company.

Please note that while not having seen the actual inventory in person (other than on paper), I am comfortable with the hundreds of locations I have reviewed over the past 40 years in the way this inventory would be stored, laid out and how it is accessed. It should be noted that I have made the critical assumption in this matter that all of the information provided is true and accurate. My assessment is solely based on the information provided and my experience with multiple situations in the past. It should also be noted that currently we have seen a drop in the value of all goods as the interest rates have started to climb.

I believe that in a "fair-market" scenario, the inventory would generate in the range of $0.10 cents on the dollar and under a "forced liquidation" (auction) the inventory would generate in the range of $0.05 cents on the dollar.

Fair-Market value is defined as the price agreed upon by a willing buyer and willing seller, both knowledgeable of all relevant facts, neither being under any compulsion to buy or sell, and both given a reasonable amount of time to complete the transaction. The Fair-Market value is not determined, in this case, by a forced sale, nor is the Fair-Market value being determined by a sale within a market place other than that in which the items would most commonly be sold to the public, i.e. the end-user, taking into consideration the location of the items whenever possible.

Forced liquidation value is the estimated gross amount expressed in terms of money which could be typically realized from a properly advertised and conducted public sale (auction), with the seller being compelled to sell, as of a specific date, with a sense of immediacy on an as-is/where-is basis.

I would like to mention a number of mitigating factors in my determining the current value of said inventory and why I think under the scenarios in which I have assessed the assets there is a minimal amount of value to a 3rd party buying the inventory in any type of liquidation.

I believe whether the inventory is sold as a whole or individually by locations the costs to the



buyer of putting it into use will exceed the cost of purchasing the inventory. It will need to be packed for shipping, actually shipped, unpacked, put through whatever inventory system the purchaser is using (new SKU #'s) and then put on shelves. This is the main factor as to the minimal value to an interested purchaser.

The inventory is located in facilities in Texas, Indiana, Illinois, Georgia, Oklahoma, Pennsylvania and Arkansas.

Additionally, there are the unknown factors such as the different categories which describe the inventory and how much of it can actually be used by the purchaser. By this I mean we have line items described as raw material, WIP (work-in-process), finished goods, purchased finished goods and made in-house finished goods. A portion of these items will be of no use to a certain number of potential purchasers unless they are manufacturing and/or selling the same products as ProAir and therefore if that is the case the number of potential purchasers will be even more limited.

You must also consider the costs of the liquidation process itself to your client in having to remain on the premises until the goods are not only sold but picked up and moved. So you will have, in addition to labor and commissions of a broker or auctioneer, costs such as rent, utilities and insurance of the property as well. If you consider these costs to the seller or the buyer, they may affect the sales price in either scenario in the amount of 2-3 cents of the purchase price.

If the inventory were to be sold in some fashion as to continue in it's present capacity, whether to the current debtor or an entity taking over and continuing to operate in the same fashion and in-place, the inventory would very well likely have a value in the range of 75-80% of it's current cost value.

In this appraisal, value has been established by the sales comparison or market approach. This method of valuation involves comparison of the property with identical and similar items that have recently sold within the market and is based on the premise that the asset is continuing to be used in its' present capacity and that a knowledgeable purchaser can go to the marketplace and buy an existing one. The market is an established means of buying and selling assets through channels including but not limited to auctions, second hand dealers, public and private sales.

In our opinion, the most common market for inventory of this nature is the market consisting of sales to members of the public (the end-user) through either dealers and/or properly advertised and "reasonable and commercial" auction sales. Where and when necessary, conversations with local dealers and resources such as the Internet, Machinery Trader, The Last Bid, Industrial Marketplace, The Book, Top Bid, blue books and other available and applicable journals and periodicals have been utilized as well as our own personal experience with similar items.

Conclusions consider but are not limited to the following items: condition at time of observation,



quantities and desirability, location, general appearance, psychological appeal, physical condition, cost of similar or like used and or new, degree of specialization or modification, adaptability, market economics and quality of name acceptance. The ability of the asset group as a whole to draw sufficient prospective buyers to ensure competitive bidding is also considered. Any deletions or additions to the items as a whole could change the psychological and/or monetary appeal necessary to gain the estimated prices indicated.

We have taken these items as a sampling of the whole, and this appraisal is based on the critical assumption that the sample is representative and fair. While this appraiser has undertaken to make every reasonable effort to ensure the samples taken are representative and fair, no warranty is given or implied that this is, in fact, the case.

Unless expressly stated, the condition of the items is good for their type, with serious deficiencies and repairs noted. Ordinary wear and tear common to these types of items is not noted.

Unless otherwise stated herein, the appraised values are based on the whole ownership and possessory interest undiminished by any liens, fractional interest or any other form or encumbrances. This appraisal is not an indication of, nor certificate of title or ownership. The identification of the interest of the client is simply that represented to the appraiser by such party and no inquiry or investigation will or has been done nor is any opinion to be given as to the truth of such representation.

The value conclusions expressed herein are based on the appraiser's best judgment and opinion and are not a representation or warranty that the items will realize those values if offered for sale at auction or otherwise. The values expressed are based on current information on the date that the appraisal was made. No opinion is expressed as to any past value, nor, unless otherwise expressly stated, as to any future value.

We are not and will not be responsible for, nor do we verify any statements or claims made by the debtor, owner, attorney, court officer, trustee and financial institutions that have engaged us to perform this appraisal.

I certify that to the best of my knowledge and belief:

A. Statements of fact contained in this report are true and correct. The opinions stated are based on a full and fair consideration of all the facts available.

B. The reported analyses, opinions and conclusions are limited only by the reported critical assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions.



C. I have no undisclosed past, present or contemplated future interest in the appraised Items or in any proceeds to be derived there from, and I have no personal interest or bias with respect to the parties involved.

D. Neither employment nor compensation for this appraisal were contingent upon the reporting of a predetermined value that favors the client, on the amount of the value estimate, on the attainment of a stipulated result, or on the occurrence of a subsequent event.

E. I have personally inspected the property that is the subject of this report unless otherwise noted.

F. Unless noted elsewhere, no one provided significant professional assistance to the persons signing this report.

G. This appraisal has been prepared in conformity with and is subject to the International Society of Appraisers' (ISA) and the American Society of Appraisers (ASA) Appraisal Report Writing Standard and code of ethics. In addition, my analyses, opinions and conclusions were developed, and this report has been prepared, inconformity with the Appraisal Foundation's Uniform Standard of Professional Appraisal Practice (USPAP). Any departure from these standards, the reasons for such departure and its impact on the appraiser's value conclusions were discussed with the client in advance and are noted in this report.

The factors taken into consideration for performance of this appraisal are subject to fluctuation and change and should be taken into account in determining your reliance on it. It is suggested that no more than (6) six months pass from the completion date of this appraisal before the validity of this report should be re-evaluated or updated due to outside influences such as but not limited to depreciation, obsolescence of and functional capability of the equipment itself, along with market demand and/or income capability.

With the exception of our client, possession of this report or its copy does not carry with it the right of publication, nor may this report be used for any purpose by anyone other than our client or his agent without our previous written consent. If this report is reproduced, copied or otherwise used, it must be done so in the report's entirety including the cover document and all attachments. Furthermore, no change to any item in this appraisal shall be made by anyone other than us. I consider all information regarding this appraisal as confidential. I will retain a copy of this document along with any original notes, and I will not allow others to have access to these records without your written permission unless ordered to do so by a court of law.

Enclosed please find Invoice #22-5099 for services rendered in this matter. If we may be of further assistance in this or other matters, please do not hesitate to contact us at your earliest convenience.



Very Truly Yours,
Paul E. Saperstein Co., Inc.

Michael Saperstein
Mes

By E-Mail Only

Cc: James Fox, Esquire